# UNITED STATES DISTRICT COURT
## FOR THE
## EASTERN DISTRICT OF WISCONSIN, MILWAUKEE DIVISION

| | | |
|---|---|---|
| Girl Scouts of Manitou Council, Inc., a Wisconsin nonprofit corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. |
| Girl Scouts of the United States of America, Inc., a District of Columbia nonprofit corporation, | ) ) ) ) | TRIAL BY JURY DEMANDED ON ALL ISSUES SO TRIABLE |
| Defendant. | ) ) ) | |

## COMPLAINT

Plaintiff, Girl Scouts of Manitou Council, Inc. ("Manitou Council"), by and through its attorneys, complains of the Defendant, Girl Scouts of the United States of America, Inc. ("GSUSA"), as follows:

## PARTIES

1.     Plaintiff, Manitou Council, is a Wisconsin nonprofit corporation, having its principal place of business in Sheboygan, Wisconsin.

2.     Defendant, GSUSA, is a District of Columbia nonprofit corporation, having its principal place of business in New York, New York.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction over the subject matter of this case pursuant to 28 USC § 1332 as there exists complete diversity between the parties and the amount in controversy exceeds $75,000.00, exclusive of interest.

4.     Venue properly lies in the Eastern District of Wisconsin pursuant to 28 USC §1391 as a substantial part of the events giving rise to Manitou Council's claims occurred therein.

## FACTS APPLICABLE TO ALL COUNTS

### A.     The GSUSA Business Model

5.     GSUSA is in the business of distributing Girl Scouting – its programs, services and merchandise – throughout the United States and its territories.

6.     In furtherance of that business, GSUSA has adopted a distribution model which utilizes hundreds of separate and independent nonprofit corporations which are called "councils".

7.     In 2005, there were 315 such independent, separately incorporated councils in the United States and its territories.

8.     Each council is operated under a contract with GSUSA, called a "charter," which contractually establishes and governs the respective rights, duties and obligations of GSUSA and the individual councils.

9.     Each council, per their charter, is assigned a specific, non-overlapping territory, or "jurisdiction", within which it operates exclusively.

10.     Each council is governed by its own independent board of directors and has its own officers and employees.

11.     GSUSA is not a member of the individual councils.

12.     Each council is responsible for its own finances and financial well being. Revenues are derived by each, independent council primarily through the following activities: donor solicitations, sales of Girl Scout branded cookies, sales of other Girl Scout branded

Case 2:08-cv-00184-JPS   Filed 02/29/08   Page 2 of 54   Document 1

products and services, and assessments of fees and charges associated with the use of council-owned camps and other facilities.

13. Each independent council is responsible for its own expenses, including the following: purchases, at wholesale, of Girl Scout branded cookies and other products; costs associated with the acquisition, ownership and/or lease of offices, camp grounds, meeting facilities and other real property; costs associated with the hiring and staffing of a chief executive officer and other administrative staff; the payment of overhead and operations; the payment of health, general liability, and other insurances; and the payment of all other expenses and costs associated with the ownership and operation of an independent Girl Scout council business.

14. The councils are engaged in the distribution of Girl Scouting within their assigned territories and derive all, or substantially all, of their revenues from the distribution of Girl Scout programs and products within those territories and from charitable donations.

15. GSUSA derives substantially all of its revenue and income from the activities of the councils, including, without limitation, revenue derived from the following: annual, individual membership fees of $10.00 for each girl and adult member; gross profits on the sale of its branded merchandise to the councils, which merchandise is sold to the councils at wholesale and not at cost; royalties paid by GSUSA-approved and licensed bakeries; fees charged to the councils for various training seminars, operation booklets and other services and materials; new and renewal charter fees; and charitable donations.

**B.    Manitou Council**

16. Manitou Council is the chartered Girl Scout council having the right and responsibility under its charter to offer, develop, manage and retain Girl Scouting in the specified territory consisting of all, or portions, of the counties of Calumet, Dodge, Fond du Lac,

3

Manitowoc, Ozaukee, Sheboygan and Washington in the state of Wisconsin. Manitou Council has more than 7,000 members within this territory.

17.     GSUSA first charted Manitou Council in 1950 and has routinely renewed that charter from then until the present time. Most recently, Manitou Council's charter was renewed on September 11, 2005, with a renewal effective date of January 1, 2006. The Manitou Council charter is attached hereto as Exhibit A (the "Manitou Council Charter" or "Charter").

18.     The Manitou Council Charter constitutes a contract between GSUSA and Manitou Council. The terms and conditions of that contract are as set forth in the Charter (Ex. A), the Application for a Girl Scout Council Charter (Ex. B), the GSUSA Constitution (Ex. C at pp. 6-15), the GSUSA Bylaws (Ex. C at pp. 16-21), the GSUSA Policies (Ex. C at pp. 22-26) and the GSUSA Standards (Ex. C at pp. 35-36). At the effective date of Manitou Council's most recently renewed charter, GSUSA had published and distributed to Manitou Council the foregoing documents in its publication entitled *Blue Book of Basic Documents 2003*. That publication is attached hereto as Exhibit C (the "Blue Book"). Collectively, all of these documents, Exhibits A through C, are referred to herein as the "Charter Contract Documents".

19.     The Criteria and Standards for an effective Girl Scout council are set forth at pages 35 and 36 of the Blue Book. As stated therein, these Criteria and Standards "are the foundation on which all work of the council should be built and the prime resource for all organizational review and appraisal. Essential to the chartering process, they also are an enduring point of reference for the desired level of performance."

20.     Manitou Council has at all times been in full compliance with the aforesaid Criteria and Standards and with all other terms and conditions of the Charter Contract Documents.

21.     Manitou Council has not been advised or put on notice by GSUSA that it is in breach of any of the aforesaid Criteria and Standards or of any term or condition of the Charter Contract Documents.

22.     Manitou Council is engaged in a highly competitive business. It competes with both for-profit and nonprofit businesses that provide life enhancing and personal growth opportunities for girls; such as Campfire Girls, YMCA/YWCA Indian Guides, sports clubs, adventure camps and the like. Manitou Council also competes in the very competitive market for charitable contributions. In this market, Manitou Council competes with all other nonprofit organizations, not just those directed to girls, who seek the limited pool of charitable donations from individuals, businesses and foundations located within Manitou Council's territory.

23.     Manitou Council has consistently met or exceeded GSUSA performance standards in essentially all areas, including, but not limited to: girl and membership recruiting, membership retention, market share, volunteerism, diversity, program quality, charitable donations, and overall fiscal responsibility and performance.

24.     A requirement for obtaining its charter was that Manitou Council be an independent, nonprofit corporation, governed by an independent board of directors.

25.     As an independent, chartered Girl Scout council, Manitou Council has solicited and received tens of millions of dollars in property and monetary charitable donations from individuals, businesses, foundations, United Ways and others located within the Manitou Council territory. All of those donations were solicited by Manitou Council, and were contributed by the donors, with the express and/or implicit understanding that those donations would be used by Manitou Council, not some other council, for the use and benefit of girls and Girl Scouting

5

within the Manitou Council territory, not for girls or Girl Scouting outside of the Manitou Council territory.

26.    Annually, Manitou Council participates in the Girl Scout cookie sale for the purpose of teaching girls business skills and responsibility. Those sales result in the generation of revenue for Girl Scouting in the Manitou Council territory. Annually, those cookie sales generate in excess of one million dollars. Those cookie sales are conducted by local, Manitou Council Girl Scout girls and troops, and are made to individuals and businesses located within the Manitou Council territory. Those cookie sales are made with the express and/or implicit understanding with the purchasers that sale proceeds will be used to benefit girls and Girl Scouting in the local Manitou Council territory.

27.    Manitou Council, through its board of directors, has caused these locally generated charitable donations and revenues to be used for the benefit of Manitou Council and Girl Scouting in the Manitou Council territory, including:

(a)    Manitou Council owns, has developed and continuously maintains two Girl Scout camps, Camp Evelyn and Camp Manitou. Camp Evelyn is a 240 acre camp located in Plymouth, Wisconsin. It has both river and lake frontages. Camp Evelyn is developed with a large dining hall, a commercial kitchen, an Olympic-sized pool and 40 other buildings. Camp Manitou is a 140 acre camp near Two Rivers, Wisconsin, with four troop houses and direct river frontage. The fair market value of these camps, which are owned by Manitou Council, is in excess of $12,000,000.00.

(b)    Manitou Council has constructed a state of the art, 8,000 square foot council headquarters on property owned by it in Sheboygan, Wisconsin. The facility

6

includes administrative offices and meeting/activity rooms. The fair market value of this property is in excess of $3,000,000.00.

(c)     Manitou Council has recruited and retained a superior administrative staff. Currently, Manitou Council employs a CEO and a staff of sixteen employees.

(d)     Manitou Council has recruited and trained tens of thousands of adult volunteers.

(e)     Manitou Council has acquired and developed state of the art communications and office equipment and systems.

(f)     Manitou Council has regularly generated positive earnings, thereby enabling Manitou Council to maintain and invest a substantial reserve account.

(g)     Manitou Council has established a Girl Scout council that is fully and effectively delivering Girl Scouting to girls in its territory.

28.     Manitou Council has established a close and positive relationship with local individuals, businesses, charitable organizations and municipalities, and has created considerable and valuable good will within the community.

## C.     GSUSA's "Realignment" of Manitou Council

29.     In 2005, GSUSA announced it intended to modify its business plan by "realigning" and thereby reducing the number of councils which it would use to distribute Girl Scouting. GSUSA has announced it intends to achieve a reduction in councils from 315 to 109 by the year 2009.

30.     In 2006, Manitou Council was told by GSUSA that Manitou Council was one of the councils that would be required to "realign" with other councils as part of GSUSA's newly announced business plan.

7

31.     Per GSUSA's realignment strategy, 15 councils presently operating in Wisconsin and the upper peninsula of Michigan are to be reduced to a total of three councils; one consisting of the northern half of Wisconsin and the U.P., one in the southeast corner of Wisconsin, and one covering southwest and south-central Wisconsin. Manitou Council was told it would be "realigned" with six other councils (the "Six Councils") located in, and comprising, the northern half of Wisconsin and all of the upper peninsula of Michigan. GSUSA's proposed, realigned councils for the state of Wisconsin and the U.P. are reflected in the map attached hereto as Exhibit D.

32.     Manitou Council initially agreed it would explore the option of realigning its council as envisioned by GSUSA.

33.     As the realignment process unfolded, Manitou Council learned and came to understand that GSUSA's realignment strategy was not optional. Rather, Manitou Council learned and was informed by GSUSA that realignment was mandatory.

34.     Further, Manitou Council learned and was informed by GSUSA that Manitou Council would be required to merge its council into an entirely new corporate entity comprised of itself and the six other councils as reflected in the attached map.

35.     The merger being mandated by GSUSA would require Manitou Council to undertake a complete corporate restructuring that would result in the dissolution of Manitou Council and the delivery of all of its considerable assets and good will to the proposed, new council to the north, as well as to the other to-be-formed councils to the south and southwest.

36.     The merger mandated by GSUSA would result in the following:

        (a)     Manitou Council's membership ranks would be taken and redistributed three ways: 60 percent would be handed over to the new, merged council to the north, 35

percent being handed over to the new council to the southeast, and 5 percent would be handed over to the new council to the southwest;

(b)     Manitou Council's territory (i.e. its jurisdiction) would be taken and redistributed among the three new councils;

(c)     Manitou Council's CEO and all other employees would be terminated, with no guarantee of future employment;

(d)     Manitou Council's board of directors would be disbanded, with no guarantee that any of the board members would serve on the board of the new entity; and

(e)     All of Manitou Council's financial assets – its cash, investments, personal property, real property and good will – would be taken and redistributed among the other councils.

37.     As is its right, obligation and duty under the law, the board of directors of Manitou Council undertook an investigation to determine if the forced merger would be in the best interest of Manitou Council, of its current members, of prospective members and of the donors and communities located within Manitou Council's territory.

38.     In connection with its investigation, Manitou Council requested, among other things, that GSUSA produce data, studies or reports that would support any of the following fundamental propositions:

(a)     That the merged council would have increased (or at least have comparable) membership market share;

(b)     That the merged council would have improved (or at least have comparable) membership growth;

(c)     That the merged council would have improved (or at least have comparable) girl membership retention rates;

(d)     That the merged council would have improved (or at least have comparable) diversity of membership;

(e)     That the merged council would result in higher quality (or at least have comparable) programs and program delivery;

(f)     That the merged council would have as effective and involved board membership and leadership;

(g)     That the merged council would have as effective and professional executive leadership and staffing;

(h)     That the merged council would have improved (or at least have comparable) systems and operations;

(i)     That voluntary adult membership retention would be improved (or at least be comparable);

(j)     That adult membership diversity would be improved (or at least be comparable);

(k)     That programs and mechanisms insuring the safety of girls, such as are in placed at Manitou Council, would continue in the merged council;

(l)     That the merged council would be financially solvent and would generate operating surpluses;

(m)     That operating surpluses would be effectively invested;

(n)     That public support and charitable contributions would improve (or at least be comparable) under the merged council;

(o)     That funding from the local United Ways and other local sources would not be negatively affected by the loss of a local, community based council;

(p)     That individual and business contributions would not be negatively affected;

(q)     That cookie sales and cookie sale revenues would not be negatively affected by the merger;

(r)     That Manitou Council's camp sites and office facility would be effectively utilized and that adequate funds and resources would be available for the care and maintenance of those facilities; and

(s)     That a cost-benefit analysis had been undertaken and that the analysis revealed a positive benefit.

39.     GSUSA has refused or has been unable to provide any data, reports or studies to favorably support any of these propositions.

40.     Manitou Council's own investigation was unable to find support for any of the propositions stated in paragraph 38, *supra*.  Further (and completely apart from the fact that Manitou Council was being ordered to dissolve and give away all of its assets), Manitou Council determined, among numerous additional items, that:

(a)     Geographically large councils, such as the merged council being mandated by GSUSA, result in reduced market share and an increased cost per girl being served;

(b)     Geographically large councils, such as the merged council being mandated by GSUSA, would result in the loss of donations from local United Ways, Community Chests, and other charitable foundations whose guidelines require local, not regional, giving;

11

(c)     The mandated merger would result in the loss of charitable donations from local businesses whose giving decisions are based on the presence of a local council and local council board of directors;

(d)     Substantial individual donations would not be made;

(e)     Cookie sales in the Manitou Council territory and the entire "realigned" territory would be negatively affected;

(f)     Certain of the councils with whom Manitou Council was being forced to merge realize little or negative annual earnings, and annually operate with deficits. Manitou Council's good will and strong financial condition would be used to bolster these other councils, to the direct detriment of girls in Manitou Council's territory;

(g)     Certain of the councils with whom Manitou Council was being forced to merge have significant conditions of deferred maintenance on their property, resulting in unsafe conditions at those properties and requiring the diversion of future funds to rectify those conditions – funds that would otherwise be used for upkeep of other properties and for the delivery of programs to girls;

(h)     Certain of the other councils with whom Manitou Council was being forced to merge had limited or inconsistent volunteer training programs and volunteer background check systems, resulting in questionable program delivery effectiveness and real girl safety concerns;

(i)     The wants and needs of girls living in predominantly rural areas, such as the U.P., and those of girls living in the Manitou Council territory are vastly different;

(j)     Manitou Council's camp facilities would be underutilized;

(k)     Certain of the other councils are not actively implementing new Girl Scout program models;

(l)     Recruitment, training, face-to-face contact and interaction of, and between, the merged council and adult volunteers would be seriously and negatively affected, resulting in diminished program delivery to girls; and

(m)     Minority, ethnic, and racial groups are not being consistently served by certain of the other councils.

41.     The board of directors of Manitou Council concluded, in good faith and in its best judgment, that the merger being mandated by GSUSA would not be in the best interests of Manitou Council, its members or the community it serves.

42.     Manitou Council repeatedly expressed its concerns and negative view of the merger to GSUSA.

43.     GSUSA insisted that Manitou Council merge and refused to modify its proposed realignment map as it affects Manitou Council.

44.     In 2007, GSUSA's mandate to merge became coercive and threatening.  GSUSA threatened Manitou Council with the loss of its charter and/or the loss of its territory if it did not proceed with the forced merger.  For example, on October 3, 2007, GSUSA's Chief Executive Officer and GSUSA's Chair of the National Board Task Group on Realignment wrote to Manitou Council and stated in no uncertain terms:

> … This communication restates and reaffirms the [GSUSA] Task Group's prior decisions.  GSUSA remains firm that the three Wisconsin mergers and jurisdiction changes are the right configuration to ensure a strong and sustainable Girl Scout presence in your state.  We will not again reconsider the jurisdictional boundaries, as approved by the National Board on August 24, 2006.

"Therefore, effective immediately, you are directed to engage with the three council realignment groups to which you are assigned. Further, and no later than October 15, you are directed to secure your board's approval of and authorization for your signature on the Northwestern Great Lakes Good Faith Agreement, and to ensure that all Manitou CRC [i.e. Council Realignment Committee] representatives and CRC sub-committee members have signed the Confidentiality Agreement. We also direct your CRC representatives and board to sign related documents for your other council realignment groups. Should you fail to meet this directive in its entirety; the National Board will take all necessary and further action in accordance with the Blue Book of Basic Documents 2006. (underscore added.)

A copy of the October 3, 2007 letter is attached here as Exhibit E.

45.     The "Good Faith Agreement" referred to in the October 3, 2007 letter was, in fact, a board resolution prepared by GSUSA and forced upon Manitou Council's board of directors by GSUSA. The resolution purported to commit Manitou Council "for a period of twelve (12) months to good faith negotiations toward a potential merger with the other six councils in northern Wisconsin and the U.P.". Manitou Council, under the stated threat of harsh consequences from GSUSA, signed the forced resolution, expressly noting thereon, however, that "by letter dated October 3, 2007 Girl Scouts of the USA has mandated that Girl Scouts of Manitou Council adopt the following resolutions no later than October 15, 2007, or the National Board will take all necessary and further action in accordance with the *Blue Book of Basic Documents 2006*." A copy of the resolution is attached hereto as Exhibit F.

46.     Manitou Council continued to express its doubts and reservations to GSUSA about the forced merger. GSUSA insisted Manitou Council proceed with the merger.

47.     In April of 2007, GSUSA supplied Manitou Council and the six other councils with whom it was being ordered to merge, with a GSUSA prepared form of a formal Letter of Intent to merge. Manitou Council was instructed that it must sign a form of that Letter of Intent

14

and thereby commit itself to negotiate a definite agreement with the other six councils "with respect to the merger of these separate councils into one legal entity, the 'Surviving Council.'" The GSUSA mandated, form Letter of Intent is attached hereto as Exhibit G.

48.     Manitou Council refused to sign the Letter of Intent since a merger would be harmful to, and not in the best interest of, Manitou Council, its members or the community serviced by Manitou Council.  On January 9, 2008, Manitou Council sent a letter to GSUSA stating it would not proceed with the coerced merger.  A copy of the letter is attached hereto as Exhibit H.  On that same date, Manitou Council's attorney sent a letter to GSUSA setting forth the legal framework behind Manitou Council's decision not to merge, including the statutory constraints on GSUSA's conduct created by the Wisconsin Fair Dealership Law.  A copy of the letter is attached hereto as Exhibit I.

49.     GSUSA has stated, and has persisted in the position, that it has the absolute right and authority to revoke Manitou Council's charter and/or to give Manitou Council's territory to any other council or councils.

50.     In furtherance of that position, and in apparent retaliation for Manitou Council's decision not to merge, GSUSA has initiated a procedure whereby it intends to remove Manitou Council's territory (or jurisdiction).  Through this jurisdictional change procedure, GSUSA now intends to accomplish precisely what Manitou Council refused to agree to through the coerced, merger process.  A copy of GSUSA's letter, dated January 24, 2008, initiating this jurisdictional change procedure is attached hereto as Exhibit J.

51.     The jurisdictional change procedure initiated by GSUSA is a sham.  It is nothing but a continuation of the coercion already leveled against Manitou Council in connection with the merger and, in fact, is the coercive action threatened by GSUSA in its letter of October 7,

15

2007 (Ex. E). While the letter of January 24, 2008 pretends to enlist Manitou Council into some sort of a process whereby changes to Manitou Council's territory will be evaluated, GSUSA has already definitively stated in its letter of October 3, 2007 (Ex. E) that it "will not again reconsider the jurisdictional boundaries, as approved by the National Board on August 24, 2006 [i.e. the boundaries established by the realignment map (Ex. D)]." The letter of January 24, 2008 establishes a new, cynical process whereby GSUSA will achieve the taking and redistribution of Manitou Council's territory, precisely as it has been attempting to do since 2006. The procedure announced by GSUSA makes clear that GSUSA is retaining for itself, and that it will in fact exercise, the absolute and exclusive power to take and redistribute Manitou Council's territory, stating: "As you know, 'in all matters concerning jurisdictional lines, the Board of Directors [of GSUSA] has the authority to make the final decision....'". (Ex. J.)

52.     GSUSA intends to take and redistribute Manitou Council's territory shortly after March 31, 2008. (Ex. J.)

### D.     Collaborating Councils

53.     The six other councils with whom GSUSA has tried to force Manitou Council to merge are:

- Girl Scouts of the Fox River Area, Inc.
- Girl Scouts of the Peninsula Waters, Inc.
- Girl Scouts of Lac-Baie Council, Inc.
- Girl Scouts of Woodland Council, Inc.
- Girl Scouts of Birch Trails Council WI, Inc.
- Girl Scouts of Indian Waters Council, Inc.

54.     Each of these councils (the "Six Councils"), separately and collectively, have actively worked with and collaborated with GSUSA to force Manitou Council to merge.

55. The Six Councils have repeatedly stated to Manitou Council's representatives that Manitou Council must merge as mandated by GSUSA.

56. The Six Councils have complained to GSUSA that Manitou Council was not proceeding with the merger and have requested GSUSA to take punitive action against Manitou Council.

57. The Six Councils have actively taken steps and worked with GSUSA to prevent Manitou Council from withdrawing from the mandated merger process.

58. On May 18, 2007, the Six Councils communicated with GSUSA and therein stated, among other things: "We unanimously and strongly oppose [Manitou Council's request not to merge with the Six Councils] and propose adherence to the boundaries agreed to … and accepted by GSUSA in August of 2006…"; and "If a 'hard-line' position is needed by GSUSA, we strongly encourage them to take it to ensure the success of the movement".

59. On September 27, 2007, the Six Councils corresponded to GSUSA and therein solicited the affirmative action of GSUSA to force Manitou Council to sign the form resolution (Ex. F) and to sign all other documents in furtherance of the coerced merger. GSUSA's letter to Manitou Council on October 3, 2007 (Ex. E) was in direct response to the Six Council's demand.

60. At all times during the forced merger talks, the Six Councils were informed and put on notice by Manitou Council that Manitou Council was not in favor of the merger and did not believe it could be forced into the merger.

61. Notwithstanding Manitou Council's repeated statements to the Six Councils that it was not in favor of the merger, the Six Councils, in collaboration with GSUSA, have created web sites, have mailed and e-mailed news letters and other written materials, and have regularly

stated verbally to the public that the merger with Manitou Council was a done deal and would occur.

62.     The Six Councils know they will derive substantial economic benefit, and that Manitou Council will suffer irreparable harm, as a result of the forced merger of the councils and/or as a result of the forced taking and redistribution of Manitou Council's territory.

63.     On January 9, 2008, the Six Councils were advised, in writing, of Manitou Council's decision not to proceed with the merger.  A copy of the letter to the Six Councils is attached hereto as Exhibit K.  The Six Councils were also provided with a copy of the letter from Manitou Council's attorney to GSUSA (Ex. I), stating the legal basis for Manitou Council's decision.

64.     On information and belief, the Six Councils are actively participating in the procedure initiated by GSUSA for removing and redistributing Manitou Council's territory.  See Exhibit J.

**E.     Harm**

65.     The forced merger would result in the complete dissolution of Manitou Council, the loss of its charter, the loss of its territory, the loss of its assets, the loss of its sources of revenue, the loss of its board of directors, the loss of its employees, the loss of its members and volunteers, the loss of its IRS tax exempt status, and the loss of its good will and standing in the community.  In short, it would result in the complete elimination of Manitou Council and its business.

66.     The loss of any portion of Manitou Council's territory will result in the loss of current and prospective members in that territory, the loss of the ability to offer Girl Scouting to girls in the lost territory, the loss of the ability to generate revenue through product sales and

from charitable giving in the lost territory, and the loss of its good will and standing in the community. The loss of Manitou Council's territory, as contemplated by GSUSA's recently initiated jurisdictional change process, will result in the constructive or *de facto* termination of Manitou Council's Charter and the destruction of its business.

67. Thus far, as a result of GSUSA's conduct and the announcement by GSUSA and the Six Councils of the "fact" of the merger and resulting loss of Manitou Council as the local Girl Scout council, Manitou Council has already suffered the loss, in 2007, of $12,650.00 in charitable contributions from businesses, the loss of $12,350.00 in charitable contributions from individuals, and the loss of $3,153.00 in charitable contributions from United Ways and Community Chests; that is, a loss already of approximately $28,153.00 in charitable donations for 2007. Going forward, the ongoing threat of the forced merger and/or taking of Manitou Council's territory will result, annually, in the loss of charitable donations of approximately $89,000.00.

68. As a result of GSUSA's efforts to coerce Manitou Council into a merger and, more recently, to take and redistribute Manitou Council's territory, (a) Manitou Council's board members, CEO and staff have spent hundreds of hours investigating, addressing and defending against GSUSA's wrongful conduct; (b) Manitou Council has had to retain the services, and incur the expense, of legal counsel; (c) Manitou Council has been diverted from attending to its business; and (d) has otherwise been damaged directly and indirectly.

## COUNT I

## VIOLATIONS OF THE WISCONSIN FAIR DEALERSHIP LAW

1-68 Paragraphs 1-68, supra, are hereby adopted as if fully set forth herein as paragraphs 1 through 68 of Count I.

### A. The Parties' Relationship is Governed by the Wisconsin Fair Dealership Law.

69. Currently and at all times pertinent to this Complaint, there was in force and effect the Wisconsin Fair Dealership Law (WFDL). Wis. Stats. § 135.01 *et seq.*

70. There at all times existed a "community of interest" between GSUSA and Manitou Council, as defined in Wis. Stats. § 135.02(1):

> "Community of interest" means a continuing financial interest between the grantor and grantee in either the operation of the dealership business or the marketing of such goods or services.

71. The Charter Contract Documents created a "dealership", as defined in Wis. Stat. § 135.02(3)(a):

> "Dealership" means … [a] contract or agreement, either expressed or implied, whether oral or written, between 2 or more persons, by which a person is granted the right to sell or distribute goods or services, or use a trade name, trademark, service mark, logotype, advertising or other commercial symbol, in which there is a community of interest in the business of offering, selling or distributing goods or services at wholesale, retail, by lease, agreement or otherwise.

72. GSUSA is a "grantor", as defined in Wis. Stats. § 132.02(5):

> "Grantor" means a person who grants a dealership.

73. Manitou Council is a "dealer", as defined in Wis. Stats. § 135.02(2):

> "Dealer" means a person who is a grantee of a dealership situated in this state.

74. Both GSUSA and Manitou Council are "persons", as defined in Wis. Stats. § 135.02(6):

> "Person" mans a natural person, partnership, joint venture, corporation or other entity.

75. The underlying purposes and policies of the WFDL are:

(a)     To promote the compelling interest of the public in fair business relations between dealers and grantors, and in the continuation of dealerships on a fair basis;

(b)     To protect dealers against unfair treatment by grantors, who inherently have superior economic power and superior bargaining power in the negotiation of dealerships;

(c)     To provide dealers with rights and remedies in addition to those existing by contract or by common law;

(d)     To govern all dealerships, including any renewals or amendments, to the full extent consistent with the constitutions of this state and the United States.

Wis. Stats. § 135.025(2).

76.     The WFDL is to be liberally construed and applied to promote the forgoing underlying remedial purposes and policies.  Wis. Stats. § 135.025(1).

77.     Pursuant to Section 135.03 of the WFDL, "[n]o grantor, directly or through any officer, agent or employee, may terminate, cancel, fail to renew or substantially change the competitive circumstances of a dealership agreement without good cause.  …."  Wis. Stats. § 135.03.

78.     "Good cause" is defined at Section 135.02(4) of the WFDL to mean:

(a)     Failure by a dealer to comply substantially with essential and reasonable requirements imposed upon the dealer by the grantor, or sought to be imposed by the grantor, which requirements are not discriminatory as compared with requirements imposed on other similarly situated dealers either by their terms or in the manner of their enforcement; or

(b)     Bad faith by the dealer in carrying out the terms of the dealership.

Wis. Stats. § 135.02(4).

79. Pursuant to Section 135.025(3) of the WFDL:

> The effect of this chapter may not be varied by contract or agreement.  Any contract or agreement purporting to do so is void and unenforceable to that extent only.

Wis. Stats. § 135.025(3).

80. Pursuant to Section 135.06 of the WFDL:

> If any grantor violates this chapter, a dealer may bring an action against such grantor in any court of competent jurisdiction for damages sustained by the dealer as a consequence of the grantor's violation, together with the actual costs of the action, including reasonable actual attorney fees, and the dealer also may be granted injunctive relief against unlawful termination, cancellation, nonrenewal or substantial change of competitive circumstances.

Wis. Stats. § 135.06.

81. Pursuant to Section 135.065 of the WFDL:

> In any action brought by a dealer against a grantor under this chapter, any violation of this chapter by the grantor is deemed an irreparable injury to the dealer for determining if a temporary injunction should be issued.

Wis. Stats. § 135.065.

**B.      The Forced Merger is a Wrongful Termination or Substantial Change to Competitive Circumstances Without Good Cause.**

82. GSUSA has mandated Manitou Council to merge into a new council.

83. The merger mandated by GSUSA would cause a termination, cancellation or substantial change to the competitive circumstances of Manitou Council's dealership agreement.

84. GSUSA does not have good cause for these actions, and GSUSA is in violation of Section 135.03 of the WFDL.

**C.    The Change in Territory is a Wrongful Termination or Substantial Change to Competitive Circumstances Without Good Cause.**

85.    GSUSA has initiated procedures to take Manitou Council's territory and to redistribute that territory to one or more of the Six Councils and/or other councils in Wisconsin.

86.    A change to Manitou Council's territory will substantially change the competitive circumstances of Manitou Council's dealership agreement.

87.    The taking of all, or substantially all, of Manitou Council's territory will result in a constructive termination or cancellation of Manitou Council's dealership agreement as well as a substantial change to the competitive circumstances of the dealership agreement.

88.    GSUSA does not have good cause for its actions, and GSUSA is in violation of Section 135.03 of the WFDL.

**D.    GSUSA's Notice of Termination or Change in Competitive Circumstances is Void.**

89.    GSUSA's letter of January 24, 2008 (Ex. J), which purports to place Manitou Council on notice that its territory is being taken, is in violation of Section 135.04 of the WFDL, in that the notice:

(a)    fails to give Manitou Council at least 90 days prior written notice of the termination, cancellation or substantial change in the competitive circumstances of the dealership agreement;

(b)    fails to state the good cause reasons for the termination, cancellation or substantial change in competitive circumstances of the dealership agreement; and

(c)    fails to give Manitou Council 60 days to rectify any claimed deficiencies.

90.     The *sole* reason given by GSUSA in its letter of January 24, 2008 for its intended change in Manitou Council's territory is that Manitou Council has refused to proceed with GSUSA's mandated merger.  That reason is not good cause.

91.     The notice contained in GSUSA's letter of January 24, 2008 is in violation of Section 135.03 of the WFDL, and is void and of no effect.

> **E.     Terms Purporting to Give GSUSA the Authority to Terminate or Change the Competitive Circumstances Without Good Cause are Void.**

92.     The letter of January 24, 2008 (Ex. J), and GSUSA's conduct pursuant thereto, purports to be authorized by the "Blue Book of Basic Documents 2006" as it relates to "council jurisdiction".

93.     The "Blue Book of Basic Documents 2006" is not the effective compilation of documents affecting the Manitou Council Charter, as that publication contains documents that did not exist as of the date Manitou Council's Charter was most recently renewed.  The "Blue Book of Basic Documents 2003" (Ex. C) contains the documents which were in force and effect as of the date Manitou Council's Charter was most recently renewed.

94.     GSUSA's letter of January 24, 2008 (Ex. J) purports to rely upon the following language contained in the *Blue Book of Basic Documents 2006*:

> In all matters concerning jurisdictional lines, the Board of Directors has the authority to make the final decision, either during the term of a charter or upon issuance of a new charter.

95.     *The Blue Book of Basic Documents 2003*, which contains the documentation applicable to this cause, states:

> In all matters of dispute concerning jurisdiction lines, including mergers, consolidations, or other corporate reorganizations, the National Board has the authority to make the final decision either during the term of a charter or upon issuance of a new charter.

(Ex. C at p. 33).

96.     Regardless of the version of the "*Blue Book*" relied upon by GSUSA, the above-quoted provisions (as well as any other provisions in the Charter Contract Documents) which purport to give GSUSA the authority to cancel, terminate or substantially change the competitive circumstances of Manitou Council's dealership without good cause are in variance with Section 135.03 of the WFDL and are, therefore, void and unenforceable pursuant to Section 135.025(3) of the WFDL.

> **F.      Manitou Council is Entitled to Equitable Relief.**

97.     GSUSA's wrongful conduct is causing and will cause irreparable harm to Manitou Council.

98.     Manitou Council does not have an adequate remedy at law.

99.     Manitou Council is entitled to injunctive relief pursuant to Section 135.06 of the WFDL as well as under Federal Rule of Civil Procedure 65.

100.    Manitou Council is entitled to declaratory relief pursuant to 28 U.S.C. § 2201.

**WHEREFORE**, Manitou Council prays for the following relief:

A.      An order declaring:

    (1)     the Manitou Council Charter Contract Documents create a "dealership" under the WFDL;

    (2)     GSUSA is a "grantor" and Manitou Council is a "dealer" under the WFDL;

    (3)     GSUSA does not have good cause to terminate, cancel or substantially change the competitive circumstances of Manitou Council's dealership;

    (4)     GSUSA's forced merger is a wrongful termination, cancellation or

substantial change to the competitive circumstances of Manitou Council's dealership without good cause;

  (5) GSUSA's taking and redistribution of Manitou Council's territory to other councils is a wrongful termination, cancellation or substantial change to the competitive circumstances of Manitou Council's dealership without good cause;

  (6) all provisions in the Manitou Council Charter Contract Documents which purport to give GSUSA authority to terminate, cancel or change the competitive circumstances of Manitou Council's dealership without good cause are void and unenforceable; and

  (7) GSUSA's purported notice of termination or change in competitive circumstances (Exhibit J) is void and unenforceable.

 B. A temporary, preliminary and/or permanent injunction maintaining the status quo and prohibiting GSUSA, its agents, representatives, employees, attorneys and all persons acting in concert with them from:

  (1) going forward with the jurisdictional change proceedings initiated by GSUSA in its letter of January 24, 2008 (Exhibit J);

  (2) constructively terminating or cancelling Manitou Council's dealership agreement through a change in Manitou Council's territory/jurisdiction;

  (3) substantially changing the competitive circumstances of Manitou Council's dealership agreement through a change in Manitou Council's territory/jurisdiction; and

  (4) terminating or cancelling Manitou Council's dealership agreement through

a forced merger.

C.       A judgment against GSUSA in the amount of damages sustained by Manitou Council as a consequence of GSUSA's violations of the WFDL, together with prejudgment interest and the actual costs of this action, including reasonable actual attorney fees.

D.       Such further relief as the Court deems proper and just.

## COUNT II

## BREACHES OF CONTRACT

1-68       Paragraphs 1 through 68, supra, are hereby adopted as if fully set forth herein as paragraphs 1 through 68 of Count II.

69-81       Paragraphs 69 through 81 (Count I) are hereby adopted as if fully set forth herein as paragraphs 69 through 81 of Count II.

82-100    [Omitted]

101.       There is a binding and enforceable contract between GSUSA and Manitou Council.  The terms of that contract are contained in the express terms of the Manitou Council Charter and the Charter Contract Documents, Exhibits A-C.

102.       In addition to the express terms of the contract, the obligation of good faith and fair dealing is an implied condition of the contract. The obligation of good faith and fair dealing requires that neither party to the contract intentionally or purposely do anything to prevent the other from carrying out its part under the contract, or do anything which would have the effect of destroying or injuring the right of a party to receive the fruits of the contract.  Mere compliance with the form but not the substance of a contract breaches the covenant of good faith.  The terms of the contract are interpreted and implemented in light of, and in conformance with, the duty of good faith and fair dealing.

27

### A. GSUSA's Breach of the Provisions Relating to the Requirements, Criteria and Standards Of a Girl Scout Council.

103. There are four express "requirements" for a Girl Scout council charter. These four requirements were established decades ago by the Girl Scout National Council pursuant to the authority granted the National Council at Article 8.1 of the Girl Scout Constitution. (Blue Book, Ex. C at p. 10.) The four requirements established by the National Council are as follows:

> To receive and retain a charter, a Girl Scout council agrees:
> - to subscribe to the purpose, adhere to the policies and be guided by the standards of Girl Scouts of the United States of America.
> - to develop, manage, and maintain Girl Scouting throughout the areas of its jurisdiction, in such manner and subject to such limitations as prescribed in the Constitution, Bylaws, and policies of Girl Scouts of the United States of America.
> - to participate in the activities and business of Girl Scouts of the United States of America.
> - to make reports of its work to Girl Scouts of the United States of America; pay its charter fee; have at all times a registered board of directors; and make sure that all persons affiliating with the local council meet individual membership requirements. (Blue Book, Ex. C at pp. 28-29.)

104. These four requirements are expressly set forth in the Application (Ex. B) and form a part of the contract between Manitou Council and GSUSA.

105. In addition to creating duties owed from Manitou Council to GSUSA, the foregoing requirements grant Manitou Council the express, fundamental right "to develop, manage, and maintain Girl Scouting throughout the areas of its jurisdiction."

106. The foregoing, agreed requirements also bind and entitle Manitou Council "to subscribe to the <u>purpose</u>, adhere to the <u>policies</u>, and be guided by the <u>standards</u> of Girl Scouts of the United States of America." (underscore added.)

107.    The "purpose" of GSUSA is as set forth in the Preamble to the Constitution of GSUSA.  It is "to dedicate ourselves to the purpose of inspiring girls with the highest ideals of character, conduct, patriotism, and service that they may become happy and resourceful citizens." (Blue Book, Ex. C at p.6.)

108.    The "policies" of GSUSA are expressly stated at pages 22 through 26 of the Blue Book.  (Ex. C at pp. 22-26.)

109.    The "standards" for a Girl Scout council are set forth at pages 35 and 36 of the Blue Book and are identified as "Criteria and Standards for an Effective Girl Scout Council." (Ex. C at pp. 35-36).

110.    As expressly stated and represented by GSUSA, and as agreed between GSUSA and Manitou Council, these Criteria and Standards (i) "delineate the way in which Girl Scout councils are expected to fulfill their charter requirements;" (ii) "emanate from the major beliefs and principles of the Girl Scout Movement;" (iii) "cover broad areas of a council's responsibility and serve as broad categories of measurement"; (iv) "are the foundation on which all the work of the council should be built and the prime resource for all organizational review and appraisal"; and (v) "essential to the chartering process, they also are an enduring point of reference for the desired level of performance."  (Ex. C at p. 35.)

111.    There exist no other requirements, purpose, policies, criteria or standards in the Charter or Charter Contract Documents.

112.    Manitou Council has at all times complied with and performed in accordance with the aforesaid requirements, purpose, policies, criteria and standards.

113.    Manitou Council has never agreed to any other requirements, purpose, policies, criteria or standards; and no other requirements, purpose, policies, criteria or standards are part of the contract between Manitou Council and GSUSA.

114.    In justifying its new business plan calling for the realignment of councils from 315 to 109, GSUSA stated that it would apply two overriding criteria when forming the new, realigned councils.  The two, stated criteria were (a) total girl population within a council of 100,000, and (b) total household income within a council of $15 Billion.  These criteria were described by GSUSA as its "capacity" criteria.

115.    Ignoring entirely the requirements, purpose, policies, criteria and standards contained in the Charter Contract Documents, and using only its so-called capacity criteria, GSUSA redrew the Wisconsin and U.P. council map and took the steps alleged herein to force and coerce Manitou Council to merge with the Six Councils or, alternatively, to take Manitou Council's territory and redistribute it to the Six Councils and other councils in Wisconsin.

116.    GSUSA has no right or authority under the Charter Contract Documents to unilaterally and materially change the requirements, purpose, policies, criteria and standards to which it and Manitou Council had agreed.

117.    GSUSA's unauthorized actions to force Manitou Council into a merger and/or to take Manitou Council's territory so as to satisfy its so-called capacity criteria is a material breach of the contract between GSUSA and Manitou Council; both the express terms thereof and the implied duty of good faith and fair dealing contained therein as a matter of law.

**B.    GSUSA's Breach of the Contract Provisions Relating to Jurisdiction.**

118.    Together with the right and license granted to use the service marks and trade marks of Girl Scouts, the grant of an exclusive geographic territory, or jurisdiction, is the single most valuable and important right granted to Manitou Council under the Charter.

119.    From, and only from, the exclusive jurisdiction granted under the Charter, Manitou Council derives its members, volunteers, troops, donor base and revenues.  It is only within its exclusive jurisdiction that Manitou Council dispenses its exclusive service and product: Girl Scouting.  Without its exclusive jurisdiction, Manitou Council has no business to operate.

120.    The critical and fundamental nature of a council's right to its jurisdiction is stated and restated in essentially every document comprising the Charter Contract Documents.

121.    The second of the four fundamental "requirements" for a Girl Scout council is "to develop, manage and maintain Girl Scouting throughout the areas of its jurisdiction … ."  (Blue Book, Ex. C at p. 28.)  Very simply, without a jurisdiction, there is no place to develop, manage or maintain Girl Scouting.


122.    The Manitou Council Charter (Ex. A) expressly established, by agreement, a specific jurisdiction.  The Charter provides in pertinent part:

> … GIRL SCOUTS OF MANITOU COUNCIL, INC. is hereby chartered by Girl Scouts of the United States of America … <u>to operate as a Girl Scout council within the area of jurisdiction agreed upon with Girl Scouts of the United States of America,</u> with the duties, rights, powers and privileges of a local Girl Scout council as defined by Girl Scouts of the United States of America. (underscore added.)

123. The most recent Application for the renewal of Manitou Council's charter (Ex. B) repeatedly confirms the primacy of Manitou Council's territory or jurisdiction, stating in pertinent part:

> The Girl Scouts of Manitou Council, Inc. … hereinafter referred to as Council, <u>now having jurisdiction over the area described in the official record</u> of the council's jurisdiction … <u>and holding a charter for this jurisdiction</u> which expires December 31, 2005, <u>hereby applies for a charter for the same jurisdiction</u> … .
>
> IN APPLYING FOR THIS CHARTER, THE COUNCIL AGREES:
> …
>
> 2. To develop, manage, and maintain Girl Scouting <u>throughout the area of its jurisdiction</u> … .
> …
>
> SUBJECT TO THE LIMITATIONS HEREIN CONTAINED, <u>THE CHARTER</u> APPLIED FOR, <u>WHEN ISSUED, WILL CONFER FOR THE DURATION OF ITS TERM</u> THE FOLLOWING RIGHTS:
> …
>
> 5. <u>The right to develop, manage, and maintain Girl Scouting throughout the area of the jurisdiction of the Council</u>.
> …
> (underscore added.)

124. While the undertakings contained in the Application and, thus, the Charter include an express reservation by GSUSA of the right to revoke or terminate the charter in accordance with the GSUSA Constitution and the procedures adopted thereunder, there is no reservation by GSUSA of a right to modify a council's jurisdiction once agreed to. See Ex. B, *inter alia.*

125. Each and every criteria and standard for an effective Girl Scout council (Blue Book, Ex. C at pp. 35-36) is either expressly or implicitly limited to the performance of a council within its exclusive, agreed upon jurisdiction. For example:

(a)     Criterion I States: "An effective Girl Scout program is delivered to girls in all segments of its jurisdiction."  (underscore added.)

(b)     Standard 1 under Criterion I states: "Based on a thorough understanding of the populations within its jurisdiction, the council attracts and retains membership from all areas of its jurisdiction and all segments of its population."  (underscore added.)

(c)     Standard 2 under Criterion I states: "The council develops the structure and the systems … for girls to participate in Girl Scouting …, with program enrichments that meet the needs and interests of girls in the jurisdiction."  (underscore added.)

(d)     Criterion III states: "An effective Girl Scout council has sufficient resources and assumes responsibility for managing them, in order to **ensure** the continuation and expansion of Girl Scouting in the council's jurisdiction."  (underscore and emphasis added.)

(e)     Standard I under Criterion III states: "The council's … volunteers and employed staff reflect[] all areas of its jurisdiction and all segments of its population." (underscore added.)

(g)     Standard 6 under Criterion III states: "The council receives financial support as a result of being actively involved and recognized as a critical resource in the community."  (underscore added.)

126.     In short, as expressed throughout the Charter Contract Documents and as specifically stated and agreed to in the Application: the charter, when issued, conferred in Manitou Council for the duration of the term the right to develop, manage and maintain Girl Scouting throughout the agreed area of the jurisdiction of the council.

33

127.    GSUSA has no right or authority under the Charter Contract Documents to take or remove Manitou Council's agreed-upon jurisdiction.

128.    GSUSA's unauthorized efforts to take Manitou Council's jurisdiction, whether by coerced merger or through a direct taking and redistribution of the jurisdiction, is a material breach of the contract between GSUSA and Manitou Council; both the express terms thereof and the implied duty of good faith and fair dealing contained therein as a matter of law.

### C.    GSUSA's Breach of its Charter Revocation Procedures.

129.    GSUSA has established and published specific "procedures" whereby a council's performance is measured and whereby a council's charter may be issued, renewed and revoked. These procedures are set forth in full at pages 30 through 32 of the Blue Book (Ex. C at pp. 30-32).

130.    Pursuant to those procedures, Manitou Council's performance was assessed and measured immediately prior to the most recent renewal of its charter.  Manitou Council met or exceeded GSUSA's procedures for renewal and Manitou Council's charter was in fact renewed.

131.    Pursuant to GSUSA's published procedures, if a council's "performance indicates that it is not developing, managing, and maintaining Girl Scouting throughout the area of its jurisdiction, fully meeting charter requirements, or is seriously deficient in one or more critical priorities, the council may receive a charter with qualifications."  (Ex. C at p. 30.)  When such a condition is identified, "[t]he National Board of Directors may also invoke its procedures for initiating a Charter Compliance Audit, or for Non-Issuing or Revocation of Charters.  These procedures can be initiated at any time during the charter period."(*Id.*)

132.     Pursuant to GSUSA's published procedures, the Charter Compliance Audit precedes revocation and is only "initiated by the National Board of Directors in critical situations." (Ex. C at p. 31.)

133.     Manitou Council has never received a charter with qualifications.  Manitou Council has never been, and is not now, the subject of the GSUSA's procedures for a Charter Compliance Audit or its procedures for Non-Issuing or Revocation of its charter.

134.     Through its coerced merger process and its most recent efforts to take and redistribute Manitou Council's jurisdiction, GSUSA is attempting to effect a constructive revocation or termination of Manitou Council's charter.

135.     GSUSA's conduct is in breach of its own revocation and termination procedures, is wrongful, and is a breach of contract.

**D.     GSUSA's Breach of its Jurisdictional Change Procedures.**

136.     GSUSA has established and published specific "procedures" whereby a council's jurisdiction can be changed.  Those procedures are set forth in full at pages 32 through 33 of the Blue Book (Ex. C at pp. 32-33).

137.     Pursuant to those published procedures, the process for a change in a council's jurisdiction "may be initiated by a single Girl Scout council, by several Girl Scout councils together, or by an individual community within a Girl Scout council."  (Ex. C at p. 32.)

138.     Nowhere in the GSUSA's procedures for changing a Girl Scout council's jurisdiction is GSUSA granted the right or authority to initiate or spearhead a jurisdictional change.  This is entirely consistent with the fact that the Application (Ex. B) does not reserve or grant any right to GSUSA to change the agreed-upon jurisdiction following the issuance of the

charter. Any "procedure" which purported to give GSUSA such power would be in breach of the charter.

139. Three separate procedures are established by which a council's jurisdiction can be changed. They are identified in the procedures as Section I, II and III.

(a) "Section I" of GSUSA's procedures for changing a Girl Scout jurisdiction is applicable <u>only</u> in those situations where each of the affected councils agree to the change. (Ex. C at p. 32.)

(b) "Section II" of GSUSA's procedures for changing a Girl Scout jurisdiction is applicable <u>only</u> when (i) the change process has been initiated by a Girl Scout council, by several Girl Scout councils together, or by an individual community within a Girl Scout council, and (ii) the affected councils cannot reach agreement. (Ex. C at pp. 32-33.)

(c) "Section III" of GSUSA's procedures for changing a Girl Scout jurisdiction is applicable only when two or more councils agree to a merger, consolidation or other corporate reorganization. (Ex. C at p. 33.)

(d) Within the context only of these three procedures for changing a Girl Scout council's jurisdiction, the National Board of GSUSA reserves for itself the authority to make final decisions. (Ex. C at p. 33.)

140. None of the conditions precedent for a jurisdictional change established by GSUSA's own procedures have been met with regard to Manitou Council; i.e. there is no agreement for change among the affected councils (Section I), there has been no process initiated by one or more councils or by a community within a council's jurisdiction (Section II), and there

Case 2:08-cv-00184-JPS   Filed 02/29/08   Page 36 of 54   Document 1

has been no agreement for merger, consolidation or other corporate reorganization among the affected councils (Section III).

141.    GSUSA's letter of January 24, 2008 (Ex. J), whereby GSUSA initiated a jurisdictional change, is without support or authority in its own procedures, is wrongful and is a breach of contract.

### E.    Impact of the Wisconsin Fair Dealership Law.

142.    GSUSA's conduct constitutes breaches of contract without any reference to the Wisconsin Fair Dealership Law, Wis. Stats. § 135.01 *et seq.*

143.    However, to the extent GSUSA claims to rely upon any provision in the Charter Contract Documents as authorization for its wrongful efforts to cancel, terminate or substantially change the competitive circumstances of Manitou Council's charter without good cause, such provision is void and unenforceable pursuant to Sections 135.03 and 135.025(3) of the WFDL. As such, the contract must be interpreted and applied as if any such provisions are not present in the contract.

### F.    Manitou Council is Entitled to Equitable Relief.

144.    GSUSA's breaches and threatened breaches are causing, and will cause, irreparable harm to Manitou Council.

145.    Manitou Council does not have an adequate remedy at law.

146.    Manitou Council is entitled to injunctive relief pursuant to F.R.C.P. 65.

147.    Manitou Council is entitled to declaratory relief pursuant to 28 U.S.C. § 2201.

**WHEREFORE**, Manitou Council prays for the following relief:

A.    An order declaring:

(1)    GSUSA's forced merger and resulting dissolution of Manitou Council and

its assets is a breach of contract; and

    (2)    GSUSA's efforts to take and redistribute Manitou Council's jurisdiction is a breach of contract.

B.    A temporary, preliminary and/or permanent injunction maintaining the status quo and prohibiting GSUSA, its agents, representatives, employees, attorneys and all persons acting in concert with them from:

    (1)    going forward with the jurisdictional change procedures initiated by GSUSA in its letter of January 24, 2008 (Exhibit J);

    (2)    constructively terminating and/or revoking Manitou Council's charter through the taking and redistributing of Manitou Council's jurisdiction; and

    (3)    terminating and/or revoking Manitou Council's charter through a forced merger.

C.    A judgment against GSUSA in the amount of damages sustained by Manitou Council as a consequence of GSUSA's breaches of contract, together with prejudgment interest and costs.

D.    Such further relief as the Court deems proper and just.

**COUNT III**

**TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**

1-68    Paragraphs 1 through 68, supra, are hereby adopted as if fully set forth herein as paragraphs 1 through 68 of Count III.

69-100    Paragraphs 69 through 100 (Count I) are hereby adopted as if fully set forth herein as paragraphs 69 through 100 of Count III.

101-147   Paragraphs 101 through 147 (Count II) are hereby adopted as if fully set forth herein as paragraphs 101 through 147 of Count III.

148.   Manitou Council has longstanding and established relationships with individuals, businesses, foundations, United Ways and community chests whereby these individuals and entities annually make substantial charitable donations to Manitou Council. Manitou Council has an expectancy of continuing, prospective relationships with, and donations from, these donors.

149.   GSUSA has at all times known that Manitou Council has these longstanding and prospective donor relationships and that Manitou Council has an expectancy of continuing charitable donations from these donors.

150.   GSUSA has interfered with these prospective donor relationships, through its efforts to force Manitou Council to merge with the Six Councils and/or through its efforts to take Manitou Council's jurisdiction. GSUSA's interference is ongoing.

151.   GSUSA's interference with these prospective donor relationships was, and is, intentional. Indeed, the intent and purpose of GSUSA's efforts to force Manitou Council to merge and/or to take Manitou Council's jurisdiction and redistribute it to other councils is to permanently cause these donors' charitable contributions to be paid to councils other than Manitou Council.

152.   As a direct result of GSUSA's actions and its publication of its intention to eliminate Manitou Council as the local Girl Scout council, certain of Manitou Council's donors have already stopped making charitable donations to Manitou Council or have stated they will no longer make charitable donations to Manitou Council. Other of Manitou Council donors, per their own rules and regulations regarding their giving criteria, will be precluded from making

further donations to Manitou Council.

153.    GSUSA's conduct is wrongful, in violation of the WFDL and in breach of the Charter Contract Documents.  GSUSA's conduct is neither justified nor privileged.

154.    GSUSA's interference is malicious.

155.    Manitou Council has been damaged by GSUSA's wrongful conduct by the loss of charitable donations, the loss of prospective charitable donations, and the loss of good will in the donor community.

156.    GSUSA's continued wrongful interference will cause irreparable harm to Manitou Council.

157.    Manitou Council's remedy at law is inadequate.

158.    Manitou Council is entitled to injunctive relief pursuant to F.R.C.P. 65.

**WHEREFORE**, Manitou Council prays for the following relief:

A.    A temporary, preliminary and/or permanent injunction maintaining the status quo and prohibiting GSUSA, its agents, representatives, employees, attorneys and all persons acting in concert with them from interfering with Manitou Council's charitable donors, including the prohibition of:

(1)    going forward with the jurisdictional change procedures initiated by GSUSA in its letter of January 24, 2008 (Exhibit J);

(2)    constructively terminating and/or cancelling Manitou Council's charter through a change in Manitou Council's jurisdiction; and

(3)    terminating or cancelling Manitou Council's charter through a forced merger.

B.    A judgment against GSUSA in the amount of damages sustained by Manitou

Council as a consequence of GSUSA's wrongful interference, together with prejudgment interest and the actual costs of this action.

      C.      An award of punitive damages.

      D.      An award of attorneys' fees.

      E.      Such further relief as the Court deems proper and just.

## COUNT IV

## ECONOMIC COERCION

1-68     Paragraphs 1 through 68, supra, are hereby adopted as if fully set forth herein as paragraphs 1 through 68 of Count IV.

69-100     Paragraphs 69 through 100 (Count I) are hereby adopted as if fully set forth herein as paragraphs 69 through 100 of Count IV.

101-147     Paragraphs 101 through 147 (Count II) are hereby adopted as if fully set forth herein as paragraphs 101 through 147 of Count IV.

148-158     Paragraphs 148 through 158 (Count III) are hereby adopted as if fully set forth herein as paragraphs 148 through 158 of Count IV.

159.     In retaliation for Manitou Council and its board's initial reluctance and ultimate refusal to proceed with the merger, GSUSA has wrongfully threatened, and has now wrongfully implemented proceedings, to take all of Manitou Council's jurisdiction.

160.     GSUSA's wrongful threats and acts were always on a take it or leave it basis and were meant and intended to coerce Manitou Council to merge with the Six Councils.

161.     The loss of Manitou Council's jurisdiction would be devastating to Manitou Council and would result in the loss of its business.

162.     The coercive threats and actions by GSUSA seek to compel Manitou Council to give up its business with no exchange of value or consideration from GSUSA, or the other councils, in return.

163.     GSUSA's coercive threats and actions are intended to deprive Manitou Council and its board of directors of their unfettered free will.

164.     Manitou Council has no remedy at law other than to seek the protection of the Court to enjoin GSUSA's wrongful, coercive threats and actions.

165.     Absent the Court's intervention, Manitou Council will be irreparably harmed through the loss of its jurisdiction and the resulting loss of its business.

166.     Manitou Council is entitled to injunctive relief pursuant to F.R.C.P. 65.

167.     GSUSA's conduct is malicious.

**WHEREFORE**, Manitou Council prays for the following relief:

A.     A temporary, preliminary and/or permanent injunction maintaining the status quo and prohibiting GSUSA, its agents, representatives, employees, attorneys and all persons acting in concert with them from:

(1)     going forward with the jurisdictional change procedures initiated by GSUSA in its letter of January 24, 2008 (Exhibit J);

(2)     constructively terminating or cancelling Manitou Council's charter through a change in Manitou Council's jurisdiction; and

(3)     terminating or cancelling Manitou Council's charter through a forced merger.

B.     A judgment against GSUSA in the amount of damages sustained by Manitou Council as a consequence of GSUSA's wrongful coercion, together with prejudgment interest

and the actual costs of this action.

C.    An award of punitive damages.

D.    An award of attorneys' fees.

E.    Such further relief as the Court deems proper and just.

## COUNT V

## TORTIOUS INTERFERENCE WITH FIDUCIARY DUTIES

1-68    Paragraphs 1 through 68, supra, are hereby adopted as if fully set forth herein as paragraphs 1 through 68 of Count V.

69-100    Paragraphs 69 through 100 (Count I) are hereby adopted as if fully set forth herein as paragraphs 69 through 100 of Count V.

101-147    Paragraphs 101 through 147 (Count II) are hereby adopted as if fully set forth herein as paragraphs 101 through 147 of Count V.

148-158    Paragraphs 148 through 158 (Count III) are hereby adopted as if fully set forth herein as paragraphs 148 through 158 of Count V.

159-167    Paragraphs 159 through 167 (Count IV) are hereby adopted as if fully set forth herein as paragraphs 159 through 167 of Count V.

168.    Manitou Council is a nonprofit corporation with an independent board of directors.

169.    GSUSA has at all times known Manitou Council is a nonprofit corporation with an independent board of directors.

170.    GSUSA has at all times known, as a matter of fundamental nonprofit corporate law and common understanding, that Manitou Council's board of directors has fiduciary duties

owing to the nonprofit corporation and its members. Those fiduciary duties include the duties of loyalty, good faith and due care.

171.    The careful exercise of the Manitou Council's fiduciary duties is an express requirement of being an effective Girl Scout council. Per GSUSA's "Criteria and Standards for an Effective Girl Scout Council", at Criterion III:

> The council board carries out, in a timely manner, its stewardship responsibilities with respect to development and management of all council assets: human, fiscal, and property. (Standard 3)
>
> The council board exercises financial leadership to provide for the perpetuation of Girl Scouting within it jurisdiction. (Standard 4)
>
> The council receives financial support as a result of being actively involved and recognized as a critical resource in the community. (Standard 6)

(Blue Book, Ex. C at p. 36.)

172.    GSUSA at all times knew the Manitou Council board had a duty to independently investigate the forced merger and to determine, using its own independent judgment, if the merger was in the best interest of Manitou Council and its members.

173.    GSUSA at all times knew it would be a breach of the Manitou Council board's fiduciary duties to the corporation and to its members to recommend a merger which, in the board's independent judgment following its own investigation, was <u>not</u> in the best interests of Manitou Council or its members.

174.    GSUSA at all times knew that as the stewards of the tens of millions of dollars in property and money charitably donated to Manitou Council, the board owed a duty to the donors and the community to ensure their donations were properly utilized and that the donors' donative intentions were properly met.

175.    Through its wrongful, coercive threats and actions, GSUSA has sought, and continues to seek, to cause the board of directors to breach their fiduciary duties and to thereby cause the board of directors to recommend and agree to a merger which the board of directors knows is not in the best interest of the corporation and its members.

176.    Through its wrongful, coercive threats and actions, GSUSA has sought, and continues to seek, to cause the board of directors to breach their fiduciary duties as stewards of the charitably donated property and money, and to thereby cause the board of directors to allow these assets to be disbursed to councils and persons who were not the intended beneficiaries or caretakers thereof.

177.    Manitou Council has no adequate remedy at law other than to seek the protection of the Court to enjoin GSUSA's wrongful and tortious interference.

178.    GSUSA's conduct is causing irreparable harm.

179.    Manitou Council is entitled to injunctive relief pursuant to F.R.C.P. 65.

180.    GSUSA's conduct is malicious.

**WHEREFORE**, Manitou Council prays for the following relief:

A.    A temporary, preliminary and/or permanent injunction maintaining the status quo and prohibiting GSUSA, its agents, representatives, employees, attorneys and all persons acting in concert with them from:

    (1)    going forward with the jurisdictional change procedures initiated by GSUSA in its letter of January 24, 2008 (Exhibit J);

    (2)    constructively terminating or cancelling Manitou Council's charter through a change in Manitou Council's jurisdiction; and

    (3)    terminating or cancelling Manitou Council's charter through a forced

merger.

B.    A judgment against GSUSA in the amount of damages sustained by Manitou Council as a consequence of GSUSA's tortious interference, together with prejudgment interest and the actual costs of this action.

C.    An award of punitive damages.

D.    An award of attorneys' fees.

E.    Such further relief as the Court deems proper and just.

## COUNT VI

## CONSPIRACY TO VIOLATE THE WISCONSIN FAIR DEALERSHIP LAW

1-180    Paragraphs 1 through 180, supra, are hereby adopted as if fully set forth herein as paragraphs 1 through 180 of Count VI.

181.    GSUSA and the Six Councils have combined and, through their concerted actions, have sought to accomplish the violations of the WFDL, all as more fully set forth above and adopted herein.

182.    Through the combination and concerted actions of GSUSA and the Six Councils, these co-conspirators have sought to assist with, facilitate, intensify and ensure the effectiveness and completeness of the unlawful conduct heretofore alleged and to maximize the harm suffered by Manitou Council.

183.    The conduct of GSUSA and the Six Councils is malicious.

184.    The liability of the co-conspirators is joint and several.

**WHEREFORE**, Manitou Council prays for the following relief:

A.    An order declaring:

(1)    the Manitou Council Charter Contract Documents create a "dealership"

46

under the WFDL;

(2)    GSUSA is a "grantor" and Manitou Council is a "dealer" under the WFDL;

(3)    GSUSA does not have good cause to terminate, cancel or substantially change the competitive circumstances of Manitou Council's dealership;

(4)    GSUSA's forced merger is a wrongful termination, cancellation or substantial change to the competitive circumstances of Manitou Council's dealership without good cause;

(5)    GSUSA's taking and redistribution of Manitou Council's territory to other councils is a wrongful termination, cancellation or substantial change to the competitive circumstances of Manitou Council's dealership without good cause;

(6)    all provisions in the Manitou Council Charter Contract Documents which purport to give GSUSA authority to terminate, cancel or change the competitive circumstances of Manitou Council's dealership without good cause are void and unenforceable; and

(7)    GSUSA's purported notice of termination or change in competitive circumstances (Exhibit J) is void and unenforceable.

B.    A temporary, preliminary and/or permanent injunction maintaining the status quo and prohibiting GSUSA, its agents, representatives, employees, attorneys and all persons acting in concert with them from:

(1)    going forward with the jurisdictional change proceedings initiated by GSUSA in its letter of January 24, 2008 (Exhibit J);

(2)     constructively terminating or cancelling Manitou Council's dealership agreement through a change in Manitou Council's territory/jurisdiction;

(3)     substantially changing the competitive circumstances of Manitou Council's dealership agreement through a change in Manitou Council's territory/jurisdiction; and

(4)     terminating or cancelling Manitou Council's dealership agreement through a forced merger.

C.     A judgment against GSUSA in the amount of damages sustained by Manitou Council as a consequence of the unlawful conspiracy to violate the WFDL, together with prejudgment interest and the actual costs of this action, including reasonable actual attorney fees.

D.     Such further relief as the Court deems proper and just.

## COUNT VII

## CONSPIRACY TO TORTIOUSLY INTERFERE WITH PROSPECTIVE ECONOMIC ADVANTAGE

1-184     Paragraphs 1 through 184, supra, are hereby adopted as if fully set forth herein as paragraphs 1 through 184 of Count VII.

185.     GSUSA and the Six Councils have combined and, through their concerted actions, have sought to accomplish the tortious interference with Manitou Council's charitable donors and with those donors' prospective contributions, all as more fully described in the allegations set forth above and adopted hereby.

186.     Through the combination and concerted actions of GSUSA and the Six Councils, these co-conspirators have sought to assist with, facilitate, intensify and ensure the wrongful interference directed at Manitou Council's donors and the prospective economic relations with those donors, and to maximize the harm suffered by Manitou Council.

187. The conduct of GSUSA and the Six Councils is malicious.

188. The liability of the co-conspirators is joint and several.

**WHEREFORE**, Manitou Council prays for the following relief:

A.     A temporary, preliminary and/or permanent injunction maintaining the status quo and prohibiting GSUSA, its agents, representatives, employees, attorneys and all persons acting in concert with them from interfering with Manitou Council's charitable donors, including the prohibition of:

      (1)     going forward with the jurisdictional change procedures initiated by GSUSA in its letter of January 24, 2008 (Exhibit J);

      (2)     constructively terminating and/or cancelling Manitou Council's charter through a change in Manitou Council's jurisdiction; and

      (3)     terminating or cancelling Manitou Council's charter through a forced merger.

B.     A judgment against GSUSA in the amount of damages sustained by Manitou Council as a consequence of the unlawful conspiracy to wrongfully interfere, together with prejudgment interest and the actual costs of this action.

C.     An award of punitive damages.

D.     An award of attorneys' fees.

E.     Such further relief as the Court deems proper and just.

## COUNT VIII

## CONSPIRACY TO ECONOMICALLY COERCE

1-188     Paragraphs 1 through 188, supra, are hereby adopted as if fully set forth herein as paragraphs 1 through 188 of Count VIII.

189.     GSUSA and the Six Councils have combined and, through their concerted actions, have sought to accomplish the economic coercion more fully described in the allegations set forth above and adopted hereby.

190.     Through the combination and concerted actions of GSUSA and the Six Councils, these co-conspirators have sought to assist with, facilitate, intensify and achieve the wrongful economic coercion directed at Manitou Council, and to maximize the harm suffered by Manitou Council.

191.     The conduct of GSUSA and the Six Councils is malicious.

192.     The liability of the co-conspirators is joint and several.

**WHEREFORE**, Manitou Council prays for the following relief:

A.     A temporary, preliminary and/or permanent injunction maintaining the status quo and prohibiting GSUSA, its agents, representatives, employees, attorneys and all persons acting in concert with them from:

> (1)     going forward with the jurisdictional change procedures initiated by GSUSA in its letter of January 24, 2008 (Exhibit J);
>
> (2)     constructively terminating or cancelling Manitou Council's charter through a change in Manitou Council's jurisdiction; and
>
> (3)     terminating or cancelling Manitou Council's charter through a forced merger.

B.     A judgment against GSUSA in the amount of damages sustained by Manitou Council as a consequence of the unlawful conspiracy to wrongfully coerce, together with prejudgment interest and the actual costs of this action.

C.     An award of punitive damages.

D.      An award of attorneys' fees.

## COUNT IX

## CONSPIRACY TO TORTIOUSLY INTERFERE WITH FIDUCIARY DUTIES

1-192     Paragraphs 1 through 192, supra, are hereby adopted as if fully set forth herein as paragraphs 1 through 192 of Count IX.

193.     GSUSA and the Six Councils have combined and, through their concerted actions, sought to accomplish the tortious interference with the fiduciary duties of Manitou Council's board of directors, all as more fully described in the allegations set forth above and adopted hereby.

194.     Through the combination and concerted action of GSUSA and the Six Councils, these co-conspirators have sought to assist with, facilitate, intensify and achieve the interference and to maximize the harm suffered by Manitou Council.

195.     The conduct of GSUSA and the Six Councils is malicious.

196.     The liability of the co-conspirators is joint and several.

**WHEREFORE**, Manitou Council prays for the following relief:

A.      A temporary, preliminary and/or permanent injunction maintaining the status quo and prohibiting GSUSA, its agents, representatives, employees, attorneys and all persons acting in concert with them from:

(1)      going forward with the jurisdictional change procedures initiated by GSUSA in its letter of January 24, 2008 (Exhibit J);

(2)      constructively terminating or cancelling Manitou Council's charter through a change in Manitou Council's jurisdiction; and

(3)      terminating or cancelling Manitou Council's charter through a forced

merger.

B.   A judgment against GSUSA in the amount of damages sustained by Manitou Council as a consequence of the unlawful conspiracy to tortiously interfere, together with prejudgment interest and the actual costs of this action.

C.   An award of punitive damages.

D.   An award of attorneys' fees.

E.   Such further relief as the Court deems proper and just.

## COUNT X

## INJURY TO BUSINESS AND RESTRAINT OF WILL

1-196   Paragraphs 1 through 196, supra, are hereby adopted as if fully set forth herein as paragraphs 1 through 196 of Count X.

197.   At all times pertinent hereto, there was in force and effect the following law:

> Any 2 or more persons who shall combine, associate, agree, mutually undertake or concert together for the purpose of willfully or maliciously injuring another in his or her reputation, trade, business or profession by any means whatever, or for the purpose of maliciously compelling another to do or perform any act against his or her will, or preventing or hindering another from doing or performing any lawful act shall be punished by imprisonment in the county jail not more than one year or by fine not exceeding $500.

Wis. Stats. § 134.01.

198.   The conduct of GSUSA and the Six Councils has violated, and continues to violate, Section 134.01.

199.   Civil liability arises as a result of violations of Section 134.01.

200.   The conduct of GSUSA and the Six Councils is willful and malicious in that it was intended to have, among others, the following effects:

(a)     to completely destroy and cause the dissolution of Manitou Council;

(b)     to retaliate against and punish Manitou Council for exercising its lawful right not to restructure its corporate existence and merge with the Six Councils;

(c)     to take and convert all of Manitou Council's assets – human, fiscal, property and good will – without the payment of any consideration to Manitou Council; and

(d)     through intimidation, to hold Manitou Council up as an example to all other Girl Scout councils of the devastating consequences that would result to any council who dared to disagree with GSUSA, to insist on the exercise of its lawful rights or to protect and preserve its assets.

201.    Liability under Section 134.01 is joint and several.

**WHEREFORE**, Manitou Council prays for the following relief:

A.      A temporary, preliminary and/or permanent injunction maintaining the status quo and prohibiting GSUSA, its agents, representatives, employees, attorneys and all persons acting in concert with them from:

(1)     going forward with the jurisdictional change procedures initiated by GSUSA in its letter of January 24, 2008 (Exhibit J);

(2)     constructively terminating or cancelling Manitou Council's charter through a change in Manitou Council's jurisdiction; and

(3)     terminating or cancelling Manitou Council's charter through a forced merger.

B.      A judgment against GSUSA in the amount of damages sustained by Manitou Council as a consequence of unlawful association, together with prejudgment interest and the actual costs of this action.

C.    An award of punitive damages.

D.    An award of attorneys' fees.

E.    Such further relief as the Court deems proper and just.

Dated at Milwaukee, Wisconsin, this 29th day of February, 2008.


/s/ Tomislav Z. Kuzmanovic
Tomislav Z. Kuzmanovic
State Bar No. 1003563
Attorneys for Plaintiff
HINSHAW & CULBERTSON LLP
100 E. Wisconsin Avenue, Suite 2600
Milwaukee, WI 53202
Phone No.:  414-276-6464
Fax No.:  414-276-9220
E-mail: tkuzmanovic@hinshawlaw.com

Gary W. Leydig  (IL Lic. No. 3128377)
Riordan, Fulkerson, Hupert & Coleman
30 North LaSalle Street, Suite 2630
Chicago, Illinois 60602
Phone:  (312) 346-4740
Fax:  (312) 346-1168
E-mail: gleydig@rfsc-law.com
(Application for Admission Pending)