# UNITED STATES DISTRICT COURT
## FOR THE
## EASTERN DISTRICT OF WISCONSIN, MILWAUKEE DIVISION

| | | |
|---|---|---|
| Girl Scouts of Manitou Council, Inc., | ) | |
| a Wisconsin nonprofit corporation, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  08-CV-0184-JPS |
| | ) | |
| Girl Scouts of the United States | ) | |
| of America, Inc., a District of Columbia | ) | TRIAL BY JURY DEMANDED ON |
| nonprofit corporation, | ) | ALL ISSUES SO TRIABLE |
| | ) | |
| Defendant. | ) | |

## <u>SECOND AMENDED COMPLAINT</u>

Plaintiff, Girl Scouts of Manitou Council, Inc. ("Manitou Council"), by and through its attorneys, complains of the Defendant, Girl Scouts of the United States of America, Inc. ("GSUSA"), as follows:

### PARTIES

1.     Plaintiff, Manitou Council, is a Wisconsin nonprofit corporation, having its principal place of business in Sheboygan, Wisconsin.

2.     Defendant, GSUSA, is a District of Columbia nonprofit corporation, having its principal place of business in New York, New York.

### JURISDICTION AND VENUE

3.     This Court has jurisdiction over the subject matter of this case pursuant to 28 USC § 1332 as there exists complete diversity between the parties and the amount in controversy exceeds $75,000.00, exclusive of interest.

4.     Venue properly lies in the Eastern District of Wisconsin pursuant to 28 USC §1391 as a substantial part of the events giving rise to Manitou Council's claims occurred therein.

## FACTS APPLICABLE TO ALL COUNTS

### A.     The GSUSA Business Model

5.     GSUSA is in the business of distributing Girl Scouting – its programs, services and merchandise – throughout the United States and its territories.

6.     In furtherance of that business, GSUSA has adopted a distribution model which utilizes hundreds of separate and independent nonprofit corporations which are called "councils".

7.     In 2005, there were 315 such independent, separately incorporated councils in the United States and its territories.

8.     Each council is operated under a contract with GSUSA, called a "charter," which contractually establishes and governs the respective rights, duties and obligations of GSUSA and the individual councils.

9.     Each council, per their charter, is assigned a specific, non-overlapping territory, or "jurisdiction", within which it operates exclusively.

10.     Each council is governed by its own independent board of directors and has its own officers and employees.

11.     GSUSA is not a member of the individual councils.

12.     Each council is responsible for its own finances and financial well being. Revenues are derived by each, independent council primarily through the following activities: donor solicitations, sales of Girl Scout branded cookies, sales of other Girl Scout branded

Case 2:08-cv-01841-JPS   Filed 03/11/2009   Page 2 of 131   Document 30-2

products and services, and assessments of fees and charges associated with the use of council-owned camps and other facilities.

13.     Each independent council is responsible for its own expenses, including the following: purchases, at wholesale, of Girl Scout branded cookies and other products; costs associated with the acquisition, ownership and/or lease of offices, camp grounds, meeting facilities and other real property; costs associated with the hiring and staffing of a chief executive officer and other administrative staff; the payment of overhead and operations; the payment of health, general liability, and other insurances; and the payment of all other expenses and costs associated with the ownership and operation of an independent Girl Scout council business.

14.     The councils are engaged in the distribution of Girl Scouting within their assigned territories and derive all, or substantially all, of their revenues from the distribution of Girl Scout programs and products within those territories and from charitable donations.

15.     GSUSA derives substantially all of its revenue and income from the activities of the councils, including, without limitation, revenue derived from the following: annual, individual membership fees of $10.00 for each girl and adult member; gross profits on the sale of its branded merchandise to the councils, which merchandise is sold to the councils at wholesale and not at cost; royalties paid by GSUSA-approved and licensed bakeries; fees charged to the councils for various training seminars, operation booklets and other services and materials; new and renewal charter fees; and charitable donations.

### B.     Manitou Council

16.     Manitou Council is the chartered Girl Scout council having the right and responsibility under its charter to offer, develop, manage and retain Girl Scouting in the specified territory consisting of all, or portions, of the counties of Calumet, Dodge, Fond du Lac,

Manitowoc, Ozaukee, Sheboygan and Washington in the state of Wisconsin. Manitou Council has more than 7,000 members within this territory.

17. GSUSA first charted Manitou Council in 1950 and has routinely renewed that charter from then until the present time. Most recently, Manitou Council's charter was renewed on September 11, 2005, with a renewal effective date of January 1, 2006. The Manitou Council charter is attached hereto as Exhibit A (the "Manitou Council Charter" or "Charter").

18. The Manitou Council Charter constitutes a contract between GSUSA and Manitou Council. The terms and conditions of that contract are as set forth in the Charter (Ex. A), the Application for a Girl Scout Council Charter (Ex. B), the GSUSA Constitution (Ex. C at pp. 6-15), the GSUSA Bylaws (Ex. C at pp. 16-21), the GSUSA Policies (Ex. C at pp. 22-26) and the GSUSA Standards (Ex. C at pp. 35-36). At the effective date of Manitou Council's most recently renewed charter, GSUSA had published and distributed to Manitou Council the foregoing documents in its publication entitled *Blue Book of Basic Documents 2003*. That publication is attached hereto as Exhibit C (the "Blue Book"). Collectively, all of these documents, Exhibits A through C, are referred to herein as the "Charter Contract Documents".

19. The Criteria and Standards for an effective Girl Scout council are set forth at pages 35 and 36 of the Blue Book. As stated therein, these Criteria and Standards "are the foundation on which all work of the council should be built and the prime resource for all organizational review and appraisal. Essential to the chartering process, they also are an enduring point of reference for the desired level of performance."

20. Manitou Council has at all times been in full compliance with the aforesaid Criteria and Standards and with all other terms and conditions of the Charter Contract Documents.

21.     Manitou Council has not been advised or put on notice by GSUSA that it is in breach of any of the aforesaid Criteria and Standards or of any term or condition of the Charter Contract Documents.

22.     Manitou Council is engaged in a highly competitive business.  It competes with both for-profit and nonprofit businesses that provide life enhancing and personal growth opportunities for girls; such as Campfire Girls, YMCA/YWCA Indian Guides, sports clubs, adventure camps and the like.  Manitou Council also competes in the very competitive market for charitable contributions.  In this market, Manitou Council competes with all other nonprofit organizations, not just those directed to girls, who seek the limited pool of charitable donations from individuals, businesses and foundations located within Manitou Council's territory.

23.     Manitou Council has consistently met or exceeded GSUSA performance standards in essentially all areas, including, but not limited to: girl and membership recruiting, membership retention, market share, volunteerism, diversity, program quality, charitable donations, and overall fiscal responsibility and performance.

24.     A requirement for obtaining its charter was that Manitou Council be an independent, nonprofit corporation, governed by an independent board of directors.

25.     As an independent, chartered Girl Scout council, Manitou Council has solicited and received tens of millions of dollars in property and monetary charitable donations from individuals, businesses, foundations, United Ways and others located within the Manitou Council territory.  All of those donations were solicited by Manitou Council, and were contributed by the donors, with the express and/or implicit understanding that those donations would be used by Manitou Council, not some other council, for the use and benefit of girls and Girl Scouting

Case 2:08-cv-01841-SJF Filed 03/11/2009   Page 5 of 131   Document 1320-2

within the Manitou Council territory, not for girls or Girl Scouting outside of the Manitou Council territory.

26.     Annually, Manitou Council participates in the Girl Scout cookie sale for the purpose of teaching girls business skills and responsibility. Those sales result in the generation of revenue for Girl Scouting in the Manitou Council territory.  Annually, those cookie sales generate in excess of one million dollars.  Those cookie sales are conducted by local, Manitou Council Girl Scout girls and troops, and are made to individuals and businesses located within the Manitou Council territory.  Those cookie sales are made with the express and/or implicit understanding with the purchasers that sale proceeds will be used to benefit girls and Girl Scouting in the local Manitou Council territory.

27.     Manitou Council, through its board of directors, has caused these locally generated charitable donations and revenues to be used for the benefit of Manitou Council and Girl Scouting in the Manitou Council territory, including:

(a)     Manitou Council owns, has developed and continuously maintains two Girl Scout camps, Camp Evelyn and Camp Manitou.  Camp Evelyn is a 240 acre camp located in Plymouth, Wisconsin. It has both river and lake frontages. Camp Evelyn is developed with a large dining hall, a commercial kitchen, an Olympic-sized pool and 40 other buildings.  Camp Manitou is a 140 acre camp near Two Rivers, Wisconsin, with four troop houses and direct river frontage.  The fair market value of these camps, which are owned by Manitou Council, is in excess of $12,000,000.00.

(b)     Manitou Council has constructed a state of the art, 8,000 square foot council headquarters on property owned by it in Sheboygan, Wisconsin.  The facility

Case 2:08-cv-01843-JPS   Filed 03/12/2009   Page 6 of 131   Document 120-2

includes administrative offices and meeting/activity rooms. The fair market value of this property is in excess of $3,000,000.00.

      (c)     Manitou Council has recruited and retained a superior administrative staff. Currently, Manitou Council employs a CEO and a staff of sixteen employees.

      (d)     Manitou Council has recruited and trained tens of thousands of adult volunteers.

      (e)     Manitou Council has acquired and developed state of the art communications and office equipment and systems.

      (f)     Manitou Council has regularly generated positive earnings, thereby enabling Manitou Council to maintain and invest a substantial reserve account.

      (g)     Manitou Council has established a Girl Scout council that is fully and effectively delivering Girl Scouting to girls in its territory.

28.     Manitou Council has established a close and positive relationship with local individuals, businesses, charitable organizations and municipalities, and has created considerable and valuable good will within the community.

### C.    GSUSA's "Realignment" of Manitou Council

29.     In 2005, GSUSA announced it intended to modify its business plan by "realigning" and thereby reducing the number of councils which it would use to distribute Girl Scouting. GSUSA has announced it intends to achieve a reduction in councils from 315 to 109 by the year 2009.

30.     In 2006, Manitou Council was told by GSUSA that Manitou Council was one of the councils that would be required to "realign" with other councils as part of GSUSA's newly announced business plan.

Case 2:08-cv-00184-JPS   Filed 03/11/2009   Page 7 of 131   Document 30-2

31.     Per GSUSA's realignment strategy, 15 councils presently operating in Wisconsin and the upper peninsula of Michigan are to be reduced to a total of three councils; one consisting of the northern half of Wisconsin and the U.P., one in the southeast corner of Wisconsin, and one covering southwest and south-central Wisconsin.  Manitou Council was told it would be "realigned" with six other councils (the "Six Councils") located in, and comprising, the northern half of Wisconsin and all of the upper peninsula of Michigan.  GSUSA's proposed, realigned councils for the state of Wisconsin and the U.P. are reflected in the map attached hereto as Exhibit D.

32.     Manitou Council initially agreed it would explore the option of realigning its council as envisioned by GSUSA.

33.     As the realignment process unfolded, Manitou Council learned and came to understand that GSUSA's realignment strategy was not optional.  Rather, Manitou Council learned and was informed by GSUSA that realignment was mandatory.

34.     Further, Manitou Council learned and was informed by GSUSA that Manitou Council would be required to merge its council into an entirely new corporate entity comprised of itself and the six other councils as reflected in the attached map.

35.     The merger being mandated by GSUSA would require Manitou Council to undertake a complete corporate restructuring that would result in the dissolution of Manitou Council and the delivery of all of its considerable assets and good will to the proposed, new council to the north, as well as to the other to-be-formed councils to the south and southwest.

36.     The merger mandated by GSUSA would result in the following:

        (a)     Manitou Council's membership ranks would be taken and redistributed three ways:  60 percent would be handed over to the new, merged council to the north, 35

8

percent being handed over to the new council to the southeast, and 5 percent would be handed over to the new council to the southwest;

(b)     Manitou Council's territory (i.e. its jurisdiction) would be taken and redistributed among the three new councils;

(c)     Manitou Council's CEO and all other employees would be terminated, with no guarantee of future employment;

(d)     Manitou Council's board of directors would be disbanded, with no guarantee that any of the board members would serve on the board of the new entity; and

(e)     All of Manitou Council's financial assets – its cash, investments, personal property, real property and good will – would be taken and redistributed among the other councils.

37.     As is its right, obligation and duty under the law, the board of directors of Manitou Council undertook an investigation to determine if the forced merger would be in the best interest of Manitou Council, of its current members, of prospective members and of the donors and communities located within Manitou Council's territory.

38.     In connection with its investigation, Manitou Council requested, among other things, that GSUSA produce data, studies or reports that would support any of the following fundamental propositions:

(a)     That the merged council would have increased (or at least have comparable) membership market share;

(b)     That the merged council would have improved (or at least have comparable) membership growth;

Case 2:08-cv-01841-SJPS Filed 03/12/2009 Page 9 of 32 Document 130-2

(c)     That the merged council would have improved (or at least have comparable) girl membership retention rates;

(d)     That the merged council would have improved (or at least have comparable) diversity of membership;

(e)     That the merged council would result in higher quality (or at least have comparable) programs and program delivery;

(f)     That the merged council would have as effective and involved board membership and leadership;

(g)     That the merged council would have as effective and professional executive leadership and staffing;

(h)     That the merged council would have improved (or at least have comparable) systems and operations;

(i)     That voluntary adult membership retention would be improved (or at least be comparable);

(j)     That adult membership diversity would be improved (or at least be comparable);

(k)     That programs and mechanisms insuring the safety of girls, such as are in placed at Manitou Council, would continue in the merged council;

(l)     That the merged council would be financially solvent and would generate operating surpluses;

(m)     That operating surpluses would be effectively invested;

(n)     That public support and charitable contributions would improve (or at least be comparable) under the merged council;

(o)     That funding from the local United Ways and other local sources would not be negatively affected by the loss of a local, community based council;

(p)     That individual and business contributions would not be negatively affected;

(q)     That cookie sales and cookie sale revenues would not be negatively affected by the merger;

(r)     That Manitou Council's camp sites and office facility would be effectively utilized and that adequate funds and resources would be available for the care and maintenance of those facilities; and

(s)     That a cost-benefit analysis had been undertaken and that the analysis revealed a positive benefit.

39.     GSUSA has refused or has been unable to provide any data, reports or studies to favorably support any of these propositions.

40.     Manitou Council's own investigation was unable to find support for any of the propositions stated in paragraph 38, *supra*.  Further (and completely apart from the fact that Manitou Council was being ordered to dissolve and give away all of its assets), Manitou Council determined, among numerous additional items, that:

(a)     Geographically large councils, such as the merged council being mandated by GSUSA, result in reduced market share and an increased cost per girl being served;

(b)     Geographically large councils, such as the merged council being mandated by GSUSA, would result in the loss of donations from local United Ways, Community Chests, and other charitable foundations whose guidelines require local, not regional, giving;

11

(c)     The mandated merger would result in the loss of charitable donations from local businesses whose giving decisions are based on the presence of a local council and local council board of directors;

(d)     Substantial individual donations would not be made;

(e)     Cookie sales in the Manitou Council territory and the entire "realigned" territory would be negatively affected;

(f)     Certain of the councils with whom Manitou Council was being forced to merge realize little or negative annual earnings, and annually operate with deficits. Manitou Council's good will and strong financial condition would be used to bolster these other councils, to the direct detriment of girls in Manitou Council's territory;

(g)     Certain of the councils with whom Manitou Council was being forced to merge have significant conditions of deferred maintenance on their property, resulting in unsafe conditions at those properties and requiring the diversion of future funds to rectify those conditions – funds that would otherwise be used for upkeep of other properties and for the delivery of programs to girls;

(h)     Certain of the other councils with whom Manitou Council was being forced to merge had limited or inconsistent volunteer training programs and volunteer background check systems, resulting in questionable program delivery effectiveness and real girl safety concerns;

(i)     The wants and needs of girls living in predominantly rural areas, such as the U.P., and those of girls living in the Manitou Council territory are vastly different;

(j)     Manitou Council's camp facilities would be underutilized;

12

(k)     Certain of the other councils are not actively implementing new Girl Scout program models;

(l)     Recruitment, training, face-to-face contact and interaction of, and between, the merged council and adult volunteers would be seriously and negatively affected, resulting in diminished program delivery to girls; and

(m)     Minority, ethnic, and racial groups are not being consistently served by certain of the other councils.

41.     The board of directors of Manitou Council concluded, in good faith and in its best judgment, that the merger being mandated by GSUSA would not be in the best interests of Manitou Council, its members or the community it serves.

42.     Manitou Council repeatedly expressed its concerns and negative view of the merger to GSUSA.

43.     GSUSA insisted that Manitou Council merge and refused to modify its proposed realignment map as it affects Manitou Council.

44.     In 2007, GSUSA's mandate to merge became coercive and threatening.  GSUSA threatened Manitou Council with the loss of its charter and/or the loss of its territory if it did not proceed with the forced merger.  For example, on October 3, 2007, GSUSA's Chief Executive Officer and GSUSA's Chair of the National Board Task Group on Realignment wrote to Manitou Council and stated in no uncertain terms:

> … This communication restates and reaffirms the [GSUSA] Task Group's prior decisions.  GSUSA remains firm that the three Wisconsin mergers and jurisdiction changes are the right configuration to ensure a strong and sustainable Girl Scout presence in your state.  <u>We will not again reconsider the jurisdictional boundaries, as approved by the National Board on August 24, 2006</u>.

> "Therefore, effective immediately, you are directed to engage with the three council realignment groups to which you are assigned. Further, and no later than October 15, you are directed to secure your board's approval of and authorization for your signature on the Northwestern Great Lakes Good Faith Agreement, and to ensure that all Manitou CRC [i.e. Council Realignment Committee] representatives and CRC sub-committee members have signed the Confidentiality Agreement. We also direct your CRC representatives and board to sign related documents for your other council realignment groups. Should you fail to meet this directive in its entirety; the National Board will take all necessary and further action in accordance with the Blue Book of Basic Documents 2006. (underscore added.)

A copy of the October 3, 2007 letter is attached here as Exhibit E.

45.     The "Good Faith Agreement" referred to in the October 3, 2007 letter was, in fact, a board resolution prepared by GSUSA and forced upon Manitou Council's board of directors by GSUSA. The resolution purported to commit Manitou Council "for a period of twelve (12) months to good faith negotiations toward a potential merger with the other six councils in northern Wisconsin and the U.P.". Manitou Council, under the stated threat of harsh consequences from GSUSA, signed the forced resolution, expressly noting thereon, however, that "by letter dated October 3, 2007 Girl Scouts of the USA has mandated that Girl Scouts of Manitou Council adopt the following resolutions no later than October 15, 2007, or the National Board will take all necessary and further action in accordance with the *Blue Book of Basic Documents 2006*." A copy of the resolution is attached hereto as Exhibit F.

46.     Manitou Council continued to express its doubts and reservations to GSUSA about the forced merger. GSUSA insisted Manitou Council proceed with the merger.

47.     In April of 2007, GSUSA supplied Manitou Council and the six other councils with whom it was being ordered to merge, with a GSUSA prepared form of a formal Letter of Intent to merge. Manitou Council was instructed that it must sign a form of that Letter of Intent

and thereby commit itself to negotiate a definite agreement with the other six councils "with respect to the merger of these separate councils into one legal entity, the 'Surviving Council.'" The GSUSA mandated, form Letter of Intent is attached hereto as Exhibit G.

48.     Manitou Council refused to sign the Letter of Intent since a merger would be harmful to, and not in the best interest of, Manitou Council, its members or the community serviced by Manitou Council.  On January 9, 2008, Manitou Council sent a letter to GSUSA stating it would not proceed with the coerced merger.  A copy of the letter is attached hereto as Exhibit H.  On that same date, Manitou Council's attorney sent a letter to GSUSA setting forth the legal framework behind Manitou Council's decision not to merge, including the statutory constraints on GSUSA's conduct created by the Wisconsin Fair Dealership Law.  A copy of the letter is attached hereto as Exhibit I.

49.     GSUSA has stated, and has persisted in the position, that it has the absolute right and authority to revoke Manitou Council's charter and/or to give Manitou Council's territory to any other council or councils.

50.     In furtherance of that position, and in apparent retaliation for Manitou Council's decision not to merge, GSUSA has initiated a procedure whereby it intends to remove Manitou Council's territory (or jurisdiction).  Through this jurisdictional change procedure, GSUSA now intends to accomplish precisely what Manitou Council refused to agree to through the coerced, merger process.  A copy of GSUSA's letter, dated January 24, 2008, initiating this jurisdictional change procedure is attached hereto as Exhibit J.

51.     The jurisdictional change procedure initiated by GSUSA is a sham.  It is nothing but a continuation of the coercion already leveled against Manitou Council in connection with the merger and, in fact, is the coercive action threatened by GSUSA in its letter of October 7,

2007 (Ex. E). While the letter of January 24, 2008 pretends to enlist Manitou Council into some sort of a process whereby changes to Manitou Council's territory will be evaluated, GSUSA has already definitively stated in its letter of October 3, 2007 (Ex. E) that it "will not again reconsider the jurisdictional boundaries, as approved by the National Board on August 24, 2006 [i.e. the boundaries established by the realignment map (Ex. D)]." The letter of January 24, 2008 establishes a new, cynical process whereby GSUSA will achieve the taking and redistribution of Manitou Council's territory, precisely as it has been attempting to do since 2006. The procedure announced by GSUSA makes clear that GSUSA is retaining for itself, and that it will in fact exercise, the absolute and exclusive power to take and redistribute Manitou Council's territory, stating: "As you know, 'in all matters concerning jurisdictional lines, the Board of Directors [of GSUSA] has the authority to make the final decision….'". (Ex. J.)

52.    GSUSA intends to take and redistribute Manitou Council's territory shortly after March 31, 2008. (Ex. J.)

**D.    Collaborating Councils**

53.    The six other councils with whom GSUSA has tried to force Manitou Council to merge are:

- Girl Scouts of the Fox River Area, Inc.
- Girl Scouts of the Peninsula Waters, Inc.
- Girl Scouts of Lac-Baie Council, Inc.
- Girl Scouts of Woodland Council, Inc.
- Girl Scouts of Birch Trails Council WI, Inc.
- Girl Scouts of Indian Waters Council, Inc.

54.    Each of these councils (the "Six Councils"), separately and collectively, have actively worked with and collaborated with GSUSA to force Manitou Council to merge.

55.     The Six Councils have repeatedly stated to Manitou Council's representatives that Manitou Council must merge as mandated by GSUSA.

56.     The Six Councils have complained to GSUSA that Manitou Council was not proceeding with the merger and have requested GSUSA to take punitive action against Manitou Council.

57.     The Six Councils have actively taken steps and worked with GSUSA to prevent Manitou Council from withdrawing from the mandated merger process.

58.     On May 18, 2007, the Six Councils communicated with GSUSA and therein stated, among other things: "We unanimously and strongly oppose [Manitou Council's request not to merge with the Six Councils] and propose adherence to the boundaries agreed to … and accepted by GSUSA in August of 2006…"; and "If a 'hard-line' position is needed by GSUSA, we strongly encourage them to take it to ensure the success of the movement".

59.     On September 27, 2007, the Six Councils corresponded to GSUSA and therein solicited the affirmative action of GSUSA to force Manitou Council to sign the form resolution (Ex. F) and to sign all other documents in furtherance of the coerced merger.  GSUSA's letter to Manitou Council on October 3, 2007 (Ex. E) was in direct response to the Six Council's demand.

60.     At all times during the forced merger talks, the Six Councils were informed and put on notice by Manitou Council that Manitou Council was not in favor of the merger and did not believe it could be forced into the merger.

61.     Notwithstanding Manitou Council's repeated statements to the Six Councils that it was not in favor of the merger, the Six Councils, in collaboration with GSUSA, have created web sites, have mailed and e-mailed news letters and other written materials, and have regularly

stated verbally to the public that the merger with Manitou Council was a done deal and would occur.

62.     The Six Councils know they will derive substantial economic benefit, and that Manitou Council will suffer irreparable harm, as a result of the forced merger of the councils and/or as a result of the forced taking and redistribution of Manitou Council's territory.

63.     On January 9, 2008, the Six Councils were advised, in writing, of Manitou Council's decision not to proceed with the merger.  A copy of the letter to the Six Councils is attached hereto as Exhibit K.  The Six Councils were also provided with a copy of the letter from Manitou Council's attorney to GSUSA (Ex. I), stating the legal basis for Manitou Council's decision.

64.     On information and belief, the Six Councils are actively participating in the procedure initiated by GSUSA for removing and redistributing Manitou Council's territory.  See Exhibit J.

### E.     Harm

65.     The forced merger would result in the complete dissolution of Manitou Council, the loss of its charter, the loss of its territory, the loss of its assets, the loss of its sources of revenue, the loss of its board of directors, the loss of its employees, the loss of its members and volunteers, the loss of its IRS tax exempt status, and the loss of its good will and standing in the community.  In short, it would result in the complete elimination of Manitou Council and its business.

66.     The loss of any portion of Manitou Council's territory will result in the loss of current and prospective members in that territory, the loss of the ability to offer Girl Scouting to girls in the lost territory, the loss of the ability to generate revenue through product sales and

from charitable giving in the lost territory, and the loss of its good will and standing in the community. The loss of Manitou Council's territory, as contemplated by GSUSA's recently initiated jurisdictional change process, will result in the constructive or *de facto* termination of Manitou Council's Charter and the destruction of its business.

67. Thus far, as a result of GSUSA's conduct and the announcement by GSUSA and the Six Councils of the "fact" of the merger and resulting loss of Manitou Council as the local Girl Scout council, Manitou Council has already suffered the loss, in 2007, of $12,650.00 in charitable contributions from businesses, the loss of $12,350.00 in charitable contributions from individuals, and the loss of $3,153.00 in charitable contributions from United Ways and Community Chests; that is, a loss already of approximately $28,153.00 in charitable donations for 2007. Going forward, the ongoing threat of the forced merger and/or taking of Manitou Council's territory will result, annually, in the loss of charitable donations of approximately $89,000.00.

68. As a result of GSUSA's efforts to coerce Manitou Council into a merger and, more recently, to take and redistribute Manitou Council's territory, (a) Manitou Council's board members, CEO and staff have spent hundreds of hours investigating, addressing and defending against GSUSA's wrongful conduct; (b) Manitou Council has had to retain the services, and incur the expense, of legal counsel; (c) Manitou Council has been diverted from attending to its business; and (d) has otherwise been damaged directly and indirectly.

## COUNT I

## VIOLATIONS OF THE WISCONSIN FAIR DEALERSHIP LAW

1-68 Paragraphs 1-68, supra, are hereby adopted as if fully set forth herein as paragraphs 1 through 68 of Count I.

### A. The Parties' Relationship is Governed by the Wisconsin Fair Dealership Law.

69. Currently and at all times pertinent to this Complaint, there was in force and effect the Wisconsin Fair Dealership Law (WFDL). Wis. Stats. § 135.01 *et seq*.

70. There at all times existed a "community of interest" between GSUSA and Manitou Council, as defined in Wis. Stats. § 135.02(1):

> "Community of interest" means a continuing financial interest between the grantor and grantee in either the operation of the dealership business or the marketing of such goods or services.

71. The Charter Contract Documents created a "dealership", as defined in Wis. Stat. § 135.02(3)(a):

> "Dealership" means … [a] contract or agreement, either expressed or implied, whether oral or written, between 2 or more persons, by which a person is granted the right to sell or distribute goods or services, or use a trade name, trademark, service mark, logotype, advertising or other commercial symbol, in which there is a community of interest in the business of offering, selling or distributing goods or services at wholesale, retail, by lease, agreement or otherwise.

72. GSUSA is a "grantor", as defined in Wis. Stats. § 132.02(5):

> "Grantor" means a person who grants a dealership.

73. Manitou Council is a "dealer", as defined in Wis. Stats. § 135.02(2):

> "Dealer" means a person who is a grantee of a dealership situated in this state.

74. Both GSUSA and Manitou Council are "persons", as defined in Wis. Stats. § 135.02(6):

> "Person" mans a natural person, partnership, joint venture, corporation or other entity.

75. The underlying purposes and policies of the WFDL are:

(a)    To promote the compelling interest of the public in fair business relations between dealers and grantors, and in the continuation of dealerships on a fair basis;

(b)    To protect dealers against unfair treatment by grantors, who inherently have superior economic power and superior bargaining power in the negotiation of dealerships;

(c)    To provide dealers with rights and remedies in addition to those existing by contract or by common law;

(d)    To govern all dealerships, including any renewals or amendments, to the full extent consistent with the constitutions of this state and the United States.

Wis. Stats. § 135.025(2).

76.    The WFDL is to be liberally construed and applied to promote the forgoing underlying remedial purposes and policies.  Wis. Stats. § 135.025(1).

77.    Pursuant to Section 135.03 of the WFDL, "[n]o grantor, directly or through any officer, agent or employee, may terminate, cancel, fail to renew or substantially change the competitive circumstances of a dealership agreement without good cause.  …."  Wis. Stats. § 135.03.

78.    "Good cause" is defined at Section 135.02(4) of the WFDL to mean:

(a)    Failure by a dealer to comply substantially with essential and reasonable requirements imposed upon the dealer by the grantor, or sought to be imposed by the grantor, which requirements are not discriminatory as compared with requirements imposed on other similarly situated dealers either by their terms or in the manner of their enforcement; or

(b)    Bad faith by the dealer in carrying out the terms of the dealership.

Wis. Stats. § 135.02(4).

79.     Pursuant to Section 135.025(3) of the WFDL:

The effect of this chapter may not be varied by contract or
agreement.  Any contract or agreement purporting to do so is void
and unenforceable to that extent only.

Wis. Stats. § 135.025(3).

80.     Pursuant to Section 135.06 of the WFDL:

If any grantor violates this chapter, a dealer may bring an action
against such grantor in any court of competent jurisdiction for
damages sustained by the dealer as a consequence of the grantor's
violation, together with the actual costs of the action, including
reasonable actual attorney fees, and the dealer also may be granted
injunctive relief against unlawful termination, cancellation,
nonrenewal or substantial change of competitive circumstances.

Wis. Stats. § 135.06.

81.     Pursuant to Section 135.065 of the WFDL:

In any action brought by a dealer against a grantor under this
chapter, any violation of this chapter by the grantor is deemed an
irreparable injury to the dealer for determining if a temporary
injunction should be issued.

Wis. Stats. § 135.065.

**B.      The Forced Merger is a Wrongful Termination or Substantial Change
to Competitive Circumstances Without Good Cause.**

82.     GSUSA has mandated Manitou Council to merge into a new council.

83.     The merger mandated by GSUSA would cause a termination, cancellation or

substantial change to the competitive circumstances of Manitou Council's dealership agreement.

84.     GSUSA does not have good cause for these actions, and GSUSA is in violation of

Section 135.03 of the WFDL.

Case: 3:08-cv-00184-bbc   Filed: 03/11/2009   Page 22 of 131   Document 132-2
Case 2:08-cv-00184-JPS   Filed 03/11/2009   Page 22 of 61   Document 13-2

### C. The Change in Territory is a Wrongful Termination or Substantial Change to Competitive Circumstances Without Good Cause.

85.     GSUSA has initiated procedures to take Manitou Council's territory and to redistribute that territory to one or more of the Six Councils and/or other councils in Wisconsin.

86.     A change to Manitou Council's territory will substantially change the competitive circumstances of Manitou Council's dealership agreement.

87.     The taking of all, or substantially all, of Manitou Council's territory will result in a constructive termination or cancellation of Manitou Council's dealership agreement as well as a substantial change to the competitive circumstances of the dealership agreement.

88.     GSUSA does not have good cause for its actions, and GSUSA is in violation of Section 135.03 of the WFDL.

### D. GSUSA's Notice of Termination or Change in Competitive Circumstances is Void.

89.     GSUSA's letter of January 24, 2008 (Ex. J), which purports to place Manitou Council on notice that its territory is being taken, is in violation of Section 135.04 of the WFDL, in that the notice:

(a)     fails to give Manitou Council at least 90 days prior written notice of the termination, cancellation or substantial change in the competitive circumstances of the dealership agreement;

(b)     fails to state the good cause reasons for the termination, cancellation or substantial change in competitive circumstances of the dealership agreement; and

(c)     fails to give Manitou Council 60 days to rectify any claimed deficiencies.

90.     The *sole* reason given by GSUSA in its letter of January 24, 2008 for its intended change in Manitou Council's territory is that Manitou Council has refused to proceed with GSUSA's mandated merger.  That reason is not good cause.

91.     The notice contained in GSUSA's letter of January 24, 2008 is in violation of Section 135.03 of the WFDL, and is void and of no effect.

> **E.     Terms Purporting to Give GSUSA the Authority to Terminate or Change the Competitive Circumstances Without Good Cause are Void.**

92.     The letter of January 24, 2008 (Ex. J), and GSUSA's conduct pursuant thereto, purports to be authorized by the "Blue Book of Basic Documents 2006" as it relates to "council jurisdiction".

93.     The "Blue Book of Basic Documents 2006" is not the effective compilation of documents affecting the Manitou Council Charter, as that publication contains documents that did not exist as of the date Manitou Council's Charter was most recently renewed.  The "Blue Book of Basic Documents 2003" (Ex. C) contains the documents which were in force and effect as of the date Manitou Council's Charter was most recently renewed.

94.     GSUSA's letter of January 24, 2008 (Ex. J) purports to rely upon the following language contained in the *Blue Book of Basic Documents 2006*:

> In all matters concerning jurisdictional lines, the Board of
> Directors has the authority to make the final decision, either during
> the term of a charter or upon issuance of a new charter.

95.     *The Blue Book of Basic Documents 2003*, which contains the documentation applicable to this cause, states:

> In all matters of dispute concerning jurisdiction lines, including
> mergers, consolidations, or other corporate reorganizations, the
> National Board has the authority to make the final decision either
> during the term of a charter or upon issuance of a new charter.

(Ex. C at p. 33).

96.     Regardless of the version of the "*Blue Book*" relied upon by GSUSA, the above-quoted provisions (as well as any other provisions in the Charter Contract Documents) which purport to give GSUSA the authority to cancel, terminate or substantially change the competitive circumstances of Manitou Council's dealership without good cause are in variance with Section 135.03 of the WFDL and are, therefore, void and unenforceable pursuant to Section 135.025(3) of the WFDL.

**F.     Manitou Council is Entitled to Equitable Relief.**

97.     GSUSA's wrongful conduct is causing and will cause irreparable harm to Manitou Council.

98.     Manitou Council does not have an adequate remedy at law.

99.     Manitou Council is entitled to injunctive relief pursuant to Section 135.06 of the WFDL as well as under Federal Rule of Civil Procedure 65.

100.    Manitou Council is entitled to declaratory relief pursuant to 28 U.S.C. § 2201.

**WHEREFORE**, Manitou Council prays for the following relief:

A.     An order declaring:

   (1)     the Manitou Council Charter Contract Documents create a "dealership" under the WFDL;

   (2)     GSUSA is a "grantor" and Manitou Council is a "dealer" under the WFDL;

   (3)     GSUSA does not have good cause to terminate, cancel or substantially change the competitive circumstances of Manitou Council's dealership;

   (4)     GSUSA's forced merger is a wrongful termination, cancellation or

25

substantial change to the competitive circumstances of Manitou Council's dealership without good cause;

(5)    GSUSA's taking and redistribution of Manitou Council's territory to other councils is a wrongful termination, cancellation or substantial change to the competitive circumstances of Manitou Council's dealership without good cause;

(6)    all provisions in the Manitou Council Charter Contract Documents which purport to give GSUSA authority to terminate, cancel or change the competitive circumstances of Manitou Council's dealership without good cause are void and unenforceable; and

(7)    GSUSA's purported notice of termination or change in competitive circumstances (Exhibit J) is void and unenforceable.

B.    A temporary, preliminary and/or permanent injunction maintaining the status quo and prohibiting GSUSA, its agents, representatives, employees, attorneys and all persons acting in concert with them from:

(1)    going forward with the jurisdictional change proceedings initiated by GSUSA in its letter of January 24, 2008 (Exhibit J);

(2)    constructively terminating or cancelling Manitou Council's dealership agreement through a change in Manitou Council's territory/jurisdiction;

(3)    substantially changing the competitive circumstances of Manitou Council's dealership agreement through a change in Manitou Council's territory/jurisdiction; and

(4)    terminating or cancelling Manitou Council's dealership agreement through

a forced merger.

C.     A judgment against GSUSA in the amount of damages sustained by Manitou Council as a consequence of GSUSA's violations of the WFDL, together with prejudgment interest and the actual costs of this action, including reasonable actual attorney fees.

D.     Such further relief as the Court deems proper and just.

## COUNT II

## BREACHES OF CONTRACT

1-68    Paragraphs 1 through 68, supra, are hereby adopted as if fully set forth herein as paragraphs 1 through 68 of Count II.

69-81    Paragraphs 69 through 81 (Count I) are hereby adopted as if fully set forth herein as paragraphs 69 through 81 of Count II.

82-100    [Omitted]

101.    There is a binding and enforceable contract between GSUSA and Manitou Council.  The terms of that contract are contained in the express terms of the Manitou Council Charter and the Charter Contract Documents, Exhibits A-C.

102.    In addition to the express terms of the contract, the obligation of good faith and fair dealing is an implied condition of the contract. The obligation of good faith and fair dealing requires that neither party to the contract intentionally or purposely do anything to prevent the other from carrying out its part under the contract, or do anything which would have the effect of destroying or injuring the right of a party to receive the fruits of the contract.  Mere compliance with the form but not the substance of a contract breaches the covenant of good faith.  The terms of the contract are interpreted and implemented in light of, and in conformance with, the duty of good faith and fair dealing.

Case 2:08-cv-01841-AJS   Filed 03/11/2009   Page 27 of 131   Document 130-2
Case 2:08-cv-01841-AJS   Filed 03/11/2009   Page 27 of 31   Document 130-2

### A. GSUSA's Breach of the Provisions Relating to the Requirements, Criteria and Standards Of a Girl Scout Council.

103.    There are four express "requirements" for a Girl Scout council charter.  These four requirements were established decades ago by the Girl Scout National Council pursuant to the authority granted the National Council at Article 8.1 of the Girl Scout Constitution.  (Blue Book, Ex. C at p. 10.)  The four requirements established by the National Council are as follows:

> To receive and retain a charter, a Girl Scout council agrees:
> - to subscribe to the purpose, adhere to the policies and be guided by the standards of Girl Scouts of the United States of America.
> - to develop, manage, and maintain Girl Scouting throughout the areas of its jurisdiction, in such manner and subject to such limitations as prescribed in the Constitution, Bylaws, and policies of Girl Scouts of the United States of America.
> - to participate in the activities and business of Girl Scouts of the United States of America.
> - to make reports of its work to Girl Scouts of the United States of America; pay its charter fee; have at all times a registered board of directors; and make sure that all persons affiliating with the local council meet individual membership requirements.  (Blue Book, Ex. C at pp. 28-29.)

104.    These four requirements are expressly set forth in the Application (Ex. B) and form a part of the contract between Manitou Council and GSUSA.

105.    In addition to creating duties owed from Manitou Council to GSUSA, the foregoing requirements grant Manitou Council the express, fundamental right "to develop, manage, and maintain Girl Scouting throughout the areas of its jurisdiction."

106.    The foregoing, agreed requirements also bind and entitle Manitou Council "to subscribe to the <u>purpose</u>, adhere to the <u>policies</u>, and be guided by the <u>standards</u> of Girl Scouts of the United States of America." (underscore added.)

107. The "purpose" of GSUSA is as set forth in the Preamble to the Constitution of GSUSA. It is "to dedicate ourselves to the purpose of inspiring girls with the highest ideals of character, conduct, patriotism, and service that they may become happy and resourceful citizens." (Blue Book, Ex. C at p.6.)

108. The "policies" of GSUSA are expressly stated at pages 22 through 26 of the Blue Book. (Ex. C at pp. 22-26.)

109. The "standards" for a Girl Scout council are set forth at pages 35 and 36 of the Blue Book and are identified as "Criteria and Standards for an Effective Girl Scout Council." (Ex. C at pp. 35-36).

110. As expressly stated and represented by GSUSA, and as agreed between GSUSA and Manitou Council, these Criteria and Standards (i) "delineate the way in which Girl Scout councils are expected to fulfill their charter requirements;" (ii) "emanate from the major beliefs and principles of the Girl Scout Movement;" (iii) "cover broad areas of a council's responsibility and serve as broad categories of measurement"; (iv) "are the foundation on which all the work of the council should be built and the prime resource for all organizational review and appraisal"; and (v) "essential to the chartering process, they also are an enduring point of reference for the desired level of performance." (Ex. C at p. 35.)

111. There exist no other requirements, purpose, policies, criteria or standards in the Charter or Charter Contract Documents.

112. Manitou Council has at all times complied with and performed in accordance with the aforesaid requirements, purpose, policies, criteria and standards.

113.    Manitou Council has never agreed to any other requirements, purpose, policies, criteria or standards; and no other requirements, purpose, policies, criteria or standards are part of the contract between Manitou Council and GSUSA.

114.    In justifying its new business plan calling for the realignment of councils from 315 to 109, GSUSA stated that it would apply two overriding criteria when forming the new, realigned councils.  The two, stated criteria were (a) total girl population within a council of 100,000, and (b) total household income within a council of $15 Billion.  These criteria were described by GSUSA as its "capacity" criteria.

115.    Ignoring entirely the requirements, purpose, policies, criteria and standards contained in the Charter Contract Documents, and using only its so-called capacity criteria, GSUSA redrew the Wisconsin and U.P. council map and took the steps alleged herein to force and coerce Manitou Council to merge with the Six Councils or, alternatively, to take Manitou Council's territory and redistribute it to the Six Councils and other councils in Wisconsin.

116.    GSUSA has no right or authority under the Charter Contract Documents to unilaterally and materially change the requirements, purpose, policies, criteria and standards to which it and Manitou Council had agreed.

117.    GSUSA's unauthorized actions to force Manitou Council into a merger and/or to take Manitou Council's territory so as to satisfy its so-called capacity criteria is a material breach of the contract between GSUSA and Manitou Council; both the express terms thereof and the implied duty of good faith and fair dealing contained therein as a matter of law.

**B.    GSUSA's Breach of the Contract Provisions Relating to Jurisdiction.**

118.    Together with the right and license granted to use the service marks and trade marks of Girl Scouts, the grant of an exclusive geographic territory, or jurisdiction, is the single most valuable and important right granted to Manitou Council under the Charter.

119.    From, and only from, the exclusive jurisdiction granted under the Charter, Manitou Council derives its members, volunteers, troops, donor base and revenues.  It is only within its exclusive jurisdiction that Manitou Council dispenses its exclusive service and product: Girl Scouting.  Without its exclusive jurisdiction, Manitou Council has no business to operate.

120.    The critical and fundamental nature of a council's right to its jurisdiction is stated and restated in essentially every document comprising the Charter Contract Documents.

121.    The second of the four fundamental "requirements" for a Girl Scout council is "to develop, manage and maintain Girl Scouting throughout the areas of its jurisdiction … ."  (Blue Book, Ex. C at p. 28.)  Very simply, without a jurisdiction, there is no place to develop, manage or maintain Girl Scouting.

122.    The Manitou Council Charter (Ex. A) expressly established, by agreement, a specific jurisdiction.  The Charter provides in pertinent part:

> … GIRL SCOUTS OF MANITOU COUNCIL, INC. is hereby chartered by Girl Scouts of the United States of America … <u>to operate as a Girl Scout council within the area of jurisdiction agreed upon with Girl Scouts of the United States of America,</u> with the duties, rights, powers and privileges of a local Girl Scout council as defined by Girl Scouts of the United States of America.  (underscore added.)

Case 2:08-cv-00184-SJPS   Filed 03/11/2009   Page 31 of 31   Document 20-2
Case 2:08-cv-00184-JPS   File 03/11/2009   Page 31 of 131   Document 130-2

123.    The most recent Application for the renewal of Manitou Council's charter (Ex. B)

repeatedly confirms the primacy of Manitou Council's territory or jurisdiction, stating in

pertinent part:

> The Girl Scouts of Manitou Council, Inc. … hereinafter referred to
> as Council, <u>now having jurisdiction over the area described in the
> official record</u> of the council's jurisdiction … <u>and holding a charter
> for this jurisdiction</u> which expires December 31, 2005, <u>hereby
> applies for a charter for the same jurisdiction</u> … .
>
> IN APPLYING FOR THIS CHARTER, THE COUNCIL
> AGREES:
> …
>
> 2.      To develop, manage, and maintain Girl Scouting
> <u>throughout the area of its jurisdiction</u> … .
> …
>
> SUBJECT TO THE LIMITATIONS HEREIN CONTAINED,
> <u>THE CHARTER</u> APPLIED FOR, <u>WHEN ISSUED, WILL
> CONFER FOR THE DURATION OF ITS TERM</u> THE
> FOLLOWING RIGHTS:
> …
>
> 5.      <u>The right to develop, manage, and maintain Girl Scouting
> throughout the area of the jurisdiction of the Council</u>.
> …
> (underscore added.)

124.    While the undertakings contained in the Application and, thus, the Charter include

an express reservation by GSUSA of the right to revoke or terminate the charter in accordance

with the GSUSA Constitution and the procedures adopted thereunder, there is no reservation by

GSUSA of a right to modify a council's jurisdiction once agreed to.  See Ex. B, *inter alia*.

125.    Each and every criteria and standard for an effective Girl Scout council (Blue

Book, Ex. C at pp. 35-36) is either expressly or implicitly limited to the performance of a council

within its exclusive, agreed upon jurisdiction.  For example:

Case 2:08-cv-00184-JPS   Filed 03/11/09   Page 32 of 131   Document 130-2

(a)    Criterion I States: "An effective Girl Scout program is delivered to girls in all segments of its jurisdiction."  (underscore added.)

(b)    Standard 1 under Criterion I states: "Based on a thorough understanding of the populations within its jurisdiction, the council attracts and retains membership from all areas of its jurisdiction and all segments of its population."  (underscore added.)

(c)    Standard 2 under Criterion I states: "The council develops the structure and the systems … for girls to participate in Girl Scouting …, with program enrichments that meet the needs and interests of girls in the jurisdiction."  (underscore added.)

(d)    Criterion III states: "An effective Girl Scout council has sufficient resources and assumes responsibility for managing them, in order to **ensure** the continuation and expansion of Girl Scouting in the council's jurisdiction."  (underscore and emphasis added.)

(e)    Standard I under Criterion III states: "The council's … volunteers and employed staff reflect[] all areas of its jurisdiction and all segments of its population."  (underscore added.)

(g)    Standard 6 under Criterion III states: "The council receives financial support as a result of being actively involved and recognized as a critical resource in the community."  (underscore added.)

126.    In short, as expressed throughout the Charter Contract Documents and as specifically stated and agreed to in the Application: the charter, when issued, conferred in Manitou Council for the duration of the term the right to develop, manage and maintain Girl Scouting throughout the agreed area of the jurisdiction of the council.

127.    GSUSA has no right or authority under the Charter Contract Documents to take or remove Manitou Council's agreed-upon jurisdiction.

128.    GSUSA's unauthorized efforts to take Manitou Council's jurisdiction, whether by coerced merger or through a direct taking and redistribution of the jurisdiction, is a material breach of the contract between GSUSA and Manitou Council; both the express terms thereof and the implied duty of good faith and fair dealing contained therein as a matter of law.

### C.    GSUSA's Breach of its Charter Revocation Procedures.

129.    GSUSA has established and published specific "procedures" whereby a council's performance is measured and whereby a council's charter may be issued, renewed and revoked. These procedures are set forth in full at pages 30 through 32 of the Blue Book (Ex. C at pp. 30-32).

130.    Pursuant to those procedures, Manitou Council's performance was assessed and measured immediately prior to the most recent renewal of its charter.  Manitou Council met or exceeded GSUSA's procedures for renewal and Manitou Council's charter was in fact renewed.

131.    Pursuant to GSUSA's published procedures, if a council's "performance indicates that it is not developing, managing, and maintaining Girl Scouting throughout the area of its jurisdiction, fully meeting charter requirements, or is seriously deficient in one or more critical priorities, the council may receive a charter with qualifications."  (Ex. C at p. 30.)  When such a condition is identified, "[t]he National Board of Directors may also invoke its procedures for initiating a Charter Compliance Audit, or for Non-Issuing or Revocation of Charters.  These procedures can be initiated at any time during the charter period."(*Id.*)

132.    Pursuant to GSUSA's published procedures, the Charter Compliance Audit precedes revocation and is only "initiated by the National Board of Directors in critical situations." (Ex. C at p. 31.)

133.    Manitou Council has never received a charter with qualifications.  Manitou Council has never been, and is not now, the subject of the GSUSA's procedures for a Charter Compliance Audit or its procedures for Non-Issuing or Revocation of its charter.

134.    Through its coerced merger process and its most recent efforts to take and redistribute Manitou Council's jurisdiction, GSUSA is attempting to effect a constructive revocation or termination of Manitou Council's charter.

135.    GSUSA's conduct is in breach of its own revocation and termination procedures, is wrongful, and is a breach of contract.

       **D.      GSUSA's Breach of its Jurisdictional Change Procedures.**

136.    GSUSA has established and published specific "procedures" whereby a council's jurisdiction can be changed.  Those procedures are set forth in full at pages 32 through 33 of the Blue Book (Ex. C at pp. 32-33).

137.    Pursuant to those published procedures, the process for a change in a council's jurisdiction "may be initiated by a single Girl Scout council, by several Girl Scout councils together, or by an individual community within a Girl Scout council."  (Ex. C at p. 32.)

138.    Nowhere in the GSUSA's procedures for changing a Girl Scout council's jurisdiction is GSUSA granted the right or authority to initiate or spearhead a jurisdictional change.  This is entirely consistent with the fact that the Application (Ex. B) does not reserve or grant any right to GSUSA to change the agreed-upon jurisdiction following the issuance of the

Case 2:08-cv-01841-JPS   Filed 03/12/09   Page 35 of 131   Document 120-2

charter.  Any "procedure" which purported to give GSUSA such power would be in breach of the charter.

139.　　Three separate procedures are established by which a council's jurisdiction can be changed.  They are identified in the procedures as Section I, II and III.

(a)　　"Section I" of GSUSA's procedures for changing a Girl Scout jurisdiction is applicable <u>only</u> in those situations where each of the affected councils agree to the change.  (Ex. C at p. 32.)

(b)　　"Section II" of GSUSA's procedures for changing a Girl Scout jurisdiction is applicable <u>only</u> when (i) the change process has been initiated by a Girl Scout council, by several Girl Scout councils together, or by an individual community within a Girl Scout council, and (ii) the affected councils cannot reach agreement.  (Ex. C at pp. 32-33.)

(c)　　"Section III" of GSUSA's procedures for changing a Girl Scout jurisdiction is applicable only when two or more councils agree to a merger, consolidation or other corporate reorganization.  (Ex. C at p. 33.)

(d)　　Within the context only of these three procedures for changing a Girl Scout council's jurisdiction, the National Board of GSUSA reserves for itself the authority to make final decisions.  (Ex. C at p. 33.)

140.　　None of the conditions precedent for a jurisdictional change established by GSUSA's own procedures have been met with regard to Manitou Council; i.e. there is no agreement for change among the affected councils (Section I), there has been no process initiated by one or more councils or by a community within a council's jurisdiction (Section II), and there

has been no agreement for merger, consolidation or other corporate reorganization among the affected councils (Section III).

141.    GSUSA's letter of January 24, 2008 (Ex. J), whereby GSUSA initiated a jurisdictional change, is without support or authority in its own procedures, is wrongful and is a breach of contract.

### E.    Impact of the Wisconsin Fair Dealership Law.

142.    GSUSA's conduct constitutes breaches of contract without any reference to the Wisconsin Fair Dealership Law, Wis. Stats. § 135.01 *et seq.*

143.    However, to the extent GSUSA claims to rely upon any provision in the Charter Contract Documents as authorization for its wrongful efforts to cancel, terminate or substantially change the competitive circumstances of Manitou Council's charter without good cause, such provision is void and unenforceable pursuant to Sections 135.03 and 135.025(3) of the WFDL. As such, the contract must be interpreted and applied as if any such provisions are not present in the contract.

### F.    Manitou Council is Entitled to Equitable Relief.

144.    GSUSA's breaches and threatened breaches are causing, and will cause, irreparable harm to Manitou Council.

145.    Manitou Council does not have an adequate remedy at law.

146.    Manitou Council is entitled to injunctive relief pursuant to F.R.C.P. 65.

147.    Manitou Council is entitled to declaratory relief pursuant to 28 U.S.C. § 2201.

**WHEREFORE**, Manitou Council prays for the following relief:

A.    An order declaring:

(1)    GSUSA's forced merger and resulting dissolution of Manitou Council and

37

Case 2:08-cv-00184-JPS    Filed 03/11/2009    Page 37 of 131    Document 30-2
Case 2:08-cv-00184-JPS    Filed 03/11/2009    Page 37 of 131    Document 30-2

its assets is a breach of contract; and

    (2)    GSUSA's efforts to take and redistribute Manitou Council's jurisdiction is a breach of contract.

B.    A temporary, preliminary and/or permanent injunction maintaining the status quo and prohibiting GSUSA, its agents, representatives, employees, attorneys and all persons acting in concert with them from:

    (1)    going forward with the jurisdictional change procedures initiated by GSUSA in its letter of January 24, 2008 (Exhibit J);

    (2)    constructively terminating and/or revoking Manitou Council's charter through the taking and redistributing of Manitou Council's jurisdiction; and

    (3)    terminating and/or revoking Manitou Council's charter through a forced merger.

C.    A judgment against GSUSA in the amount of damages sustained by Manitou Council as a consequence of GSUSA's breaches of contract, together with prejudgment interest and costs.

D.    Such further relief as the Court deems proper and just.

## COUNT III

## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

1-68    Paragraphs 1 through 68, supra, are hereby adopted as if fully set forth herein as paragraphs 1 through 68 of Count III.

69-100    Paragraphs 69 through 100 (Count I) are hereby adopted as if fully set forth herein as paragraphs 69 through 100 of Count III.

101-147    Paragraphs 101 through 147 (Count II) are hereby adopted as if fully set forth herein as paragraphs 101 through 147 of Count III.

148.    Manitou Council has longstanding and established relationships with individuals, businesses, foundations, United Ways and community chests whereby these individuals and entities annually make substantial charitable donations to Manitou Council.  Manitou Council has an expectancy of continuing, prospective relationships with, and donations from, these donors.

149.    GSUSA has at all times known that Manitou Council has these longstanding and prospective donor relationships and that Manitou Council has an expectancy of continuing charitable donations from these donors.

150.    GSUSA has interfered with these prospective donor relationships, through its efforts to force Manitou Council to merge with the Six Councils and/or through its efforts to take Manitou Council's jurisdiction.  GSUSA's interference is ongoing.

151.    GSUSA's interference with these prospective donor relationships was, and is, intentional.  Indeed, the intent and purpose of GSUSA's efforts to force Manitou Council to merge and/or to take Manitou Council's jurisdiction and redistribute it to other councils is to permanently cause these donors' charitable contributions to be paid to councils other than Manitou Council.

152.    As a direct result of GSUSA's actions and its publication of its intention to eliminate Manitou Council as the local Girl Scout council, certain of Manitou Council's donors have already stopped making charitable donations to Manitou Council or have stated they will no longer make charitable donations to Manitou Council.  Other of Manitou Council donors, per their own rules and regulations regarding their giving criteria, will be precluded from making

further donations to Manitou Council.

153. GSUSA's conduct is wrongful, in violation of the WFDL and in breach of the Charter Contract Documents. GSUSA's conduct is neither justified nor privileged.

154. GSUSA's interference is malicious.

155. Manitou Council has been damaged by GSUSA's wrongful conduct by the loss of charitable donations, the loss of prospective charitable donations, and the loss of good will in the donor community.

156. GSUSA's continued wrongful interference will cause irreparable harm to Manitou Council.

157. Manitou Council's remedy at law is inadequate.

158. Manitou Council is entitled to injunctive relief pursuant to F.R.C.P. 65.

**WHEREFORE**, Manitou Council prays for the following relief:

A. A temporary, preliminary and/or permanent injunction maintaining the status quo and prohibiting GSUSA, its agents, representatives, employees, attorneys and all persons acting in concert with them from interfering with Manitou Council's charitable donors, including the prohibition of:

      (1) going forward with the jurisdictional change procedures initiated by GSUSA in its letter of January 24, 2008 (Exhibit J);

      (2) constructively terminating and/or cancelling Manitou Council's charter through a change in Manitou Council's jurisdiction; and

      (3) terminating or cancelling Manitou Council's charter through a forced merger.

B. A judgment against GSUSA in the amount of damages sustained by Manitou

Council as a consequence of GSUSA's wrongful interference, together with prejudgment interest and the actual costs of this action.

      C.      An award of punitive damages.

      D.      An award of attorneys' fees.

      E.      Such further relief as the Court deems proper and just.

**COUNT IV**

**ECONOMIC COERCION**

1-68    Paragraphs 1 through 68, supra, are hereby adopted as if fully set forth herein as paragraphs 1 through 68 of Count IV.

69-100    Paragraphs 69 through 100 (Count I) are hereby adopted as if fully set forth herein as paragraphs 69 through 100 of Count IV.

101-147    Paragraphs 101 through 147 (Count II) are hereby adopted as if fully set forth herein as paragraphs 101 through 147 of Count IV.

148-158    Paragraphs 148 through 158 (Count III) are hereby adopted as if fully set forth herein as paragraphs 148 through 158 of Count IV.

159.    In retaliation for Manitou Council and its board's initial reluctance and ultimate refusal to proceed with the merger, GSUSA has wrongfully threatened, and has now wrongfully implemented proceedings, to take all of Manitou Council's jurisdiction.

160.    GSUSA's wrongful threats and acts were always on a take it or leave it basis and were meant and intended to coerce Manitou Council to merge with the Six Councils.

161.    The loss of Manitou Council's jurisdiction would be devastating to Manitou Council and would result in the loss of its business.

162. The coercive threats and actions by GSUSA seek to compel Manitou Council to give up its business with no exchange of value or consideration from GSUSA, or the other councils, in return.

163. GSUSA's coercive threats and actions are intended to deprive Manitou Council and its board of directors of their unfettered free will.

164. Manitou Council has no remedy at law other than to seek the protection of the Court to enjoin GSUSA's wrongful, coercive threats and actions.

165. Absent the Court's intervention, Manitou Council will be irreparably harmed through the loss of its jurisdiction and the resulting loss of its business.

166. Manitou Council is entitled to injunctive relief pursuant to F.R.C.P. 65.

167. GSUSA's conduct is malicious.

**WHEREFORE**, Manitou Council prays for the following relief:

A. A temporary, preliminary and/or permanent injunction maintaining the status quo and prohibiting GSUSA, its agents, representatives, employees, attorneys and all persons acting in concert with them from:

    (1)    going forward with the jurisdictional change procedures initiated by GSUSA in its letter of January 24, 2008 (Exhibit J);

    (2)    constructively terminating or cancelling Manitou Council's charter through a change in Manitou Council's jurisdiction; and

    (3)    terminating or cancelling Manitou Council's charter through a forced merger.

B. A judgment against GSUSA in the amount of damages sustained by Manitou Council as a consequence of GSUSA's wrongful coercion, together with prejudgment interest

and the actual costs of this action.

      C.     An award of punitive damages.

      D.     An award of attorneys' fees.

      E.     Such further relief as the Court deems proper and just.

**COUNT V**

**TORTIOUS INTERFERENCE WITH FIDUCIARY DUTIES**

      1-68     Paragraphs 1 through 68, supra, are hereby adopted as if fully set forth herein as paragraphs 1 through 68 of Count V.

      69-100     Paragraphs 69 through 100 (Count I) are hereby adopted as if fully set forth herein as paragraphs 69 through 100 of Count V.

      101-147     Paragraphs 101 through 147 (Count II) are hereby adopted as if fully set forth herein as paragraphs 101 through 147 of Count V.

      148-158     Paragraphs 148 through 158 (Count III) are hereby adopted as if fully set forth herein as paragraphs 148 through 158 of Count V.

      159-167     Paragraphs 159 through 167 (Count IV) are hereby adopted as if fully set forth herein as paragraphs 159 through 167 of Count V.

      168.     Manitou Council is a nonprofit corporation with an independent board of directors.

      169.     GSUSA has at all times known Manitou Council is a nonprofit corporation with an independent board of directors.

      170.     GSUSA has at all times known, as a matter of fundamental nonprofit corporate law and common understanding, that Manitou Council's board of directors has fiduciary duties

owing to the nonprofit corporation and its members. Those fiduciary duties include the duties of loyalty, good faith and due care.

171. The careful exercise of the Manitou Council's fiduciary duties is an express requirement of being an effective Girl Scout council. Per GSUSA's "Criteria and Standards for an Effective Girl Scout Council", at Criterion III:

> The council board carries out, in a timely manner, its stewardship responsibilities with respect to development and management of all council assets: human, fiscal, and property. (Standard 3)
>
> The council board exercises financial leadership to provide for the perpetuation of Girl Scouting within it jurisdiction. (Standard 4)
>
> The council receives financial support as a result of being actively involved and recognized as a critical resource in the community. (Standard 6)

(Blue Book, Ex. C at p. 36.)

172. GSUSA at all times knew the Manitou Council board had a duty to independently investigate the forced merger and to determine, using its own independent judgment, if the merger was in the best interest of Manitou Council and its members.

173. GSUSA at all times knew it would be a breach of the Manitou Council board's fiduciary duties to the corporation and to its members to recommend a merger which, in the board's independent judgment following its own investigation, was <u>not</u> in the best interests of Manitou Council or its members.

174. GSUSA at all times knew that as the stewards of the tens of millions of dollars in property and money charitably donated to Manitou Council, the board owed a duty to the donors and the community to ensure their donations were properly utilized and that the donors' donative intentions were properly met.

175.     Through its wrongful, coercive threats and actions, GSUSA has sought, and continues to seek, to cause the board of directors to breach their fiduciary duties and to thereby cause the board of directors to recommend and agree to a merger which the board of directors knows is not in the best interest of the corporation and its members.

176.     Through its wrongful, coercive threats and actions, GSUSA has sought, and continues to seek, to cause the board of directors to breach their fiduciary duties as stewards of the charitably donated property and money, and to thereby cause the board of directors to allow these assets to be disbursed to councils and persons who were not the intended beneficiaries or caretakers thereof.

177.     Manitou Council has no adequate remedy at law other than to seek the protection of the Court to enjoin GSUSA's wrongful and tortious interference.

178.     GSUSA's conduct is causing irreparable harm.

179.     Manitou Council is entitled to injunctive relief pursuant to F.R.C.P. 65.

180.     GSUSA's conduct is malicious.

**WHEREFORE**, Manitou Council prays for the following relief:

A.     A temporary, preliminary and/or permanent injunction maintaining the status quo and prohibiting GSUSA, its agents, representatives, employees, attorneys and all persons acting in concert with them from:

(1)     going forward with the jurisdictional change procedures initiated by GSUSA in its letter of January 24, 2008 (Exhibit J);

(2)     constructively terminating or cancelling Manitou Council's charter through a change in Manitou Council's jurisdiction; and

(3)     terminating or cancelling Manitou Council's charter through a forced

merger.

B.      A judgment against GSUSA in the amount of damages sustained by Manitou Council as a consequence of GSUSA's tortious interference, together with prejudgment interest and the actual costs of this action.

C.      An award of punitive damages.

D.      An award of attorneys' fees.

E.      Such further relief as the Court deems proper and just.

### COUNT VI

### CONSPIRACY TO VIOLATE THE WISCONSIN FAIR DEALERSHIP LAW

1-180      Paragraphs 1 through 180, supra, are hereby adopted as if fully set forth herein as paragraphs 1 through 180 of Count VI.

181.      GSUSA and the Six Councils have combined and, through their concerted actions, have sought to accomplish the violations of the WFDL, all as more fully set forth above and adopted herein.

182.      Through the combination and concerted actions of GSUSA and the Six Councils, these co-conspirators have sought to assist with, facilitate, intensify and ensure the effectiveness and completeness of the unlawful conduct heretofore alleged and to maximize the harm suffered by Manitou Council.

183.      The conduct of GSUSA and the Six Councils is malicious.

184.      The liability of the co-conspirators is joint and several.

**WHEREFORE**, Manitou Council prays for the following relief:

A.      An order declaring:

(1)      the Manitou Council Charter Contract Documents create a "dealership"

46

under the WFDL;

(2) GSUSA is a "grantor" and Manitou Council is a "dealer" under the WFDL;

(3) GSUSA does not have good cause to terminate, cancel or substantially change the competitive circumstances of Manitou Council's dealership;

(4) GSUSA's forced merger is a wrongful termination, cancellation or substantial change to the competitive circumstances of Manitou Council's dealership without good cause;

(5) GSUSA's taking and redistribution of Manitou Council's territory to other councils is a wrongful termination, cancellation or substantial change to the competitive circumstances of Manitou Council's dealership without good cause;

(6) all provisions in the Manitou Council Charter Contract Documents which purport to give GSUSA authority to terminate, cancel or change the competitive circumstances of Manitou Council's dealership without good cause are void and unenforceable; and

(7) GSUSA's purported notice of termination or change in competitive circumstances (Exhibit J) is void and unenforceable.

B. A temporary, preliminary and/or permanent injunction maintaining the status quo and prohibiting GSUSA, its agents, representatives, employees, attorneys and all persons acting in concert with them from:

(1) going forward with the jurisdictional change proceedings initiated by GSUSA in its letter of January 24, 2008 (Exhibit J);

(2)     constructively terminating or cancelling Manitou Council's dealership agreement through a change in Manitou Council's territory/jurisdiction;

(3)     substantially changing the competitive circumstances of Manitou Council's dealership agreement through a change in Manitou Council's territory/jurisdiction; and

(4)     terminating or cancelling Manitou Council's dealership agreement through a forced merger.

C.     A judgment against GSUSA in the amount of damages sustained by Manitou Council as a consequence of the unlawful conspiracy to violate the WFDL, together with prejudgment interest and the actual costs of this action, including reasonable actual attorney fees.

D.     Such further relief as the Court deems proper and just.

## COUNT VII

## CONSPIRACY TO TORTIOUSLY INTERFERE WITH PROSPECTIVE ECONOMIC ADVANTAGE

1-184     Paragraphs 1 through 184, supra, are hereby adopted as if fully set forth herein as paragraphs 1 through 184 of Count VII.

185.     GSUSA and the Six Councils have combined and, through their concerted actions, have sought to accomplish the tortious interference with Manitou Council's charitable donors and with those donors' prospective contributions, all as more fully described in the allegations set forth above and adopted hereby.

186.     Through the combination and concerted actions of GSUSA and the Six Councils, these co-conspirators have sought to assist with, facilitate, intensify and ensure the wrongful interference directed at Manitou Council's donors and the prospective economic relations with those donors, and to maximize the harm suffered by Manitou Council.

187.    The conduct of GSUSA and the Six Councils is malicious.

188.    The liability of the co-conspirators is joint and several.

**WHEREFORE**, Manitou Council prays for the following relief:

A.    A temporary, preliminary and/or permanent injunction maintaining the status quo and prohibiting GSUSA, its agents, representatives, employees, attorneys and all persons acting in concert with them from interfering with Manitou Council's charitable donors, including the prohibition of:

    (1)    going forward with the jurisdictional change procedures initiated by GSUSA in its letter of January 24, 2008 (Exhibit J);

    (2)    constructively terminating and/or cancelling Manitou Council's charter through a change in Manitou Council's jurisdiction; and

    (3)    terminating or cancelling Manitou Council's charter through a forced merger.

B.    A judgment against GSUSA in the amount of damages sustained by Manitou Council as a consequence of the unlawful conspiracy to wrongfully interfere, together with prejudgment interest and the actual costs of this action.

C.    An award of punitive damages.

D.    An award of attorneys' fees.

E.    Such further relief as the Court deems proper and just.

## COUNT VIII

## CONSPIRACY TO ECONOMICALLY COERCE

1-188    Paragraphs 1 through 188, supra, are hereby adopted as if fully set forth herein as paragraphs 1 through 188 of Count VIII.

189. GSUSA and the Six Councils have combined and, through their concerted actions, have sought to accomplish the economic coercion more fully described in the allegations set forth above and adopted hereby.

190. Through the combination and concerted actions of GSUSA and the Six Councils, these co-conspirators have sought to assist with, facilitate, intensify and achieve the wrongful economic coercion directed at Manitou Council, and to maximize the harm suffered by Manitou Council.

191. The conduct of GSUSA and the Six Councils is malicious.

192. The liability of the co-conspirators is joint and several.

**WHEREFORE**, Manitou Council prays for the following relief:

A. A temporary, preliminary and/or permanent injunction maintaining the status quo and prohibiting GSUSA, its agents, representatives, employees, attorneys and all persons acting in concert with them from:

  (1) going forward with the jurisdictional change procedures initiated by GSUSA in its letter of January 24, 2008 (Exhibit J);

  (2) constructively terminating or cancelling Manitou Council's charter through a change in Manitou Council's jurisdiction; and

  (3) terminating or cancelling Manitou Council's charter through a forced merger.

B. A judgment against GSUSA in the amount of damages sustained by Manitou Council as a consequence of the unlawful conspiracy to wrongfully coerce, together with prejudgment interest and the actual costs of this action.

C. An award of punitive damages.

D.	An award of attorneys' fees.

## COUNT IX

## CONSPIRACY TO TORTIOUSLY INTERFERE WITH FIDUCIARY DUTIES

1-192	Paragraphs 1 through 192, supra, are hereby adopted as if fully set forth herein as paragraphs 1 through 192 of Count IX.

193.	GSUSA and the Six Councils have combined and, through their concerted actions, sought to accomplish the tortious interference with the fiduciary duties of Manitou Council's board of directors, all as more fully described in the allegations set forth above and adopted hereby.

194.	Through the combination and concerted action of GSUSA and the Six Councils, these co-conspirators have sought to assist with, facilitate, intensify and achieve the interference and to maximize the harm suffered by Manitou Council.

195.	The conduct of GSUSA and the Six Councils is malicious.

196.	The liability of the co-conspirators is joint and several.

**WHEREFORE**, Manitou Council prays for the following relief:

A.	A temporary, preliminary and/or permanent injunction maintaining the status quo and prohibiting GSUSA, its agents, representatives, employees, attorneys and all persons acting in concert with them from:

(1)	going forward with the jurisdictional change procedures initiated by GSUSA in its letter of January 24, 2008 (Exhibit J);

(2)	constructively terminating or cancelling Manitou Council's charter through a change in Manitou Council's jurisdiction; and

(3)	terminating or cancelling Manitou Council's charter through a forced

Case 2:08-cv-00184-JPS   Filed 03/11/2009   Page 55 of 132   Document 130-2

merger.

B.     A judgment against GSUSA in the amount of damages sustained by Manitou Council as a consequence of the unlawful conspiracy to tortiously interfere, together with prejudgment interest and the actual costs of this action.

C.     An award of punitive damages.

D.     An award of attorneys' fees.

E.     Such further relief as the Court deems proper and just.

## COUNT X

### INJURY TO BUSINESS AND RESTRAINT OF WILL

1-196     Paragraphs 1 through 196, supra, are hereby adopted as if fully set forth herein as paragraphs 1 through 196 of Count X.

197.     At all times pertinent hereto, there was in force and effect the following law:

> Any 2 or more persons who shall combine, associate, agree, mutually undertake or concert together for the purpose of willfully or maliciously injuring another in his or her reputation, trade, business or profession by any means whatever, or for the purpose of maliciously compelling another to do or perform any act against his or her will, or preventing or hindering another from doing or performing any lawful act shall be punished by imprisonment in the county jail not more than one year or by fine not exceeding $500.

Wis. Stats. § 134.01.

198.     The conduct of GSUSA and the Six Councils has violated, and continues to violate, Section 134.01.

199.     Civil liability arises as a result of violations of Section 134.01.

200.     The conduct of GSUSA and the Six Councils is willful and malicious in that it was intended to have, among others, the following effects:

      (a)      to completely destroy and cause the dissolution of Manitou Council;

      (b)      to retaliate against and punish Manitou Council for exercising its lawful right not to restructure its corporate existence and merge with the Six Councils;

      (c)      to take and convert all of Manitou Council's assets – human, fiscal, property and good will – without the payment of any consideration to Manitou Council; and

      (d)      through intimidation, to hold Manitou Council up as an example to all other Girl Scout councils of the devastating consequences that would result to any council who dared to disagree with GSUSA, to insist on the exercise of its lawful rights or to protect and preserve its assets.

201.    Liability under Section 134.01 is joint and several.

**WHEREFORE**, Manitou Council prays for the following relief:

A.    A temporary, preliminary and/or permanent injunction maintaining the status quo and prohibiting GSUSA, its agents, representatives, employees, attorneys and all persons acting in concert with them from:

      (1)      going forward with the jurisdictional change procedures initiated by GSUSA in its letter of January 24, 2008 (Exhibit J);

      (2)      constructively terminating or cancelling Manitou Council's charter through a change in Manitou Council's jurisdiction; and

      (3)      terminating or cancelling Manitou Council's charter through a forced merger.

B.    A judgment against GSUSA in the amount of damages sustained by Manitou Council as a consequence of unlawful association, together with prejudgment interest and the actual costs of this action.

Case 2:08-cv-00401-JPS   Filed 03/11/09   Page 53 of 131   Document 130-2

C.      An award of punitive damages.

D.      An award of attorneys' fees.

E.      Such further relief as the Court deems proper and just.

**COUNT XI**

**FURTHER BREACHES OF CHARTER RENEWAL PROCEDURES**

1-68      Paragraphs 1 through 68 of the Complaint are hereby adopted as if fully set forth herein as paragraphs 1 through 68 of Count XI.

69-81      Paragraphs 69 through 81 (Count I) of the Complaint are hereby adopted as if fully set forth herein as paragraphs 69 through 81 of Count XI.

82-100      [Omitted]

101-143      Paragraphs 101 through 143 (Count II) of the Complaint are hereby adopted as if fully set forth herein as paragraphs 101 through 143 of Count XI.

144-201      [Omitted]

202.      At Count II, Manitou Council alleges various breaches of the Charter Contract Documents as they relate to charter renewals.  Since the initiation of this action on February 29, 2008, GSUSA has breached and/or threatens to breach the Charter Contract Documents in the further manner alleged in this Count XI.

203.      The Charter Contract Documents provide that, eighteen months before the expiration of Manitou Council's charter, GSUSA is to provide Manitou Council with an application for the renewal of its charter for a new term.  *See* Ex. C at p. 30.  The term of Manitou Council's current charter expires December 31, 2009.

204.    In breach of the Charter Contract Documents, GSUSA did not provide Manitou Council with an application for renewal of its charter eighteen months prior to December 31, 2009.

205.    The Charter Contract Documents provide that, after delivery to a council of its charter renewal application, a charter renewal process is supposed to proceed, whereby: (a) a GSUSA "team" reviews and assesses a council's performance and progress, and agrees on critical priorities for which the council should be commended and those that need further work; (b) the GSUSA team recommends, through various GSUSA staff and committees, the action to be taken on the charter renewal application based on its review and assessment of the council; and (c) if the review and assessment do not reveal any serious deficiencies, the council's charter is renewed for four years. *See* Ex. C at p. 30.

206.    Manitou Council has requested that GSUSA provide Manitou Council with an application for renewal of its charter and for the renewal process to be completed. Despite this request, GSUSA has not provided Manitou Council with an application, has not initiated the charter renewal process, and, on December 30, 2008, GSUSA corresponded to Manitou Council and stated: "This process was suspended during realignment."

207.    The Charter Contract Documents do not authorize GSUSA to unilaterally change, modify or "suspend" material terms of the contract. GSUSA's "suspension" of the charter application renewal process is a breach of the Charter Contract Documents and, effective January 1, 2010, Manitou Council is entitled to a renewed charter term through December 31, 2013.

208.    Alternatively, the "suspension" is a waiver of the charter application renewal process and, effective January 1, 2010, Manitou Council is entitled to a renewed charter term through December 31, 2013.

209.    By a letter dated February 2, 2009, GSUSA, through its attorney, has advised Manitou Council that "With respect to all councils whose charters expire December 31, 2009, the National Board expects to renew or extend such charters for a minimum of one year."

210.    The Charter Contract Documents do not allow for GSUSA's unilateral changes in or modifications to, the charter renewal process.  GSUSA's apparent abandonment of the contractual procedures and its creation of some system whereby GSUSA simply "expects to renew or extend" charters is a material breach of contract.  Alternatively, GSUSA's letter of February 2, 2009, effects a waiver by GSUSA of the charter renewal procedures.

211.    Based on GSUSA's letter of February 2, 2009, GSUSA is estopped from taking any action to terminate or not renew Manitou Council's charter prior to December 31, 2010.

212.    GSUSA's breaches of contact will cause irreparable harm to Manitou Council through the loss of its charter, and no remedy at law would be adequate.

213.    Manitou Council is entitled to declaratory relief pursuant to 28 U.S.C. § 2201.

214.    If, in the course of these proceedings, GSUSA reneges on its representation that it is "extending" Manitou Council's charter through December 31, 2010, Manitou Council would be entitled to all further, necessary or proper relief pursuant to 28 U.S.C. § 2202, including without limitation injunctive relief pursuant to F.R.C.P. 65 and/or judgment for money damages.

**WHEREFORE**, Manitou Council prays for the following relief:

A.    An order declaring:

(1)    GSUSA's failure to provide Manitou Council with a charter renewal application is a breach of contract.

(2)    GSUSA's failure to perform in accordance with the charter renewal review and assessment procedures is a breach of contract or, alternatively,

a waiver by GSUSA of those requirements; and, accordingly, Manitou Council's charter is renewed affective January 1, 2010 for a term of four years.

(3) GSUSA is estopped from taking any action inconsistent with its representation that Manitou Council's charter will be renewed or extended for a minimum of one year after December 31, 2009.

B. An order entitling Manitou Council to all further necessary or proper relief including, without limitation, injunctive relief and/or a judgment for money damages.

## COUNT XII

## FURTHER BREACHES OF JURISDICITONAL CHANGE PROCEDURES

1-68 Paragraphs 1 through 68 of the Complaint are hereby adopted as if fully set forth herein as paragraphs 1 through 68 of Count XII.

69-81 Paragraphs 69 through 81 (Count I) of the Complaint are hereby adopted as if fully set forth herein as paragraphs 69 through 81 of Count XII.

82-100 [Omitted]

101-143 Paragraphs 101 through 143 (Count II) are hereby adopted as if fully set forth herein as paragraphs 101 through 143 of Count XII.

144-214 [Omitted]

215. At Count II of the Complaint, Manitou Council alleges various breaches of the Charter Contract Documents as they relate to Manitou Council's jurisdiction. Since the initiation of this action on February 29, 2008, GSUSA has breached the Charter Contract Documents in the further manner alleged in this Count XII.

216. The jurisdictional change process wrongfully initiated by GSUSA requires certain

procedures be followed and met before any changes to Manitou Council's jurisdiction can be considered or acted upon by GSUSA. This includes the requirement that any recommendation and subsequent action by GSUSA with regard to Manitou Council's jurisdiction be based only on data provided to GSUSA by one or more of the councils, or by community sources, within the area of the jurisdiction under review.

217.    GSUSA was provided *no* data from any council or from any community source.

218.    In breach of the Charter Contract Documents, GSUSA ordered changes to Manitou Council's jurisdiction based solely on self-serving "data" of its own creation and not from any data provided by any council or community sources.

219.    GSUSA's breaches and threatened breaches are causing, and will cause, irreparable harm to Manitou Council.

220.    Manitou Council does not have an adequate remedy at law.

221.    Manitou Council is entitled to injunctive relief pursuant to F.R.C.P. 65.

222.    Manitou Council is entitled to declaratory relief pursuant to 28 U.S.C. § 2201.

**WHEREFORE**, Manitou Council prays for the following relief:

A.    An order declaring GSUSA's actions to change Manitou Council's jurisdiction in the absence of any data from any council or community source a breach of contract.

B.    A temporary, preliminary and/or permanent injunction maintaining the status quo and prohibiting GSUSA, its agents, representatives, employees, attorneys and all persons acting in concert with them from:

> (1)    going forward with the jurisdictional change procedures initiated by GSUSA in its letter of January 24, 2008 (Exhibit J);
>
> (2)    constructively terminating and/or revoking Manitou Council's charter

through the taking and redistributing of Manitou Council's jurisdiction; and

    (3)    terminating and/or revoking Manitou Council's charter through a forced merger.

C.    A judgment against GSUSA in the amount of damages sustained by Manitou Council as a consequence of GSUSA's breaches of contract, together with prejudgment interest and costs.

D.    Such further relief as the Court deems proper and just.

## COUNT XIII

## BREACH OF FIDUCIARY DUTY

1-222    Paragraphs 1 through 222 of the Complaint are hereby adopted as if fully set forth herein as paragraphs 1 through 222 of Count XIII.

223.    GSUSA required and caused Manitou Council to amend its Articles of Incorporation to include the following provisions:

    (1)    That the term of Manitou Council's corporate existence would continue only so long as it held a charter from GSUSA;

    (2)    That Manitou Council's corporate purpose was solely to be a Girl Scout council; and

    (3)    That in the event of dissolution of Manitou Council as a corporate entity all of Manitou Council's assets would be transferred and assigned to GSUSA.

224.    These provisions repose extraordinary trust and confidence in GSUSA and result in a superiority, an influence and an advantage in GSUSA over Manitou Council and its assets.

225.     A fiduciary relationship exists between GSUSA and Manitou Council in connection with the aforesaid provisions.

226.     Pursuant to that fiduciary relationship, GSUSA is required to act fairly, honestly and with utmost good faith, and to take no action that would arbitrarily, without good cause, in bad faith or unfairly cause the termination or non-renewal of Manitou Council's charter; which termination or non-renewal would, because of the aforesaid provisions, cause the immediate cessation of Manitou Council's corporate purpose and term, require the immediate dissolution of the corporation and require the transfer and assignment of all of Manitou Council's assets to GSUSA for no consideration.

227.     It is GSUSA's position it has unfettered discretion to terminate or not renew Manitou Council's charter.

228.     That position, GSUSA's conduct and its threatened conduct are breaches of GSUSA's fiduciary duties, including its duties of good faith, loyalty, fair dealing, fidelity and honesty.  That position, GSUSA's conduct and its threatened conduct are oppressive and are an abuse and misuse of the trust and confidence reposed in GSUSA.

229.     The aforesaid provisions of Manitou Council's Articles of Incorporation requiring its assets be transferred and assigned to GSUSA upon dissolution were never envisioned or intended by Manitou Council as a means by which GSUSA could unilaterally and subversively *cause* the dissolution of Manitou Council and thereby effect the transfer of all of Manitou Council's assets to GSUSA or its designee.  For GSUSA to have caused these provisions to be adopted in the first instance, or to urge now that they be interpreted and enforced, for such an unconscionable purpose is a constructive fraud and cannot be sanctioned by the law.

230.    Manitou Council has been damaged, and will continue to be damaged, by GSUSA's conduct.

231.    GSUSA's breaches and threatened breaches of its fiduciary duties are causing, and will cause, irreparable harm to Manitou Council.

232.    The breaches of fiduciary duties alleged herein make appropriate the award of punitive damages.

233.    Manitou Council does not have an adequate remedy at law.

234.    Manitou Council is entitled to injunctive relief pursuant to F.R.C.P. 65.

235.    Manitou Council is entitled to declaratory relief pursuant to 28 U.S.C. § 2201.

**WHEREFORE**, Manitou Council prays for the following relief:

A.    An order declaring:

(1)    A fiduciary relationship exists between GSUSA and Manitou Council with regard to any action by GSUSA that would cause Manitou Council's charter to be terminated or not renewed and thereby forcing the dissolution of Manitou Council as a corporate entity and the transfer and distribution of Manitou Council's assets to GSUSA; and

(2)    Any action by GSUSA to terminate or not renew Manitou Council's charter must be exercised in conformance with GSUSA's fiduciary duties of utmost good faith, loyalty, honesty, fidelity and fair dealing.

B.    A temporary, preliminary and/or permanent injunction maintaining the *status quo* and prohibiting GSUSA, its, agents, representatives, employees, attorneys and all persons acting in concert with them from terminating or not renewing Manitou Council's charter in breach of GSUSA's fiduciary duties.

C.     A judgment against GSUSA in the amount of the damages sustained by Manitou

Council as a result of GSUSA's breaches of its fiduciary duties, together with punitive damages,

attorney's fees, prejudgment interest and costs.

D.     Such further relief as the Court deems proper and just.


Dated: March 31, 2009                          GIRL SCOUTS OF MANITOU COUNCIL, INC.


                                     By:  /s/ Gary W. Leydig
                                          One of its Attorneys


Gary W. Leydig
Illinois License No. 3128377
Riordan, Fulkerson, Hupert & Coleman
30 North LaSalle Street, Suite 2630
Chicago, Illinois 60602
Phone:  (312) 346-4740
Fax:  (312) 346-1168
gleydig@rfsc-law.com


Tomislav Z. Kuzmanovic
Wisconsin License No. 1003563
Russell A. Klingaman
Wisconsin License No. 1000676
Hinshaw & Culbertson LLP
100 East Wisconsin Avenue, Suite 2600
Milwaukee, Wisconsin 53202
Phone:  (414) 276-6464
Fax:  (414) 276-9220
tkuzmanovic@hinshawlaw.com
rklingaman@hinshawlaw.com

# Exhibit A


# Girl Scouts

# GIRL SCOUT COUNCIL CHARTER

Which is to certify

### This is to certify that

GIRL SCOUTS OF MANITOU COUNCIL, INC.

is hereby chartered by Girl Scouts of the United States of America, a corporation chartered by Act of Congress, to operate as a Girl Scout council within the area of jurisdiction agreed upon with Girl Scouts of the United States of America, with the duties, rights, powers, and privileges of a local Girl Scout council as defined by Girl Scouts of the United States of America.

This charter is effective     January 1, 2006     for up to    Four    years.

This charter is issued subject to all the terms and conditions set forth in the application therefore, dated    April 13, 2005   , which is made a part hereof.

In testimony whereof, Girl Scouts of the United States of America has caused this charter to be signed by its officers and its corporate seal to be hereunto affixed, this    11th    day of    September    in the year    2005

Girl Scouts of the United States of America

Girl Scouts of Manitou Council, Inc.
Wisconsin

Issued to:

_Patricia Diaz Dennis_
Patricia Diaz Dennis
Chair, National Board of Directors

_Council President_

_Kathy Cloninger_
Kathy Cloninger
Chief Executive Officer

# Exhibit B



# APPLICATION FOR A
# GIRL SCOUT COUNCIL CHARTER
## January 1, 2006 – December 31, 2009

Girl Scouts of the USA
420 Fifth Avenue
New York, NY 10018-2798

| This charter will not be issued until application is approved pursuant to the authority of the Board of Directors of Girl Scouts of the United States of America. | For Use of Girl Scouts of the USA | | |
|---|---|---|---|
| | Board Action | Issued | Term 1-1-06 – 12-31-09 |
| To: National Board of Directors, Girl Scouts of the United States of America 420 Fifth Avenue, New York, NY 10018-2798 | Council Code 493 | | |

The ___Girl Scouts of Manitou Council, Inc.___ , State of __Wisconsin__
　　　　　(Official Name of Council)

hereinafter referred to as the Council, now having jurisdiction over the area described in the official record of the council's jurisdiction on file with the Girl Scouts of the United States of America and holding a charter for this jurisdiction which expires December 31, 2005, hereby applies for a charter for this jurisdiction for the same jurisdiction, subject to change at the discretion of GSUSA, for the term January 1, 2006, through December 31, 2009.

## IN APPLYING FOR THIS CHARTER, THE COUNCIL AGREES:

1. To subscribe to the purpose, adhere to the policies, and be guided by the standards of Girl Scouts of the United States of America.

2. To develop, manage, and maintain Girl Scouting throughout the area of its jurisdiction, in such manner and subject to such limitations as prescribed in the Constitution, Bylaws, and policies of Girl Scouts of the United States of America.

3. To participate in the activities and business of Girl Scouts of the United States of America.

4. To make reports of its work to Girl Scouts of the United States of America, pay its charter fee, have at all times a registered board of directors, and make sure that all persons affiliating with the Council meet individual membership requirements.

## SUBJECT TO THE LIMITATIONS HEREIN CONTAINED, THE CHARTER APPLIED FOR, WHEN ISSUED, WILL CONFER FOR THE DURATION OF ITS TERM THE FOLLOWING RIGHTS:

1. The right to be identified with the Girl Scout Movement in the United States of America, which is directed and coordinated by Girl Scouts of the United States of America, a member of the World Association of Girl Guides and Girl Scouts.

2. The right to use the words "Girl Scouts" as part of the designation of the Council (whether or not incorporated).

3. The right to use Girl Scout program and the right to use Girl Scout insignia in connection with that program.

4. The right to use the trademark "Girl Scouts" and the service mark, as defined in Girl Scouts of the United States of America's graphic guidelines, on products or merchandise obtained and used for the day-to-day operations of the Council, including stationery, office supplies, items with council and camp names and symbols, brochures, newsletter and such items as Girl Scouts of the United States of America may hereafter designate. Any other use of marks or insignia owned by Girl Scouts of the United States of America on products or merchandise must be approved by Girl Scouts of the United States of America. This includes but is not limited to merchandise to be sold by the Council. This right is nonexclusive and nontransferable.

5. The right to develop, manage, and maintain Girl Scouting throughout the area of the jurisdiction of the Council.

6. The right to receive services from Girl Scouts of the United States of America.

7. The right, through delegates elected to the National Council of Girl Scouts of the United States of America, to participate in the business of Girl Scouts of the United States of America.

We understand and agree, that in carrying out the terms and other obligations of the charter applied for, we will act in accordance with the Constitution and Bylaws of Girl Scouts of the United States of America and that the rights and responsibilities granted in the charter are limited by the aforesaid Constitution and Bylaws.

We also understand and agree that the rights and responsibilities granted by the charter cannot be delegated nor can the jurisdiction for which the charter is sought be changed without the written authorization of Girl Scouts of the United States of America.

By agreeing to adhere to the policies of Girl Scouts of the United States of America, we understand and agree to operate as a council in accordance with and to be limited by policies so identified, published, and distributed to councils by Girl Scouts of the United States of America, accepting them as binding on the Council, on all its members, officers, employees, and those affiliating with it.

By agreeing to be guided by the standards of Girl Scouts of the United States of America, we understand that as a council we have committed ourselves and those affiliating with us to follow and be guided by the standards published from time to time by Girl Scouts of the United States of America.

We understand and agree that it is the Council's responsibility to see that each person affiliating with it meets at all times the individual membership requirements established by Girl Scouts of the United States of America, and to register with Girl Scouts of the United States of America all girls and adults participating in Girl Scouting within its jurisdiction, whether in troops or in any other capacity, except those adults working in a temporary advisory or consultative capacity.

We understand and agree that the charter applied for may be revoked or terminated by Girl Scouts of the United States of America under the provisions of its Constitution, that the rights conferred by the charter cease to exist upon termination or revocation of the charter, and that upon revocation or termination of the charter, the Council can no longer and, therefore, will not exercise any of the rights granted to it therein.

We understand and agree that the Council's articles of incorporation and bylaws, which are attached, are a part of this application.

We understand and agree to pay the Council's charter fee, for which a check is attached, computed at:

    $40.00 for a total population within the Council's jurisdiction of 100,000 or over.

    $20.00 for a total population within the Council's jurisdiction of less than 100,000.

---

**Name of Council**

    Girl Scouts of Manitou Council, Inc.

| **Signature of President/Chair of the Board** | **Date of Signature** |
|---|---|
| *Luis J. Rui* | 4 - 13 - 05 |

**Scheduled Date for Council Performance Assessment**

    January 20, 2005

No. 3613 Form 1          Rev. GSUSA 5/0

# Exhibit C

# BLUE BOOK

## of basic

# documents

## 2003

This edition supersedes all previous editions of the *Blue Book*.



Copyright 2003 by Girl Scouts of the United States of America

All rights reserved

This book may not be reproduced in whole or in part in any form or by any means, electronic or mechanical, including photocopying, recording, or by any information storage and retrieval system now known or hereafter invented, without prior written permission of Girl Scouts of the United States of America, 420 Fifth Avenue, New York, NY 10018-2798.

Printed in the United States of America

# Contents

Congressional Charter of Girl Scouts of the United States of America .................................. 4

Constitution of Girl Scouts of the United States of America ............................................. 6

Bylaws of Girl Scouts of the United States of America ................................................... 16

Policies of Girl Scouts of the United States of America ................................................. 22

Credentials ................................................................................................................. 27

Criteria and Standards for an Effective Girl Scout Council ............................................. 35

Index .......................................................................................................................... 37

# Congressional Charter[1]
## of Girl Scouts of the United States of America

## Chapter 803 –
## Girl Scouts of the United States of America

**Sec.**

| | |
|---|---|
| 80301. | Organization. |
| 80302. | Purposes. |
| 80303. | Governing body. |
| 80304. | Powers. |
| 80305. | Exclusive right to emblems, badges, marks, and words. |
| 80306. | Restrictions. |
| 80307. | Annual report. |

## 80301. Organization

**(a) Federal charter.**—Girl Scouts of the United States of America (in this chapter, the "corporation") is a body corporate and politic of the District of Columbia.

**(b) Domicile.**—The domicile of the corporation is the District of Columbia.

**(c) Perpetual existence.**—Except as otherwise provided, the corporation has perpetual existence.

## 80302. Purposes

The purposes of the corporation are—

**(1)** to promote the qualities of truth, loyalty, helpfulness, friendliness, courtesy, purity, kindness, obedience, cheerfulness, thriftiness, and kindred virtues among girls, as a preparation for their responsibilities in the home and for service to the community;

**(2)** to direct and coordinate the Girl Scout movement in the United States and territories and possessions of the United States; and

**(3)** to fix and maintain standards for the movement that will inspire the rising generation with the highest ideals of character, patriotism, conduct, and attainment.

## 80303. Governing Body

**(a) National council.**—

**(1)** There shall be a National Council of Girl Scouts. The number, qualifications, and term of office of members of the Council are as provided in the constitution of the corporation, except that members of the Council must be citizens of the United States.

**(2)** The Council may adopt and amend a constitution and bylaws and elect a board of directors, officers, and agents.

**(3)** The constitution may prescribe the number of members of the Council necessary for a quorum. That number may be less than a majority of the entire Council.

**(4)** Meetings of the Council shall be held as provided in the constitution to hold elections and receive reports of the officers and board of directors. Special meetings may be called as provided in the constitution.

1. Girl Scouts was first incorporated in 1915 under the corporate laws of the District of Columbia. A Congressional Charter was granted by Special Act of Congress. Public Law 66-680 as rewritten as 1950. The Congressional Charter as rewritten by Public Law 112, approved August 17, 1951; Public Law 105-225.

Case 5:09-cv-03339-JF   Document 51   Filed 04/07/2009   Page 2 of 41   Document 1-5

**(b) Board of directors.—**
**(1)** To the extent provided in the constitution and bylaws, the board of directors shall have the powers of the Council and manage the activities of the corporation between meetings of the Council. The number, qualifications, and term of office of directors are as provided in the constitution.

**(2)** The constitution may prescribe the number of directors necessary for a quorum. That number shall be at least 20 or two-fifths of the entire board.

**(c) Executive and other committees.—**The bylaws may provide for—
**(1)** an executive committee to carry out the powers of the board of directors between meetings of the board; and

**(2)** other committees to operate under the general supervision of the board of directors.

**(d) Location of meetings and records.—**The Council and the board of directors may hold meetings and keep the seal and records of the corporation in or outside the District of Columbia.

# 80304. Powers

**The corporation may—**
**(1)** adopt and amend a constitution, bylaws, and regulations, including regulations for the election of associates and successors;

**(2)** adopt and alter a seal;

**(3)** have offices and conduct its activities in the District of Columbia and in the States, territories, and possessions of the United States;

**(4)** acquire, own, lease, encumber, and transfer property, and use any income from the property, as necessary to carry out the purposes of the corporation;

**(5)** sue and be sued within the jurisdiction of the United States; and

**(6)** do any other act necessary to carry out this chapter and the purposes of the corporation.

# 80305. Exclusive right to emblems, badges, marks, and words

The corporation has the exclusive right to use all emblems and badges, descriptive or designating marks, and words or phrases the corporation adopts, including the badge of the Girl Scouts, Incorporated, referred to in the Act of August 12, 1937 (ch. 590, 50 Stat. 623), and to authorize their use, during the life of the corporation, in connection with the manufacture, advertisement, and sale of equipment and merchandise. This section does not affect any vested rights.

# 80306. Restrictions

**(a) Profit.—**The corporation may not operate for profit.

**(b) Political activities.—**The corporation shall be nonpolitical and nonsectarian.

# 80307. Annual report

Not later than April 1 of each year, the corporation shall submit a report to Congress on the activities of the corporation during the prior fiscal year. The report shall be printed each year, with accompanying illustrations, as a separate House document of the session of the Congress to which the report is submitted.

# Constitution[2]
## of Girl Scouts of the United States of America

Founded by Juliette Low, March 12, 1912
Chartered by special act of Congress
(Public Law 460; approved March 16, 1950)
Congressional Charter subsequently revised under Public Law 105-225;
approved August 12, 1998

## Preamble

Promise

*The Promise*
On my honor, I will try:
 To serve God and my country,
 To help people at all times,
 And to live by the Girl Scout Law.

Law

*The Law*
I will do my best to be
 honest and fair,
 friendly and helpful,
 considerate and caring,
 courageous and strong, and
 responsible for what I say and do,
and to
 respect myself and others,
 respect authority,
 use resources wisely,
 make the world a better place, and
 be a sister to every Girl Scout.

beliefs and principles
of the G.S. Movement
in the U.S.A.

*Beliefs and Principles*
We, the members of Girl Scouts of the United States of America, united
by a belief in God and by acceptance of the Girl Scout Promise and Law,

founders' names

And inspired by the aims of the Founder of the Scout Movement, Lord
Baden-Powell, and of the Founder of the Girl Scout Movement in the
United States, Juliette Low,

purpose of Movement

Do dedicate ourselves to the purpose of inspiring girls with the highest
ideals of character, conduct, patriotism, and service that they may
become happy and resourceful citizens.

spiritual force

We believe that the motivating force in Girl Scouting is a spiritual one.

2. Major revision adopted by the National Council, November 1957. Amended November 1960, October 1972, October 1975, October 1978,
October 1981, October 1984, October 1990, October 1996, October 1999, October 2002.

6

We affirm that the Girl Scout Movement shall ever be open to all girls and adults who accept the Girl Scout Promise and Law.

open membership

We maintain that the strength of the Girl Scout Movement rests in the voluntary leadership of its adult members, in the cooperation and support of the community, and in the affiliation with Girl Guide and Girl Scout Movements of other countries through the World Association of Girl Guides and Girl Scouts.

voluntary leadership

community support
World Association

We declare that the democratic way of life and the democratic process shall guide all our activities.

democratic process

We hold that ultimate responsibility for the Girl Scout Movement rests with volunteers.

responsibility
of volunteers

Reaffirming these, our beliefs and principles, we do adopt this Constitution.

# Article I Name of the Corporation

Corporation

The name of this corporation is Girl Scouts of the United States of America.

name

# Article II Purpose of the Corporation

**Purpose of Corporation**

The purpose of the corporation is to promote the Girl Scout Movement in the United States of America, which includes the United States, its territories, and possessions, by directing and coordinating the Movement and by providing and administering the Girl Scout program in accordance with the purposes set forth in its Congressional Charter.

purpose

jurisdiction

# Article III The Girl Scout Program

**Girl Scout Program**

The Girl Scout program is an informal educational program designed to help girls put into practice the fundamental principles of the Girl Scout Movement as set forth in the Preamble. It is carried out in small groups with adult leadership and provides a wide range of activities developed around the interests and needs of girls.

fundamentals

# Article IV The National Council

**National Council**

**1.** The membership of this corporation shall consist of the members for the time being of the National Council of Girl Scouts of the United States of America, and the corporation in meeting assembled shall be known as the National Council.

corporation membership

**2.** The National Council shall have all the powers conferred by the Congressional Charter and by other applicable laws, and shall exercise these powers with due regard for its position as the coordinating head of the Girl Scout Movement in the United States.

powers

| | |
|---|---|
| eligibility for membership | **3.** Only citizens of the United States who are members of the Girl Scout Movement in the United States and who are 14 years of age or over may be members of the National Council. |
| membership | **4.** The membership of the National Council shall consist of delegates elected by Girl Scout councils who are registered through such local councils; delegates from USA Girl Scouts Overseas,[3] who are selected by a committee appointed by the National Board of Directors; members of the National Board of Directors and National Nominating Committee; Past Presidents of Girl Scouts of the United States of America; and such other persons as may be elected by the National Council; provided that the number of delegates from local councils and USA Girl Scouts Overseas shall not at any time exceed two thousand, and that at least four-fifths of the entire membership shall at all times consist of delegates from local councils and USA Girl Scouts Overseas. |
| formula for delegates | **5.** Each local council to which a charter has been issued and remains in force shall be entitled to one delegate and, in addition, one further delegate for each eighteen hundred girls under its jurisdiction who are members registered with Girl Scouts of the United States of America as of September 30 of the year preceding the regular session of the National Council; USA Girl Scouts Overseas collectively shall be entitled to the number of delegates according to the same formula prescribed for local councils. The prescribed figure of eighteen hundred girls shall be adjusted up or down by three hundred or multiples thereof when necessary to keep the total number of local council and USA Girl Scouts Overseas delegates as close as possible to two thousand but not in excess of two thousand. |
| executive staff members | **6.** Executive staff members employed by any local council shall be eligible for election as delegates to the National Council, provided that the number of such executive staff members from any local council shall not exceed the number of volunteers elected for the same period as delegates from that local council. |
| term for delegates | **7.** Subject to the requirements of the preceding sections of this article, delegates elected by local councils shall serve as members of the National Council for three years from the date of their election or until their successors are elected, provided they remain the delegates of the local council which elected them; delegates from USA Girl Scouts Overseas shall serve as members for three years from the date of their selection or until their successors are selected, provided they remain delegates from USA Girl Scouts Overseas; members of the National Board of Directors and National Nominating Committee shall be members of the National Council during their term of office; those persons elected by the National Council shall serve until the next regular session of the National Council. |

3. "Overseas" is a designation for the Girl Scouts of the USA program delivered outside the jurisdiction of a chartered Girl Scout council.

# Article V Sessions of the National Council

**1.** There shall be a regular session of the National Council held triennially at such time and place (not necessarily within the District of Columbia) as it may determine or as may be determined by the National Board of Directors in the absence of action by the National Council. Notice of the time, place, and purpose of such session shall be mailed not less than 60 days before the session to each local council, to each USA Girl Scouts Overseas committee, and to each member of the National Board of Directors and National Nominating Committee.

**2.** The National Council at its sessions shall hold elections, amend the Constitution, establish requirements for credentials, and shall determine the general lines of policy of the Girl Scout Movement and program by considering and acting upon proposals directed toward the fostering and improvement of Girl Scouting, by receiving and acting upon reports of its National Board of Directors, and by giving guidance to the National Board upon general lines of direction of the Movement and program.

**3.** Special sessions of the National Council shall be called by the President at any time upon written request of 20 members of the National Board of Directors or of 20 percent of the membership of the National Council, of which number one-tenth shall represent each of at least three geographical areas of the country as defined in the Bylaws. The purpose of such session shall be limited to the legitimate business of the National Council and shall be stated with the request. No other business shall be transacted except that for which the session has been called. Notice of a special session, stating the time, place, and purpose thereof, shall be mailed not less than 30 days before the session to each local council, to each delegate from USA Girl Scouts Overseas, to each member of the National Board of Directors and National Nominating Committee, and to each member elected by the National Council entitled to vote at such session.

**4.** Two hundred members of the National Council present in person shall constitute a quorum for the transaction of business at sessions of the National Council, provided, however, that delegates are present from one or more local councils in a majority of the geographical areas of the country as defined in the Bylaws. In the absence of a quorum, a majority of those present at the time and place set for a session may take an adjournment from time to time until a quorum shall be present.

**5.** At sessions of the National Council each National Council member present in person shall be entitled to one vote. Elections to office and to the National Board of Directors shall be by ballot and a plurality of votes cast shall elect. Decision on annual membership dues shall be by ballot and shall require a majority of votes cast. All other matters shall be determined by a majority vote of the members present and voting, unless otherwise provided by this Constitution.

# Article VI Proposals to the National Council

**1.** Proposals directed toward the fostering and improvement of Girl Scouting that are to be acted upon by the National Council may be originated (a) by the National Board of Directors and (b) by local councils. Proposals shall be submitted according to the following procedures:

**a.** Proposals originated by the National Board of Directors: (1) such proposals shall be sent to local councils for consideration prior to the next session of the National Council, together with the recommendations of the National Board of Directors; (2) action shall be taken on such proposals by the National Council at its next session.

**b.** Proposals originated by local councils: (1) such proposals shall be sent to the National Board of Directors by such date as shall be determined by the National Board of Directors; (2) the National Board of Directors, in its sole discretion, shall determine whether such proposals relate to matters which should properly be acted upon by the National Council, except that a proposal submitted by a minimum of 15 percent of all Girl Scout councils holding a charter issued by the National Board of Directors of Girl Scouts of the USA as of September 30 of the year preceding the regular session of the National Council shall be determined by the National Board of Directors to relate to matters which should properly be acted upon by the National Council; (3) proposals which the National Board determines relate to matters which should properly be acted upon by the National Council shall be sent to local councils for consideration prior to the next session of the National Council, together with the recommendations of the National Board of Directors; (4) action shall be taken on such proposals by the National Council at its next session.

**2.** Any proposal involving a constitutional amendment shall be governed by the provisions of the article on amendments.

# Article VII Local Girl Scout Councils

Local Girl Scout councils shall be organized to further the development of the Girl Scout Movement in the United States; to establish local responsibility for leadership, administration, and supervision of the program; and to develop, manage, and maintain Girl Scouting in accordance with the terms of their charters.

# Article VIII Credentials

**1.** The National Council shall establish requirements for certificates of membership, local council charters, and all other credentials.

**2.** The National Board of Directors shall administer the requirements for the credentials established by the National Council, and may establish standards and issue standards, procedures, and interpretations regarding such requirements provided such standards, procedures, and interpretations are consistent with the requirements established by the National Council.

Case 2:08-cv-01841-SJPS Filed 03/11/2009 Page 78 of 131 Document 130-5

**3.** The National Board of Directors, in its sole discretion, shall have the power to issue these credentials subject to the requirements established by the National Council, and to revoke them when, in its opinion, the terms and conditions thereof or requirements therefor are being violated or when the best interests of Girl Scouting are not being furthered.

issuance

revocation

**4.** Charters and other credentials shall be issued for no more than six years. Certificates of membership shall be issued for no more than one year, except for lifetime membership. All credentials shall bear the name of Juliette Low.

duration

# Article IX Membership Dues

**Membership Dues**

Every person accepting the principles of the Girl Scout Movement and desiring to be a member of the Girl Scout Movement in the United States of America shall pay annual or lifetime membership dues to Girl Scouts of the United States of America.

# Article X National Board of Directors

**National Board of Directors**

**1.** The affairs of the corporation between sessions of the National Council shall be managed by a National Board of Directors, except that the Bylaws may provide for an Executive Committee to exercise the powers of the National Board in the interim between its meetings.

management of corporation
Executive Committee

**2.** The National Board of Directors shall consist of the President, the Vice Presidents, the Secretary, and the Treasurer; and 35 members-at-large. The Chair of the National Nominating Committee, if not already elected to the National Board, shall be ex officio a member of the National Board. The Chief Executive Officer and the Chief Financial Officer shall be ex officio members without vote. The National Board shall at all times be representative of the various geographical areas of the country.

composition

**3.** All members-at-large of the National Board of Directors shall be elected by the National Council at each regular session to serve a three-year term beginning at the time of their installation at the session when elected and ending upon the installation of their successors at the next regular session of the National Council except that National Board members elected also as members of the National Nominating Committee shall have a three-year term to coincide with the term of National Nominating Committee members.

election of members
terms

Of those nominated by the National Nominating Committee at least one-third shall be serving at the time of their nomination either a first or second term as members of the National Board of Directors.

Members of the National Board of Directors shall serve for no more than three consecutive terms, except that, regardless of the number of terms any person shall have served as a member of the National Board of

number of terms

Directors, such person may be eligible to be a member of the National Board when serving as an officer of the corporation elected by the National Council or as Chair of the National Nominating Committee.

nonparticipating members

**4.** Any National Board member who is absent from two consecutive National Board meetings in their entirety without good cause, acceptable to the President or designee, shall be removed from the National Board by a majority vote of the National Board members present and voting at any regular meeting of the National Board of Directors.

Further, a National Board member may be removed with or without cause by a three-fourths vote of the total number of the National Board of Directors.

vacancies

**5.** The National Board shall have power to fill vacancies in its own membership until the next regular session of the National Council, including any vacancy created by the election of a member-at-large to another capacity on the National Board and installation in such capacity, except for the Chair of the National Nominating Committee. In filling vacancies the National Board shall conform to the requirements of Section 2 of this article.

emergency powers

term of members in emergency

**6.** In the event of an emergency which makes it impossible for the National Council to meet, all the powers of the National Council, except the conducting of elections, shall, to the extent permissible by law, be automatically conferred on the National Board of Directors until such time as a session of the National Council can be held. Action taken by the National Board of Directors under these emergency powers shall be reported to the National Council at its next session. In such an emergency, the term of office of all members of the National Board of Directors and National Nominating Committee shall be extended until elections are held and successors installed at the next regular session of the National Council. Such an extended term shall be considered to be one term of office.

**Officers**

of the corporation

# Article XI Officers

**1.** The officers of the corporation shall be the President, who shall have the working title Chair of the National Board of Directors; the First and Second Vice Presidents, who shall have the working titles of Vice Chairs; the Secretary; the Treasurer; the Chief Executive Officer; the Chief Financial Officer; and such other officers as the Bylaws may provide.

election

term

maximum number of terms

**2.** The President, the Vice Presidents, the Secretary, and the Treasurer shall be elected by the National Council at each regular session to serve a three-year term beginning at the time of the installation at the session when elected and ending upon the installation of their successors at the next regular session of the National Council. Each person shall serve no more than three consecutive terms in any one or any combination of these offices. Regardless of the number of consecutive terms any person shall have served in any one or any combination of these offices other

than that of President, such person shall be eligible for three consecutive terms as President. All of these officers shall be elected from the membership of the National Council.

**3.** The Chief Executive Officer and the Chief Financial Officer shall be appointed by the National Board of Directors to hold office at its pleasure. Such other officers as the National Board of Directors may deem necessary may be elected or appointed by the National Board as provided in the Bylaws.

Chief Executive Officer, Chief Financial Officer,

other officers

**4.** A vacancy among the officers of the corporation shall be filled by the National Board of Directors for the remainder of the unexpired term.

vacancies

**5.** In recognition of distinguished service, all Past Presidents of Girl Scouts of the United States of America shall be honorary officers and members of the National Council with full voting rights. The Past Presidents shall be members ex officio of the National Board of Directors without vote except during any period when they may be serving as duly elected members of the National Board of Directors.

Past Presidents

**6.** The National Council may elect distinguished citizens as honorary officers of the National Council.

honorary officers

# Article XII National Nominating Committee and Nominations

**National Nominating Committee and Nominations**

**1.** There shall be a National Nominating Committee consisting of nine members. The committee shall be representative of the various geographical areas of the country, and shall include at least two National Board members and at least three persons who are not National Board members.

membership

**2.** Members of the committee shall be elected by the National Council to serve a three-year term beginning at the adjournment of the National Council when elected and ending with adjournment of the next regular session of the National Council. Members shall serve for no more than two consecutive terms. At least three members, but no more than four, shall serve a second consecutive term. The National Board of Directors shall have the power to fill vacancies in the committee. The requirements of Section 1 of this article shall be adhered to in filling vacancies.

election

terms of office

vacancies

**3.** The committee shall present to the National Council, at its regular session, a single slate of nominations for President of the corporation, the Vice Presidents; the Secretary, the Treasurer, nominations for members-at-large of the National Board of Directors; and nominations for members of the National Nominating Committee, including a nominee to serve as Chair of the National Nominating Committee. Nominations may be made from the floor at any regular session of the National Council provided that

duties

nominations from floor

notice of such nominations and written consent of the nominee(s) are presented to the President at least two days prior to the election.

**Vice Chair**

**4.** At a committee meeting held following the National Council Session, the committee shall elect a Vice Chair from among its membership. A vacancy in the office of Chair shall be filled by the Vice Chair until the next regular session of the National Council.

**removal**

**5.** Any National Nominating Committee member who is absent from two consecutive National Nominating Committee meetings in their entirety without good cause, acceptable to the National Nominating Committee Chair, upon recommendation of the National Nominating Committee to the National Board of Directors, shall be removed from the National Nominating Committee by a majority vote of the National Board member present and voting at any regular meeting of the National Board of Directors.

Further, upon recommendation of the National Nominating Committee to the National Board of Directors, a National Nominating Committee member may be removed with or without cause by a three-fourths vote of the total number of the National Board of Directors.

## Article XIII Partial Terms

**Partial Terms**

A person who has served more than half of a specific term, as that specific term is set forth in the Constitution or Bylaws, shall be considered to have served the full term.

## Article XIV Finance

**Finance**

**contributions**

**1.** Contributions for the purposes of this corporation shall be collected only as authorized by the National Council or the National Board of Directors.

**debts**

**2.** Debts of the corporation shall be incurred only as directed by resolution of the National Council or the National Board of Directors.

**limitations of liability**

**3.** The corporation shall not be liable for the debts of any local council or other unit holding a credential or any group of members of the Movement, or any representative of any such unit or group, or any representative of this corporation unless incurred by resolution of the National Council or National Board of Directors.

## Article XV Insignia

**Insignia**

**trefoil**
**badges, insignia, and uniforms**

The official emblem of the Girl Scout Movement in the United States is the trefoil. The badges, insignia, and uniforms of Girl Scouts of the United States of America shall be protected to the fullest extent possible and shall be made available to and used only by members registered with Girl Scouts of the United States of America, or persons authorized by the National Board of Directors.

14

# Article XVI Bylaws

The National Council or the National Board of Directors shall have power to adopt Bylaws not inconsistent with this Constitution, the Congressional Charter, or other applicable laws.

# Article XVII Amendments

This Constitution may be amended by a two-thirds vote of those present and voting at any session of the National Council, provided that the National Board of Directors, in its sole discretion, shall have deemed the proposed amendment appropriate as an amendment and provided that it shall have been included in the call of the session together with the National Board's recommendation thereon. An amendment to an amendment properly before any session of the National Council may be made by a majority vote of those present and voting in accordance with the rules governing the session, provided the proposed amendment thereto does not alter the intent or increase the scope of the amendment acted upon by the National Board of Directors.

**Bylaws**

adoption

**Amendments**

vote by National
Council requirements

recommendation by
National Board of Directors

amendment to
an amendment

# Bylaws[4]
## of Girl Scouts of the United States of America

## Article I
# Meetings of the National Board of Directors

**National Board of Directors**

**regular meetings**

**1.** The National Board of Directors shall hold at least two regular meetings a year. In the year in which the National Council convenes, one meeting shall be held immediately following and at the same place as the National Council Session. Other meetings shall be held at such time and place as the National Board may direct. Notice of time and place of such meeting shall be mailed to each member of the National Board not less than 30 days before the meeting.

**special meetings**

**2.** Special meetings may be called by the President. A special meeting shall be called by the President upon written request of 10 members of the National Board. Notice of time, place, and purpose of a special meeting shall be sent not less than 10 days before the meeting to each member of the National Board at the address on file at national headquarters.

**quorum**

**3.** A majority of the National Board members must be present (in person or linked by telecommunication or by means such that all members participating in the meeting are able to hear one another) to constitute a quorum. In the absence of a quorum, a majority of those present for the meeting (in person or by telecommunication) at the time and place set for the meeting may take an adjournment from time to time until a quorum shall be present or set a time for another telecommunication linkage to ensure the presence of a quorum.

**Officers**

# Article II Officers

**duties of officers**

**1.** The duties of the officers, pursuant to authority conferred by the National Council or the National Board of Directors, shall be as follows:

**President**

**a.** The President, who shall have the working title Chair of the National Board of Directors, shall be the principal officer of the corporation and shall preside at all meetings of the National Council, the National Board of Directors, and the Executive Committee, except such meetings for which the duty of presiding is delegated to the First Vice President, Second Vice President, Secretary, or Treasurer. The President shall perform such duties as are usual to this office and such other duties as are prescribed elsewhere in the Bylaws. The President shall be responsible for seeing that the lines of direction given by the National Council and the action of the National Board of Directors are carried into effect and for reporting to the National Council and the National Board of Directors as to the conduct

4. Major revision adopted by the National Board of Directors, November 1957. Amended October1959, April 1960, October 1963, January 1965, January 1967, January 1968, May 1968, October1972, May 1973, October 1974, January 1976, January 1977, May 1978, May 1979, May 1981,October 1981, January 1985, January 1988, October 1990, January 1991, June 1993, September 1993, September 1996, February 1998,

Case 2:08-cv-01024-JPS Filed 03/11/2009 Page 84 of 131 Document 320-5

and management of the affairs of the corporation. The President shall be ex officio a member of all committees established by the National Board.

**b.** The Vice Presidents, who shall have the working title of Vice Chairs, in order of their rank, shall perform the duties of the President in case of the President's absence or disability, and shall assist the President in such duties as the President shall assign.

**c.** The Secretary shall be responsible for seeing that notice is given of all meetings of the National Council, National Board of Directors, and Executive Committee and that minutes of such meetings are kept. The Secretary shall be responsible for the seal of the corporation and its custody. The Secretary shall perform such duties as are usual to this office.

**d.** On behalf of the National Board, the Treasurer shall provide effective stewardship, control, and oversight of the corporation's finances and shall delegate specific duties to the Chief Financial Officer (CFO) and the Assistant Treasurer, if appointed, to execute directives of the National Board of Directors in connection therewith, including but not limited to the receipt, custody, disbursement, and borrowing of money; the receipt, custody, and disposal of securities; the execution, in the name of the corporation, of all contracts or other instruments authorized generally or specifically by the National Board of Directors. The Treasurer shall be ex officio a member of the Finance Committee.

**e.** The CEO shall be the Chief Executive Officer of the corporation and shall be responsible to the National Board of Directors, through the President, for the performance of such duties as may be prescribed by the National Board of Directors.

**f.** The CFO shall be responsible to the National Board of Directors for maintaining budgetary control of finances of the corporation and for seeing that no obligations are incurred in the name of the corporation except for the purpose of the corporation and pursuant to proper authorization. The CFO shall manage the accounts and all financial records, prepare and issue the financial statements and reports, and perform such other duties as are usual to this office.

# Article III International Commissioner

At each meeting of the National Board of Directors immediately following the regular session of the National Council, the President shall appoint from among the members of the National Board of Directors the International Commissioner, who shall assist the President in the work with the World Association of Girl Guides and Girl Scouts.

# Article IV Executive Committee

**1.** There shall be an Executive Committee which shall have and may exercise the powers of the National Board of Directors in the interim between National Board meetings, except that the National Board shall not delegate to the Executive Committee the power to determine what reports and proposals are to be submitted to the National Council, to approve the budget, or to adopt or amend policies which are to be in the *Blue Book of Basic Documents*, except in case of an emergency when these powers are deemed to be delegated. The Executive Committee shall submit to the National Board of Directors reports of action taken between National Board meetings.

**2.** The Executive Committee shall consist of no more than 18 members, among whom shall be the President, the First Vice President, Second Vice President, Secretary, and Treasurer, the Chair of the National Nominating Committee, and no less than two nor more than 11 members-at-large from the National Board of Directors. Those members-at-large shall include the International Commissioner and the respective chairs of the standing committees established by the National Board, and, if appointed, the Assistant Treasurer. The Chief Executive Officer and Chief Financial Officer shall be ex officio members without vote. At the meeting of the National Board of Directors immediately following the regular session of the National Council, the National Board shall elect the members-at-large from nominations submitted by the President. At least two of the members-at-large shall be persons who did not serve on the Executive Committee during the preceding three years. A vacancy among the members-at-large shall be filled by the National Board for the remainder of the unexpired term.

**3.** The Executive Committee shall meet as needed. Notice of time and place of such meetings shall be mailed to each member of the Executive Committee not less than 10 days before the meeting. Such meetings shall be called by the Chair. Special meetings may be called by either the Chair or upon written request of six members. Notice of time, place or method, and purpose of a special meeting shall be sent not less than 24 hours before the meeting to each member of the Executive Committee at the address on file at national headquarters. Notice will be deemed to be duly sent if transmitted by mail, telegraph, or telephone, except that a notice of a meeting to be held on less than five days' notice shall not be transmitted by mail. Nine members of the Executive Committee must be present (in person or linked by telecommunication by means such that all members participating in the meeting are able to hear one another) to constitute a quorum for transaction of business. In the absence of a quorum, a majority of those present (in person or by telecommunication) at the time and place set for the meeting may take an adjournment from time to time until a quorum shall be present or set a time for another telecommunication linkage to ensure the presence of a quorum.

# Article V Committees

**1.** The National Board of Directors shall establish standing committees and such other committees as it deems necessary. The National Board shall establish the functions of these committees, which shall operate under the general supervision of the National Board of Directors.

**2.** Except where otherwise provided in the Constitution and Bylaws, the chairs of committees established by the National Board shall be appointed by the President, and subject to the approval of the National Board of Directors, for a term beginning at the time of the approval of the appointment and ending at the close of the next regular session of the National Council, and shall serve in this capacity for no more than three consecutive terms. The appointment of the chair of each of the standing committees shall be at the meeting of the National Board of Directors immediately following the regular session of the National Council, except that vacancies may be filled at any regular meeting of the National Board.

**3.** Members of committees established by the National Board shall be appointed by the President, in consultation with the chair of the respective committee, subject to the approval of the National Board of Directors, for a term beginning at the time of the approval of the appointment and ending at the close of the next regular session of the National Council, and shall serve for no more than four consecutive terms on any one committee. Members of committees shall be appointed at any regular meeting of the National Board but, in the event that the date of such appointment shall be more than 18 months prior to the next regular session of the National Council, the committee member shall be deemed to have served a full term. Members of the Finance Committee shall include the Treasurer, except that the Treasurer shall not be chair of said committee.

# Article VI Finance

**1.** The fiscal year of the corporation shall begin on October 1 and shall end on September 30.

**2.** Certified public accountants shall be retained by the National Board of Directors to make an annual examination of the financial accounts of the corporation. The certified public accountants shall submit a report of this examination to the National Board of Directors.

**3.** All persons having access to or responsibility for the handling of monies and securities shall be bonded.

**4a.** The National Board of Directors shall designate the monetary limit at which transactions as defined in 4c, in amounts equal to or in excess of the limit, shall require the signature/approval of the Treasurer, or one of the Treasurer's. nominees, *and* the signature/approval of the Chief

Financial Officer, or one of the Chief Financial Officer's nominees, such nominees having been approved by the National Board of Directors.

**b.** Transactions as defined in 4c in an amount less than the monetary limit designated by the National Board shall require the signature/approval of the Treasurer, or one of the Treasurer's nominees, or the signature/approval of the Chief Financial Officer, or one of the Chief Financial Officer's nominees, such nominees having been approved by the National Board of Directors.

**c.** Transactions shall include checks, drafts, notes, orders, sales of securities, electronic funds transactions, and other forms of electronic commerce that the National Board may deem appropriate.

**d.** The National Board of Directors shall approve means other than original signatures by which approval is effected.

*access to securities*

**e.** Access to securities held by the corporation shall be by two persons, namely the Treasurer or President, or their approved nominees, and by the Chief Financial Officer or the Chief Financial Officer's nominees, such nominees having been approved by the National Board of Directors.

*indemnification*

**5.** This corporation shall indemnify directors and officers against all qualified expenses incurred in connection with the defense of any action relating to negligence or misconduct in the performance of duty in the manner prescribed by District of Columbia law.

# Article VII Blue Book of Basic Documents

**Blue Book of Basic Documents**

*distribution*

*contents*

The National Board of Directors shall cause to be published and widely distributed the *Blue Book of Basic Documents*, which shall contain the Congressional Charter, the Constitution and Bylaws, requirements for credentials as established by the National Council, and such other material as the National Board of Directors shall direct.

# Article VIII
# Geographical Areas of the Country

**Geographical Areas**

Geographical areas of the country shall consist of the following:

**Geographical Area 1:** Connecticut, Maine, Massachusetts, New Hampshire, New Jersey, New York, Rhode Island, Vermont, Puerto Rico, and the United States Virgin Islands

**Geographical Area 2:** Delaware, District of Columbia, Kentucky, Maryland, Ohio, Pennsylvania, Virginia, and West Virginia

**Geographical Area 3:** Alabama, Florida, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, and Tennessee

**Geographical Area 4:** Illinois, Indiana, Michigan, Minnesota, North Dakota, South Dakota, and Wisconsin

**Geographical Area 5:** Arkansas, Colorado, Iowa, Kansas, Missouri, Nebraska, New Mexico, Oklahoma, Texas, and Wyoming

**Geographical Area 6:** Alaska, Arizona, California, Hawaii, Idaho, Montana, Nevada, Oregon, Utah, Washington, American Samoa, Guam, Midway Islands, and Wake Island

# Article IX Parliamentary Authority

The latest edition of *Robert's Rules of Order Newly Revised* shall be the parliamentary authority governing the meetings of the National Council, the National Board of Directors, the Executive Committee, and all committees.

# Article X Amendments

These Bylaws may be amended by a majority of those present (in person or linked by telecommunication as described under Article I, Section 3 of the Bylaws) and voting at any meeting of the National Board of Directors, or present and voting at any meeting of the National Council, provided that the proposed amendment shall have been included in the call for the meeting.

**Parliamentary Authority**

*Robert's Rules of Order Newly Revised*

**Amendments**

# Policies

## of Girl Scouts of the United States of America

## Pluralism and Diversity in Girl Membership

All Girl Scout councils and USA Girl Scouts Overseas committees shall be responsible for seeing that membership is reflective of the pluralistic nature of their populations and that membership is extended to all girls in all population segments and geographic areas in their jurisdictions. A girl who meets or can meet membership requirements shall not be denied admission or access to Girl Scout program because of race, color, ethnicity, creed, national origin, socioeconomic status, or disability. Reasonable accommodations shall be made for girls with disabilities to ensure that girls have access to activities.

## Selection of Adults

Every adult volunteer and executive staff member in Girl Scouting must be selected on the basis of qualifications for membership, ability to perform the job, and willingness and availability to participate in training for it. In selection of adults, there shall be no discrimination on the basis of race, color, ethnicity, sex, creed, national origin, or socioeconomic status. There shall be no discrimination against an otherwise qualified individual by reason of disability or on the basis of age. Members of Girl Scout council boards of directors and the National Board of Directors shall be selected so that the boards of directors represent diverse population groups and can bring to their deliberations a variety of points of view and life experiences, as well as access to cultural, religious, educational, civic, and economic resources. Executive staff shall be selected as needed to provide managerial and specialist expertise, research capability, and continuity to support the delivery of program to girls through volunteers.

## Affirmative Action for Volunteers

There shall be no discrimination against an otherwise qualified adult volunteer by reason of disability or on the basis of age. Furthermore, there shall be no discrimination on the basis of race, color, ethnicity, sex, creed, national origin, or socioeconomic status. In addition, to ensure full equality of opportunity in all operations and activities of the organization, affirmative action policies and procedures shall be utilized in the recruitment, selection, training, placement, and recognition of volunteers. Special emphasis shall be placed upon securing representation of underrepresented population groups.

## EEO/Affirmative Action for Employed Staff

There shall be no discrimination on the basis of race, color, creed, sex, age, disability, national origin, citizenship, or marital status. In addition, to ensure full equality of opportunity in all operations and activities of the organization, every staff member employed in Girl Scouting shall be selected under fair employment procedures that provide equal employment opportunities to all people. There shall be special efforts in affirmative action in the recruitment, hiring, training, and promotion of persons from underutilized ethnically and racially diverse groups and individuals with disabilities, and to make reasonable accommodations for physical and mental limitations of employees and applicants consistent with performance of essential job functions and the effective operations of the business.

## Selection of National Meeting Places

Gatherings planned and held by the national Girl Scout organization for nationwide attendance shall be held in communities where individuals attending will have freedom of choice in seating, eating, and living accommodations in hotels and buildings engaged by the organization.

Case 2:08-cv-01841-SJPSFileEd 03/11/2009 Page 90 of 131 Document 120-5

## Grievance/Separation of Employed Staff

Every person employed in Girl Scouting shall be protected by fair personnel policies and procedures, including formal problem resolution procedures.

## Membership Registration

All girls and adults participating in the Girl Scout Movement shall be registered as members with Girl Scouts of the United States of America and individually pay the $10 annual membership dues,[5] except those adults who are lifetime members or who are working in a temporary advisory or consultative capacity.

## Place of Religion in the Girl Scout Program

Girls are encouraged and helped through the Girl Scout program to become better members of their own religious group, but every Girl Scout group must recognize that religious instruction is the responsibility of parents and religious leaders.

## Respect for Religious Opinions and Practices

Every Girl Scout group shall respect the varying religious opinions and practices of its membership in planning and conducting activities.

## Flexibility in Wording for Spiritual Beliefs in the Girl Scout Promise

Girl Scouts of the USA makes no attempt to define or interpret the word "God" in the Girl Scout Promise. It looks to individual members to establish for themselves the nature of their spiritual beliefs. When making the Girl Scout Promise, individuals may substitute wording appropriate to their own spiritual beliefs for the word "God."

## Troops Sponsored by Religious Groups

When a Girl Scout troop is sponsored by one religious group, members of different faiths or religious affiliations within the troop shall not be required to take part in religious observance of the sponsoring group.

## Health and Safety

Girl Scouts of the United States of America, local councils, other units holding a credential, and USA Girl Scouts Overseas committees shall be responsible for seeing that all activities are planned and carried out so as to safeguard the health, safety, and general well-being of the participants.

## Political and Legislative Activity

Girl Scouts of the United States of America and any Girl Scout council or other organization holding a Girl Scouts of the United States of America credential may not, nor may they authorize anyone on their behalf to, participate or intervene directly or indirectly in any political campaign on behalf of or in opposition to any candidate for public office; or participate in any legislative activity or function which contravenes the laws governing tax-exempt organizations.

## Girl Scout Council Authority and Responsibility

Within the terms of its charter, a Girl Scout council shall have the authority and responsibility to: provide and safeguard the Girl Scout program, build an organization to serve its membership, secure and direct personnel, extend membership opportunities to all girls within its jurisdiction, finance its work, and develop its community and public relationships; *however, a Girl Scout council shall not have the authority to establish any form of local council membership dues*, nor shall a Girl Scout council use membership dues collected from girls and adults registering with GSUSA through the council as a source of investment income. The local council shall be accountable to the National Board of Directors of Girl Scouts of the United States of America for the proper exercise of this authority.

## Troops and Communities Within a Girl Scout Council Jurisdiction

When a Girl Scout council is chartered and the territory in which it is to operate has been decided upon, all Girl Scout troops in all the communities within that territory shall be under

5. Effective October 1, 2003.

its jurisdiction, and the Girl Scouts of the United States of America shall act through the local council in its relations with these troops and communities.

## USA Girl Scouts Overseas Committee Responsibility

*(for troops living outside the jurisdiction of a chartered Girl Scout council as members of USA Girl Scouts Overseas)*

Every USA Girl Scouts Overseas troop must be affiliated with a USA Girl Scouts Overseas Committee, which shall accept responsibility for: seeing that overseas committee members, leaders, and girls affiliating with the troop meet individual membership requirements; seeing that each person affiliating with the troop subscribes to the purpose, adheres to the policies, and maintains the standards of Girl Scouts of the USA; securing and endorsing the leaders of the troop; seeing that the work of the troop is financed and authorizing the methods and manner of collecting funds raised in the name of the troop; and paying the annual fee of $1 to Girl Scouts of the USA for the use of the Girl Scout program.

## Administration of Girl Scout Camping

All types of Girl Scout camping must be under the administration of a Girl Scout council, federation, or group licensed by Girl Scouts of the United States of America, except that troop camping by a USA Girl Scouts Overseas troop may be authorized by its troop committee.

## Restricted Use of Membership and Mailing Lists

The release and distribution of Girl Scout membership lists is prohibited except upon approval by Girl Scouts of the United States of America.

## Fundraising Methods

All fundraising methods employed by Girl Scout groups must be in keeping with the principles for which the organization stands.

## Control of Funds

All money raised, or earned, and other assets received in the name of and for the benefit of Girl Scouting must be authorized by a Girl Scout council or Girl Scouts of the United States of America and used for the purposes of Girl Scouting. Such monies and other assets become the property of and are administered by the Girl Scout council or Girl Scouts of the USA. Such assets are not the property of individuals, geographic units, or communities within a Girl Scout council.

## Family Solicitation

Financial support for Girl Scout councils is derived from the broader community. Local councils are encouraged to solicit the families of girl members for voluntary financial support as one part of an overall fundraising campaign. This may be done at the time of membership registration. Any such family contribution shall be voluntary, not a prerequisite for membership and not considered a fee for local council services.

## Fundraising by Girl Scouts of the United States of America and Girl Scout Councils

Fundraising to promote the interests of the Girl Scout Movement may be conducted by Girl Scouts of the United States of America and Girl Scout councils both independently and collaboratively. GSUSA and councils are encouraged to work together to maximize contributions to Girl Scouting.

### Solicitation of Corporations and Foundations

GSUSA requests for funding shall be initiated only after consultation with the council serving the jurisdiction where the funding source directs that solicitations be received.

Prior to solicitation of a corporation or foundation located outside a council's jurisdiction, the initiating council shall consult with the council serving the jurisdiction where the funding source directs that solicitations be received.

Case 2:08-cv-01184-SJPSF File 03/11/2009 Page 25 of 31 Document 130-5

## Solicitation of Contributions

Adult members in their Girl Scout capacities may not solicit financial contributions for purposes other than Girl Scouting. Adults may engage in combined fundraising efforts authorized by the Girl Scout council and in which the local council is a beneficiary. Girl members may not engage in any direct solicitation for money.

## Juliette Low World Friendship Fund

All monies collected for the Juliette Low World Friendship Fund must be used "for the promotion of Girl Guiding and Girl Scouting throughout the world as a contribution toward world peace and goodwill" and shall be administered by the National Board of Directors of Girl Scouts of the United States of America in its sole discretion. (The resolution creating the Juliette Low World Friendship Fund was adopted by the National Council, October 1927.)

## Letter of Introduction for International Travel

Any member of the Girl Scout Movement traveling in a foreign country, in order to be recognized officially as a Girl Scout by other Girl Guide or Girl Scout associations, must have a letter of introduction from Girl Scouts of the United States of America. Members registered through a local council or with a USA Girl Scouts Overseas troop must have the approval of the local council or the USA Girl Scouts Overseas committee before receiving such a letter.

## Permission for Commercial Endorsements

Permission to endorse commercial products or to give endorsement of such by implication must be obtained from Girl Scouts of the United States of America and shall be granted only when such endorsement is in keeping with Girl Scout principles and activities.

## Individual Testimonials

Individual members of the Girl Scout Movement shall not allow their names, in their Girl Scout capacities, to be used in advertising testimonials directly or indirectly endorsing any product or service.

## Authorization of Books, Plays, Motion Pictures, Radio and TV Programs About Girl Scouting

A book, play, motion picture, or radio or television program about Girl Scouts or Girl Scouting shall be accepted as authorized by Girl Scouts of the United States of America only when the script, manuscript, or proof has been approved by Girl Scouts of the United States of America.

## Girl Scout Trademark

Every product sold in connection with a Girl Scout council-sponsored product sale shall bear the Girl Scout name and service mark, either on the product or on its packaging. Every item bearing any of the registered Girl Scout names, logos, or marks purchased or developed for resale[6], including items to be sold in council-sponsored product sales, shall be purchased (1) from a GSUSA-licensed vendor, (2) from the National Equipment Service, or (3) produced with prior approval from GSUSA *when items are not readily available from a licensed supplier.* Every item bearing the Girl Scout name and service mark, including items for resale or nonresale[7] by councils, shall conform to the Girl Scout *Graphic Guidelines* published by GSUSA. Items used for both resale and nonresale shall adhere to the stipulations stated above for resale items.

## Cause-Related Marketing

GSUSA may develop alliances and relationships with corporations and businesses for the purposes of advancing Girl Scouting. A Girl Scout council may develop similar alliances with businesses within its jurisdiction, or may work in partnership with GSUSA to develop strategic alliances outside of its jurisdiction. These corporations must have policies and operations compatible with the values of Girl Scouting. The guiding principles for such relationships shall be as follows:

- the Girl Scout image will be preserved and enhanced;

---

6. "Resale" is defined as any item resold or given away in connection with an event for which a fee, price, or admission is paid. This includes, but is not limited to, product sales.

7. "Non-resale" is defined as any item provided, consumed, or used for the promotion and delivery of Girl Scout program. This includes items given as donor recognitions.

- significant revenue and/or visibility will be generated;
- program activities will be enriched;
- membership outreach efforts will be supported; and
- the integrity and financial well-being of GSUSA and Girl Scout councils will be maintained or enriched.

## Internet Sales

Sales on a Web site on the Internet[8] of any products sold in council-sponsored product sales, such as Girl Scout cookies, candy, nuts, calendars, or magazine subscriptions, may not be conducted by anyone at any time.

Sales on the Internet of Girl Scout merchandise, such as uniforms, insignia, publications, and equipment, may only be conducted by duly authorized and licensed Girl Scout councils, council shops, retail agencies, and/or GSUSA-licensed vendors. Permission to sell on the Internet must be obtained from GSUSA.

For safety and security reasons, sales on the Internet for any Girl Scout troop/group money-earning activities may not be conducted by individual girls, parents, or other adults.

8. Sales on the Internet include online auctions, broadcast e-mail messages, and/or posting on individual Girl Scout, troop/group, or Girl Scout council Web sites.

# Credentials

## (See Constitution, Article VIII)

## Certificate of Membership

A certificate of membership is issued to each girl or adult who meets the requirements for membership. Credentials that the National Board of Directors issues, other than the certificate of membership, include the Girl Scout council charter, the Girl Scout license, and the federation certificate (not in use at present).

Girl Scouts of the United States of America authorizes USA Girl Scouts Overseas in communities outside the U.S.A. where there is no chartered Girl Scout council. These troops are known collectively as USA Girl Scouts Overseas.

## Membership Requirements

**Membership as a Girl Scout** is granted to any girl who:
- has made the Girl Scout Promise[9] and accepted the Girl Scout Law;
- has paid annual membership dues;
- meets applicable membership standards.

**Membership as a Girl Scout adult** is granted to any person who:
- accepts the principles and beliefs as stated in the Preamble of the Constitution;
- has paid annual or lifetime membership dues;
- meets applicable membership standards.

**Lifetime membership as a Girl Scout adult** is granted to any person (18 years of age or older or a high school graduate or equivalent) who:
- accepts the principles and beliefs as stated in the Preamble of the Constitution;
- has paid lifetime membership dues of 25 times the annual membership dues; lifetime membership dues of 13 times the annual membership dues shall be offered to any girl

who is a registered Senior Girl Scout at the time of her high school graduation or equivalent, and be available to her before the girl's current membership expires;
- meets applicable membership standards.

### Applicable Membership Standards

Membership standards are not credentials. They are included here only for ready reference in relation to membership requirements. Applicable membership standards are as follows:

**Girl Scouts**

Daisy Girl Scout age 5–6 OR
in kindergarten-grade 1

Brownie Girl Scout age 6–7–8 OR
grade 1–2–3

Junior Girl Scout age 8–9–10–11 OR
grade 3–4–5–6

Cadette Girl Scout age 11–12–13–14 OR
grade 6–7–8–9

Senior Girl Scout age 14–15–16–17 OR
grade 9–10–11–12

**Girl Scout Adults**

Minimum age—18 years of age or a high school graduate or equivalent.

## Membership Dues and Procedures for Registration

In order to be a member of the Girl Scout Movement in the United States of America, a person must register with and pay annual or lifetime membership dues to Girl Scouts of the United States of America. This is done locally through the Girl Scout council or USA Girl Scouts Overseas committee with which she or he is affiliated or through national headquarters if she or he has no

9. See page 23, "Flexibility in Wording for Spiritual Beliefs in the Girl Scout Promise."

council affiliation. Girl Scout councils account for membership dues in the custodian fund and transmit to GSUSA within the calendar month all monies received for membership dues. These funds are not to be invested by the council for the purpose of generating income for the council.

The **Girl Scout membership year** is October 1 through September 30.

**New members** of Girl Scout troops/groups, both girls and adults, pay $10 when they initially become members of the Movement.[10]

**Continuing members** of Girl Scout troops/groups, both girls and adults, pay $10 when they renew their membership at the beginning of each membership year.

**Nontroop-affiliated girl and adult members** on both local council and national levels also pay $10 dues each membership year.

**Lifetime members** pay 25 times the annual membership dues[11] at the time they become lifetime members.

When a member transfers from one troop/group or position to another or to another local council, the member does not re-register until her/his current membership expires at the beginning of the next membership year.

The national organization determines the system and method for registering members through Girl Scout councils. Each Girl Scout council verifies the accuracy of the troop/group and/or individual member information and forwards it with the membership dues directly to national headquarters.

National Board members, National Board standing committee members, other national volunteers, and other adult members who have their contact only with the national organization use registration forms received from the national organization. They forward the completed registration forms and dues directly to national headquarters.

USA Girl Scouts Overseas use registration forms received from the national organization. They also forward the completed registration forms and dues directly to national headquarters.

The membership dues of one person may not be transferred to the credit of another person. Membership dues are not refundable.

Adults serving in more than one Girl Scout position pay membership dues only once annually.

# Girl Scout Council Charter

A Girl Scout council charter is a credential issued by the National Board of Directors of Girl Scouts of the United States of America in accordance with the Constitution of Girl Scouts of the USA, Article VII and Article VIII. The Girl Scout council charter defines the relationship between a council and Girl Scouts of the USA. It binds the elements of Girl Scouting across the nation into one large and cohesive Girl Scout Movement and gives us a common purpose.

The Girl Scout council charter is issued by the National Board of Directors of Girl Scouts of the USA to an organization exclusively devoted to the Girl Scout Movement in the United States, granting it the right to develop, manage, and maintain Girl Scouting in a specified area of jurisdiction, which is established by the National Board of Directors, and to call itself a Girl Scout council. A Girl Scout council charter is issued for no more than four years.[12]

## Requirements for a Girl Scout Council Charter

To receive and retain a charter, a Girl Scout council agrees:
- to subscribe to the purpose, adhere to the policies, and be guided by the standards of Girl Scouts of the United States of America.
- to develop, manage, and maintain Girl Scouting throughout the areas of its jurisdiction, in such manner and subject to such limitations as prescribed in the Constitution, Bylaws, and policies of Girl Scouts of the United States of America.

10. Effective October 1, 2003.
11. Adopted by National Council in October 1999, lifetime membership dues of 13 times the annual
member ...

12. In February 1996, the National Board of Directors took action to revise certain aspects of the GSUSA chartering process. These revisions include charters being issued for no more than four years; staggered expiration dates; elimination of the less than full-term charter, with councils not in compli...

- to participate in the activities and business of Girl Scouts of the United States of America.
- to make reports of its work to Girl Scouts of the United States of America; pay its charter fee; have at all times a registered board of directors; and make sure that all persons affiliating with the local council meet individual membership requirements.

## The Charter, When Issued to a Girl Scout Council, Will Confer the Following Rights:

- the right to be identified with the Girl Scout Movement in the United States of America, which is directed and coordinated by Girl Scouts of the United States of America, a member of the World Association of Girl Guides and Girl Scouts.
- the right to use the words "Girl Scouts" as part of the designation of the council.
- the right to use Girl Scout program and the right to use Girl Scout insignia in connection with that program.
- the right to use the trademark "Girl Scouts" and the service mark, as defined in Girl Scouts of the United States of America's *Graphic Guidelines*, on products or merchandise obtained and used for the day-to-day operations of the council, including stationery, office supplies, items with council and camp names, and symbols, brochures, newsletters, and such items as Girl Scouts of the USA may hereinafter designate. Any other use of marks or insignia owned by Girl Scouts of the United States of America on products or merchandise must be approved by Girl Scouts of the United States of America. This includes but is not limited to merchandise to be sold by the council. This right is nonexclusive and nontransferable.
- the right to develop, manage, and maintain Girl Scouting throughout the jurisdiction of the council.
- the right to receive services from Girl Scouts of the United States of America.
- the right, through delegates elected to the National Council of Girl Scouts of the United

States of America, to participate in the business of Girl Scouts of the United States of America.

## In Accepting a Charter, a Girl Scout Council Assumes the Following Obligations:

- We understand and agree that, in carrying out the terms and other obligations of the charter applied for, we will act in accordance with the Constitution and Bylaws of Girl Scouts of the United States of America and that the rights and responsibilities granted in the charter are limited to the aforesaid Constitution and Bylaws.
- We also understand and agree that the rights and responsibilities granted by the charter cannot be delegated nor can the jurisdiction for which the charter is sought be changed without the written authorization of Girl Scouts of the United States of America.
- By agreeing to adhere to the policies of Girl Scouts of the United States of America, we understand and agree to operate as a council in accordance with and to be limited by policies so identified, published, and distributed to councils by Girl Scouts of the United States of America, accepting them as binding on the council, on all its members, officers, employees, and those affiliating with it.
- By agreeing to be guided by the standards of Girl Scouts of the United States of America, we understand that as a council we have committed ourselves and those affiliating with us to follow and be guided by the standards published from time to time by Girl Scouts of the United States of America.
- We understand and agree that it is the council's responsibility to see that each person affiliating with it meets at all times the individual membership requirements established by Girl Scouts of the United States of America, and to register with Girl Scouts of the United States of America all girls and adults participating in Girl Scouting within its jurisdiction, whether in troops or in any other capacity, except those adults working in a temporary advisory or consultative capacity.
- We understand and agree that the charter

applied for may be revoked or terminated by Girl Scouts of the United States of America under the provisions of its Constitution, that the rights conferred by the charter cease to exist upon termination or revocation of the charter, and that upon revocation or termination of the charter, the council can no longer and, therefore, will not exercise any of the rights granted to it therein.

- We understand and agree that the council's articles of incorporation and bylaws that are attached are a part of this application.
- We understand and agree to pay the council's charter fee as indicated on the Application for a Girl Scout Council Charter.

## Procedures for Issuing Girl Scout Council Charters

Beginning in the year 2000, all councils will be in a four-year charter cycle. Terms will be staggered, with approximately one-fourth of all council charters expiring December 31 of each year, and the following procedures will be in effect:

- Eighteen months prior to the expiration of a council's charter, the council receives from Girl Scouts of the USA an Application for a Girl Scout Council Charter.
- The council conducts its performance assessment with GSUSA and submits the final report no later than December 31 in the year before its charter expires. The Council Service Team assigned to the council reviews the results of the Council Performance Assessment against the criteria and standards for an effective Girl Scout council and critical priorities, examines other data related to the critical performance priorities accumulated over the four-year charter period, assesses the council's performance and progress, and agrees upon recommendations on those critical priorities for which the council should be commended and those that need further work.
- The Council Service Team presents the recommendations and documentation on the renewal of each council's charter to the National Board Liaison; the appropriate staff member designated by the CEO; and the Council Service Director for the service area to which councils are assigned, who review the recommendations and documentation and present both to the Councils Committee for action to be taken on the council's charter.

- The Councils Committee reviews and acts upon the recommendations and documentation of the National Board Liaison, the designated staff member, and the Council Service Director, and submits its recommendation to the National Board of Directors.

- The National Board of Directors reviews the Councils Committee recommendation and takes action on the issuance of the council charter for four years.

- Following action of the National Board of Directors on the renewal of the council charter, a letter is sent from the National Secretary to the president/chair of the board and chief executive officer of each council receiving a charter, indicating the critical performance priorities in which a council has done well and those needing further work.

- The Membership Credentials Unit, upon notification of the National Board of Directors' approval for the issuance of the council's charter, processes the charter application and sends the charter certificate to the council.

- In the event the analysis of a council's performance indicates that it is not developing, managing, and maintaining Girl Scouting throughout the area of its jurisdiction, fully meeting charter requirements, or is seriously deficient in one or more critical priorities, the council may receive a charter with qualifications. The National Board of Directors may also invoke its procedures for initiating a Charter Compliance Audit, or for Non-Issuing or Revocation of Charters. These procedures can be initiated at any time during the charter period.

- In cases where a council is receiving a charter with qualifications, a letter is sent to each member of the council board of directors and the chief executive officer, in which the qualifications are defined and annual benchmarks for progress are set. Insufficient progress toward meeting council performance standards each year of the four-year charter cycle may lead to non-issuance of a succeeding charter.

Case 2:08-cv-01034-JPS Filed 03/11/2009 Page 98 of 131 Document 120-5

## Procedures for a Charter Compliance Audit

The Charter Compliance Audit, initiated by the National Board of Directors in critical situations, provides a process for intervention at the policy level that may occur after the regular Girl Scout Council Performance Assessment and before steps toward charter revocation.

The audit is conducted at any time within a charter period, when the monitoring of required reports, the observations of the assigned Council Service Team, or other evidence indicates a sharp decrease in the level of performance as defined by the criteria and standards for an effective Girl Scout council and critical priorities, or if the welfare of Girl Scouting is threatened by a local council's blatant disregard for policies or other charter obligations.

The Girl Scout council will receive written notification that it has been scheduled for a Charter Compliance Audit, as follows:

**1.** The National Board of Directors sends notice to the affected Girl Scout council, from one to three months prior to the scheduled date of the Charter Compliance Audit, citing specific examples of non-compliance.

**2.** Upon receiving notification of a Charter Compliance Audit, the Girl Scout council's board of directors appoints a local council documentation team of three to five members, including at least one officer, or other member of the local council board of directors, and the council executive director as a resource person.

**3.** The National Board Liaison, the designated staff member, the Council Service Directors, and/or their appointees comprise the national team that will conduct an on-site visit.

**4.** At least one month prior to the scheduled on-site visit, the local council documentation team collects data relevant to the identified problem areas and sends it to the national team.

**5.** During the on-site visit, the local council documentation team and the national team review all of the relevant data to validate expressed concerns and problem issues. The national team gives an oral report on the teams' conclusions to the local council board of directors.

**6.** The National Board Liaison and the designated staff member prepare a written report of their findings and make recommendations regarding action to be taken to the Councils Committee. The Councils Committee reviews and acts upon the recommendations and submits its recommendation to the National Board of Directors.

**7.** The National Board of Directors receives a summary of the audit findings and takes the action required.

## Procedures for Non-Issuing or Revocation of Term Charters

When the National Board of Directors believes or is informed by the Councils Committee that a local council has been or might have been at fault through any of the following acts or omissions:

**1.** Violation of any term, condition, or requirement of its charter or its application therefor; or

**2.** Failure to comply with any policy, credential standard, or directive issued or established by or under the authority of the National Board of Directors; or

**3.** Deficiency in respect to its resources, finances, personnel, administrators, manner of supervising the program, effectiveness in its attempt to reach and serve all girls within its jurisdiction, or otherwise, such that in the opinion of the National Board of Directors it appears that such local council is unable adequately to develop, manage, and maintain Girl Scouting within its jurisdiction; or

**4.** Engaging in any act or omission, or any course of conduct, that in the opinion of the National Board of Directors is not in the best interests of Girl Scouting.

The National Board may give notice to the local council involved, indicating generally the nature of the fault or failure.

The notice shall also state a reasonable time within which the local council shall respond in writing. The National Board shall provide to such local council an opportunity to be heard by a committee named by the National Board. The committee shall receive proof and information at such place and in such fair manner as the committee shall prescribe and shall then report its findings and recommendations to such local council and to the National Board.

The National Board shall thereupon determine, in its sole discretion, whether the charter shall be issued or revoked, or may take such action as it deems appropriate.

## Procedures for Changing a Girl Scout Council Jurisdiction[13]

### Section I
When two or more Girl Scout councils agree to transfer a part of one council jurisdiction to another council:

**1.** Each local council's board of directors must approve the change.

**2.** An Application for Change in Girl Scout Council Jurisdiction is completed by each council and sent to the Council Service Director. The Council Service Director reviews the application and forwards it to the National Board Liaison and the designated staff member for approval and transmittal to Membership Credentials.

**3.** Membership Credentials processes the application, makes the necessary changes in the official records of Girl Scouts of the USA, and notifies each local council president/chair of the board of the approval of changes in jurisdiction. The councils notify their membership of the changes in jurisdictions.
**Note:** This process may be initiated by a single Girl Scout council, by several Girl Scout councils together, or by an individual community

within a Girl Scout council. If an individual community within a Girl Scout council wishes to be removed from the local council's jurisdiction and added to that of another local council, the community initiates the request, in writing, to its own local council president.

### Section II
After utilizing the steps in Section I above, if agreement cannot be reached between the boards of directors of the Girl Scout councils to transfer a part of one jurisdiction to another council:

**1.** The council presidents of each council notify their respective Council Service Director that their boards of directors are unable to reach agreement on a transfer of part of one's jurisdiction to the other. The Council Service Director notifies the designated staff member.

**2.** The National Board Liaison and the designated staff member will invite all affected councils to provide information on how the requested change will impact the delivery of Girl Scout program. Community leaders from the councils affected also may be invited to provide reaction to the requested change. A summary of the data collected will be shared with each council board involved in the process.

**3.** Using the data provided from council and community sources, the National Board Liaison and the designated staff member will develop a recommendation for jurisdictional boundaries to be forwarded to the affected councils. The council service director will complete an Application for Change in Girl Scout Council Jurisdiction pursuant to the recommendations.

**4.** After the Application for Change in Girl Scout Council Jurisdiction is completed, the Council Service Director forwards it to the National Board Liaison and the designated staff member for signature and transmittal to the Councils Committee. The Councils Committee reviews the application and recommends action to the National Board of Directors. The action of the National Board of Directors shall be considered final.

13. All actions taken must be consistent with state law.

Case 2:08-cv-00134-PSPS Filed 03/11/2009 Page 100 of 131 Document 120-5

**5.** After action by the National Board of Directors, the National Secretary will notify each council president/chair of the board of the decision that has been made. Each local council is responsible for notifying its membership of any changes in jurisdiction.

**6.** After approval by the National Board of Directors, Membership Credentials processes the application and makes the necessary changes in the official records of Girl Scouts of the USA.

*Section III*
When two or more Girl Scout councils agree to conduct a jurisdictional feasibility study that will result in a merger, consolidation, or other corporate reorganization:

**1.** Each council notifies its respective Council Service Director and requests advice and assistance from Girl Scouts of the USA, including a general assessment of the appropriateness of such proposal.

**2.** The decision to engage in a jurisdictional feasibility study with the possible result of a merger, consolidation, or other corporate reorganization must be approved by each council's board of directors.

**3.** The board of directors of each council appoints several of its officers and board members to serve on an intercouncil jurisdictional feasibility study steering committee. The steering committee provides joint leadership to the feasibility study, with each board of directors receiving periodic progress reports. Girl Scouts of the USA volunteers and staff provide ongoing support to the steering committee.

**4.** The intercouncil jurisdictional feasibility study steering committee develops a vision statement (or purpose of the study), and a plan and time schedule for carrying out the feasibility study and the proposed merger, consolidation, or other corporate reorganization, which must be approved by each council's board of directors.

**5.** Each board of directors must vote on the plan of merger, consolidation, or other corporate reor-

ganization and distribution of assets, and refer it to the council's membership for a vote according to the laws of the state of incorporation.

**6.** An Application for Change in Council Jurisdiction is completed by each council and sent to the Council Service Director, who forwards it to the National Board Liaison and designated staff member for approval. A recommendation for changing the jurisdictions of the councils involved is sent to the Councils Committee of the National Board of Directors. The Councils Committee reviews the recommendation and recommends action to the National Board of Directors.

**7.** The National Board of Directors takes action on the recommendation to change the jurisdictional boundaries of the councils involved. Following approval of the National Board of Directors, Membership Credentials processes the application, makes the necessary changes in the official records of Girl Scouts of the USA, and notifies each council president/chair of the board of the approval of changes in jurisdiction. The councils notify their membership of the changes in jurisdiction.

*Section IV*
In all matters of dispute concerning jurisdiction lines, including mergers, consolidations, or other corporate reorganizations, the National Board has the authority to make the final decision either during the term of a charter or upon issuance of a new charter.

# Procedures for Changing a Girl Scout Council Name

In order for a local council to change its name, the following procedures are followed:

**1.** The local council submits the proposed name to its Council Service Director.

**2.** The Council Service Director transmits the name to Membership Credentials for GSUSA clearance and approval.

**3.** Membership Credentials notifies the local council and its Council Service Director that the name is available for the local council's use and that the incorporated council should start proper legal proceedings to effect the change in name in the state in which the local council is incorporated.

**4.** When the local council receives permission from the state for the use of the local council's new corporate name, the local council notifies its Council Service Director and Membership Credentials that the corporate name has been approved by the state on a specified date.

# License

A Girl Scout license is a credential issued for no more than four years by the National Board of Directors of Girl Scouts of the United States of America to a group of persons, a corporation, or other form of organization granting it the right to carry out specific activities in the name of Girl Scouting (as approved by the National Council in 1969).

## Requirements for a License

In order to receive a license, the applicant must give assurance that it will conform to all applicable standards, procedures, and interpretations mutually established by the National Board of Directors and the board of directors of the Girl Scout local council or councils involved.

## Procedures for Issuing a License

A designated representative of Girl Scouts of the United States of America supplies the applicant with three copies of an Application for a Girl Scout License.

The applicant, consulting as necessary with a representative of Girl Scouts of the United States of America, completes the license application and transmits two copies, together with any other requested information, to the National Board of Directors.

If there is a Girl Scout council(s) involved in the group to be licensed, the applicant obtains from the board(s) of directors of the local council(s) the applicable standards, procedures, and interpretations that the board(s) has proposed for incorporation in the license agreement.

The National Board of Directors or the Executive Committee acts upon the license application and, when approval for issuance is given, the license is transmitted to the license group.

Case 2:08-cv-00084-PSPS Filed 03/11/2009 Page 102 of 131 Document 1 320-5

# Criteria and Standards for an Effective Girl Scout Council

The criteria and standards for an effective Girl Scout council are established by the National Board of Directors to delineate the way in which Girl Scout councils are expected to fulfill their charter requirements.

The criteria and standards emanate from the major beliefs and principles of the Girl Scout Movement as expressed in the Congressional Charter and the Constitution of Girl Scouts of the United States of America. The criteria cover broad areas of a council's responsibility and serve as broad categories of measurement.

The standards are developed within the context of each criterion. They are the foundation on which all the work of the council should be built and the prime resource for all organizational review and appraisal. Essential to the chartering process, they also are an enduring point of reference for the desired level of performance.

## Criterion I: Membership Extension and Access to Girl Scout Program

An effective Girl Scout council ensures that Girl Scout program is delivered to girls in all segments of its jurisdiction.

### Standard 1

Based on a thorough understanding of the populations within its jurisdiction, the council attracts and retains membership from all areas of its jurisdiction and all segments of its population.

### Standard 2

The council develops the structure and systems, including electronic means, for girls to participate in Girl Scouting using current Girl Scout materials, with program enrichments that meet the needs and interests of girls in the jurisdiction.

### Standard 3

Program activities throughout every part of the council demonstrate the beliefs and principles of the Girl Scout Movement, as embodied in the Girl Scout Promise and Law and the four Program Goals for girls.

### Standard 4

Requirements that ensure the protection of the health, safety, and security of participants are evident in all program activities, including those that use electronic means.

### Standard 5

Through a comprehensive adult development system, the council recruits, screens, trains, provides support for, and addresses needs of adults who work directly with girls.

### Standard 6

The council has a comprehensive communications and community relations plan that promotes and safeguards the Girl Scout brand image and that includes electronic transmission as a means of keeping all segments of the population well informed about the basic messages of Girl Scouting.

# Criterion II: Maintaining Organizational Integrity

An effective Girl Scout council sustains the purpose of the Girl Scout Movement by conducting its business through the democratic process, consistent with the charter requirements, policies, and standards of Girl Scouts of the USA.

## Standard 1
The council board of directors ensures compliance with policies, standards, and procedures as stated in the *Blue Book of Basic Documents* and other GSUSA publications.

## Standard 2
The council fulfills its corporate obligations as required by local, state, and federal law, and through the rights and obligations defined in the Girl Scout council charter.

## Standard 3
The council has a nominating committee, elected by the corporation, that annually proposes a full single slate of nominees with the experience and skills necessary to provide leadership and direction to the council, and reflecting the diversity of the jurisdiction, for election by the membership body.

## Standard 4
The council actively seeks to strengthen the democratic process to ensure that the membership is involved in direction setting and influencing major policy decisions.

# Criterion III: The Development and Stewardship of Resources

An effective Girl Scout council has sufficient resources and assumes responsibility for managing them, in order to ensure the continuation and expansion of Girl Scouting in the council's jurisdiction.

## Standard 1
The council's human resources policies and practices attract, develop, and retain operational volunteers and employed staff reflecting all areas of its jurisdiction and all segments of its population.

## Standard 2
The council board ensures that all adults carry out their responsibility to raise funds to support the council's work, using methods in keeping with the principles, policies, standards, and goals of Girl Scouts of the USA.

## Standard 3
The council board carries out, in a timely manner, its stewardship responsibilities with respect to development and management of all council assets: human, fiscal, and property.

## Standard 4
The council board exercises financial leadership to provide for the perpetuation of Girl Scouting within its jurisdiction.

## Standard 5
The council utilizes an integrated corporate planning/management system to maximize the effective and responsible development and use of resources.

## Standard 6
The council receives financial support as a result of being actively involved and recognized as a critical resource in the community.

# Index

Adults in Girl Scouting. *See also* Employed staff; Volunteers, adult
  age and membership requirements, 27
Advertising testimonials, 25
Affirmative action, 22
Age requirements, 27
Amendments, 15
  to Bylaws, 5, 21
  to Constitution, 5, 10, 15
Annual report to Congress, 5
Applications
  for change in council jurisdiction, 32
  for council charter, 30
Approved signatures, 19–20
Assistant Treasurer, 17, 18
Audits
  annual financial, 19
  charter compliance, 30, 31

Baden-Powell, Lord Robert, 6
Badges, Girl Scout, 5, 14
Beliefs and principles of GSUSA, 6–7
*Blue Book of Basic Documents*, 18, 20
Board of Directors. *See also* National Board of Directors
  of local councils, 22
Bonding, 19
Books about Girl Scouts, 25
Brownie Girl Scouts, 27
Businesses. *See* Corporations
Bylaws, GSUSA, 16–21
  amendments to, 5, 21
  power to adopt, 5, 15

Cadette Girl Scouts, 27
Camping, administration of, 24
Cause-related marketing, 25–26
Certificate of membership, 27
Certified public accountants (CPAs), 19
Chair of the National Board of Directors. *See* President, National
Chair of the National Nominating Committee, 11, 12, 13–14
Charter, Girl Scout council, 11, 28–34
  compliance audit, 30, 31
  issuance of, 29, 30
  non-issuance or revocation of, 30, 31–32
  obligations of acceptance of, 29–30
  requirements, 28–29
  term of, 28, 30
Charter Compliance Audit, 30, 31
Chief Executive Officers (CEOs), 12–13
  duties of, 17
  on National Board, 11
Chief Financial Officers (CFOs), 12–13
  duties of, 19–20
  on National Board, 11
Commercial endorsements, 25
Committees of the National Board of Directors, 5, 19
  chairs, appointment and terms, 19
  establishment of, 19
  members, appointment and terms, 19
  parliamentary rules for meetings, 21
Community relations, 7
  councils' responsibility for, 35
Compliance audit, 30, 31
Congressional Charter, 4–5, 6
Constitution, GSUSA, 6–15
  amendments to, 5, 10, 15
  power to adopt, 4
  Preamble, 6–7
Contributions, 14, 25
Corporations
  financial support from, 24
  strategic alliances with, 25–26
Council Performance Assessment, 30, 31
Councils, Girl Scout, 10
  adult volunteers in, 36
  authority of, 23
  board of directors of, 22
  charter. *See* Charter, Girl Scout council
  criteria and standards for, 35–36
  delegates to National Council from, 8
  development and stewardship of resources, as standard, 36
  diversity of members, 22
  dues, prohibited, 23
  employed staff, 22, 23
  finances, 14, 19–20, 24–25
  jurisdiction, 23–24
    changing, procedure for, 32–33
  maintaining organizational integrity, as standard, 36
  membership registration by, 28
  name changes, procedures for, 33–34
  performance assessment, 30, 31
  proposals to National Council, 10
  responsibilities of, 10, 23, 30–32
Councils Committee, 30, 31, 32
Council Service Director, 30, 32, 33
Council Service Team, 30
Credentials, 10–11, 27–34
  council charters, 28–34
  licenses, 34
  membership, 27–28

Criteria and standards for an effective
    Girl Scout council, 35–36

Daisy Girl Scouts, 27
Debts, 14
Delegates to National Council, 8
Democratic process, 7
Descriptive marks, 5
Discrimination, 22
Diversity in girl membership, 22
Dues, membership. See Membership dues

EEO/affirmative action for employed staff, 22
Elections
    of National Council delegates, 8
    of National Board members, 5, 9, 11, 13–14
    of officers of GSUSA, 9, 12, 13
Emblems, Girl Scout, 5, 14
    trademark requirements, 25, 29
Emergency powers, 12
Employed staff
    EEO/affirmative action for, 22
    grievance or separation of, 23
    of local councils, 22, 23
    of National Council, 8, 36
Endorsements, commercial, 25
Exclusive rights, 5
Executive Committee, 5, 18
    election to, 18
    meetings, 18
    parliamentary rules for, 21
    members, 18
    powers, 5, 11, 18
        limitations of, 18
    reports to National Board, 18
    vacancies, 18

Families, financial support from, 24
Federal charters, 4
Federation certificate, 27
Films about Girl Scouts, 25
Finance, 14, 19–20
    annual examination of, 19
    approved signatures, 19–20
    control of funds, 24
    indemnification, 20
    limitation of liability, 5
    of lone troops overseas, 24
    profits and, 5
Finance Committee, 19
Fiscal year, 19
Foundations
    financial support from, 24
    strategic alliances with, 25–26
Founders of movement, 6

Fundraising, 24–25. See also Finance

Geographical areas, GSUSA, 20–21, 22
Girl Scout adults. See also Employed staff;
        Volunteers, adult
    age and membership requirements, 27
Girl Scout councils. See Councils, Girl Scout
Girl Scout Law, 6, 27
Girl Scout Movement
    beliefs and principles, 6–7
    GSUSA's relationship to, 5
    purposes of, 4, 6, 7
    spiritual force of, 6
Girl Scout name, 7
    trademark requirements, 25, 29
Girl Scout Promise, 6, 27
    flexibility in wording for spiritual beliefs, 23
Girl Scouts of the USA (GSUSA), 4–5
    debts, 14
    finance, 14, 19–20
    founding members, 6
    geographical areas, 20–21, 22
    governing body of, 4–5
    incorporation of, 4
    jurisdiction, 5, 7
    licensing, 25, 34
    limitation of liability, 5
    officers of. See Officers of GSUSA
    organization of, 4
    powers, 5, 6
    property, 5, 6
    purposes, 4, 6, 7
    restrictions, 5
    trademark requirements, 25, 29
Graphic Guidelines, 25, 29
Grievance or separation of employed staff, 23
Groups. See Troops/groups

Health and safety, 23
    councils' promotion of, 35
Honorary officers, 13

Indemnification, 20
Insignia, 5, 14, 29
International Commissioner, 17
Internet sales, 26

Juliette Low World Friendship Fund, 25
Junior Girl Scouts, 27
Jurisdiction
    of councils, 23–24
    changing, procedure for, 32–33
    criteria and standards for, 35
    fundraising by, 24
    of GSUSA, 5, 7

Case 2:08-cv-00184-PS Filed 03/11/2009 Page 69 of 131 Document 120-5

Law, Girl Scout, 6, 27
Letter of introduction (international), 25
Liability, limitation of, 5
License (licensing), 25, 34
Lifetime membership, 27, 28
Lists, restricted use of, 24
Local councils. See Councils, Girl Scout
Location, of meetings, 5, 9, 22
Lone troops overseas. See USA Girl Scouts Overseas
Low, Juliette, 6

Mailing lists, restricted use of, 24
Marketing, cause-related, 25–26
Marks, descriptive or designating, 5
Meetings
    Executive Committee, 18
    location of, 5, 9, 22
    National Board, 5, 16
    National Council, 4, 9
    notice of, 16, 17
    parliamentary rules for, 21
Membership
    age standards, 27
    certificate of, 27
    certificates of, 10, 11
    criteria and standards for, 35
    dues. See Membership dues
    lifetime, 27, 28
    lists, restricted use of, 24
    openness policy, 7, 22
    registration, 23, 27–28
    requirements and standards, 27
Membership Credentials Unit, 30, 33–34
Membership dues, 9, 11, 27–28
    collection of, responsibility of local councils, 23
    council dues prohibited, 23
    current amounts of, 28
    registration and, 23, 27–28
    transfer of, not allowed, 28
Membership year, 28
Motion pictures about Girl Scouts, 25

National Board Liaison, 30, 31, 32
National Board of Directors, 5, 11–12
    amendments proposed by, 15, 21
    composition of, 11
    credentials issued by, 10–11, 27–34
    as delegates to National Council, 8
    election to, 5, 9, 11, 13–14
    emergency powers, 12
    financial powers, 19–20
    management function, 11
    meetings, 5, 16
        notice of, 16, 17
        parliamentary rules for, 21

members of, 5, 11–12
    diversity in, 22
    non-participating, 12
powers, 5, 11–12, 15
proposals to National Council, 10, 18
resignation from, 12
standing committees, 5, 19
terms of office, 11–12, 19
vacancies, 12
National Council, 4, 7–10
    delegates to, 7–8
    election of national officers by, 13–14
    emergencies and, 12
    management of corporation between meetings, 5
    meetings (sessions), 4, 9
        location of, 5, 9, 22
        notice of, 16, 17
        parliamentary rules for, 21
        quorum, 4, 9
        regular, triennial, 9
        responsibilities at, 9
        special, 4, 9
    members of, 4, 7, 8
    powers, 5, 7–10, 15
    proposals to, 10, 18
    size and composition of, 8, 9
    voting, 9, 12–13
National Equipment Service, 25
National Nominating Committee, 13–14
    chair, 11, 12, 13–14
    election and terms of office, 11, 13
    members, 13
        of National Council, 8
National President. See President, National
National Vice Presidents. See Vice Presidents, National
Nominations of officers, 13–14
Non-Issuing or Revocation of Charters, 30, 31–32

Officers of GSUSA, 12–13. See also specific officers
    duties, 12, 16–17
    election, 9, 12
    on the Executive Committee, 18
    honorary, 13
    nominations, 13–14
    terms of office, 12–13
        partially served, 14
    vacancies, 13
Open membership, 7
Overseas troops. See USA Girl Scouts Overseas

Parliamentary authority, 21
Partial terms, 14
Past Presidents, 8, 13
Performance, councils', 30, 31
Personnel policies, for employed staff, 22, 23

Plays about Girl Scouts, 25
Pluralism in girl membership, 22
Policies, basic document of, 22–26
Political and legislative activities, policies on, 5, 23
Preamble, to Constitution, 6–7
President, National, 12–13. *See also* Past Presidents
    duties of, 16–17
    election of, 12, 13–14
    on National Board, 11
Principles and beliefs of GSUSA, 6–7
Product sales
    Girl Scout name and trademark required on, 25, 29
    on the Internet, 26
    resale versus non-resale, 25
Profits, 5
Promise, Girl Scout, 6, 27
    flexibility in wording for spiritual beliefs, 23
Proposals to National Council, 10, 18

Racial discrimination, 22
Radio programs about Girl Scouts, 25
Records (record keeping), 5, 17
Registration, membership, 23, 27–28
Religious policies, 6, 23
Resale versus non-resale, 25
Revocation, 11
    of charters, 30, 31–32
*Robert's Rules of Order Newly Revised,* 21

Safety. *See* Health and safety
Sales. *See* Product sales
Secretary, National, 12–13
    duties of, 17
    election of, 12, 13–14
    on National Board, 11
Securities, handling, 19, 20
Senior Girl Scouts, 27
Sessions, National Council. *See* National Council,
    meetings (sessions)
Signatures, approved, 19–20
Special sessions of National Council, 4, 9
Spiritual force and beliefs, 6, 23
Standards for an effective Girl Scout council, 35–36
Standards of movement, 4, 6
Stewardship of resources, standards for, 36
Strategic alliances with corporations and foundations, 24

Tax-exempt status, 23
Television programs about Girl Scouts, 25
Terms
    of council charters, 28, 30
    of National Board, 11–12, 19
    of National Nominating Committee, 11, 13
    of officers of GSUSA, 12–13
    partial, 14

Testimonials, Girl Scout, 25
Trademark, 25, 34
Travel, letter of introduction for international, 25
Treasurer, National, 12–13
    duties of, 19–20
    election of, 12, 13–14
    on National Board, 11
Trefoil, 5, 14
Troops/groups
    in councils, 23–24
    delegates to National Council, 8
    member transfers between, 28
    religious groups sponsoring of, 23

Uniforms, 5, 14
USA Girl Scouts Overseas, 22, 24
    camping administered by, 24
    delegates to National Council, 8
    letter of introduction, 25
    membership and registration, 27, 28

Vacancies, 12, 13, 18
Vice Chair of National Nominating Committee, 14
Vice Presidents, National, 12–13
    duties of, 17
    election of, 12, 13–14
    on National Board, 11
Volunteers, adult, 7
    affirmative action for, 22
    age requirements, 27
    fundraising by, 24, 25
    leadership of, 7
    membership, 27
    registration, 27–28
    responsibilities of, 7
    selection of, 22
Voting, 9, 12–13
    on amendments, 15, 21

Web site sales, 26
World Association of Girl Guides and Girl Scouts, 7, 17
World Friendship Fund, 25

Case 2:08-cv-00084-PS File 03/4/1/2099 Page 081 of 131 Document 120-5

# Exhibit D

# GSUSA's Proposed "Realignment" of Manitou Council



Manitou Council (Green)

# Exhibit E

 **Girl Scouts**

Girl Scouts of the USA
420 Fifth Avenue
New York, NY 10018-2798
T 212 852 8000  F 212 852 6509
www.girlscouts.org

October 3, 2007

Ms. Liesl T. Rice, Board Chair
Girl Scouts of Manitou Council, Inc.
5212 Windward Court
Sheboygan, WI 53083

Dear Liesl,

This letter follows up on the call you received from Patricia Diaz Dennis and Jaclyn Libowitz on September 21, 2007, as well as your receipt of the minutes of the National Board Task Group on Realignment meeting of September 20, 2007. As a result of your September 4, 2007 meeting with Patricia Diaz Dennis and Jaclyn Libowitz, the Task Group reviewed your council's third request for a change in jurisdictional boundaries. As we have on two previous occasions, we considered your request thoroughly and carefully. This communication restates and reaffirms the Task Group's prior decisions. GSUSA remains firm that the three Wisconsin mergers and jurisdiction changes are the right configuration to ensure a strong and sustainable Girl Scout presence in your state. We will not again reconsider the jurisdictional boundaries, as approved by the National Board on August 24, 2006.

Therefore, effective immediately, you are directed to engage with the three council realignment groups to which you are assigned. Further, and no later than October 15, you are directed to secure your board's approval of and authorization for your signature on the Northwestern Great Lakes Good Faith Agreement, and to ensure that all Manitou CRC representatives and CRC sub-committee members have signed the Confidentiality Agreement. We also direct your CRC representatives and board to sign related documents for your other council realignment groups. Should you fail to meet this directive in its entirety; the National Board will take all necessary and further action in accordance with the **Blue Book of Basic Documents 2006.**

We know this has been a difficult process. We will continue to assist your council and your realignment partners in the creation of three strong councils by the effective merger dates already agreed upon.

Sincerely,

*Linda P. Foreman*

Linda Foreman
Chair, National Board Task Group on Realignment

*Kathy Cloninger*

Kathy Cloninger
Chief Executive Officer

c: Patricia Diaz Dennis
   Jaclyn Libowitz
   Ken Kirschner, Esq.

**Where Girls Grow Strong.**

# Exhibit F

Action taken by the Girl Scouts of Manitou Council Board of Directors October 10, 2007.

**Whereas:** by letter dated October 3, 2007 Girl Scouts of the USA has mandated that Girl Scouts of Manitou Council adopt the following resolution no later than October 15, 2007, or the National Board will take all necessary and further action in accordance with the *Blue Book of Basic Documents 2006.*

**Be it therefore resolved:** Girl Scouts of Manitou Council commits itself for a period of twelve (12) months to good faith negotiations toward a potential merger with the **Girl Scouts of Birch Trails Council, Girl Scouts of Fox River Area Council, Girl Scouts of Indian Waters Council, Girl Scouts of Lac-Baie Council, Girl Scouts of Manitou Council, Girl Scouts of Peninsula Waters Council and Girl Scouts of Woodland Council.** During that time (Enter Your Council Name) will not enter into merger negotiations with a third party, agrees that it shall not make any material changes affecting such Merged Councils, its leadership or its financial commitments without fully informing, in advance, all Girl Scouts Councils involved in the merger. Material changes shall include:

    a. Depletion of liquid resources beyond reasonable accommodation of retention and severance;

    b. Operating deficit greater than 3% of total expenditures projected for the financial period;

    c. Capital expenditures greater than $50,000 for non-emergency improvements or alterations thereon;

    d. Entering into contracts that obligates the new council for more than two fiscal years;

    e. Changes in ownership/leasing documents to real and personal property that would encumber the new councils for more than five (5) years.

Girl Scouts of Manitou Council's delegation to the Council Realignment Committee shall consist of our CEO and the following board member: Denise Schemenauer, Liesl Rice. At the end of the above authorized negotiations period, if not sooner, the committee will submit its report and recommendations to the full board. The twelve (12) month time period may be extended by vote of the board, upon request by the negotiations committee. It is hereby resolved on this 10th day of October, 2007.

Liesl Rice
Chair of the Board
Girl Scouts of Manitou Council

Denise Schemenauer
Chief Executive Officer
Girl Scouts of Manitou Council

# Exhibit G

[Date]

Ladies and Gentlemen:

This letter agreement sets out certain understandings among **Girl Scouts of Birch Trails Council Wisconsin, Girl Scouts of Fox River Area, Girl Scouts of Indian Waters Council, Girl Scouts of Lac-Baie Council, Girl Scouts of Manitou Council, Girl Scouts of Peninsula Waters Council and Girl Scouts of Woodland Council** , (each, a separate "Council" and collectively the "Merging Councils") with respect to the merger of these separate Councils into one legal entity, the "Surviving Council." We refer to this merger as "the Merger." This letter agreement has been approved by the Boards of Directors of each Council.

1.    Agreement to Work in Good Faith

Each of the Merging Councils agrees to proceed in good faith to negotiate a definitive agreement with respect to the Merger (the "Merger Agreement"). This document incorporates the Good Faith Agreement of [date] signed by all of the above named councils.

2.    Council Realignment Committee

(a)    *Negotiation of Merger Agreement*

The terms of the Merger Agreement will be negotiated by a committee consisting of the Board Chairs or Board Designee of the Merging Councils (Kelly Klaas, Lynn Moon, Sharon Masek, Christine Olsen, Liesl Rice, Mary Ann Toma and Patty Van Ryzin); the Chief Executive Officers of each Merging Council (Jean Barnes, Helen Heinz, Valerie Plasky, Mary Radke, Fran Raley, Ann Saris and Denise Schemenauer); (the "Council Realignment Committee", or "CRC"); or any other designees approved by the CRC.

(b)    *Access to Information for Purposes of Due Diligence Review*

Each Merging Council (a "Providing Council") shall afford the members of the Council Realignment Committee and each other Merging Council's respective attorneys, accountants and other professional advisors, reasonable access to such Providing Council's books and records in order to permit the other Merging Councils to make a reasonable and appropriate review of the business, properties and operations of such Providing Council in connection with the Merger. All information, documents and materials made available by a Providing Council shall be subject to the terms of the Confidentiality Agreement, attached hereto as Exhibit A, executed by each Merging Council, and may only be used for purposes relating to the merger.

(c)    *Chief Executive Officer Search*

A CEO Selection Committee, appointed by the Council Realignment Committee, and consisting of **Kelly Klaas, Chair, Mike Barnes, Dr. Jane Bishop, Laura Hookom, Linda Levin, Susan McFadden and Patty Payette, or any other designee approved by the CRC,** will conduct a search for, and evaluate, candidates for the position of Chief Executive Officer of the Surviving Council. Once the CEO Search Committee identifies a minimum of two final candidates for this position, the CEO Search Committee will make recommendation to the CRC Board Chair/Designees for final approval. Once a final candidate is identified the CRC Board Chairs/Designees shall negotiate on behalf of the Councils, the terms on which the candidate would be employed as Chief Executive Officer, subject to the

C:\Documents and Settings\GLeydig.RFHC\Local Settings\Temporary Internet Files\OLK93\GSNWGL LOI.doc
1/7/2008
Case 2:08-cv-00084-BBS    Filed 04/17/2009    Page 62 of 151    Document 120-9

consummation of the Merger. The individual identified by the CEO Selection Committee as the final candidate for the position of Chief Executive Officer of the Surviving Council as ratified by the Council Realignment Committee shall be hired by the Council Realignment Committee as the initial Chief Executive Officer of the Surviving Council and named in the Merger Agreement.

(d)     *Reports*

The members of the Council Realignment Committee will keep the Boards of Directors of each respective Councils informed on the progress of the Merger Agreement negotiations, their due diligence review and the search for a candidate for the position of Chief Executive Officer of the Surviving Council.

3.     Transitional Nominating Committee and Board of Directors

A committee consisting of **Sharon Masek, Chair, Lou Ann Balding, Anne Jacobson , Peter Kelly , Toni Loch , Patty Schreiber and Nancy Schmidt, or any other designee approved by the CRC** (the "Nominating Committee") will conduct a search for, and evaluate, candidates for the Board of Directors of the Surviving Council. The members of the Nominating Committee will keep the Boards of Directors of their respective Councils informed on the progress of their search for candidates for the board of directors of the Surviving Council. The individuals identified by the Nominating Committee as the final candidates for the Board of Directors of the Surviving Council shall be named as the initial directors of the Surviving Council in the Merger Agreement submitted to the boards of directors of the councils for approval as described in Section 4 below.

4.     Approval of Merger Agreement

The Merging Councils acknowledge that this letter agreement does not contain all matters upon which they must agree in order for the Merger to be consummated. Once the terms of the Merger Agreement have been negotiated, the Merger Agreement will be submitted to the Board of Directors of each Merging Council for approval and, if approved by each Board of Directors in their sole discretion, the Merger Agreement will be submitted to the delegate body of each Merging Council for approval. 

5.     Exclusivity

While this letter agreement is in effect, each Merging Council agrees that it shall not authorize any of its Directors, Officers, Employees, Agents, Advisors and Representatives (such Council's "Representatives") to, directly or indirectly, solicit offers from, or make any offers to, any person or entity to acquire (directly or indirectly) the equity or assets of (a) the Merging Council or (b) such other person or entity, whether by purchase of securities, merger, consolidation, purchase or license of assets or otherwise (a "Competing Transaction"). Each Merging Council agrees that it shall not authorize any of its Representatives to participate in any discussions regarding a Competing Transaction, or enter into or authorize any agreement regarding a Competing Transaction.

***The foregoing paragraph does not restrict any of the councils from conducting business of the ordinary course consistent with past or commercially reasonable practice.***

6.     No Material Changes

While this letter agreement is in effect, each Merging Council agrees that it shall not make any material changes affecting such Merging Council, its leadership or its financial commitments without informing, in advance, the other Merging Councils.

C:\Documents and Settings\GLeydig.RFHC\Local Settings\Temporary Internet Files\OLK93\GSNWGL LOI.doc

Case 2:08-cv-00484-BBS    Filed 04/17/2009   Page 73 of 131    Document 120-9

7.    Expenses

It is the intent that each Merging Council shall share equally the expenses in connection with the Merger, unless otherwise agreed by the CRC.

8.    Termination

Each of the Merging Councils agrees to use commercially reasonable efforts to negotiate and enter into the Merger Agreement on or before May 1, 2008. This letter agreement shall terminate on the first to occur of (a) the consummation of the Merger or (b) May 1, 2008, unless otherwise agreed in writing by all the Merging Councils. All written agreements signed in connection with the Merger other than this Letter of Intent (including, but not limited to, any confidentiality agreements) shall survive the termination of this letter agreement according to their terms.

9.    Governing Law

This letter agreement shall be governed by the laws of the State of Wisconsin without giving effect to the choice of law provisions thereof.

10.    Amendments

The rights and obligations of any Merging Council under this letter agreement may not be assigned without the prior written consent of the other Merging Councils.

This letter agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute one and the same document.

This letter agreement has been executed on behalf of each of the Merging Councils on this ___ day of _____, 2007.

**Girl Scouts of Birch Trails Council Wisconsin, Inc.**

By_____
    Name:
    Title:

By_____
    Name:
    Title:

**Girl Scouts of the Fox River Area, Inc.**

By_____
    Name:
    Title:

By_____
    Name:
    Title:

**Girl Scouts of Indian Waters Council, Inc.**

By_____

3

Name:
Title:

By_____
    Name:
    Title:

**Girl Scouts of Lac-Baie Council, Inc.**

By_____
    Name:
    Title:

By_____
    Name:
    Title:

**Girl Scouts of Manitou Council, Inc.**

By_____
    Name:
    Title:

By_____
    Name:
    Title:

**Girl Scouts of Peninsula Waters Council, Inc.**

By_____
    Name:
    Title:

By_____
    Name:
    Title:

**Girl Scouts of Woodland Council, Inc.**

By_____
    Name:
    Title:

By_____
    Name:
    Title:

4

# Exhibit H



January 9, 2008

Girl Scouts of Manitou Council
5212 Windward Court
Sheboygan, WI 53083
T 920 565 4575   F 920 565 4583
growstrong@gsmanitou.org

<u>**VIA FACSIMILE & U.S. MAIL**</u>
(212) 852-6509
(212) 852-6517

Ms. Patricia Diaz Dennis
Chair of the Board
Girl Scouts of the USA
103 Devine Street
San Antonio, TX 78212-2523

Ms. Kathy Cloninger
Chief Executive Officer
Girl Scouts of the USA
420 Fifth Avenue
New York, New York 10018-2798

Dear Ms. Cloninger and Ms. Diaz Dennis:

After careful consideration, the Board of Directors of Girl Scouts of Manitou Council, Inc. ("Manitou Council") has concluded that a merger with the other Councils currently suggested by Girl Scouts of the USA ("GSUSA") is not in the best interest of Manitou Council and its members. Under threat of retribution by GSUSA, Manitou Council adopted, on October 10, 2007, the so-called good faith resolution mandated by GSUSA. Now, even the twelve-month due diligence period provided for therein has been reneged upon by GSUSA and we are being ordered to execute a Letter of Intent which, among other things, mandates the execution of a merger agreement no later than May 1, 2008. These arbitrary and mandatory time frames which are being imposed upon the Board of Directors of Manitou Council are inappropriate. From the analysis and due diligence review we have undertaken thus far, it is our opinion that GSUSA's suggested merger is not an appropriate option for Manitou Council. Accordingly, Manitou Council will not be executing the Letter of Intent GSUSA has forwarded to us for that purpose.

We have been advised by our legal counsel that Manitou Council is fully within its rights to be taking this action and that GSUSA has stepped outside the bounds of its authority by dictating such fundamental policy decisions to the Manitou Council Board of Directors. We have asked our legal counsel, Mr. Gary Leydig, to correspond separately to you to address the various legal issues raised by GSUSA's efforts to force a merger upon Manitou Council. While the introduction of our lawyer into the conversation runs the risk of being perceived by GSUSA as confrontational, it is not so intended. Rather, it is our sincere hope that Mr. Leydig and your counsel will commence a dialogue that will lead to a reasonable and satisfactory resolution of these issues; a resolution that, thus far, we have been unable to achieve on our own.

As you know, Manitou Council has been whole-heartedly committed to enhancing the lives of girls in our territory through Girl Scouting since our charter was first granted in 1950. We are one of the most successful Councils in the country. Our goal, no, our *duty* to the Manitou Council members and to our community is to maintain and expand upon that success. GSUSA's





proposed merger would take us in the other direction. We know that GSUSA also has only the best interests of our girls and our community in mind. Since our goals are the same, there is no reason why we cannot find common ground on the current "realignment" issue.

After our attorneys have had an opportunity to talk these matters through, we are confident they will agree on a reasonable approach and we will all be able to get back to what we do best: providing the opportunities and challenges of Girl Scouting to girls in the Manitou Council territory.

Sincerely,

Liesl T. Rice, Board Chair

Denise Schemenauer, Chief Executive Officer

# Exhibit I

LAW OFFICES

# RIORDAN, FULKERSON, HUPERT & COLEMAN

30 NORTH LA SALLE STREET
SUITE 2630
CHICAGO, ILLINOIS 60602
TELEPHONE (312) 346-4740
FACSIMILE (312) 346-168
www.rfsc-law.com

GARY W. LEYDIG, OF COUNSEL
gleydig@rfsc-law.com

THOMAS P. RIORDAN (1920-1965)
ROBERT KEITH LARSON (1951-1995)
RICHARD J. RIORDAN (1950-1997)

January 9, 2008

<u>VIA FACSIMILE & U.S. MAIL</u>

Ms. Patricia Diaz Dennis
Chair of the Board
Girl Scouts of the USA
103 Devine Street
San Antonio, Texas 78212-2523
Facsimile: (212) 852-6517

Ms. Kathy Cloninger
Chief Executive Officer
Girl Scouts of the USA
420 Fifth Avenue
New York, New York 10018-2798
Facsimile: (212) 852-6509

RE:     Girl Scouts of Manitou Council, Inc.

Dear Ms. Dennis and Ms. Cloninger:

I am the attorney for Girl Scouts of Manitou Council, Inc. ("Manitou Council"). As you know from Manitou Council's letter to you of this same date, I have been advising Manitou Council with regard to the efforts of Girl Scouts of the USA ("GSUSA") to force Manitou Council into a merger with other councils in Wisconsin and Michigan. I have advised Manitou Council that GSUSA has no authority to dictate the activities and decisions of Manitou Council's Board of Directors and most certainly has no authority to direct the disposition of Manitou Council's assets or the destruction of its present corporate existence under the Wisconsin nonprofit corporation law. Instinctively, the members of the Manitou Council Board of Directors could not understand how, being charged with the duty to do what is in the best interests of their nonprofit corporation, they could be forced to take actions they independently and in good faith concluded were *not* in the best interests of their organization. The Board's instincts were absolutely correct and, as just stated, I have so advised them.

The Board of Directors of Manitou Council is committed to providing the very best Girl Scouting experience to girls residing within its territory. Precisely as a function of that commitment, the Board of Manitou Council has concluded, in good faith and using its best judgment, that the "realignment" dictated by GSUSA is *not* in the best interest of Manitou

Council, its members or the community at large. Notwithstanding this conclusion, Manitou Council has absolutely no desire to be at odds with GSUSA or its sister councils, and sincerely wants to find a solution that is in the best interest of everyone. Fearing the lines of communication have been cut off by GSUSA, however, Manitou Council's Board contacted me for my advice and assistance.

The purpose of this letter is two-fold. First, I want to outline why GSUSA cannot, as a matter of law, dictate the merger of Manitou Council into some other existing or newly created council. I am happy to discuss my conclusions with you or your legal counsel in greater detail after you have had a chance to review this letter. Second, armed with the knowledge of what GSUSA can and cannot legally mandate to Manitou Council, I want to invite GSUSA to engage in an honest conversation with Manitou Council – not a take-it-or-leave-it directive but a true, bilateral conversation – as how to best promote and grow Girl Scouting in the Manitou Council territory. The bottom line is that both GSUSA and Manitou Council are committed to the identical goal: to provide the girls residing in the Manitou Council territory with the very best Girl Scouting experience possible. In light of that common goal, I simply do not believe a reasonable solution cannot be found. Both Manitou Council and I look forward to the conversation that will get us to that common goal.

Manitou Council is incorporated under the Wisconsin Nonstock Corporations Act. Wis. Stat. § 181.0103 *et seq.* I suspect every nonprofit council within the Girl Scout system is operating under a comparable statute. In any event, Wisconsin law requires that both board and member approval precede any transfer or merger. Under fundamental common law and statutory concepts of directors' fiduciary duties to their organizations, a board cannot approve or recommend a merger which, in its judgment, is not in the best interest of the organization or its members. GSUSA's own rules and procedures, as well as its proposed merger documents, recognize the supremacy of these fundamental state laws. For example, the GSUSA's *Blue Book of Basic Documents* recognizes in its "Procedures for Changing a Girl Scout Council Jurisdiction" that "[a]ll actions taken must be consistent with state law."(Blue Book at footnote 13). Accordingly, Section IV of those same Procedures which purports to bypass state law and give GSUSA the power to force a transfer or merger without the Manitou Council Board's approval is wholly void and unenforceable. The absolute need to obtain the consent and approval of Manitou Council's Board is also reflected in GSUSA's draft "Letter of Intent." Section 4 of that document provides: "Once the terms of the Merger Agreement have been negotiated, the Merger Agreement will be submitted to the Board of Directors of each Merging Council for approval and, if approved by each Board of Directors in their sole discretion, the Merger Agreement will be submitted to the delegate body of each Merging Council for approval." As this language recognizes, Manitou Council must exercise its own, independent discretion in deciding whether to merge or not.

Notwithstanding the obvious requirement under the law that Manitou Council's Board exercise its own, independent judgment on the subject of transfer or merger (and your own documents' recognition of that law), your letter of October 3, 2007, addressed to Ms. Liesl T. Rice, contains the following rather harsh directive and threat: "We also direct your CRC

representatives and board to sign related documents for your other council realignment groups. Should you fail to meet this directive in its entirety; the National Board will take all necessary and further action in accordance with the Blue Book of Basic Documents 2006." Precisely what "necessary and further action" is being referenced is not clear, though I suspect you were referring to Section IV of the Procedures, discussed above, which as we have seen is unlawful and unenforceable. If by "necessary and further action" GSUSA was threatening the revocation, termination or modification of Manitou Council's charter, such action would also be unlawful under Wisconsin's Fair Dealership Law, Wis. Stat. § 135.01 *et seq*. Among other things, any such attempted revocation or modification could be enjoined in a court of law and GSUSA would be liable for damages, including actual costs and attorneys' fees. GSUSA and the other councils it is working with to impose the merger on Manitou Council also need to be aware of Wis. Stat. § 134.01 which makes unlawful a mutual undertaking of two or more persons or entities for the purpose of maliciously compelling another to do or perform any act against their will, or preventing or hindering another from doing or performing any lawful act. While this statute makes such conduct a crime, punishable by imprisonment of up to one year, the Wisconsin courts have interpreted it as also providing a civil cause of action.

While there certainly are other laws and statutes which touch upon this subject, these are the ones that immediately came to mind as I came to understand the current state of affairs between GSUSA and Manitou Council. As I stated above, my first goal for this letter was to apprise GSUSA of the same laws of which I have apprised Manitou Council. It is, in my opinion, imperative that everyone understand the implications of their prior and proposed conduct before a productive dialogue can be commenced. As I also stated, it is Manitou Council's sincere desire to commence such a dialogue. I am optimistic that GSUSA is of the same mind. To that end, I look forward to hearing from you or your legal counsel within the next few days and, at that time, we can begin to discuss how a mutually beneficial and satisfactory resolution of this particular matter can be achieved.

Best regards,

Gary W. Leydig, *of counsel*
Riordan, Fulkerson, Hupert & Coleman

GWL:cd

cc:    Ms. Liesl T. Rice
       Ms. Denise Schemenauer

# Exhibit J

 **Girl Scouts**

Girl Scouts of the USA
420 Fifth Avenue
New York, NY 10018-2798
T 212 852 8000  F 212 852 6509
www.girlscouts.org

January 24, 2008

Liesl T. Rice- Board Chair
Girl Scouts of Manitou Council, Inc.
5212 Windward Court
Sheboygan, WI 53083

Elise Oppman- Board Chair
Girl Scouts of the Fox River Area, Inc.
4693 N. Lynndale Drive
Appleton, WI 54913

Lynn Moon- Board Chair
Girl Scouts of Peninsula Waters, Inc.
131 West Washington Street, Ste. C
Marquette, MI 49855

Emily Lundberg- Board Chair
Girl Scouts of Lac-Baie Council, Inc.
PO Box 9456
Green Bay, WI 54308

Tod Planer- Board Chair
Girl Scouts of Woodland Council, Inc.
3910 Chestnut Street
Wisconsin Rapids, WI 54494

Christine Olson- Board Chair
Girl Scouts of Birch Trails Council WI, Inc.
3511 Camp Phillips Road
Schofield, WI 54476

Sharon Masek- Board Chair
Girl Scouts of Indian Waters Council, Inc.
4222 Oakwood Hills Parkway
Eau Claire, WI 54701

Dear Liesl, Elise, Lynn, Emily, Tod, Christine and Sharon:

We are in receipt of a letter dated January 9, 2008 ("Letter") from Liesl T. Rice, Board Chair, and Denise Schemenauer, Chief Executive Officer of Girl Scouts of Manitou Council ("Manitou"), a copy of which is enclosed for your convenience. As the Letter indicates, the Board Chair of Manitou has notified Girl Scouts of the USA that Manitou's Board of Directors will no longer participate in the merger process and, therefore, is unable to reach agreement on the combination or transfer of jurisdiction of Manitou with other Councils, including Girl Scouts of Birch Trails Council Wisconsin, Girl Scouts of Fox River Area, Girl Scouts of Indian Waters Council, Girl Scouts of Lac-Baie Council, Girl Scouts of Peninsula Waters Council, and Girl Scouts of Woodland Council ("Merging Councils").

Manitou has concluded that "merger is not an appropriate option for Manitou Council" and it will not execute a Letter of Intent to combine with the Merging Councils. Thus, it appears that no agreement can be reached between the boards of directors of the Merging Councils and Manitou to combine or transfer jurisdictions. Since the parties have been unable to reach agreement, pursuant to the *Blue Book of Basic Documents 2006*, a national team composed of National Board Members, National Staff and a National Operational Volunteer will be led by me. This national team invites the affected councils to provide information by March 31, 2008 on how Manitou's action not to merge will impact delivery of Girl Scout program. The national team may invite community leaders from the affected councils to provide their reaction to the requested change by Manitou as well. We will share a summary of the data collected with each council board involved in the process.



In accordance with the **Blue Book of Basic Documents 2006**, the national team will include the data provided by councils and community sources to develop a recommendation for jurisdictional boundaries. We will forward such recommendation to the affected councils and, if necessary, complete an Application for Change in Girl Scout Council Jurisdiction ("Application") pursuant to the recommendation.

After the Application is completed, Kathy Cloninger, CEO of Girl Scouts of the USA, will review the Application and recommend action to the National Board of Directors. As you know, "in all matters concerning jurisdictional lines, the Board of Directors has the authority to make the final decision, either during the term of a charter or upon issuance of a new charter." Upon action by the National Board of Directors, GSUSA will record any change in jurisdiction in the official records of GSUSA. Please consult the **Blue Book of Basic Documents 2006** for further information regarding council jurisdiction.

If you have any questions, please contact the undersigned. We look forward to receiving your submissions at your earliest convenience but by no later than March 31, 2008.

Very truly yours,

Joan Wagnon
Chair, National Team
Board Member, GSUSA
joan_wagnon@kdor.state.ks.us

CC: Denise Schemenauer, CEO, Girl Scouts of Manitou Council
    Ann Saris, CEO, Girl Scouts of Woodland Council
    Fran Raley, CEO, Girl Scouts of Fox River Area Council
    Mary Radke, CEO, Girl Scouts of Birch Trails Council
    Jean E. Barnes, CEO, Girl Scouts of Peninsula Waters Council
    Helen Heinz, CEO, Girl Scouts of Indian Waters Council
    Val Plasky, CEO, Girl Scouts of Lac-Baie Council
    Sheryl Schulte, Director Council Partnerships Administration
        Sschulte@girlscouts.org

2

# **Exhibit K**

 **Girl Scouts**

Girl Scouts of Manitou Council
5212 Windward Court
Sheboygan, WI 53083
T 920 565 4575  F 920 565 4583
growstrong@gsmanitou.org

January 9, 2008

Dear Council Realignment Committee Representatives:

Following thorough analysis, discussion and independent consideration, the Board of Directors of the Girl Scouts of Manitou Council has decided not to execute the Letter of Intent to merge with your councils. We believe that in attempting to mandate a merger Girl Scouts of the USA has stepped outside its bounds of authority. Our attorney has advised us that this action is fully within our legal right.

Although we disagree that GSUSA has the legal right to mandate their merger plan, our intent has never been to complicate or slow this process for your councils. Each step Manitou Council has taken toward realignment has been the result of pressure on the part of GSUSA.

Our attorney is communicating this decision on our behalf directly with Kathy Cloninger, Patricia Diaz Dennis and GSUSA's legal counsel. That letter has been uploaded with this one.

Although merger discussions between us will not continue, we hope to maintain productive operational relationships in support of Girl Scouting in the states of Wisconsin and Michigan. Specifically, we hope to work together to develop a productive registration process for girls registering for camp in our joint summer program booklet and on those sessions within it that involve operational collaboration.

We truly wish you success in your vision for Girl Scouting in the northern part of Wisconsin and the Upper Peninsula of Michigan.

Sincerely,

Liesl Rice
Board Chair

Denise Schemenauer
CEO

**Where Girls Grow Strong.**