# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

_____

GIRL SCOUTS OF MANITOU COUNCIL INC.,

               Plaintiff,

v.                                                   Case No. 08-CV-184

GIRL SCOUTS OF THE UNITED STATES OF AMERICA INC.,

               Defendant.

_____

# ORDER

The Girl Scout Law is a pledge ritualistically recited and "shared by every member" of the Girl Scouts of the United States of America ("Girl Scouts" or "GSUSA"), the defendant in this action. *See* Girl Scouts of the United States of America, Girl Scout Promise and Law, http://www.girlscouts.org/program/gs_central/ promise_law/ (last visited March 31, 2010). The Girl Scout Law, described by the GSUSA as the "credo of girl scouting," entails the ten tenets each scout must strive to fulfill in their daily lives. *Id.* In relevant part, the Girl Scout Law requires that every member must do their "best to be honest and fair." *Id.* The plaintiff, Girl Scouts of Manitou Council, Inc. ("Manitou"), an organization that provides Girl Scouting to seven counties in eastern Wisconsin, contends that the national organization of the Girl Scouts has not been loyal to the terms of its own Law, in that the GSUSA has not been "honest and fair" in its dealings with the Manitou Council. Specifically, Manitou argues that GSUSA, acting pursuant to a national strategy that would eventually merge the council into a larger regional council, has violated the Wisconsin Fair Dealership Law ("WFDL"), Wis. Stat. § 135.01, breached the terms

of the charter that created the council, and committed several related torts. (Docket #120). After extensive discovery, on August 31, 2009, GSUSA, asserting that there were no genuine issues of material fact necessitating a trial in this case, moved pursuant to Fed. R. Civ. P. 56 for a summary judgment in its favor on all counts of Manitou's Second Amended Complaint ("complaint"). (Docket #134). On that same day, Manitou moved for summary judgment in its favor on the breach of contract claim and the WFDL claim. (Docket #141). After reviewing the voluminous record, consisting of hundreds of pages submitted by each party, and consulting the relevant law, the court is now prepared to make a ruling on the parties' cross-motions for summary judgment.

## BACKGROUND

The court begins with an admittedly detailed, but necessary recounting of the undisputed facts animating the current litigation.[1]

### A.   The Girl Scouts of the United States of America

Juliette Gordon Low founded the Girl Scouts on March 12, 1912, in Savannah, Georgia. From humble beginnings as a troop of eighteen girls, the Girl Scout movement has expanded rapidly, such that today hundreds of thousands of adult volunteers are helping nearly three million girl members participate in the

---

[1] The court notes that a significant portion of the briefing by both sides in this case was entirely orthogonal to the issue at hand. The question of whether the GSUSA's realignment plan was a wise decision as a matter of policy is completely divorced from the question of whether the GSUSA's actions complied with the law. Moreover, the court notes that much of the briefing consists of name-calling by the parties. *See, e.g.* Pl's Reply Br. 3 ("GSUSA's representations to the Court are not minor or inadvertent . . . [t]hey are knowing misrepresentations of fact.") The Seventh Circuit has recently scolded parties for submitting briefs that are "replete with argumentative posturing." *Mason v. Smithkline Beecham Corp.*, No. 08-2265, 2010 U.S. App. LEXIS 3631, at *3 (7th Cir. Feb. 23, 2010). This court echoes the Seventh Circuit's concerns here.

organization throughout the United States and in more than ninety countries around the world. The organization has influenced the lives of more than forty million women since its inception and boasts alumni from all facets of American life, including, among other notables, Sandra Day O'Connor, Hilary Clinton, Lucille Ball, and Katie Couric. Currently headquartered in New York City, GSUSA reported in Fiscal Year 2008 revenues exceeding seventy million dollars derived from membership dues, donations, and the sales of Girl Scout merchandise.[2]

In 1950, Congress incorporated the organization as the "Girl Scouts of the United States of America" in order to promote the qualities of "truth, loyalty, helpfulness, friendliness, courtesy, purity, kindness, obedience, cheerfulness, thriftiness, and kindred virtues among girls." 36 U.S.C. § 80302. The self-espoused purpose of the Girl Scout movement is to "inspir[e] girls with the highest ideals of character, conduct, patriotism, and service that they may become happy and resourceful citizens." *See* Girl Scout Constitution, Preamble. Of particular note for this case, GSUSA has espoused as a central tenet of the organization that Girl Scout membership be "reflective of the pluralistic nature" of the populace and that membership should be "extended to all girls in all population segments and geographic areas." *See* GSUSA, *Blue Book of Basic Documents 2006*, at 21.

According to the GSUSA's congressional charter, the organization is headed by a National Council of Girl Scouts ("National Council"), which includes delegates

---

[2] The national organization's revenue does not stem from the sales of Girl Scout cookies, as the sales revenue from the cookies accrues to the local councils that conduct the sales.

Case 2:08-cv-00184-JPS   Filed 03/31/10   Page 3 of 89   Document 172

from every local Girl Scout council and is empowered to adopt and amend a constitution, create bylaws, and elect a board of directors for the organization. 36 U.S.C. § 80303. Accordingly, the National Council created a constitution ("Girl Scout Constitution") for the organization in November of 1957. The National Council has since amended the Girl Scout Constitution ten times.

The current manifestation of the Girl Scout Constitution outlines the basic means by which Girl Scouting is provided throughout the country. Specifically, Article VII of the Girl Scout Constitution states that "local Girl Scout councils shall be organized to further the development of the Girl Scout Movement in the United States; to establish local responsibility for leadership, administration, and supervision of the program; and to develop, manage, and maintain Girl Scouting in accordance with the terms of their charters." The Girl Scout Constitution further authorizes the National Council to establish requirements that an organization must comply with in order to become an official Girl Scout council.[3] GSUSA Const. art. VIII, § 2. In turn, the National Board of Directors ("National Board"), a body authorized by Article X of the Girl Scout Constitution to "manage the affairs" of the GSUSA,[4] is broadly empowered to issue credentials to a given council and revoke such credentials when

_____

[3] The National Board of Directors may also supplement the National Council's requirements for a local council and establish its own standards for issuing charters to and maintaining the charters for the local councils, so long as those requirements are consistent with those set forth by the National Council. GSUSA Const. art. VII, § 2.

[4] Specifically, Article X, Section 2 of the Girl Scout Constitution states that the National Board shall consist of the President, the Vice Presidents, the Secretary, the Treasurer, and thirty-five "at-large" members. The Chief Executive Officer of the GSUSA and the Chief Financial Officer of the GSUSA are authorized to sit as "ex officio members" of the board, without having the power to vote. The Girl Scout Constitution further commands that the National Board "be representative of the various geographical areas of the country." GSUSA Const. art. X, § 2.

"the terms and conditions [of the credentials] or requirements . . . are being violated or when the best interests of Girl Scouting are not being furthered." GSUSA Const. art. VIII, § 3.

The net result is that the GSUSA, much like other charities and businesses, operates as a federation, carrying out its goals through individual councils, separate legal entities who are empowered to act through a "charter" granted by the national organization for a nominal fee.[5] The charter outlines each council's rights, duties, and obligations, which are derived, in part, from the GSUSA's official bylaws, policies, and other guidelines as contained in the *Blue Book of Basic Documents* ("*Blue Book*").[6] In relevant part, the credentials section of the *Blue Book* outlines both the requirements that a potential Girl Scout council must comply with to receive and retain a charter and the obligations a Girl Scout council assumes in accepting a charter. *See* GSUSA, *Blue Book of Basic Documents 2006*, at 25-26. Specifically, the *Blue Book* commits a Girl Scout council to act "in accordance with and to be limited by the policies so identified, published, and distributed to councils by [the GSUSA]." *Id.* at 26. Moreover, the *Blue Book* states that the charter of a Girl Scout council can be "revoked or terminated" by the GSUSA per the terms of the Girl Scout Constitution, extinguishing the ability of the council to exercise any rights conferred by the grant of a charter, including the right to use the Girl Scout program, be

---

[5] Each council is an independent, non-profit corporation, having its own independent board of directors, its own property, and its own staff. In addition, each Girl Scout council is responsible for the members, troops and volunteers within its exclusive jurisdiction.

[6] The court cites from the 2006 version of the *Blue Book,* as that is the version both parties agree is most relevant.

identified with the Girl Scout movement, or use the Girl Scout name or trademark. *Id.* at 25. The *Blue Book* further details the procedures for revoking a council's charter and for changing a Girl Scout council's jurisdiction.[7] *Id.* at 26-28. Each council, per its charter, is assigned to a specific, non-overlapping territory or "jurisdiction," in which it operates. A given council survives financially through donor solicitations, sales of Girl Scout cookies, sales of other Girl Scout branded products and services, and from fees charged for use of council-owned facilities. By 2005, approximately 315 Girl Scout councils existed in the United States, each with their own board of directors, officers, and professional staff.

To ensure that individual councils are successful in achieving the organization's central goals, every council's charter has a term of four years. Eighteen months prior to the expiration of a council's charter, a council will send to the GSUSA an "Application for a Girl Scout Council Charter." *Id.* at 26. In addition to an application, the individual council will conduct a performance assessment and submit a final report to the GSUSA in the year before its charter expires. *Id.* The GSUSA, in turn, will review the results of the council's performance assessment, compare the results to national standards for what constitutes an effective Girl Scout council, assess the council's performance and progress, and then make relevant recommendations to a council. *Id.* The council, in turn, acts on those recommendations and submits its own recommendations to the National Board of

---

[7] The *Blue Book*'s "Procedures for Changing a Girl Scout Council Jurisdiction" state in a footnote that "all actions taken must be consistent with state law." *See* GSUSA, *Blue Book of Basic Documents 2006,* at 28 n.13.

Directors, who makes a final determination on whether to renew the council's charter. *Id.* at 27. If a council is not "developing, managing, and maintaining Girl Scouting" in its jurisdiction, "fully meeting charter requirements," or "is seriously deficient in one or more critical priorities," the council will either receive a charter with qualifications, be subject to a Charter Compliance Audit by the National Board of Directors, or will have the charter revoked. *Id.* at 26-28.

## B.     The Manitou Council

The plaintiff, Girl Scouts of Manitou Council, is the Girl Scout council charged with carrying out the Girl Scout mission in seven counties in Eastern Wisconsin. Specifically, Manitou's jurisdiction stretches from the affluent northern Milwaukee suburbs of Mequon and Thiensville north to the cities of Sheboygan and Manitowoc and west toward the city of Fond du Lac, covering a primarily rural area. The council has been serving the area in some capacity since the early 1950s. Manitou has sixteen employees and is governed by an independent board of directors. Currently, the council boasts having approximately 7,500 girl and adult Girl Scout members, with girl membership increasing by 370 members between 2004 and 2008. In addition, Manitou possesses several pieces of property, including Camp Evelyn, a 240-acre facility near Plymouth, Wisconsin, and Camp Manitou, a 140-acre facility located near Shoto, Wisconsin, used for resident camping and other activities. Neither side disputes that Manitou Council was a "high performing" council, in that it met or exceeded several goals of the GSUSA, including having high recruitment and membership retention.

## C.    Girl Scouts Realignment Strategy

While Manitou Council may have been successful in creating a growing and vibrant environment for Girl Scouting in eastern Wisconsin, Manitou, at least from the perspective of the national organization, was not a microcosm of the national health of Girl Scouting in the early 2000s.  In 2004, after several independent studies, the GSUSA concluded that a host of problems confronted the organization. First, the Girl Scouts' efforts to provide programs to unserved or underserved communities, such as inner-city youths, presented severe challenges to the GSUSA as to how to subsidize such programs and what the best delivery systems were to implement the different programs. Moreover, the GSUSA commissioned studies indicated that, while financial pressures and new program goals made fund-raising more important than ever, raising money for the organization in challenging economic times so that GSUSA could fulfill its mission was becoming increasingly difficult.  The studies also showed that the Girl Scout movement, with its 315 councils, tended to be unfocused regarding what the organization's central goals were.  Perhaps most troubling for the organization was its belief that the Girl Scouts, while being the largest organization for girls in the world, was shrinking, despite steady increases in the general American population of girls between the ages of 5 and 17.[8]

---

[8] Manitou disputes that the Girl Scout's market share was actually decreasing.  The court does not voice an opinion on this, but merely notes that it is undisputed that GSUSA thought that its market share was decreasing.  Moreover, GSUSA has never stated that financial interests propelled its current realignment efforts.  However, the decline in membership of the GSUSA has had fiscal implications for the organization, as GSUSA's membership revenues declined by $1.9 million dollars between 2003 and 2004 and by more than $500,000 between 2005 and 2006.

In 2005, the GSUSA invited staff, council executives, and National Board members to participate in "Gap Teams," small groups that studied the GSUSA's challenges and attempted to find a means to "close the gaps between the current state and the desired state of the Girl Scout movement." (DPFF ¶ 56). One Gap Team ("Governance Gap Team"), focused on the organization's "governance and organizational structure gap," ultimately attributed many of the Girl Scouts' woes to the sheer number of councils that encompassed the Girl Scout organization. The Governance Gap Team noted that the organization's market share was significantly less in their smaller councils when compared to the largest councils, and that Girl Scout membership thrived in periods where the number of Girl Scout councils decreased. Moreover, the Governance Gap Team found that the cost per girl was less in the larger councils than in smaller councils. Additionally, the Governance Gap Team reasoned that fund-raising was far more difficult with smaller councils, as it encouraged different councils to compete against each other for donations from the same general population base. The Governance Gap Team also found that having numerous councils implementing the organization's goals tended to dilute and confuse the overall message that the organization was sending. Finally, the Governance Gap Team study concluded that having too many councils prevented the organization from "leveraging and aligning" its resources effectively, serving as a "barrier to future growth and sustainability." (DPFF ¶ 49).

After months of consultation with various parties, the GSUSA's Governance Gap Team recommended that mergers or "strategic restructuring" of the smaller

councils occur, such that the "optimal" Girl Scout council, dubbed "High Capacity Councils," would serve approximately 10,000 girls. For GSUSA, the larger councils would no longer compete for donations and would have the means to hire the best possible staff members, taking advantage of economies of scale. The Governance Gap Team crafted a new "master map" of the various Girl Scout councils, proposing consolidations where councils were in trouble or where it appeared that the need for consolidations were "obvious," making new corporate entities out of the old councils. (DPFF ¶ 65). In July 2005, the GSUSA informed executives of its various councils of the initial findings and recommendations of the Governance Gap Team.[9] A July 2005 memorandum stated that "council boundaries and jurisdiction and chartering would be defined anew using a set of capacity-based criteria." Presentations to the council executives followed that August. On September 11, 2005, the National Board approved the Governance Gap Team's recommendation that GSUSA develop and implement a process for "nationwide council realignment," such that old councils' territory, property, and employees would be merged into larger councils.[10]

---

[9] Both parties agree that July 2005 was the first time Manitou and other councils were officially informed of GSUSA's realignment plans.

[10] The initial plans of the GSUSA did not require that the executives and employees of the current councils would have the same positions or similar positions in the newly formed councils. For every realigned council, a Council Realignment Committee comprised of the Board Chairs and CEOs of the councils in the proposed new jurisdiction would be created to help form the new council, including developing a service delivery plan, preliminary budget, and funding plan. It was expected that the staff and volunteers of the legacy councils would participate in the transition toward the new, realigned councils. Moreover, the legacy councils had the possibility of serving as "service centers" or "satellite offices" in the new council. Finally, employees from the old council were allowed to fill the new staff positions of the larger council.

Case 2:08-cv-00184-JPS   Filed 03/31/10   Page 10 of 89   Document 172

**D.     Manitou and the Initial Steps Toward Realignment**

On that same day, the National Board of Directors renewed Manitou's charter ("2005 Charter" or "Charter").  The Charter itself is a fairly simple document, certifying that Manitou is authorized to "operate as a Girl Scout council within the area of jurisdiction agreed upon with [the GSUSA], with the duties, rights, powers, and privileges of a local Girl Scout council as defined by [the GSUSA]." The Charter, which is effective from "January 1, 2006, for up to four years," incorporates by reference the "terms and conditions" contained in Manitou's April 13, 2005 Application for a Girl Scout Council Charter ("Charter Application").  The Charter was signed by Liesl Rice ("Rice"), Manitou's President, Patricia Diaz Dennis ("Dennis"), the chair of the National Board of Directors, and Kathy Cloninger ("Cloninger"), GSUSA's Chief Executive Officer.  The Charter Application itself mirrors language found in the *Blue Book* outlining the requirements to apply to be a council and the rights, duties, and obligations involved in becoming a council.

On September 30, 2005, Linda Foreman, the GSUSA's National Secretary, wrote to Ms. Rice and Denise Schemenauer ("Schemenauer"), the Chief Executive Officer of Manitou, to inform the council that its charter had been renewed for up to four years without qualifications. Moreover, the September 30, 2005 letter reminded Manitou that the GSUSA and the Girl Scout councils were "engaged in a Core Business Strategy process to transform the Girl Scout Movement," including developing and implementing "a process for nationwide council realignment." The letter further noted that, because the alignment process would occur over the next

several years, council charters would only be issued on a period of "up to" four years.

In the fall and winter of 2005, a series of regional and national level meetings occurred in which representatives of various Girl Scout councils, including Manitou, conferred with the GSUSA regarding the nationwide realignment plan. In late October, GSUSA sent a memo to Council CEOs and Board Chairs asking for their input for criteria to be used to determine what a "high capacity council" entailed and suggestions regarding specific boundaries for the new councils. The minutes of a fall 2005 meeting of all of the Wisconsin Girl Scout councils led by Manitou's Schemenauer indicate that there was consensus regarding the need for realignment and consolidation of the Wisconsin councils. Ms. Schemenauer concedes that initially she was "very interested" at the time in "exploring a statewide council" for realignment.[11] (Schemenauer Dep. 184). In fact, in December of 2005, Ms. Schemenauer submitted, on behalf of the Wisconsin Alliance of Girl Scout councils, their final realignment input to GSUSA, which recommended that every realigned council serve a minimum of 10,000 girls and that Wisconsin should only have one to six councils after realignment efforts finished.[12]

---

[11] Ms. Schemenauer stated at a September 2005 meeting of the Wisconsin Alliance of councils that "everyone needs to face the fact that we are going to be realigned whether or not we like it." (Schemenauer Dep. 144).

[12] Such a recommendation was necessarily a recommendation to consolidate Manitou into another council, as Manitou had approximately 5,300 girl members at the time of the Wisconsin Alliance's recommendation.

Case 2:08-cv-00184-JPS    Filed 03/31/10    Page 12 of 89    Document 172

After reviewing the recommendations of the various councils, GSUSA, together with representatives from every council, including Manitou, met in late February of 2006 in Orlando, Florida, to discuss the final criteria for determining the makeup of the new councils and to display an initial resource map indicating a proposed national realignment plan. The resource map suggested realigning the three hundred plus local councils into 104 councils, with each council having a population base of approximately 100,000 girls.[13] The resource map merged the thirteen councils that then-existed in Wisconsin into three councils, with the majority of the territory encompassing Manitou's jurisdiction being merged into a council covering northern Wisconsin and a small portion of the upper peninsula of Michigan. Councils were informed at the meeting that, while realignment in some form would occur inevitably, councils could submit formal mapping proposals to GSUSA after appropriate discussions with neighboring councils. Manitou met with other councils at the Orlando meeting and actively discussed merging their council with those in northern Wisconsin and in the upper peninsula of Michigan.

After the Orlando meeting, Manitou seemed to support the realignment plans as envisioned by GSUSA. In a late March 2006 meeting of Manitou's Board of Directors, the board agreed that the optimal course of action would consist of a merger of most of Manitou with the councils to the north while allowing Ozaukee County, the county directly north of the city of Milwaukee, to be merged with a

---

[13] The hope was for each council to assume a 10 percent market share from the girl population, yielding 10,000 members per council. The final resource map eventually consisted of 109 realigned councils.

southeastern Wisconsin council. While other Girl Scout councils petitioned the GSUSA for changes to the proposed realignment during the spring of 2006, Manitou did nothing, assuming that the national organization would "work with [Manitou]" if the council later found the realignment plans to be dissatisfactory. (Schemenauer Dep. 323). In April of 2006, seven councils from Wisconsin and Michigan, including Manitou, the future "Northwestern Great Lakes Council,"[14] met to further discuss a mapping configuration to propose to GSUSA.[15] As a result of the April meeting, Ms. Schemenauer, as the coordinator of the Wisconsin and Michigan realignment group, submitted a memorandum on May 31, 2006, that indicated the group's willingness to "negotiate the terms of a potential council realignment."[16] Moreover, the realignment group noted that they wanted to use GSUSA's "National Resource Map as the general basis" upon which realignment would occur, with the exception that the entirety of the upper peninsula of Michigan be added to the new council's jurisdiction.[17]

_____

[14] The councils were: Girl Scouts of Birch Trails Council, Girl Scouts of Fox River Area, Girl Scouts of Indian Waters Council, Girl Scouts of Lac-Baie Council, Girl Scouts of Manitou Council, Girl Scouts of Peninsula Waters Council, and Girl Scouts of Woodland Council.

[15] Communications between the various executives of the councils in the spring of 2006 indicate that the relationship between the councils was anything but cordial, as the personalities of the executives began to clash with respect to even the most trivial happenings. For example, in a April 3, 2006 email to Rice, Schemenauer refers to the members of the Fox River Area Council as "weasely little shits" for inviting a GSUSA executive to dinner without first consulting Manitou's executives. The emails between Rice and Schemenauer reveal their frustrations with working with the members of the future Northwestern Great Lakes Council. Nonetheless, the various councils did come to some consensus regarding a proposal for realignment.

[16] The proposal, much like all the official documents regarding the consolidation of the Girl Scout councils, did not use the word "merger" to describe the restructuring of the councils, but rather used the word "realignment."

[17] The group also expressed the "wish to make some minor zip code changes to the county-based national resource map to better conform with school district boundaries."

The Girl Scouts treated the memorandum of the Wisconsin and Michigan realignment group as a formal proposal for changes to the councils' jurisdictions, responding favorably to the tentative proposal.[18]  On June 28, 2006, Ms. Schemenauer was informed that the GSUSA's Mapping Task Force, a subcommittee overseeing the realignment project, had approved the proposed changes to the resource map, sending Schemenauer's group's proposal to the National Board Realignment Task Force for approval before the recommendation was sent to the National Board of Directors for final approval.  Less than a month later, the National Board Realignment Task Force approved the May 31, 2006 proposal, and, on August 26, 2006, the National Board approved about three-hundred "Applications for Change in Council Jurisdiction," including the Wisconsin and Michigan realignment group's proposal, seemingly settling the borders for the new council.  The applications approved by the National Board would have divided Manitou, such that sixty percent of the current council's jurisdiction would go to the northern council, thirty five percent of the council would be given to a council encompassing southeastern Wisconsin, with the remainder being handed to a western Wisconsin council.

---

[18] The parties seem to dispute the nature of what Ms. Schemenauer's group submitted on May 31, 2006.  GSUSA treats the memorandum as a formal application for change in the council's jurisdiction. Manitou treats the May 31, 2006 memorandum as a mere invitation to discuss the realignment plans.  The court takes no formal stance on what the May 31, 2006 memorandum constituted at this stage of the order, but instead notes that if the memorandum was a proposal, that GSUSA responded favorably to the Wisconsin and Michigan groups' requests.  Moreover, the court notes that if Schemenauer's group's intention was to merely continue discussions and negotiations with GSUSA regarding realignment, their dissatisfaction with the realignment process was not clearly voiced by the May 31, 2006 memorandum.  Neither Schemenauer nor any other member of the Wisconsin and Michigan council group corrected the GSUSA's assumption that the May 31, 2006 memorandum was merely a proposal to the GSUSA regarding their realignment efforts, despite several communications between the parties.

Case 2:08-cv-00184-JPS   Filed 03/31/10   Page 15 of 89   Document 172

E.     **Manitou's Resistance to Realignment**

Problems began to emerge with Manitou's cooperation regarding the realignment in the fall of 2006. In early September, the Wisconsin and Michigan councils that were to encompass the Northwestern Great Lakes council met again to discuss the next steps to progress toward realigning the councils, including drafting guiding philosophies for the new council, creating a plan for collaboration between the different staffs of the various councils, discussing employed staff retention, and exploring avenues for realignment funding. The meeting was somewhat hostile, as the executives of the various councils expressed frustrations, including Ms. Schemenauer, who was upset that two Girl Scout executives had hired a consultant for the group without first checking with Ms. Schemenauer and other executives. Exasperated from the meeting, Ms. Schemenauer and Ms. Rice sent an email to the board of directors for Manitou Council, writing that "after the alliance meeting it became clear that we did need to talk to you as a group and gain your direction." Discussions within the Manitou Council manifested severe differences in philosophy and approaches to council administration with the other councils with whom Manitou was merging. At a November 28, 2006 meeting of Manitou's Board of the Directors, the board approved the creation of a task group[19] to review the national realignment plan, with the goal of making recommendations to GSUSA's

---

[19] The task group consisted of Rice, and board members Diane Krause-Stetson ("Krause-Stetson"), Mary Jo McBrearty ("McBrearty"), and Pam Dekker ("Dekker"). Both parties concede that Ms. Schemenauer played an "active role in the group" and was the person who submitted the group's position paper to the GSUSA.

Board of Directors regarding realignment issues and creating a position paper explaining Manitou's thoughts regarding realignment.

GSUSA, made aware of Manitou's growing concerns, tried to ameliorate the situation in early 2007. In January 2007, Linda Foreman ("Foreman"), a member of GSUSA's National Board and the chair of the National Board's task group on realignment, and Vicki Wright ("Wright"), GSUSA's Project Director of Council Realignment, after a lengthy invitation from Ms. Schemenauer to give a presentation on realignment, met with Manitou's Board of Directors via a teleconference. GSUSA's representatives were not able to give a full presentation because the members of the Manitou board posed to GSUSA's agents numerous questions, which Ms. Wright and Ms. Foreman attempted to answer. In March, GSUSA provided a "realignment update" bulletin to all of the councils, including Manitou, providing findings and data regarding the realignment efforts and relaying the overall progress of the project in an attempt to assuage developing anxieties over realignment.

Nonetheless, on March 27, 2007, in Manitou's "position paper" to the National Board, the council stated that they were now "opposed to [GSUSA's] current nationwide mandated merger plan." Moreover, Manitou stated in their position paper that they wanted: (1) to be exempt from the merger mandate; (2) an agreement that would protect the council for a period of ten years; and (3) the GSUSA to acknowledge that its nationwide realignment plan was "flawed." The position paper concluded by setting out Manitou's "case for opposition to GSUSA's national merger

mandate," which was a product of Ms. Schemenauer's "take" on the nationwide data and the independent studies commissioned by the GSUSA. On that same day, at the suggestion of the task group, the Manitou Board of Directors approved a resolution that Manitou would not merge with any other councils, would keep the current jurisdiction of Manitou intact, and would discontinue all efforts toward realignment pending the resolution of all realignment negotiations with the GSUSA. The decision of Manitou's Board was inspired at least in part from Manitou's inability to come to a common understanding with the councils with whom it was going to merge.[20] The Manitou Board of Directors also sent a letter to the councils that were to make up the Northwestern Great Lakes council to inform those councils of Manitou's new stance.

In mid-April 2007,[21] four representatives of Manitou: Schemenauer, Rice, Dekker, and Krause-Stetson, met with GSUSA's Cloninger and Foreman at the GSUSA's headquarters in New York City. The Manitou representatives expressed their concerns regarding nationwide realignment and demanded to speak with the demographers who crafted the initial resource map that was introduced at the Orlando meeting more than a year earlier. Heeding Manitou's request, GSUSA arranged a conference call between Manitou's representatives and the

---

[20] Minutes from the March 27, 2007 meeting indicate that Manitou and the other councils did not have a "shared vision of what a successful council would or could look like" and that the "councils in the north are unaccepting of Manitou's success measures" and "prefer expediency over due care."

[21] At some point in April 2007, GSUSA supplied Manitou and the six northern councils with a "letter of intent" to merge.

demographers on May 1, 2007. Manitou's notes from the meeting indicate that the exchange was less than satisfactory for the council.[22]

On May 9, 2007, Manitou submitted a proposal to the GSUSA whereby Manitou would be realigned with the council to be formed in the southwestern region of Wisconsin, as opposed to merging Manitou with councils in northern Wisconsin and the upper peninsula of Michigan. Manitou's proposal met with resistence. The GSUSA consulted with its experts regarding the newest proposal, but the demographers remained unpersuaded by Manitou's proposal, finding that Manitou and the northern councils' proximity, similar cultures, and economic commonalities required adhering to the May 31, 2006 proposal, which would merge the majority of Manitou's jurisdiction with the northern councils.  On May 17, 2007, the leadership of the six councils of northern Wisconsin and the upper peninsula of Michigan who would have merged with Manitou, wrote to the GSUSA to express their unanimous and "strong" opposition to Manitou's latest proposal. The GSUSA denied Manitou's proposal on May 21, 2007.[23]

In the wake of GSUSA's rejection of Manitou's proposal, the Manitou Board of Directors met on May 22, 2007. The Manitou Board "regretfully" and "with great concern" approved a motion that Manitou "proceed with the realignment as mandated by the [GSUSA] which requires Manitou Council [to] merge with the

---

[22] After a few notes jotted down on a piece of paper noting the statistics used to determine the initial resource map, the word "LIARS" is prominently written in all capital letters at the bottom of the page.

[23] Manitou was informed by GSUSA on May 21, 2007, that Manitou's new proposal would not be adopted.  However, it was not until August 3, 2007, that Linda Foreman wrote to Liesl Rice explaining the reasons for GSUSA's rejection of Manitou's proposal.

Northern councils." Nonetheless, on August 9, 2007, in a letter signed by Ms. Rice, Ms. Dekker, Ms. Krause-Stetson, and Ms. Schemenauer, the representatives of the Manitou Council wrote to Ms. Dennis, the President of the National Board of Directors of the GSUSA, requesting a "private, face-to-face meeting" with her and her legal counsel in order to "share significant information" about the organization's realignment plans, including information that "calls into question the ultimate decisions reached by the full Board." The letter was ominous, stating that the information the Manitou representatives were going to share had the "potential to be embarrassing to certain individuals, as well as to the organization." Manitou's letter to Ms. Dennis set a deadline of August 24, 2007, in which the President of the Board of Directors of the Girl Scouts could respond or else Manitou would "move ahead in a different direction."

On August 29, 2007, Ms. Dennis traveled to Milwaukee, Wisconsin, and met with four Manitou representatives, Schemenauer, Rice, Dekker, and Krause-Stetson, to further discuss Manitou's concerns. The Manitou representatives revealed the "embarrassing information" the four representatives had learned was that a large donor from a neighboring council[24] had been a member of the Girl Scouts National Board, which had been voting on the realignment plans. However, the majority of the four hour meeting was devoted to persuading Ms. Dennis to support Manitou's plan to merge its council with the southwestern Wisconsin councils, the same plan

---

[24] The donor was from the Fox River Area Girl Scout Council, one of the Girl Scout councils that the Manitou executives were having difficulties getting along with and would have merged with under the GSUSA's plan. The assumption by the Manitou representatives was that having a member who donated to a council that was going to be realigned created some sort of "conflict of interest."

Case 2:08-cv-00184-JPS   Filed 03/31/10   Page 20 of 89   Document 172

that had been rejected by the board in May. The President of the GSUSA Board listened to the Manitou representatives' concerns and promised to discuss Manitou's issues with the GSUSA leadership.

Manitou's latest attempts to persuade the GSUSA to abandon their plans for realignment did not succeed. On September 21, 2007, Ms. Dennis informed the Manitou representatives via teleconference that their second request to merge with the southwestern Wisconsin councils had not been accepted. Linda Foreman and Kathy Cloninger sent a letter to Liesl Rice on October 3, 2007, confirming the decision of the GSUSA, stating that the organization would "not again reconsider the jurisdictional boundaries, as approved by the National Board on August 24, 2006." The letter further directed Manitou to "engage with the three council realignment groups to which [Manitou was] assigned" and to "secure [Manitou's] board's approval of and authorization for" the Northwestern Great Lakes Good Faith Agreement ("Good Faith Agreement"), an agreement by which Manitou would agree to engage in good faith negotiations regarding the realignment plans, by "no later than October 15." Finally, the letter warned the council that if Manitou failed to meet the GSUSA's directives in their entirety, that the National Board would "take all necessary and further action in accordance with the *Blue Book of Basic Documents 2006*."

Accordingly, on October 10, 2007, Manitou signed the Good Faith Agreement in which Manitou Council "committ[ed] itself for a period of twelve . . . months to good faith negotiations toward a potential merger with" the six councils of northern Wisconsin and the upper peninsula of Michigan. Moreover, in the Good Faith

Agreement, Manitou agreed that it would not make any "material changes" affecting the merged council, such as depleting the liquid resources of the council or entering into contracts that obligates the new council for more than two fiscal years. The agreement also stated that Schemenauer and Rice would be the members of Manitou's delegation to the Council Realignment Committee, with the goal that the Council Realignment Committee would provide a recommendation which would be approved by the full Manitou board.

The Manitou Council Board of Directors met on November 27, 2007, to, in part, discuss the realignment process. Part of the meeting was devoted to discussions regarding whether the other northern councils had breached the terms of the Good Faith Agreement. The Manitou Board directed Ms. Schemenauer and Ms. Rice to do "further investigation" into the "legal options" Manitou had in order to determine the consequences of the council further opposing the realignment efforts. Less than a month later, the Manitou Board voted by margin of twelve to two votes to pursue litigation with the GSUSA and to discontinue participation in the GSUSA's realignment plan. On January 9, 2008, the council notified the GSUSA of the vote of the Manitou Board of Directors, stating that a "merger with the other Councils . . . is not in the best interest of Manitou and its members." Moreover, the letter informed the GSUSA that Manitou had retained legal counsel and instructed the national organization to channel communication through Manitou's lawyer. In the weeks that followed, Manitou informed its members and donors that the council would pursue litigation against GSUSA to prevent any merger. The council also informed the

remaining councils in Wisconsin of its decision.[25]  Manitou had made its decision to aggressively[26] fight the merger via litigation.

**F.    The "National Team," Manitou's Health, and the Current Litigation**

Pursuant to the guidelines in the 2006 version[27] of the *Blue Book* for when councils cannot agree to "combine" or "transfer" jurisdiction, in early 2008, the GSUSA established a "national team," which was charged with the task of collecting and analyzing information from the councils that were to form the Northwestern Great Lakes council, including Manitou, to determine "how the requested change will impact the delivery of [the] Girl Scout program."[28]  *See* GSUSA, *Blue Book of Basic Documents 2006*, at 29.  Joan Wagnon ("Wagnon"), a member of the National Board, led the national team investigating the Manitou merger with the six northern Wisconsin and Michigan councils.[29]  According to the regulations in the 2006 version

---

[25] On January 21, 2008, the "Realignment Communications Chair" of the Girl Scouts of the Northwestern Great Lakes wrote the GSUSA stating that they thought it was in the "best interests of our girls" to continue working toward the merger date of May 1, 2008.

[26] The word "aggressively" may undersell the level of emotions at play within Manitou at this point of the litigation.   For example, Ms. Schemenauer, commenting on the author, a member of the Fox Lakes Council, of an editorial piece  which opposed Manitou's litigation strategy written in a Fond Du Lac paper, stated in a April 29, 2008 email to Terri Lillesand, a member of the Manitou Board, that "Revenge is best served cold" and that "We will get her."

[27] The 2003 version of the *Blue Book* does not specify that a "national team" must be created to resolve conflicts when the board of directors of the Girl Scout councils cannot agree upon the transfer of a part of one council jurisdiction to another council.  Rather, the 2003 version of the *Blue Book* charges a "National Board Liaison" and "designated staff members" to develop a recommendation similar to the role of the "national team" under the 2006 version of the *Blue Book*.

[28] Pursuant to the 2006 *Blue Book's* regulations, a national team must "invite all affected councils to provide information on how the requested change will impact the delivery of [the] Girl Scout program." GSUSA, *Blue Book of Basic Documents 2006,* at 29.

[29] Wagnon's team was not charged with investigating the merger of the remainder of Manitou's council with the other Wisconsin Girl Scout councils to the west and the south.  GSUSA never took action to merge the remainder of Manitou's jurisdiction.

of the *Blue Book,* the national team must:  (1) use the information they collect to "develop a recommendation for jurisdictional boundaries and forward it to the affected councils"; and (2) complete an "Application for Change in Girl Scout Council Jurisdiction" pursuant to the recommendations.  *Id.*  The application then must be forwarded to the Chief Executive Officer of the GSUSA, who then, after reviewing the application, recommends action to the National Board.  *Id.*  Accordingly, the National Board must take action on the application, which is considered "final," and the GSUSA officially records the change in jurisdiction in the "official records" of the GSUSA.  *Id.*

On January 24, 2008, Ms. Wagnon notified the affected councils, including Manitou, that, because of a failure to reach agreement between the councils regarding the merger, the GSUSA had created a national team composed of members of the National Board, "National Staff," and a "national Operational Volunteer" to investigate how "Manitou's action not to merge will impact delivery of [the] Girl Scout program."  The letter further detailed the process the national team would take going forward.  Wagnon invited all affected councils to provide information to the national team by March 31, 2008.

On February 29, 2008, the same day Manitou filed a diversity action against GSUSA (Docket #1) and a motion for a preliminary injunction to enjoin the defendant from "going forward with the jurisdictional change proceedings" outlined in Wagnon's January 24, 2008 letter or changing the current jurisdiction or territory controlled by Manitou (Docket #3), the national team met for the first time.  Wagnon, writing on

behalf of the national team, wrote a March 3, 2008 letter to the seven relevant councils stating the initial thoughts garnered by the team at their first meeting. First, Ms. Wagnon reiterated that March 31, 2008, would be the deadline by which the councils had to submit information regarding "how the delivery of the Girl Scout program to all girls will be enhanced or retarded by the possible configuration." Second, Ms. Wagnon proposed an April 12, 2008 meeting of all the councils to provide the local groups an "opportunity to speak in person to representatives of the national team." Ten days later, Ms. Schemenauer, writing on behalf of Manitou, wrote a lengthy letter to Ms. Wagnon to inform her that Manitou "would not be able to participate in the current process" and stated that she felt that the "underlying dispute can only be resolved by a court." Undeterred, Ms. Wagnon wrote to Ms. Schemenauer on March 27, 2008, stating that the "national team intends to proceed with its deliberations" as had been explained "in prior letters."

The national team's efforts to gather additional information related to the merger proved difficult, however. No council submitted any new information to the national team. Moreover, Ms. Wagnon's proposed April 12, 2008 meeting never came to fruition, as none of the councils indicated a desire to participate in the public forum. The national team pressed forward, however, using the information the GSUSA provided to the team, an amalgam of data previous provided by the national organization and the affected councils. In the meanwhile, on May 1, 2008, the merger of the five Wisconsin councils and the one upper peninsula council occurred,

and the Girl Scouts of Northwestern Great Lakes council was officially formed without the participation of Manitou.

On May 16, 2008, the national team met in Seattle, Washington, to discuss the realignment dispute, review the information it did have, and formulate its recommendation to the National Board. A week and a half later, Wagnon wrote to the chairpersons of the board of directors of the individual councils, including Manitou's Rice, providing the chairs with the data that the national team had collected and was going to be used to "develop a recommendation regarding [the] jurisdictional boundaries." The information enclosed with Wagnon's letter to the council chairs was diverse and from a variety of sources.[30] Ultimately, on June 5, 2008, the national team issued its report and recommended that Manitou's jurisdiction needed to be divided up pursuant to the May 31, 2006 proposal. The national team also submitted an "Application for Change in Girl Scout Council Jurisdiction" to resolve the merger dispute.[31]

---

[30] While the parties needlessly battle in their proposed findings of fact over whether information reviewed by the national team came from Manitou, the court's review of the information the national team possessed indicate that the information included: (1) a series of the GSUSA's presentation slides that were used at the various meetings by the national organization; (2) several emails and letters between Manitou and other councils and the GSUSA; (3) notes from the meetings of the relevant Wisconsin and Michigan councils; (4) Manitou's analysis of the realignment plan; (5) memoranda between various executives at the GSUSA regarding the Wisconsin merger; (6) studies performed by outside groups regarding the realignment efforts in Wisconsin and Michigan; and (7) the letters written by the parties and their legal representatives in the wake of the litigation. Both sides concede that none of the information came *directly* from Manitou, as the council refused to participate in the process.

[31] The "Application for Change in Council Jurisdiction" submitted by the national team proposed dropping Sheboygan and Manitowoc counties and a majority of Fond du Lac and Calumet counties from Manitou's jurisdiction. The national team, whose focus was only on the dispute between Manitou and the northern councils, did not resolve the issue of the remaining Manitou jurisdiction in Ozaukee county. The portion of Manitou's jurisdiction that was to be removed by the approval of the application would have been the overwhelming majority of Manitou's present jurisdiction. Moreover, the proposed change would have severely reduced Manitou's access to donations and volunteers.

-26-

Two weeks later, on June 15, 2008, GSUSA's Chief Executive Officer, Ms. Cloninger, advised the National Board that the recommendations of the national team be adopted and that the application the national team submitted be approved. In turn, the National Board followed Cloninger's recommendations. The following day, GSUSA notified Manitou and the newly formed Northwestern Great Lakes council that a portion of Manitou's territory would be transferred to the new council effective September 15, 2008. In the months that followed, both Manitou and GSUSA prepared for the impending merger. It remains unclear what steps (and the nature of those steps), if any, GSUSA would have taken had the transferring of part of Manitou's jurisdiction to the Northwestern Great Lakes council occurred.

However, the results of the litigation altered the parties' plans. On June 5, 2008, this court denied Manitou's motion for a preliminary injunction. (Docket #58). Three months later, the Court of Appeals for the Seventh Circuit reversed this court's decision to deny Manitou's motion and "enjoined GSUSA from making any changes to, or interfering with, the current council jurisdiction of" Manitou "pending final resolution on the merits in the district court." *See Girl Scouts of Manitou Council, Inc v. Girl Scouts of the United States of America, Inc.,* 549 F.3d 1079 (7th Cir. 2008). As a result, GSUSA postponed meetings that would have begun the transition process of transferring the counties served by Manitou into the Northwestern Great Lakes council.

Given that Manitou's current charter was set to expire on January 1, 2010, Ms. Schemenauer wrote to GSUSA in late 2008 inquiring about how to renew the

council's charter given the on-going litigation. On December 30, 2008, GSUSA responded to Ms. Schemenauer's inquiry, informing the council's Chief Executive Officer that the application process has been "suspended during realignment" and that GSUSA has "not asked councils to file an application fee for the last two years." However, a month later, on January 28, 2009, GSUSA emailed council board chairs and chief executives detailing the interim chartering process during the realignment. In the January 28, 2009 email, the National Board explained that during the realignment the Girl Scouts would be using the "Council Performance Indicator" process to evaluate whether a council's charter should be renewed, a method that takes two to three weeks as opposed to the formerly used twelve to eighteen month "Council Performance Assessment" process. In letters sent in February of 2009, counsel for the defendant informed Manitou's counsel that the National Board expects to renew Manitou's charter for a minimum of one year. Accordingly, on May 11, 2009, the National Board contacted Manitou's Board Chairperson, Ms. Rice, to provide her with information regarding the Council Performance Indicator process such that Manitou's charter could be renewed. On July 29, 2009, Manitou submitted its charter application to GSUSA, requiring that Manitou complete the "Council Performance Indicator" to ensure that the charter was renewed.[32] The parties have not provided this court with any update as to whether the charter process was

_____

[32] In its application, Manitou noted explicitly that by submitting the application the council was not waiving its rights under the WFDL.

completed and whether Manitou is currently chartered as an official Girl Scout council.[33]

The evidence presented to the court indicates that Manitou's girl membership has increased in the time since GSUSA's realignment efforts began. While Manitou has had some difficulties[34] in fund-raising over the past several years, with less money flowing to the organization from sources such as the United Way, the parties dispute the reason for the monetary difficulties. The plaintiff broadly contends that GSUSA's realignment efforts have made fund-rasing more difficult for Manitou,[35] while the defendant argues that decreases in donations to Manitou are attributable to outside forces, such as the state of the economy.[36] Manitou's Chief Operations Officer concedes however, that realignment did not: (1) cause major corporate donors, such as the United Way or Community Chest, or individual donors to cease

---

[33] The court proceeds assuming the status quo has been maintained since the imposition of the preliminary injunction.

[34] Schemenauer, in her deposition testimony, agreed that there was a "dip" in Manitou's fund-raising in 2007, while the fund-raising that occurred in 2008 was "almost" at historical levels. (Schemnauer Dep. 515). Manitou's Chief Operations Officer, Diane Cline ("Cline"), in her sworn deposition stated that the council had difficulties in their 2008 Family Partnership campaign, which she attributes to the GSUSA's realignment efforts. (Cline Dep. 103-104). Manitou's financial data from 2003-2008 indicates that the amount of donations the council received in that period has fluctuated greatly, with "total public support" averaging around $210,000. Manitou's lowest years for public support were 2003 ($167,249), 2005 ($207,238), 2007 ($186,922). Manitou's best years for public support included 2004 ($260,787), 2006 ($223,380), and 2008 ($220,232).

[35] For example, Cline explained in her deposition that Manitou did not hold "ASK [fund-raising] events" in 2007 because the people Cline "was trying to recruit [for the event] that year couldn't see doing [the event] and asking their friends and family for money when they didn't know what was happening to Manitou." (Cline Dep. 77). Cline also speculates that Manitou lost thousands of dollars in donations in a Family Partnership donation campaign in September 2008 because of confusion over whether Manitou would continue to offer Girl Scouting. (Cline Dep. 103-04; 113-14).

[36] Cline stated in her deposition testimony that "because of the economy, we're down." (Cline Dep. 176). GSUSA also hypothesizes that some donors, repulsed by Manitou's litigation (and the use of council funds to pay for the litigation), may have stopped giving to the council.

or reduce their funding to Manitou; or (2) have an effect on the amount of "in-kind and miscellaneous donations," such as donations bequeathed to Manitou. (Cline Dep. 189-90; 200-01). Indeed, some of Manitou's funding may have increased due to donor's sympathy with Manitou's cause.[37]

On February 3, 2009, in the wake of the Seventh Circuit's decision, this court issued a scheduling order that set out the deadlines by which the parties could conduct discovery in the case and by which dispositive motions would be submitted to the court. Accordingly, the parties submitted cross-motions for summary judgment on August 31, 2009. (Docket #134; #141). Given the facts, the court now proceeds to address the merits of the parties' cross-motions for summary judgment.

## DISCUSSION

Summary judgment is appropriate where the evidence "shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Wis. Alumni Research Found. v. Xenon Pharms., Inc.*, 591 F.3d 876, 882 (7th Cir. 2010). A genuine issue of material fact exists when a reasonable jury could find in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). On review of cross-motions for summary judgment, a court must view all facts and inferences in the light most favorable to the nonmoving party on each motion. *Wis. Alumni Research Found.,* 591 F.3d at 882; *see also Foskett v. Great Wolf Resorts, Inc.*, 518 F.3d 518, 522 (7th

---

[37] Cline cites the funding received from United Way's Fond du Lac office as an example of Manitou's increased funding because of the current litigation. (Cline Dep. 134).

Cir. 2008) (holding that a court deciding cross-motions for summary judgment must "construe all facts and inferences therefrom in favor of the party against whom the motion under consideration is made.") The court keeps these standards in mind throughout this order in reviewing the different claims brought by Manitou.

Manitou's complaint claims thirteen separate bases for relief: (1) Violations of the Wisconsin Fair Dealership Law (WFDL); (2) Breaches of Contract; (3) Tortious Interference with Prospective Economic Advantage; (4) Economic Coercion; (5) Tortious Interference with Fiduciary Duties; (6) Conspiracy to Violate the WFDL; (7) Conspiracy to Tortiously Interfere with Prospective Economic Advantage; (8) Conspiracy to Economically Coerce; (9) Conspiracy to Tortiously Interfere with Fiduciary Duties; (10) Injury to Business and Restraint of Will; (11) Breaches of Charter Renewal Procedures; (12) Breaches of Jurisdictional Change Procedures; and (13) Breach of Fiduciary Duty. (Docket #130). GSUSA has moved this court for "an order granting summary judgment in its favor with respect to *all* causes of action asserted against it in plaintiff's second amended complaint." (Docket #134) (emphasis added). Manitou, on the other hand, has only moved for "*partial* summary judgment, on liability only, at Counts I . . . [and] Count 2," the WFDL and breach of contract claim. (Docket #141). Given the motions before the court, the court will discuss the respective claims in order, determining whether either party has met

their respective burdens in showing they are entitled to judgment as a matter of law.[38]

## A. Wisconsin Fair Dealership Law Claim

In 1974, the Wisconsin legislature enacted the WFDL in order "to protect dealers against unfair treatment by grantors." *Eisencorp, Inc. v. Rocky Mountain Radar, Inc.,* 398 F.3d 962, 965 (7th Cir. 2005). In relevant part, the WFDL states that "no grantor, directly or through any officer, agent or employee, may terminate, cancel, fail to renew or substantially change the competitive circumstances of a dealership agreement without good cause." Wis. Stat. § 135.03. The plaintiff contends that GSUSA's attempt to eliminate sixty percent of Manitou's jurisdiction, prevented only by the preliminary injunction, would have "terminated, canceled, failed to renew, or substantially changed the competitive circumstances" of the dealership agreement between the two parties and that GSUSA did not have good cause for its actions.[39] (Pl's Br. 13). The defendant, noting the Seventh Circuit's earlier opinion in this case, *Manitou,* 549 F.3d at 1094 ("Manitou is a "dealer" with the meaning of the term as defined by the WFDL"), has elected to not reargue the issue of whether the WFDL is relevant to the facts of this case. Instead, GSUSA,

---

[38] The court notes that the law that will be applied in this case on all of the claims is Wisconsin law. In federal court, the choice of law is determined by the choice of law rules of the forum state. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496-97 (1941). When the parties do not dispute what law should be applied, the court should apply forum law. *Futuresource L.L.C. v. Reuters Ltd.,* 312 F.3d 281 (7th Cir. 2002).

[39] As discussed in later footnotes, ripeness concerns prevent the court from speculating regarding what GSUSA would have done and how it would have taken such actions if the injunction was not imposed and the national organization successfully transferred Manitou's jurisdiction to the northern councils.

provides two reasons for why the defendant's actions with respect to their realignment efforts with Manitou did not run afoul of Wis. Stat. § 135.03's command.

### 1.     *Super Valu Stores* Argument

With respect to the WFDL claim, GSUSA first argues, relying on a line of cases stemming from *Super Valu Stores, Inc. v. D-Mart Food Stores, Inc.,* 146 Wis. 2d 568, 577 (Ct. App. 1988), that the parties' "dealership agreement permits GSUSA to adjust Manitou's jurisdiction."[40] (Def.'s Br. 25).  A brief discussion of *Super Valu Stores* is warranted.[41]

In *Super Valu Stores*, the defendant owned a grocery store in Wisconsin Rapids, Wisconsin, under a nonexclusive "retail sales agreement with the plaintiff, Super Valu Stores, a nationwide grocery wholesaler."  *Super Valu Stores,* 146 Wis. at 570.   The plaintiff sued the owner of the grocery store for failing to pay for merchandise and services supplied to the store under the agreement.   *Id.*   The defendant counterclaimed, arguing, in part, that Super Valu, by planning to open another store in Wisconsin Rapids, "substantially changed the competitive

---

[40] The Seventh Circuit contemplated a twist on the *Super Valu Stores* argument in its earlier opinion. *See Manitou,* 549 F.3d at 1097.  The Seventh Circuit declined to decide whether *Super Valu Stores* stands for the proposition that "any action taken by a grantor that is specifically *contemplated* by the terms of the relevant agreement cannot be a substantial change in competitive circumstances." *Id.* (emphasis added). The Seventh Circuit merely stated that the terms of the charter and charter application did not provide GSUSA the right to amend Manitou's jurisdiction during the term of the charter. *Id.* at 1098. Notably, the circuit court, quite candidly, stated that it was "unclear what exactly constitutes the agreement in this case," reserving the question as to the extent of the agreement between the parties for this court to determine.  *Id.* at 1098, n9. Here, GSUSA argues that documents incorporated by reference and extrinsic evidence indicate that the agreement allowed GSUSA to adjust Manitou's jurisdiction.

[41] Manitou insinuates in its briefs that the issue of *Super Valu Stores* was definitively decided by the Seventh Circuit's opinion and this court should not second guess the appellate court's decision.  The Seventh Circuit's comments about *Super Valu Stores* was entirely dicta, *id* at 1097 ("[A]mbiguities surrounding the relevant provision in the charter application make it unnecessary for us to decide the scope of *Super Valu Stores* decision today"), leaving it for this court to opine on the scope of the decision.

circumstances of the dealership agreement" between the two parties, violating Wis. Stat. § 135.03 of the WFDL.  *Id.* at 575.  The Wisconsin appellate court disagreed, finding that the plaintiff awarding a dealership to a third party in Wisconsin Rapids did not amount to a "substantial change of the competitive circumstances of a dealership agreement." [42] *Id.* at 574.  The *Super Valu Stores* court gave two primary reasons for finding that the grantor had not committed a violation of § 135.03.  First, the court noted that the actions taken by Super Valu were not so serious as to amount to a "*de facto* termination of the agreement," as the grantor continued to treat the grocery store as a "dealer in all respects until [the plaintiff] closed the store." *Id.* at 576 ("Super Valu did not change the credit or any other terms of its agreement . . . nor did it withdraw any product lines or take any other action amounting to a *de facto* termination of the agreement.")  The court gave as its second and "more important" reason for its decision the fact that "the retail sales agreement was

---

[42] The court notes that *Super Value Stores* is only applicable to the "substantial change" clause of § 135.03 and has no applicability with regards to the "termination" or "non-renewal" clause.  The facts of the case before the court, and when the Seventh Circuit imposed its injunction, indicate that while GSUSA wished to fully merge Manitou's jurisdiction with other Girl Scout councils in the area, the only concrete actions that GSUSA took up until the injunction was imposed was to remove a sizable portion of Manitou's jurisdiction. Because the court cannot guess at what GSUSA would have done but for the injunction being imposed, *see Texas v. United States,* 523 U.S. 296, 299 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated or indeed may not occur at all"), the court will view the harm in this case as relating to GSUSA's actual and concrete attempts to remove a majority of Manitou's jurisdiction.  Indeed, Manitou did not even respond to GSUSA's ripeness arguments.  In addition, even if the court viewed the harm as GSUSA attempting to completely merge Manitou with the other councils, if Manitou was merged into the new councils, Manitou would still exist as a satellite office, and while not a completely separate corporate entity, it is unclear as to whether such a change would be a complete termination as opposed to a "substantial change in the competitive circumstance of the dealership agreement."  *See Meyer v. Kero-Sun, Inc.,* 570 F. Supp. 402, 406 (W.D. Wis. 1983) (holding that a termination or cancellation means the act of the grantor which brings an end to the relationship).  As a result, this case is a "substantial change" case.

Case 2:08-cv-00184-JPS   Filed 03/31/10   Page 34 of 89   Document 172

nonexclusive."[43] *Id.* For the court of appeals, Super Valu Stores was true to what it stated in its agreement with the dealer – that it was authorized to "franchise other stores whenever and wherever it wish[ed]." *Id.* In cryptic language, the *Super Valu Stores* court concluded that "compliance with the express terms of the dealership agreement cannot, under the circumstances of this case, give rise to a violation of sec. 135.03." *Id.* at 577.

It is the latter statement from *Super Valu Stores* that GSUSA uses to argue that whenever a dealer takes action that is permitted by the dealership agreement, the dealer is not substantially changing the competitive circumstance of the agreement and is not violating § 135.03. To a limited extent, the logic of the principle espoused by GSUSA is textually consistent with the language of the WFDL: § 135.03 prohibits a grantor from substantially changing "the competitive circumstances of a *dealership agreement* without good cause." (emphasis added). The inclusion of the phrase "dealership agreement" in the statute implies that a mere substantial change in the competitive circumstances in which the dealership exists effectuated by the grantor is not enough to violate the WFDL; instead a grantor must

---

[43] The court notes that the Seventh Circuit analyzed the *Super Valu Stores* issue, in part, under the rubric of whether the parties' dealership agreement was "non-exclusive," finding that if the agreement was exclusive *Super Valu Stores* did not apply. *Manitou,* 549 F.3d at 1097. The parties continue to hint at this argument in their briefs. Given that the central issue is whether the statute's prohibition applies to the grantor "substantially chang[ing] the competitive circumstances in the dealership agreement," this court is at a loss as to why "nonexclusivity" is even an issue in this case or why it would be dispositive of the question of whether the statutory language was violated. Manitou is not contending that the harm effectuated by GSUSA resulted from the defendant's introducing a competitor into Manitou's territory; Manitou is contending the harm has resulted from GSUSA transferring part of Manitou's jurisdiction. Just because "exclusivity" animated the facts of *Super Valu Stores*, does not mean it animates the facts of every WFDL case or that exclusivity is the imprimatur by which a violation of the WFDL is gauged. As such, the court finds it is irrelevant as to whether the parties' dealership agreement was exclusive or not.

substantially change the competitive circumstances as envisioned by the dealership agreement. Therefore, if the dealership agreement contemplates that the grantor can, for example, raise the prices the grantor charges the dealer for the grantor's products, or alter the credit line provided to the dealer, the dealer cannot complain that the grantor has substantially changed the competitive circumstances of the dealership agreement when and if the grantor takes actions envisioned by that agreement. *See* Michael A. Bowen and Brian E. Butler, *The Wisconsin Fair Dealership Law* § 7.14 (3rd ed. 2003). GSUSA expands on this logic, arguing that the grantor does not violate Wis. Stat. § 135.03's "substantial change" clause as long as the grantor is exercising a right that either: (1) the dealer had the foresight to *explicitly*[44] place in the dealership agreement; or (2) was *implicit*[45] based on documents incorporated by reference into the agreement, written and oral statements of the parties at the time of execution, or the parties' course of performance. Ultimately, the defendant argues that the dealership agreement between the Girl Scouts and Manitou both explicitly and implicitly allowed the defendant to transfer part of the jurisdiction of the plaintiff to another council.

However, carried to its logical conclusion, GSUSA's principle has far reaching and potentially worrisome implications. If the plaintiff's assertion of the holding of

---

[44] See *Super Valu Stores,* 146 Wis. 2d at 576 (holding that the grantor, by expressly retaining the right to choose and select its retailers and enter into retail agreements with other parties at its sole choice and discretion, did not violate Wis. Stat. § 135.03's prohibition against making substantial changes to the competitive circumstances of the dealership agreement).

[45] *See Brauman Paper Co. v. Congoleum Corp.,* 563 F. Supp. 1, 3 (E.D. Wis. 1981) (holding that the dealership agreement between the parties implied that the agreement was non-exclusive in nature because of the parties' course of performance).

*Super Valu Stores* is correct, there is seemingly nothing to prevent grantors from effectively gutting the substantial change provision of Wis. Stat. § 135.03 by reserving to themselves, either explicitly or implicitly, the right to alter any term of the dealership agreement. *See* Bowen and Butler, *The Wisconsin Fair Dealership Law* § 7.14. Such an interpretation of *Super Valu Stores* is particularly troubling given the WFDL's espoused purpose, codified in § 135.025(2)(b), "[t]o protect dealers against unfair treatment by grantors, who inherently have superior economic power and superior bargaining power in the negotiation of dealerships." Given the "superior bargaining power" of dealers in negotiating the terms of a dealership agreement, if *Super Valu Stores* truly held that *whenever* the dealer takes an action explicitly or implicitly allowed by the dealership agreement there can *never* be a violation of the WFDL, the WFDL's substantial change clause is left in shambles. As such, GSUSA's interpretation of *Super Valu Stores* and Wis. Stat. § 135.03 is not one that this court is eager to endorse.[46] *Wenke v. Gehl Co.*, 2004 WI 103, ¶ 32 (2004) ("A cardinal rule in interpreting statutes is to favor a construction that will fulfill the purpose of the statute.") Moreover, the court notes that the WFDL prohibits the terms of the statute from being "varied by contract or agreement," and that "any contract or agreement purporting to do so is void." Wis. Stat. § 135.025(3). The

---

[46] In dicta, in *Jungbluth v. Hometown, Inc.*, 201 Wis. 2d 320, 332 (1996), the Wisconsin Supreme Court implicitly rejected GSUSA's argument. Noting the concern of the dealer that the broad reading of *Super Valu Stores* would provide a grantor with a "virtual blueprint to terminate a dealership at any time," the Wisconsin high court noted that "it would be unreasonable to assume that the legislature intended the dealership agreement to garner such protection at the expense of the dealer" and that "the result as depicted here would be absurd in light of the remedial purpose of the WFDL." *Id.* at 332, n.7.

plain language of the statute hints at discouraging this court from applying a broad reading to the holding of *Super Valu Stores.*[47]

The court is mindful, however, that, as a federal tribunal exercising diversity jurisdiction, this court must look to courts of the state of Wisconsin for guidance in determining the meaning of Wis. Stat. § 135.03, including the decisions of Wisconsin's intermediate courts when the state supreme court has not ruled on an issue. *Clarin Corp. v. Massachusetts Gen. Life Ins. Co.*, 44 F.3d 471, 474 (7th Cir. 1994). In this case, the last "on point" Wisconsin case regarding the contours of the "substantial change" provision of § 135.03 was *Super Valu Stores* and this court is obliged to follow the holding of that case.[48] If GSUSA's interpretation of *Super Valu Stores* is the only possible interpretation of that case, the court will apply GSUSA's view on the law. Having said that, the court is unpersuaded that GSUSA's

_____

[47] GSUSA argues that § 135.025(3) is inapplicable to the holding of *Super Valu Stores*, as Wisconsin courts have construed that provision of the WFDL to mean "that parties to a dealership agreement cannot agree to apply another state's less protective dealership law." (Def's Br. 33). While § 135.025(3) is often quoted as a reason to deny effect to a contract's choice of law provision, the defendant cites to no authority, nor can this court find any authority, that § 135.025(3) should only be applied when construing choice of law provisions in a contract. § 135.025(3) seems equally applicable in the case where a dealer attempts to use the agreement to skirt the basic protections of the WFDL.

[48] The court notes that having to rely on case law from over twenty years ago gives the court great pause. The Wisconsin Fair Dealership Law is a statute that will often pair Wisconsin dealers against grantors, who are often national in their business focus and citizens of another state, in litigation over hundreds of thousands, if not millions, of dollars. As a result, WFDL litigation tends to occur in federal court. Indeed, the overwhelming majority of "hits" for case law on the WFDL has been from federal courts. The Wisconsin Supreme Court needs an opportunity to expound upon the holding of *Super Valu Stores* and the limits of § 135.03. However, Wisconsin law implicitly prohibits the Wisconsin Supreme Court from answering questions certified by federal district courts. *See* Wis. Stat. § 821.01 ("The supreme court may answer questions of law certified to it by the supreme court of the United States, a court of appeals of the United States or the highest appellate court of any other state when requested by the certifying court if there are involved in any proceeding before it questions of law of this state which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of the supreme court and the court of appeals of this state.") As such, this court will interpret the question of law begged by the issue in this case as best as it can. However, if a higher court has the opportunity, certification may be the best route to resolve all of the WFDL issues in this case.

-38-

interpretation of the scope of *Super Valu Stores* is correct. GSUSA's proposed principle of law, while true under the facts of *Super Valu Stores* or perhaps when the dealer makes other changes contemplated by the dealership contract, must have a logical stopping point or else the protections afforded by the substantial change provision of the WFDL would be devoid of meaning. Indeed, the *Super Valu Stores* decision does provide the logical stopping point to the "whatever is in the dealership agreement is not a substantial change" rule. Compliance with the express terms of the dealership agreement cannot give rise to a violation of § 135.03 *unless* the dealer has "taken action amounting to a *de facto* termination of the agreement."[49] *Super Valu Stores,* 146 Wis. 2d at 576 (holding that a violation of the WFDL did not occur, because, in part, Super Valu Stores did not take action, such as changing the credit or "any other terms of its agreement" with the dealer). Such a reading of *Super Valu Stores* comports with the Seventh Circuit's interpretation of the "substantial change" clause in § 135.03: "the Wisconsin Fair Dealership Law makes . . . explicit" through the "provision about not 'substantially chang[ing] the competitive circumstances of the dealership [agreement]'" that the dealer cannot "constructively terminate" the dealership. *Remus v. Amoco Oil Co.*, 794 F.2d 1238, 1240. (7th Cir. 1986); *see also East Bay Running Store, Inc. v. NIKE, Inc.*, 890 F.2d 996, 1000 n.6 (7th Cir. 1989). Ultimately, the "grantor may not make changes so extensive and

---

[49] The court notes that there is nothing explicit in *Super Valu Stores* to surmise that a rule that *"whenever* a grantor's acts comply with the dealership agreement, § 135.03 has been complied with" exists. *Super Valu Stores*, 146 Wis. 2d at 577 ("Compliance with the express terms of the dealership agreement cannot, *under the circumstances of this case,* give rise to a violation of sec. 135.03") (emphasis added).

Case 2:08-cv-00184-JPS     Filed 03/31/10     Page 39 of 89     Document 172

onerous that they amount to a *de facto* termination of the dealership."[50]  Bowen and

Butler, *The Wisconsin Fair Dealership Law* § 7.14; *see also Van v. Mobil Oil Corp.*,

515 F. Supp. 487, 490 (E.D. Wis. 1981) ("At the outset, the Court rejects defendant's

contention that, as a matter of law, the change in credit terms did not constitute a

change in plaintiff's competitive circumstances . . . [a]lthough the change may have

amounted to nothing more than the adoption of a prudent business practice to

defendant, to plaintiff it constituted a barrier which had to be overcome before he

could continue operating his franchise"); *JPM, Inc. v. John Deere Indus. Equip. Co.*,

934 F. Supp. 1043, 1045 (W.D. Wis. 1995) ("Wisconsin courts acknowledge that the

protections of Wis. Stat. § 135.03 extend to "constructive" or "de facto" termination,

where a formal dealership contract continues in force although the relationship has

effectively ended in practice.")

    GSUSA argues that *Super Valu Stores* "is clear that the WFDL's language

requires deference to the parties' dealership agreement." (Def's Br. 33).  However,

*Super Valu Stores* contemplated a limit on the principle GSUSA espouses, namely

that when an action, even one contemplated by the dealership agreement, becomes

so egregious as to amount to "constructive termination" of the dealership that

§ 135.03 is violated.  *Super Valu Stores,* 146 Wis. 2d at 576.  The court's

interpretation is in line with the espoused purpose of the WFDL, § 135.025(2)(b), and

_____

[50] In addition, only the court's reading of *Super Valu Stores* is consistent with the text of § 135.03.  The text of the statute states that "no grantor may . . . substantially change the competitive circumstances of a dealership agreement without good cause."  An action taken that amounts to a constructive termination of the dealership agreement, even if theoretically contemplated by the agreement, would be against the entire reason the dealer entered into the business arrangement and would substantially change the competitive circumstances of the contract.

the WFDL's instruction to "liberally construe" and apply its terms to promote its underlying remedial purposes and policies. § 135.025(1). The court's interpretation of § 135.03 does not "completely rewrite," (Def.'s Br. 33), the statute; instead it preserves its essential meaning and provides for a balanced and moderate approach toward interpreting the WFDL's "substantial cause" language.

Given the state of the law, the court need not inquire into whether the dealership agreement between GSUSA and Manitou allowed the defendant to eliminate part of Manitou's jurisdiction because of the realignment plan, at least for the purposes of the WFDL claim. Even if[51] the dealership agreement explicitly allowed GSUSA to take away much of Manitou's territory, if the court can conclude that the undisputed facts show that the defendant's actions amounted to a "constructive termination" of the dealership agreement with Manitou, putting to the side the "good cause" standard, the terms of § 135.03 have been violated as a matter of law.[52] "Constructive termination" of a dealership agreement can occur when the grantor takes actions that amount to an "effective end to the commercially meaningful aspects of the [dealership] relationship," regardless of whether the formal contractual relationship between the parties continues in force. *Techmaster, Inc. v. Compact Automation Prods., LLC*, 462 F. Supp. 2d 932, 940 (W.D. Wis. 2006) (internal citations omitted); *see also Remus*, 794 F.2d. at 1241 (holding that a

---

[51] The court does not make a formal ruling at this stage of the order on whether the agreement authorized GSUSA to reapportion Manitou's jurisdiction.

[52] "Constructive termination" is used as a term of art whose meaning is explained in the WFDL case law. It is not meant to have any meaning beyond the WFDL claim.

-41-

constructive termination of a dealership agreement occurs when a grantor makes the dealer's "competitive circumstances so desperate that a dealer 'voluntarily' gives up the franchise."). Moreover, courts have found that a de facto termination can occur even when a grantor takes actions that merely have a "serious effect on a dealer's ability to continue" in its current market. *Wis. Compressed Air Corp. v. Gardner Denver, Inc.*, 571 F. Supp. 2d 992, 1002 (W.D. Wis. 2008).

Here, the undisputed facts demonstrate that a "constructive termination" of the dealership agreement would have occurred in this case but for the injunction imposed by the Seventh Circuit. The mandate by the GSUSA for Manitou to transfer its northern territories to the Northwestern Great Lakes Council would have had a devastating impact on the dealer. The merger would have reduced three-quarters of Manitou's girl membership, and, with that, presumably a significant portion of Manitou's revenues. The merger would have also reduced the number of volunteers in Manitou's territory by more than seventy percent. The merger would have limited the amount of revenues Manitou took in from donations, as the merger would have left Manitou as a shell of its former self. In sum, the undisputed facts indicate that GSUSA's actions would have resulted in a "substantial change in the competitive circumstances of the dealership agreement" between the parties but for the injunction. GSUSA's *Super Valu Stores* argument is not a reason to either grant the defendant's summary judgment or deny the plaintiff's motion for summary judgment on the WFDL claim.

## 2.    Good Cause

GSUSA argues, in the alternative, that it is entitled to summary judgment on Manitou's WFDL claims "because [GSUSA] had 'good cause' for the transfer [of Manitou's jurisdiction] in order to implement its national realignment strategy." (Def's Br. 36).   Under the WFDL, a grantor or licensor may "substantially change the competitive circumstances of a dealership agreement" for "good cause."  Wis. Stat. § 135.03.  The grantor bears the burden of proving good cause.  *Id.*   Under the statute, the term "good cause" has a specific meaning:  a dealer's failure to comply with "essential and reasonable requirements imposed upon the dealer by the grantor" or "bad faith by the dealer in carrying out the terms of the dealership."  Wis. Stat. § 135.02.   In this case, neither party contends that Manitou took actions providing GSUSA with "good cause" within the meaning of the *statutory* definition of "good cause."  However, "good cause" is not limited to the statutory definition of the term.  In *Ziegler Co. v. Rexnord, Inc.,* 147 Wis. 2d 308, 314 (1988) ("*Ziegler II*"), the Wisconsin Supreme Court held that a grantor's *own* circumstances could constitute good cause for reasonable, essential, and nondiscriminatory changes in the way it did business with dealers.[53]  GSUSA makes two arguments with regard to the good

---

[53] Manitou argues that *Ziegler II* is only applicable in cases where the grantor is attempting to "change its method of doing business with its dealers," not in a case, such as this, where the grantor is "switching out" one dealer for another.   The court rejects Manitou's argument.  As stated earlier, the question of whether GSUSA is actually "switching out" one dealer for another is not yet ripe for discussion and is not clear on the facts.   More importantly, even assuming that GSUSA is "swapping out" Manitou for another council, the limit that Manitou is trying to ascribe to *Ziegler II*'s holding has been foreclosed by *Morley-Murphy Co. v. Zenith Elecs. Corp.*, 142 F.3d 373, 375 (7th Cir. 1998) in which the Seventh Circuit held that *Ziegler II*'s form of good cause applied in a case where a grantor, a television manufacturer, ended its relationship with its distributor dealer, substituting the distributor dealer for retail level dealers.  *Ziegler II* is plainly relevant to this case – the question that remains is whether GSUSA has made out a case of grantor based "good cause."

Case 2:08-cv-00184-JPS    Filed 03/31/10    Page 43 of 89    Document 172

cause standard articulated in *Ziegler II*.  First, the defendant argues that, as a matter of law, the circumstances motivating GSUSA's realignment, including the reduction of Manitou's territory, constitute "good cause" within the meaning articulated by the *Ziegler II* court.  Second, GSUSA contends that in *Ziegler II* good cause does not exist as a matter of law, that applying the WFDL to the actions GSUSA took in this case would violate GSUSA's First Amendment rights to freedom of expressive association.  The court will address each of GSUSA's arguments accordingly.

### a.    The Statutory Question

Interpreting *Ziegler II,* the Seventh Circuit held in *Morley-Murphy Co. v. Zenith Electronics Corp.*, 142 F.3d 373, 377 (7th Cir. 1998), that to show good cause for making a substantial change in the competitive circumstances of a dealership agreement, the grantor must demonstrate:  "(1) an objectively ascertainable need for change, (2) a proportionate response to that need, and (3) a nondiscriminatory action."  *Id.* at 378.  Manitou only contests the first and second prongs of the *Moley-Murphy* test, arguing that GSUSA has not demonstrated a need for reducing Manitou's jurisdiction and that GSUSA did not take a proportionate response even if the organization had a need for change.

Courts have narrowly interpreted what constitutes an "objectively ascertainable need for change," finding that the "grantor must prove that it was demonstrably losing substantial amounts of money under the relationship."  *Praefke Auto Elec. & Battery Co. v. Tecumseh Prods. Co.*, 110 F. Supp. 2d 899, 906 (E.D. Wis. 2000) (rev'd on other grounds); *see also Ziegler II,* 147 Wis. 2d at 316 ("If the

-44-

grantor is demonstrably losing substantial amounts of money under the relationship, it may constitute good cause for changes in the contract"); *Morley-Murphy,* 142 F.3d at 378 (finding that a grantor who had been operating in losses for nine out of ten years with hundreds of millions of dollars in losses had demonstrated an objectively ascertainable need for change); *Wisconsin Music Network, Inc. v. Muzak Ltd. Partnership*, 822 F. Supp. 1332, 1337 (E.D. Wis. 1992) (finding the grantor's actions were "essential and reasonable" when the grantor was "having its brains beaten out in the national account marketplace" by its competitors).

Here, GSUSA has proffered several reasons to indicate that the organization had an "objectively ascertainable need" to substantially reduce Manitou's territory. For the defendant, its realignment efforts, a product of several independent studies and years of internal planning, were aimed to solidify the organization's message and boost the effectiveness of the Girl Scouts' programs, given the espoused goals of the defendant. Specifically, the national organization reasoned that consolidating the individual councils would help solidify the Girl Scouts' message because with fewer councils, the communications conveyed by each council would be more consistent.  Moreover, GSUSA concluded that realignment would make the organization more effective in a number of ways, including:  (1) reducing the frequency in which councils would compete over neighboring areas for fund-raising and personnel; (2) allowing legacy councils to pool resources to attract the best candidates for administrative positions in the new councils; (3) allowing councils to create more specialized administrative posts; (4) having more diverse population

bases with fewer economic disparities between the councils; and (5) having the financial resources to effectively deliver Girl Scout services to girls who are not serviced by a troop.

While perhaps the reasons proffered by the GSUSA for why it opted to substantially change the competitive circumstances of Manitou's dealership agreement were good ideas, nothing in the text of the WFDL, or in the case law interpreting the "good cause" standard, indicate that GSUSA has demonstrated an "objectively ascertainable need" for attempting to reduce Manitou's territory. This court agrees with the conclusion of the Seventh Circuit's earlier decision in this case that "fading brand image and waning program effectiveness . . . without a tangible effect on the bottom line" do not meet the standard of "good cause" under the WFDL. *Manitou,* 549 F.3d at 1099.

GSUSA urges the court to adopt a liberal interpretation of what constitutes "an objectively ascertainable need for change." Specifically, GSUSA argues that in the case where a grantor is a "charity or educational enterprise" that an "objectively ascertainable need for change" can include "non-economic factors," such as the need for the organization to "further its charitable or educational mission." (Def.'s Br. 37). The court refuses to adopt such an interpretation of the WFDL. This court is mindful that the *Ziegler II* court "strain[ed] to interpret the WFDL" to include grantor-based good cause, given that the statute only contemplates dealer-based good cause. *Morley-Murphy,* 142 F.3d at 377 ("We agree with the district court that one must strain to interpret the WFDL as permitting dealer termination as one form of

-46-

grantor restructuring . . . [T]hat strain does not arise because of the difference between complete termination and a lesser change in the parties' legal relationship . . . Instead, it is a natural consequence of the Wisconsin Supreme Court's interpretation of 'good cause' in *Ziegler*."); *see also Ziegler II,* 147 Wis. 2d at 325 (Abrahamson, J., concurring) ("[T]he majority's interpretation of the good cause requirement focuses on the grantor and therefore contravenes the plain language of sec. 135.02 (4), Stats. which focuses entirely on the conduct of the dealer.") The interpretation of the statute espoused by GSUSA pushes the boundaries of the meaning of good cause far beyond what the *Ziegler II* court envisioned. *Morley-Murphy,* 142 F.3d at 377 ("The Wisconsin Supreme Court was careful to limit this kind of grantor-based good cause, so that grantors would not be able to terminate merely upon a showing that they believed they could make more money without the particular dealer.") As the Seventh Circuit noted in its earlier decision in this case, the WFDL makes no distinction between "for-profit" and "not-for-profit" entities, *Manitou,* 549 F.3d at 1092, and, as such, the court cannot judicially craft a lower threshold for when not-for-profit organizations wish to substantially change the competitive circumstances of a dealership agreement. Simply put, there is nothing in the text of the statute, in the *Ziegler II* decision, or in any subsequent cases to provide a basis for an expansive definition of what an "objectively ascertainable need

for change" entails in the case of a not-for-profit grantor.[54]  To the extent the Girl Scouts wish the WFDL to contain a limit on the term "good cause" for non-economic reasons, the appropriate forum for the defendant to address its concerns is the Wisconsin legislature, not a federal district court.[55]

GSUSA further contends that the court must "tailor the good cause analysis to avoid constitutional conflict" and create a new standard for "good cause" as it pertains to the case of the WFDL applying to a not-for-profit organization. (Def.'s Br. 41).  The court disagrees.  The constitutional avoidance canon of statutory construction only informs the choice between *plausible* readings of a statute's text or case law interpreting the statute.  *Spector v. Norwegian Cruise Line Ltd.*, 545 U.S. 119, 140 (2005).  As such, the canon only "comes into play when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction; and the canon functions as a means of choosing between them."  *Clark v. Martinez,* 543 U.S. 371, 381 (2005) (emphasis added).  Here, nothing in the text of the statute or subsequent judicial interpretations of the WFDL support a reading of good cause that includes a not-for-profit organization's efforts

---

[54] The court acknowledges that this is likely a product of the fact that the Wisconsin legislature never contemplated that the WFDL would be applied to an entity like the GSUSA.  In fact, the plaintiff's own counsel boasts on his website that the Seventh Circuit's case "is the first appellate decision in the nation to apply a state franchise or dealership statute to non-profits."  *See* "Gary W. Leydig: Chicago Trial & Appellate Lawyer," http://www.leydiglaw.com/ (last visited March 31, 2010). However, given the Seventh Circuit's decision in this case, the court cannot find a principled basis for adopting the interpretation of good cause that GSUSA articulates.

[55] GSUSA cites to a myriad of cases interpreting other states' dealership laws to make the argument that good cause "may be based on a grantor's legitimate 'business' needs and such needs encompass more than simply avoiding losing money."  (Def's Resp. Br. 24).  The court is bound by the meaning of grantor based good cause as discussed by the Wisconsin Supreme Court in *Ziegler II* and by the Seventh Circuit extrapolation on the *Ziegler II* decision in *Morley-Murphy*.  Both cases provide a far higher standard for what "good cause" entails under the WFDL relative to dealership laws in other states.

to further its "charitable or educational mission," (Def's Br. 37).[56]  The court must conclude that GSUSA has not met its burden in proving that it had "an objectively ascertainable need for change" when the defendant attempted to substantially change the competitive circumstances of the dealership agreement with Manitou, and, accordingly, grantor-based good cause does not exist in this case.[57]  There is no dispute as to the facts as they pertain to the WFDL claim.[58]  Manitou has met its burden in proving, as a matter of law, that GSUSA violated Wis. Stat. § 135.03 when it took efforts to substantially reduce Manitou's jurisdiction.  The court is left to

---

[56] Wis. Stat. § 135.025(2)(d) does state that one of the underlying purposes and policies of the WFDL was to "govern all dealerships, including any renewals or amendments, to the full extent consistent with the constitutions of this state and the United States."  Moreover, courts have been willing to interpret the WFDL, such that the law does not conflict with the commerce clause of the United State Constitution. *See, e.g., Lee Beverage Co. v. I.S.C. Wines of California, Inc.*, 623 F. Supp. 867 (E.D. Wis. 1985).  However, the constitutional questions the Wisconsin legislature appeared to have in mind with regard to Wis. Stat. § 135.025(2)(d) were questions regarding the statutes' potential to violate the commerce clause of article I, section 9 of the United States Constitution and the takings clause of the Fifth Amendment of the Constitution, as applied to the states via the Fourteenth Amendment of the Constitution.  See Bowen and Butler, *The Wisconsin Fair Dealership Law* § 6.42.  Unlike the *Lee Beverage* court, this court is at a loss at how the statute can be interpreted in keeping with the purpose of the WFDL while avoiding the constitutional question regarding the First Amendment.  There is no construction of the statute that would find that GSUSA complied with the terms of Wis. Stat. § 135.03 in its dealings with Manitou.

[57] Given the court's conclusion on the "objectively ascertainably need" prong of the grantor-based good cause test, the court need not opine on whether GSUSA's proposed action to substantially reduce Manitou's jurisdiction was a proportionate response to its need.  *See Daniels v. Liberty Mut. Ins. Co.*, 484 F.3d 884, 888 (7th Cir. 2007) (holding that a federal court should not discuss legal issues that would not change the court's ultimate conclusion, as such a discussion would be advisory in nature).

[58] The parties squabble all but endlessly in their briefs to the court over whether the Girl Scout's overall membership or market share has declined.  This is immaterial.  Even if the court assumes that GSUSA's statistics regarding Girl Scout membership numbers are true, GSUSA needed to prove that the organization was in a far more "dire economic straits" to fit within the meaning of "objectively ascertainable need" to prove grantor-based good cause.  *Manitou*, 549 F.3d at 1079.

resolve whether applying the WFDL to prevent GSUSA from removing Manitou's jurisdiction would violate the defendant's First Amendment rights.[59]

### b.    The Constitutional Question

The Supreme Court has noted that the First Amendment's[60] guarantees of "freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed." *Roberts v. Jaycees*, 468 U.S. 609, 622 (1984). As such, the court has recognized that implicit in the rights protected by the First Amendment is a "right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious and cultural ends." *Id.* In *Boy Scouts of America v. Dale,* 530 U.S. 640, 648 (2000), the Supreme Court provided a three-step process to analyze whether the application of a state law would violate a group's right to freedom of association. The court must first consider whether the group making the claim engaged in expressive association. *Id.* If the group is engaged in expressive association, the court will then determine whether the state action at issue "significantly affects" the group's ability to advocate its viewpoints. *Id.* at 650. If the

---

[59] GSUSA hints in its response brief to the plaintiff's motion for summary judgment that the WFDL may violate the commerce clause of the United State Constitution. Given that Manitou is not seeking to apply the WFDL extra-territorially, the court will not evaluate any other potential constitutional infirmities to the application of the WFDL. *See Morley-Murphy,* 142 F.3d at 379.

[60] The First Amendment's text reads that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U,S, Const. amend. I. The First Amendment has been incorporated against the states through the due process clause of the Fourteenth Amendment, *Gitlow v. New York*, 268 U.S. 652 (1925), and is, therefore, applicable to the facts of this case.

-50-

court finds that the state action at issue significantly burdens the group's ability to advocate its viewpoints, the application of the state law will be allowed only if the state regulations adopted serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms. *Id.* at 656; *see also Roberts,* 468 U.S. at 623.

The first question posed by the *Dale* test is a relatively easy question for the court to answer: GSUSA is a group engaged in expressive activity. The *Dale* court noted that the First Amendment's protection of expressive association is not exclusively reserved for "advocacy groups." *Dale,* 530 U.S. at 648. However, to have a protectible right of expressive association, "a group must engage in some form of expression, whether it be public or private." *Id.* Here, the record indicates that GSUSA is actively engaged in a form of expressive activity. When Congress chartered the GSUSA in 1950, it was done such that the organization could promote virtues, such as truth, loyalty, and helpfulness, among girls. 36 U.S.C. § 80302. The Girl Scout Constitution states that the mission of the organization was to promote the "highest ideals" in girls so that members could become "happy and resourceful citizens." *See* GSUSA Const., Preamble. Moreover, one of the central goals of the organization was to ensure that the Girl Scout message was conveyed to all girl populations, such that the organization promoted pluralism and diversity. *See* GSUSA, *Blue Book of Basic Documents 2006*, at 21. Just as the Supreme Court concluded in *Dale* with regard to the Boy Scouts, "an association that seeks to transmit such a system of values engages in expressive activity." *Dale,* 530 U.S. at

-51-

650; *see also Roberts,* 468 U.S. at 636 (O'Connor, J., concurring) (citing the Girl Scouts for the proposition that "[e]ven the training of outdoor survival skills or participation in community service might become expressive when the activity is intended to develop good morals, reverence, patriotism, and a desire for self-improvement").

The far more difficult question for this court to answer is whether applying the WFDL to prevent the GSUSA from substantially reducing Manitou's jurisdiction "significantly affects"[61] the Girl Scout's ability to advocate its viewpoints. "Government action may impermissibly burden the freedom to associate in a variety of ways," including "imposing penalties or withholding benefits from individuals because of their membership in a disfavored group" and "interfering with the internal organization or affairs of the group." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 861 (7th Cir. 2006) (citing to *Roberts,* 468 U.S. at 623). At issue in this case is whether the application of the WFDL to prevent the GSUSA's realignment efforts from fully taking effect in Wisconsin would "interfere with the internal organization or affairs" of the GSUSA so much so that the organization's ability to advocate its viewpoints is "significantly affected."

Before delving into that issue, however, the court needs to discuss the applicability of the *Dale* case to the present controversy. While GSUSA relies

---

[61] "Significantly affects" is how the Supreme Court posed the second prong of the *Dale* test in that case. However, the Court has used several variations on the phrase when discussing the right to expressive association. *See Dale,* 530 U.S. at 683 (Stevens, J., dissenting) ("The relevant question is whether the mere inclusion of the person at issue would 'impose any serious burden,' 'affect in any significant way,' or be 'a substantial restraint upon' the organization's 'shared goals,' 'basic goals,' or 'collective effort to foster beliefs.'")

heavily on *Dale* in making its argument, the case is of limited relevance, in that it speaks broadly about the right to expressive association. In *Dale,* the Court held that applying New Jersey's public accommodations law to require the "forced inclusion" in the Boy Scouts of an "avowed homosexual and gay rights activist" as an assistant scoutmaster unconstitutionally infringed on the group's expressive association rights. *Dale,* 530 U.S. at 648. *Dale* ultimately stands for the proposition that "forced inclusion of an unwanted person in a group infringes on the group's freedom of expressive association if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints." *Dale*, 530 U.S. at 649. Here, the present case does not involve forcing a group to accept a specific person it does not desire.[62] *See, e.g., Boy Scouts of Am. v. Wyman*, 335 F.3d 80, 91 (2nd Cir. 2003) (finding *Dale* inapplicable because the conditioned exclusion of an organization from a forum did not rise to the level of compulsive membership).

However, even though the facts of *Dale* do not mirror the facts of this case, this does not mean that GSUSA's argument regarding its right to expressive association is completely without merit.[63] GSUSA's burden is to prove that the application of the WFDL to prevent GSUSA's realignment efforts in Wisconsin would

---

[62] However, the court does acknowledge that summary judgment for Manitou on the WFDL claim would require GSUSA to retain Manitou as a council against the national organization's wishes. The court is merely stating that the case is different than the classic forced inclusion cases, such as *Dale*, where a state law is forcing a group to accept a particular person into the group's ranks.

[63] Manitou argues that the "constitutional analysis under *Dale* only arises" under the specific facts of that case. (Pl's Resp. Br 22). However, *Dale* speaks broadly about the proper framework to analyze a claim of infringement on associational rights, and the court will apply *Dale* accordingly.

Case 2:08-cv-00184-JPS   Filed 03/31/10   Page 53 of 89   Document 172

"interfere with the internal organization or affairs" of the Girl Scouts, such that the application of the state law would "significantly affect" the Girl Scout's ability to advocate its viewpoints. In *Dale,* the court found that "there can be no clearer example of an intrusion into the internal structure or affairs of an association than a regulation that forces the group to accept members it does not desire." *Dale,* 530 U.S. at 648 (quoting *Roberts*, 468 U.S. at 623). However, forced inclusion is not the only way the application of a state law could intrude into the "internal structure or affairs of an association," and, accordingly, the court must examine whether at the summary judgment stage the undisputed facts indicate that the application of the WFDL to GSUSA's actions would impose a serious burden on the defendant's right to expressive association.

In *Roberts*, the Supreme Court first formally recognized the principle cited in *Dale* that government regulation that "interferes with the internal organization or affairs of the group" has the potential to infringe on the group's freedom of expressive association. *Id.* at 623. Like *Dale, Roberts* is not directly on point because that case was another classic "forced inclusion" case, with the Minnesota Human Rights Act being used to compel the Jaycees to accept women as regular members.[64] *Id.* However, the *Roberts* decision cited the case of *Cousins v. Wigoda,* 419 U.S. 477 (1975), as an example of a case in which a government regulation may

---

[64] The *Roberts* court ultimately came to the opposite conclusion of the *Dale* court, holding that the application of the Minnesota Act did not abridge the Jaycees freedom of intimate association or their freedom of expressive association. *Id.* at 617.

impermissibly interfere with the internal organization or affairs of an expressive group. *Roberts,* 468 U.S. at 623.

In *Cousins,* the Supreme Court held that a state court violated the Democratic Party's associational rights by enjoining the party's decision to seat one group of delegates in the 1972 Democratic National Convention instead of another group who had been elected in conformity with the Illinois Election Code but in violation of a Democratic Party rule. *Cousins,* 419 U.S. at 490-91. The *Cousins* court judged the interference imposed by Illinois law on the party's associational rights in the aggregate, hypothesizing what would occur if each state regulated the party's affairs as Illinois did. *Id.* The Court concluded that the intrusion imposed by Illinois law was significant because "if the qualifications and eligibility of delegates to National Political Party Conventions were left to state law 'each of the fifty states could establish the qualifications of its delegates to the various party conventions without regard to party policy,' ultimately creating an 'intolerable result' where the national party would be 'seriously undercut or indeed destroy the effectiveness of the National Party Convention.'" *Id.* at 490 (quoting, in part, the language of the lower court's opinion).

The principle of *Cousins* was reaffirmed in *LaFollette,* where the Supreme Court, in reversing a court order "unequivocally obligat[ing] the National [Democratic] Party to accept [a] delegation to the National Convention chosen in accord with Wisconsin law, despite contrary National Party rules." *Democratic Party of the U.S. v. Wisconsin ex rel. LaFollette,* 450 U.S. 107, 123 (1981). The *LaFollette* court held

an expressive association's choice for determining its makeup was protected by the Constitution, citing to the broad principles espoused in *Cousins* and in an analogous case decided by the D.C. Circuit Court of Appeals. *Id.* (citing to *Ripon Society, Inc. v. National Republican Party*, 525 F.2d 567, 585) ("[A] party's choice, as among various ways of governing itself, of the one which seems best calculated to strengthen the party and advance its interests, deserves the *protection* of the Constitution") (emphasis in original). Beyond *Cousins* and *LaFollette,* at least in the context of political expressive associations, the Supreme Court has "continuously stressed that when states regulate parties' internal processes they must act within limits imposed by the Constitution." *See California Democratic Party v. Jones,* 530 U.S. 567, 573 (2000) (holding that California's "blanket" primary system violated the Democratic Party's First Amendment right of association by preventing the party from prohibiting persons who were not members of the party from voting in the party's primary election); *see also Tashijan v. Republican Party of Conn.,* 479 U.S. 208 (1986) (striking down a law forbidding political parties from allowing non-members to vote in party primaries); *Eu v. San Francisco County Democratic Cent. Comm.*, 489 U.S. 214, 217 (1989) (striking down on First Amendment grounds provisions of California's election law barring political parties from endorsing, supporting, or opposing "any candidate for nomination by that party for partisan office in the direct primary election"); *cf. Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 453 (2008) (upholding a Washington law allowing the two top vote-getters for each office to advance to the general election regardless

of a party's preference against a facial challenge when the law did not, by its terms, choose the makeup of the parties' nominees). Nonetheless, the court has required that the burden that a state law imposes on how an expressive association organizes itself must be "severe" in nature and not merely "ordinary and widespread" before a court reviews the regulation in question under a strict scrutiny standard. *Clingman v. Beaver*, 544 U.S. 581, 587 (2005) ("Instead, as our cases since *Tashjian* have clarified, strict scrutiny is appropriate only if the burden is severe.")

There is no reason to believe that the principles espoused by the *Cousins* line of cases is only applicable to formal organizations engaging in *political* expression, such as a political party. While "the First Amendment 'has its fullest and most urgent application' to speech uttered during a campaign for political office," *Eu,* 489 U.S. at 223 (internal citations omitted), the *Dale* court explained that "the First Amendment's protection of expressive association is not reserved for advocacy groups."[65] *Dale,* 530 U.S. at 648. In fact, a private organization engaged in expressive association enjoys more robust rights than that of a political party, as the Supreme Court has recognized that a political party's right to freedom of expressive association is

---

[65] There are limits, of course, on how far the right to expressive association extends. Justice O'Connor explored the limits of the doctrine in *Roberts,* contending that courts should provide "complete protection for purely expressive associations, even while it readily permits state regulation of commercial affairs." *Roberts,* 468 U.S. at 635 (O'Connor, J., concurring) ("The Constitution does not guarantee a right to choose employees, customers, suppliers, or those with whom one engages in simple commercial transactions, without restraint from the State. A shopkeeper has no constitutional right to deal only with persons of one sex."); *see generally* R. Rotunda & J. Nowak, Treatise on Constitutional Law § 20.41(c) (4d ed. 2007). As discussed in the body of this order, because the Girl Scouts are predominantly engaged in protected expression, heightened scrutiny of the application of the WFDL is appropriate. Moreover, the court is guided by Justice O'Connor's comments that "no association is likely ever to be exclusively engaged in expressive activities" because it will likely take actions like "collecting dues from its members" and the mere fact that an association engages in some commercial transactions does not remove the association from the full extent of First Amendment's protections. *Roberts,* 468 U.S. at 635 (O'Connor, J., concurring).

circumscribed "when the State gives the party a role in the election process," making the political party a state actor. *N.Y. State Bd. of Elections v. Lopez Torres*, 552 U.S. 196, 203 (2008); *see also Jones*, 530 U.S. at 594 (Stevens, J., dissenting) ("The protections that the First Amendment affords to the "internal processes" of a political party . . . do not encompass a right to exclude nonmembers from voting in a state-required, state-financed primary election.")  Nor can the political party cases be limited by the principle that those cases involved state interference with *who* can be a member in a given association.  The Supreme Court has recognized the state can infringe upon a group's right to expressive association beyond when the state forces the inclusion of members into a particular group.  *See, e.g., Healy v. James,* 408 U.S. 169 (1972) (invalidating efforts by a state college to prevent a chapter of Students for a Democratic Society from holding meetings or organizing on campus); *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958) (holding that a state's demand that the NAACP reveal the names and address of all its Alabama members and agents violated the group's rights to expressive association).  In sum, the First Amendment provides expressive associations the right to "organize and direct them[selves] in the way that will make them most effective," *Ripon Society,* 527 F.2d at 585, protecting such groups against a substantial "intrusion into the internal structure or affairs of an association."[66]  *Dale,* 530 U.S. at 648; *see generally Michigan State AFL-CIO v. Employment Rels. Comm'n*, 453 Mich. 362, 399 (1996)

---

[66] The court's conclusion on the state of the law is in part a product of the utter failure of Manitou to provide any case law that would cast doubt on the nature of the right of expressive association.

(Mallet, J., concurring) ("[A]ny governmental intrusion on the internal structure and organization of a group may pose questions of constitutional significance.")

Applying those principles to the case at hand, the court concludes that application of the WFDL to prevent GSUSA from implementing their realignment plan fully constitutes a burden on the organization's ability to advocate its viewpoints. Beginning in the early part of last decade, the defendants, aided by several independent studies, concluded that the achievement of the central goals of the organization – to promote the Girl Scout movement throughout the United States – was threatened by a host of problems including an unfocused message, difficulties in fund-raising and recruiting executives, inabilities to effectively provide Girl Scouting to underprivileged populations, and, as their studies indicated, a decreased market share for the Girl Scouts in the United States. After years of consulting with executives within the organization and the leadership of the individual councils, the GSUSA concluded that realignment was the most effective means for organizing and providing the message of Girl Scouting and the best way to ensure that the Girl Scout message was not diluted. The record indicates that the executives of Manitou, who initially agreed with the defendant's broad plans for consolidating the Girl Scout councils, changed their minds about the defendant's realignment plans once the plaintiff realized the difficulties of working with executives from neighboring councils and of having to share the council's resources with their neighbors. Manitou, while voicing general allegiance to the goals of the Girl Scouting, now openly opposes the efforts of the Girl Scouts to realign the Wisconsin councils.

-59-

Manitou, through the WFDL, asks for a permanent injunction preventing the GSUSA's attempts to realign its councils, (Compl. "Count I"), the means by which the organization has decided is the best way to convey the message of Girl Scouting, including to ethnic and economic groups that have, until this time, been underserved by the organization. This court can only conclude that the application of the WFDL in this case is a direct affront to the Girl Scouts' reasoned efforts to organize and direct itself in a means that it judges most effective in proclaiming its expressive message. *Ripon Society,* 527 F.2d at 585. Moreover, as the record indicates, the sheer number of councils within the Girl Scout organization tended to dilute the national organization's message and, having Manitou maintain the entirety of its jurisdiction against the wishes of the GSUSA, would similarly affect the message of the expressive association. In addition, the natural result of summary judgment for Manitou on the WFDL claim would allow Manitou and its executives, a group who has an ideological conflict with the national organization over the long term goals of Girl Scouting, administering the expressive message for the organization in seven counties in Wisconsin.[67] *Roberts,* 468 U.S. at 481 (O'Connor, J., concurring) ("[A]n association engaged exclusively in protected expression enjoys First Amendment

---

[67] Manitou contends that "GSUSA does not identify a single expression or point of view extolled by Manitou that is in conflict with GSUSA." (Pl's Resp. Br. 22). This argument misses a major point: as discussed in the body of this order, forced inclusion is not the only means by which the state can infringe upon the freedom of expressive association. However, even if the court views this case through the lens of the forced inclusion scenario, there is a clear ideological conflict between the two parties in this case, in part, over how the Girl Scout message is conveyed and to whom the message is effectively disseminated. The court adopts a statement made by GSUSA in their reply brief: "Manitou resisted realignment because the traditional troop system had worked well for its small suburban population and it did not want to share resources with the other councils to the north whom Manitou regarded as culturally incompatible with and organizationally inferior to it." (Def's Reply Br. 11).

protection of both the content of its message and the choice of its members.")  In short, application of the WFDL in these circumstances will adversely affect GSUSA's expressive message.

Moreover, this court views the intrusion into GSUSA's internal efforts to organize itself through the application of the WFDL to be substantial.   The present case is substantively indistinguishable from *Cousins*:[68] just as if every state imposed their will in deciding the qualifications of the delegates for a national political party's convention would "seriously undercut or indeed destroy the effectiveness" of the association, *Cousins,* 419 U.S. at 490, so too would the effectiveness of an expressive association be eroded if every state's fair dealership law were used to override a given association's well-vetted choice for how it should organize itself nationally in providing its expressive message.[69]  Such a burden, when viewed in the aggregate nationally is far from an "ordinary and widespread" burden incidentally affecting the organization's expressive message, *Clingman,* 544 U.S. at 593, but

_____

[68] Indeed, Manitou does not even attempt to distinguish *Cousins* or any of the other cases discussing a state impermissibly interfering with the internal organization or affairs of an expressive group in the hundreds of pages it submitted to the court.  This is of particular note given that *Cousins* is the case cited in *Roberts* as the example of where a state impermissibly "interfere[s] with the internal organization or affairs of an expressive group.  *Roberts,* 468 U.S. at 613.  Given the central relevance of the constitutional issue to the claim at hand, the court is surprised that Manitou did not address the First Amendment issue in their reply brief to the court and did not even attempt to supplement its briefs to the court to try to distinguish the political party cases.  Manitou's silence on the issue is telling.

[69] It is of no consequence that the WFDL only applies in Wisconsin, that Manitou does not ask that the law be applied extraterritorially, or that nearly every Girl Scout council has agreed to merge.  *Cousins* instructs this court to view the impact of the challenged law in the aggregate, hypothesizing if every state had a law akin to that whose Constitutionality is being challenged.  *Cousins,* 419 U.S. at 490-91.  Moreover, the Supreme Court in *Dale* found that application of the New Jersey public accommodations law to mandate that an expressive association accept *one person* whose beliefs were in contrast with the organization infringed on the Boy Scouts' right to expressive association.  *Dale,* 530 U.S. at 640.  Likewise, the application of the WFDL in this instance to stop GSUSA's realignment efforts in Wisconsin can have a significant burden on the organization.

Case 2:08-cv-00184-JPS   Filed 03/31/10   Page 61 of 89   Document 172

rather is a substantial burden preventing the Girl Scouts from taking actions that, from the organization's perspective, will better disseminate the Girl Scout message, particularly to underprivileged populations.[70] *Cf. Roberts,* 468 U.S. at 627 ("The Act requires no change in the Jaycees' creed of promoting the interests of young men, and it imposes no restrictions on the organization's ability to exclude individuals with ideologies or philosophies different from those of its existing members.") Moreover, just as the forced inclusion of a solitary homosexual member of the Boy Scouts would significantly affect that organization's efforts to not promote homosexual conduct as a legitimate form of behavior, *Dale,* 530 U.S. at 565-66, so too would having Manitou continue permanently carrying on the mission of the Girl Scouts in Eastern Wisconsin significantly affect the GSUSA's ability to effectively disseminate a cohesive message to a broader and more robust population base.[71]

Manitou argues repeatedly in their submissions to the court that GSUSA's realignment plan is a poor means to achieve the Girl Scout's broad goals and that the empirical data does not support GSUSA's need to realign, contending ultimately that applying the WFDL would have, at best, a minor burden on the organization's ability to advocate its viewpoints. Of course, the defendant disagrees. However, "it is not for the courts to mediate the merits of [the] dispute," as the court must afford

---

[70] It is the substantial nature of the intrusion on the defendant's expressive rights, coupled with the fact that GSUSA's realignment was the result of years of study that distinguishes the application of the WFDL to GSUSA's actions in this case from other more mundane intrusions into the affairs of expressive associations.

[71] This is not to say that Manitou is opposed to promoting pluralism and diversity in the Girl Scouts. Rather, Manitou's opposition to GSUSA's realignment plans, in the view of the expressive organization, make it far more difficult for the organization to effectively promote the organization's goals.

deference to the expressive organization's determination as to the best way to organize itself. *LaFollette,* 450 U.S. at 123-24 ("[A]s is true of all expressions of First Amendment freedoms, the courts may not interfere on the ground that they view a particular expression as unwise or irrational.") The court will not, through the use of the state law at question, begin to second guess the decisions of the national organization on what the Girl Scout's message should be, who the message should be disseminated to, or how the Girl Scouts should organize itself. It is for the organization – "and not the Wisconsin legislature or any court" – to determine the means best calculated to strengthen the organization and advance its interests.[72] *Id.* at 124 n.27. The arguments that Manitou proffers should be addressed to the national organization, not to the judiciary.[73] *Id.*

Manitou further argues, puzzlingly, that "even if" the application of the WFDL stands at odds with GSUSA's "constitutionally protected point of view," that there is "nothing in the WFDL that prevents GSUSA from taking corrective action" because the dealership law enables a grantor to terminate, cancel, or not renew a dealership for good cause. Here, it is Manitou that is speaking "out of both sides of its mouth." *Manitou,* 549 F.3d at 1094. As stated earlier in this order, Manitou has argued forcefully and persuasively that the "good cause" standard under the WFDL is quite

---

[72] One might argue that there were other ways for the Girl Scouts to promote pluralism and diversity in the organization. However, such an argument is exactly what is constitutionally invidious here. The courts cannot sit second guessing the decision of an organization who, after years of studies and consultation with outside experts, concluded that national realignment was the best means to achieve its goals.

[73]In fact, Manitou did, perhaps belatedly, address their arguments to the national organization. The record demonstrates that the national organization readily listened to Manitou's arguments, but ultimately decided to go a different route. While Manitou might be disappointed that GSUSA did not adopt the plaintiff's view on how realignment should occur, the judiciary remains an improper forum to rehash such arguments.

narrow, and it is the narrow nature of the meaning of "good cause" in the WFDL that prevents GSUSA from fully implementing its realignment efforts in Wisconsin. Moreover, contrary to Manitou's argument in its brief to the court, it is not Manitou's refusal to implement programs that promotes pluralism and diversity of membership within its jurisdiction that is infringing on GSUSA's First Amendment rights. (Pl's Resp. Br. 23). It is, rather, Manitou's use of the WFDL to prevent GSUSA from organizing itself in the means the Girl Scouts have found, after much deliberation, to be most effective is what is constitutionally questionable.

Manitou next argues that GSUSA's First Amendment argument is "disingenuous," given that GSUSA initially claimed that it was only removing sixty percent of Manitou's jurisdiction, leaving Manitou intact to "interfere with GSUSA's constitutionally protected point of view." (Pl's Resp. Br. 23). However, GSUSA's sincerity regarding how its realignment efforts were an attempt to revitalize and expand the audience of the Girl Scouts' message is amply demonstrated in the record. Moreover, Manitou's assessment of GSUSA's initial averments to the court is not entirely accurate. The quote Manitou takes from GSUSA's declaration to the court must be read in context. GSUSA did not claim that it would only remove sixty percent of the council, leaving the remainder of Manitou intact in perpetuity. GSUSA merely claimed in its declaration to the court that the "jurisdictional review," as propagated by its National Team, would only result in the reduction of sixty percent of Manitou's territory. *See* Wright Decl. (Docket #19) at ¶ 75 ("GSUSA's *jurisdictional review* will not terminate, cancel or fail to renew Manitou's Charter. At

-64-

most, GSUSA may transfer 60% of Manitou's territory to the North") (emphasis added). The fact that GSUSA stated at the time of the preliminary injunction motion that the organization's initial "jurisdictional review" would not, in and of itself, merge the entirety of Manitou council with other Wisconsin councils, does not mean that GSUSA's ultimate efforts were anything but to fully implement its realignment plans.[74] Ultimately, GSUSA's rights to expressive association are not any less genuine or any less threatened by the application of the WFDL to this action because of their initial statements to the court.

Manitou, without citing any authority for its proposition, further argues that GSUSA chose to operate as a franchise system, so "having voluntarily chosen this business structure, GSUSA cannot now . . . duck its contractual and statutory obligations." (Pl's Resp. Br. 24). The court is unclear as to what Manitou's exact argument is. If Manitou is arguing that GSUSA waived its constitutional right to organize how it provides its expressive message by opting for a federated structure and to be bound by the WFDL, such an argument would fail, given that a waiver of a constitutional right must be "knowing, intelligent, and voluntary." *Johnson v. Zerbst,* 304 U.S. 458, 684 (1938) ("A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege.") Here, given the unclear state of the law as to whether WFDL even applied to the Girl Scouts and its individual councils at the beginning of the litigation, it would be difficult to conclude

---

[74] From the record before the court, how GSUSA would fully implement its realignment plans with regard to Manitou remains unclear, however.

that GSUSA knowingly and intelligently waived its rights to freedom of expressive association when the organization opted to act as a federation within Wisconsin. More broadly, choosing how to structure the organization in its efforts to effectively disseminate its message is inherent in the right to expressive association. *See Ripon Society,* 527 F.2d at 585. A statutory obligation cannot trump GSUSA's constitutional rights.

Finally, Manitou contends that protecting GSUSA's specific choice as to how to govern and organize itself – i.e., the national organization's realignment plans – means that "anything a charitable or educational association does," such as "leasing a photocopy machine," is in furtherance of and impacts the "mission" of the association, potentially implicating constitutional rights, and creating a shield to statutory obligations for the given association. Manitou misunderstands the constitutional principle. The rule is not that *whenever* the state regulates the internal processes of an expressive association that the state's action is constitutionally suspect. *Clingman v. Beaver*, 544 U.S. at 587 (finding that "ordinary and widespread" burdens on the right to expressive association are not severe in nature). The rule is that only when the state takes an action that "significantly affects" an expressive association's ability to advocate its viewpoints is the action subject to heightened constitutional scrutiny. *Dale,* 530 U.S. at 650. Here, the GSUSA did not undertake its realignment efforts on a whim, but rather after years of study, concluding ultimately that the most effective way to disseminate the Girl Scout message was through merging its various councils. For the reasons

-66-

discussed above, applying the WFDL to the GSUSA's action would, in this court's view, constitute a substantial burden on the Girl Scouts' ability to freely express itself.[75]

Given that the court finds that the application of the WFDL in this case would significantly burden the defendant's ability to advocate its viewpoints, such "infringements on expressive association are subject to strict scrutiny." *Christian Legal Soc'y,* 453 F.3d at 861. Accordingly, the "right to expressive association 'may be overridden by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas that cannot be achieved through means significantly less restrictive of associational freedoms.'" *Id* at 861-62 (quoting *Dale,* 530 U.S. at 648). The court, therefore, must examine the interest of the state in applying the WFDL to GSUSA's actions. Wisconsin's dealership law was a product of oil embargos resulting from the 1973 Yom Kippur War that induced "oil refineries and gasoline suppliers" to "rationalize their distribution networks" by terminating arrangements with retail gas stations. *See* Bowen and Butler, *The Wisconsin Fair Dealership Law* § 1.3. As stated earlier in this opinion, the Wisconsin legislature enacted the WFDL

---

[75] Manitou cites the First Circuit case of *Gun Owners' Action League v. Swift*, 284 F.3d 198, 215 (1st Cir. 2002) in support of its argument. *Gun Owners' Action League,* the only case outside of *Dale* that Manitou cites responding to GSUSA's First Amendment argument, is easily distinguishable from the case at hand. In the First Circuit case, the plaintiff challenged on First Amendment grounds a Massachusetts law requiring gun clubs that wanted to use "large capacity weapons" to have at least one shareholder licensed. *Gun Owners' Action League,* 284 F.3d at 215. The court rejected the challenge for a number of reasons. First, the license requirement did not pose a significant burden on associational rights, as "the statute neither require[d] or even suggest[ed] any forced association of gun owners with anyone of differing views." *Id.* The statute merely placed a restriction on using a type of firearm, an ordinary burden. Moreover, the court noted that the plaintiffs were not engaged in protected expressive associative activity. *Id.* (citing *City of Dallas v. Stanglin,* 490 U.S. 19, 24 (1989)). Here, the defendant is an expressive association and the burden on the association's constitutional right in applying the WFDL is significant.

to promote "fair business relations between dealers and grantors," "protect dealers against unfair treatment by grantors," and to "provide dealers with rights and remedies in addition to those existing by contract or common law." Wis. Stat. § 135.025. Nothing in the purposes of the law articulates the specific interest the state has in regulating how an expressive association organizes itself and its local affiliates in order to fulfill the organization's mission.[76] Nor has the state of Wisconsin or Manitou provided an argument as to what the compelling reason is for applying the law in this case beyond the generic economic concerns addressed in the statutory articulation of the WFDL's purposes.[77] While the economic concerns for Manitou may be weighty, it is difficult for this court to conclude that the state's interests in play in this case are anywhere comparable to those in *Roberts,* where the Supreme Court found that a compelling reason for applying the Minnesota Human Rights Act to force the Jaycees to accept women – namely, to combat the "unique evils" that occur as a result of invidious discrimination in the distribution of publicly available goods and services. *Roberts,* 468 U.S. at 629. This court cannot find that a similar evil exists in denying the full weight of the WFDL to organizations

---

[76] The history of the statute does not indicate such a concern. In fact, the Seventh Circuit's decision in this case was the first court to resolve the question of whether the WFDL could be applied to a not-for-profit association. *Manitou,* 549 F.3d at 1094. However, with such a reading of the law, the "potential for conflict" between the state dealership law and the First Amendment rights of expressive organizations has increased. *Dale,* 530 U.S. at 657.

[77] In fact, Manitou did not brief the court on the strict scrutiny issue.

that serve as dealers to an expressive association.[78]  Moreover, the application of the state law in question is used directly to substitute the GSUSA's judgment for that of Manitou with the help of the WFDL, acting as a means to suppress GSUSA's message.  As the Supreme Court made clear in *Eu*, a state cannot substitute its judgment for that of an expressive association as to the desirability of a particular "structure" for the group, any more than it can tell an association that its proposed communication to its members is unwise.[79]  *See Eu,* 489 U.S. at 232-33.  Finally, the court does not find that keeping Manitou as the Girl Scouts' conduit to provide its message in eastern Wisconsin in perpetuity constitutes the "least restrictive means" to fulfill the state's interests in protecting dealers who serve grantors that are expressive associations.  Manitou has not met its burden in proving that the application of the WFDL to the facts of this case would survive strict scrutiny.  The court cannot constitutionally rule for Manitou on its fair dealership claims, and, accordingly must rule for the defendant as a matter of law on the WFDL claims.

## B.    Breach of Contract Claims

It is undisputed that, through Manitou's Charter and its Charter Application which is incorporated by reference into the Charter, a contract existed between the parties.  However, Manitou contends that GSUSA breached both explicit provisions

---

[78] Propelling the court's conclusion is that few other councils in the entire nation or even in Wisconsin have fought the realignment efforts, indicating that preventing one Girl Scout council from merging into a larger council is not a "compelling" interest.  *Swanner v. Anchorage Equal Rights Comm'n,* 513 U.S. 979, 982 (Thomas, J., dissenting) (finding that a compelling interest is one that is a "paramount interest . . . [an] interest of the highest order.")

[79] To conclude otherwise would allow a "majority (or a powerful or vocal minority)" who value the economic interest of dealers to "force its views" on how an expressive association chooses to disseminate its viewpoint.  *Christian Legal Soc'y,* 453 F.3d at 861.

contained in the *Blue Book* and implicit terms of good faith and fair dealing when the

national organization attempted to realign the Girl Scout councils in Wisconsin.[80]

GSUSA, in turn, argues that the organization complied with the regulations provided

in the *Blue Book* and has not breached the implied covenant of good faith.

Accordingly, both parties have moved for summary judgment on the breach of

contract claims.[81]  The court will address Manitou's argument for summary judgment

first.

Manitou argues that it is entitled to judgment as a matter of law on its breach

of contract claim for one specific breach:  GSUSA's use of regulations provided in

the section of the *Blue Book* entitled "Procedures for Changing a Girl Scout Council

Jurisdiction" as a means to shrink Manitou as a Girl Scout Council with the eventual

goals of eradicating Manitou.  Manitou contends that the use of the jurisdictional

change procedures to reduce the council's jurisdiction ignores the typical means

_____

[80] Again, ripeness concerns prevent the court from speculating as to the next steps GSUSA was going to take and how the organization was going to take such actions with regard to the jurisdiction of Manitou. The court cannot guess or hypothesize that the "termination of Manitou as a Girl Scout council" would have occurred "prior to the end of its term" but for the injunction.  (Pl's Resp. Br. 32).  The court can only view the breach of contract claim through the factual lens of whether taking away sixty percent of Manitou's jurisdiction as the first steps for realignment constituted a material breach of the organization's agreement with the plaintiff.  *See Lehn v. Holmes*, 364 F.3d 862, 867 (7th Cir. 2004) ("Cases are unripe when the parties point only to hypothetical, speculative, or illusory disputes as opposed to actual, concrete conflicts.")

[81] No party contends that the First Amendment arguments apply to the breach of contract claims.  If the language of the contractual arrangement between Manitou and the Girl Scouts indicates that the Girl Scouts limited their ability to organize themselves in a means they found to be best for disseminating their message, such a contract is legitimate as long as the "party foregoing its rights has done so of its own volition, with full understanding of the consequences of its waiver."  *Forbes v. Milwaukee County*, No. 05-CV-0591, 2007 U.S. Dist. LEXIS 1282, at *26 (E.D. Wis. Jan. 4, 2007) (internal citations omitted).  The result of how the court interprets the contract in question will necessarily dictate whether GSUSA contracted away its Constitutional rights.

outlined in the *Blue Book* for rescinding a council's charter and breaches the implied covenant of good faith that exists in all contracts.

The Seventh Circuit noted in its earlier decision that it is "unclear what exactly constitutes the agreement in this case," leaving it to this court to determine what the actual agreement was. *Manitou,* 549 F.3d at 1096 n.9. To determine what constituted the actual contract, the court must first look to what made the parties' arrangement contractual in nature. It is a matter of hornbook law that a contract consists of an offer, an acceptance, and consideration. *McLellan v. Charly*, Wis. 2d 623, 645-46 (Ct. App. 2008). An offer is a communication by a party of what it will give or do in return for some act by another. *Carroll v. Stryker Corp.*, 670 F. Supp. 2d 891 (W.D. Wis. 2009) (citing *In re Lube's Estate*, 225 Wis. 365, 368, 274 N.W. 276, 278 (Wis. 1937)). Acceptance of an offer necessitates a "meeting of the minds." *Household Utilities, Inc. v. Andrews Co.*, 71 Wis. 2d 17, 29 (1976). Finally, consideration consists of a benefit to a promisor or a detriment to the promisee. *First Wis. Nat'l Bank v. Oby*, 52 Wis. 2d 1, 5 (1971).

Here, an offer was provided via the Charter Application, in which the Girl Scouts stated in broad terms what a council agrees to do if its application for a charter is accepted and what rights are conferred when the charter is issued. The acceptance of GSUSA's offer is exemplified by the signatures of the agents for each of the parties on the charter document. Finally, consideration existed because of the various benefits and detriments imposed on the parties within the Charter Application. Specifically, in return for certain rights, such as being able to use the

Girl Scout name and the right to "develop, manage, and maintain Girl Scouting throughout the area of the jurisdiction of the Council," Manitou agreed, among several requirements, to "adhere to the policies and be guided by the standards" of the GSUSA and to be limited by those prescriptions provided in the "Girl Scout Constitution, Bylaws, and policies" of the GSUSA.

Given what the contractual relationship consisted of, the court must examine the Charter and the Charter Application, the initial evidence creating a contract, and determine what the Charter and Charter Application exactly bound the parties to do, keeping in mind that if those documents were not intended to be a "complete integration" of the contractual relationship, the court can look to outside evidence to determine the full extent of the obligations created by the contract. *Scarne's Challenge, Inc. v. M. D. Orum Co.*, 267 Wis. 134, 140-141 (1954) ("Where a written contract is incomplete on its face, the only general rule which would bar parol evidence is that such evidence may not be received in order to contradict or negate the writing . . . [i]f the pleadings and affidavits before the court tend to show that the parol evidence is to be introduced . . . it has been held that it may be admitted to show the full intention of the parties, provided that such evidence is not in conflict with the terms of the writing.") Keeping in mind that the "lodestar of contract interpretation" is the intent of the parties, *Huml v. Vlazny*, 2006 WI 87, ¶ 52 (2006), the court will look at the four corners of the agreement of the parties and provide the contract terms with their plain or ordinary meaning. *Id.* However, if ambiguity is found when interpreting the words of the contract, extrinsic evidence "may be

-72-

resorted to in order to ferret out the intent of the parties." *Moran v. Shern,* 60 Wis. 2d 39, 48 (1973).

Here, the plain language of the contract states that, in providing Girl Scouting in the area of its jurisdiction, Manitou subjects itself to those rules provided in the Girl Scout Constitution, Bylaws, and "policies" of the GSUSA, an implicit recognition that GSUSA is also binding itself to comport with its own rules, regulations, and policies.[82] The parties both agree that the word "policies" refers, at least in part, to the regulations and procedures contained in the *Blue Book,* and, accordingly, the court must look to that document to evaluate whether, as Manitou alleges, GSUSA committed a material breach of its obligations under the parties' contract by using the jurisdictional change procedures to eliminate part of the plaintiff's council.[83]

Initially, the court finds that GSUSA retained broad authority to revoke Girl Scout council charters under the parties' contract. The Charter Application subjects both parties to the terms of the Girl Scout Constitution, which in relevant part states that the National Board of Directors, in its "sole discretion," has the power to revoke any charter when "the best interests of Girl Scouting are not being furthered."

---

[82] Nothing in the Charter or the Charter Application itself explicitly states that GSUSA binds itself in its dealings with Manitou to follow its own general rules. However, reading the agreement to bind GSUSA to obey its rules follows naturally from the expectations of the parties, the purpose of the agreement, and other terms in the agreement, such as Manitou being given the "right to receive services from" GSUSA. *State Farm Mut. Auto. Ins. Co. v. Langridge,* 2004 WI 113, ¶ 43 (2004) ("The court will also adopt a construction that will result in a reasonable, fair and just contract as opposed to one that is unusual or extraordinary . . . Often the court will look to the purpose of the contract and the circumstances surrounding its execution to determine the intent.")

[83] If a term is incorporated by reference within a contract and that term is "clearly identifiable," the parties agree to abide by those terms just as they agree to the other terms in the contract. *Matthews v. Wis. Energy Corp.,* 534 F.3d 547, 554 (7th Cir. 2008)

GSUSA Const. art. VIII, § 3. On the face of the agreement, GSUSA had discretion to revoke Manitou's charter if the defendant viewed the continuation of the charter to not be in the "best interests of Girl Scouting."[84]

However, given the very general scope of the power created under the Girl Scout Constitution for GSUSA to revoke a council's charter and given that Manitou invokes a fairly specific term within the *Blue Book* for its breach claim, the court must look closely at Manitou's argument to see if the more specific contract term negates the broader term. *See Thomsen-Abbott Constr. Co. v. City of Wausau*, 9 Wis. 2d 225, 234 (1960) ("Where there is an inconsistency between a specific provision and a general provision, the specific provision controls.") The "Procedures for Changing a Girl Scout Council Jurisdiction" contains a preamble and four separate sections. The preamble states that "in all matters concerning jurisdictional lines, the National Board of Directors has the authority to make the final decision, either during the term of a charter or upon issuance of a new charter." *See* GSUSA, *Blue Book of Basic Documents 2006*, at 28. The first section of the jurisdictional change section was added to the 2006 version of the *Blue Book*, providing the procedures for how, "after two or more councils agree . . . to participate in a realignment process," realigning the councils occurs successfully such that the jurisdictional areas are properly transferred or combined. *Id.* The second and third sections of the jurisdictional change procedures in the *Blue Book* carry over from older versions of the *Blue Book*

---

[84] The court finds that the greater power to revoke the charter in total includes the lesser power to revoke part of the jurisdiction of a council. Moreover, Article VIII, Section 3 of the Constitution, as it is a term of the contract, is subject to the implied terms of good faith and fair dealing, which will be discussed later in the opinion.

and state how a Girl Scout council's jurisdiction can be successfully changed through "combining" or "transferring" jurisdictions. *Id.* at 28-29. Neither of the first three sections on the "Procedures for Changing a Girl Scout Council Jurisdiction" dictate what occurs if there is a "snag" in the process, such as if two or more councils cannot reach an agreement after initially deciding to change a council's jurisdiction. Instead, the procedures that occur "when agreement cannot be reached between the boards of directors of the Girl Scout councils to combine or transfer jurisdiction" is provided in Section IV. *Id.* at 29.

Here, Manitou concedes, at least for the purposes of *its* motion for summary judgment, that GSUSA followed the provisions in Section IV for when councils cannot reach an agreement when combining or transferring jurisdictions. Instead, Manitou argues that it is irrelevant that GSUSA followed the procedures in Section IV because the plaintiff contends that that section is irrelevant for when councils agree to realign. Specifically, Manitou contends that because: (1) sections II and III of the jurisdictional change procedures refer to "combin[ing]" and "transfer[ring]" and section I refers to "realign[ing]," and (2) section IV only refers to "combin[ing]" and "transfer[ring]" that, therefore, (3) Section IV must not apply to realignment.

However, this court fails to see how Manitou's syllogism requires the conclusion that is reached. There is no indication that the words "combine" or "transfer" in Section IV are used as specific terms of art. In fact, there is nothing in Section IV, the only provisions in the jurisdictional change provisions in the *Blue Book* relating to when Girl Scout councils disagree regarding a change in jurisdiction,

specifically excludes Section I.  This court cannot arbitrarily limit Section IV to only apply to combinations or transfers of a Girl Scout council jurisdiction outside of the realignment plan.  *Vidmar v. American Family Mut. Ins. Co.*, 104 Wis. 2d 360, 366 (1981) (overruled on other grounds) (holding that a provision in a contract "should be construed, if fairly possible, to give full effect to all words and provisions of both.")  Moreover, the purpose of Section I of the jurisdictional change procedures, as evidenced by the addition of the section to the 2006 version of the *Blue Book*, was to guide councils in the onerous process of realignment through the use of a more streamlined means to combine councils.[85]  To interpret Section I as creating an absolute veto on realignment by councils who initially agreed to proceed with the jurisdictional changes, would belie Section I's apparent purpose.[86]  *Farmers Ins. Exch. v. Sorenson*, 99 F. Supp. 2d 1000, 1006 n.6 (E.D. Wis. 2000) (holding that a contract's meaning derives, in part, from its purpose).  Moreover, interpreting that councils who initially agreed to realign but could not agree to the specifics of a

[85] Section I has the board initially approve the jurisdictional change, and then much of the heavy lifting is done by the Council Realignment Committee.  Section II, the old means by which councils could combine jurisdiction, required board approval by all councils and then had each individual council vote on the plan of merger, consolidation, or reorganization before submitting the application for change to the GSUSA.

[86] Moreover, it all but seems that Section I of the jurisdictional change procedures of the *Blue Book* were fully met, indicating that Manitou effectively merged with the northern councils based on GSUSA policies. On May 22, 2007, at the latest, Manitou's board approved the change and agreed to proceed with realignment. On May 31, 2006, the seven councils, via a Council Realignment Committee, developed a plan and a timeline for carrying out the proposed change.  Additionally, GSUSA approved Manitou's application on August 26, 2006.  Indeed, GSUSA may have been generous in allowing a national team, pursuant to Section IV, arbitrate the belated complaints made by the plaintiff.  However, the court need not delve into whether GSUSA followed the exact requirements of Section I of the jurisdictional change procedures, because Section IV of those provisions of the *Blue Book* plainly apply to realignment disputes.  Finally, the court notes, that even if Section IV does not govern realignment, Section I most certainly does not contradict the general term of the contract provided by Article VIII, Section 3 of the Girl Scout Constitution providing the GSUSA with the power to remove jurisdiction from a council if such an action is in the "best interests of Girl Scouting," and, therefore, the latter term still governs.  *See Thomsen-Abbott Constr. Co.,* 9 Wis. 2d at 234.

Case 2:08-cv-00184-JPS   Filed 03/31/10   Page 76 of 89   Document 172

jurisdictional change would forever retain its jurisdiction and would not be subject to Section IV's procedures would make the preamble to the jurisdictional change provisions meaningless, as it would deprive the National Board of the authority to make the final decision "during the term of a charter" regarding a council's jurisdictional lines. *1325 N. Van Buren, LLC v. T-3 Group, Ltd.*, 2006 WI 94, ¶ 56 (2006) ("[A] contract is to be construed so as to give a reasonable meaning to each provision of the contract, and that courts must avoid a construction which renders portions of a contract meaningless, inexplicable or mere surplusage.").  Perhaps most importantly, as the plain text of Section I indicates, the term "realignment" is merely one way of "combining" or "transferring" jurisdictions. *See GSUSA, Blue Book of Basic Documents 2006,* at 28 ("The councils create a Council Realignment Committee (CRC), which includes the board chairs and CEOs of the councils that are *combining* jurisdictions") (emphasis added).  As such, Section IV governs situations when "agreement cannot be reached between the boards of directors of the Girl Scout councils to combine or transfer jurisdiction," such as during a realignment.

Accordingly, given Manitou's concession that it initially agreed to participate in the realignment process, but could not come to a final agreement regarding the jurisdictional changes, Section IV of the jurisdictional change procedures in the *Blue Book* is unambiguous in its meaning and appropriately governed the dispute

between the parties.[87] Manitou has no issue with whether GSUSA followed the specific procedures in Section IV, at least for the purposes of its summary judgment motion, and the court is unable to find as a matter of law that the defendant breached the terms of its contract with Manitou by using the *Blue Book*'s jurisdictional change provisions to effectuate the realignment.

Manitou makes much of the fact that the *Blue Book* also contains provisions for punishing a deficient council by not issuing a charter, revoking a charter, or issuing a charter with qualifications. The plaintiff asserts that because the *Blue Book* provides these measures as one way of ending the Girl Scouts' association with a given council that that is the *only* way of terminating a council's charter. However, as discussed above, the plain language of the jurisdictional change procedures of the *Blue Book* provide another scenario by which GSUSA may reduce the jurisdiction of a council – combining or transferring the territory of one Girl Scout council into another council's jurisdiction. The fact that Manitou did not explicitly violate any of the policies or requirements of the GSUSA is of no consequence. Manitou agreed to participate in the realignment process.[88] When the plaintiff decided that it could not agree to work with the councils it was merging with, Section

---

[87] Even if the court were to determine that an ambiguity exists regarding the meaning of the words "combine" or "transfer" in Section IV, GSUSA has proffered ample and undisputed evidence to indicate that the parties recognized that GSUSA's actions were loyal to the intent of the parties at the time of contracting. Moreover, the court need not delve into what else encompassed the parties' agreement, as GSUSA did not breach the terms of the contract that Manitou alleges.

[88] The record shows that Manitou's executives made positive recommendations regarding realignment during the project's initial stages, continually voiced approval for the realignment process during the spring and summer of 2006, opted to not petition GSUSA during the designated time to offer suggestions to the national organization regarding realignment, and approved the use of the GSUSA resource map for the realignment of the Wisconsin councils.

Case 2:08-cv-00184-JPS    Filed 03/31/10    Page 78 of 89    Document 172

IV of the jurisdictional change provisions of the *Blue Book* governed, allowing GSUSA to take action to resolve the problem. Moreover, the overarching statement contained in the preamble to Section IV that the National Board has the authority to make the final decisions on all changes to jurisdictional lines, coupled with the broad language of Article VIII, § 3 of the Girl Scout Constitution regarding when the GSUSA has the authority to revoke a charter, makes explicit that GSUSA retains the authority to change Manitou's jurisdictional lines.[89]

Manitou further contends that GSUSA breached the covenants of fair dealing and good faith that were implicit in the parties' contract. Under Wisconsin law, "every contract implies good faith and fair dealing between the parties to it, and a duty of cooperation on the part of the parties." *First Bank & Trust v. Firstar Info. Servs., Corp.*, 276 F.3d 317, 325 n.10 (7th Cir. 2001) (quoting *Wis. Natural Gas Co. v. Gabe's Constr. Co.*, 220 Wis. 2d 14, 582 N.W.2d 118, 121 (App.Ct. 1998)). However, the duty of good faith is a "relatively limited obligation" and is "not a basis for creating rights not expressly included in the contract." *Northgate Motors, Inc. v. GMC*, 111 F. Supp. 2d 1071, 1082 (E.D. Wis. 2000). Ultimately, good faith "is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties." *Market Street Assocs. Ltd. Partnership v. Frey*, 941 F.2d 588, 595 (7th Cir. 1991) (interpreting Wisconsin law).

---

[89] The court remains puzzled as to Manitou's unsupported assertion that a combination, transfer, or change in jurisdictional lines cannot encompass a total merger of a Girl Scout council, such that one council ceases to exist as a separate, independent entity.

Accordingly, "a party seeking to recover under this theory must show something that can support a conclusion that the party accused of bad faith has actually denied the benefit of the bargain originally intended by the parties." *Zenith Ins. Co. v. Employers Ins.*, 141 F.3d 300, 308 (7th Cir. 1998).

Here, GSUSA has not breached the implied duties of good faith and fair dealing. As discussed above, the language in the *Blue Book* was clear that, if the councils could not agree upon how their jurisdictions would be changed, Article IV of the jurisdictional change provisions would apply. "[T]here can be no breach of good faith and fair dealing 'where the contracting party complains of acts of the other party that are specifically authorized in their agreement.'" *Wis. Compressed Air Corp.,* 571 F. Supp. 2d at 999. Moreover, GSUSA's conduct did not deny Manitou the benefit of the bargain as Manitou has always had expectations that realignment would occur and that the council's charter and jurisdiction would eventually cease as a result of realignment. The record amply indicates that Manitou was fully aware at the time of contract of the provisions in the *Blue Book* allowing GSUSA to step in if an agreement could not be reached regarding realigning the councils. Moreover, Manitou knew in July of 2005, well before its charter was renewed, that "council boundaries and jurisdiction and chartering would be defined anew" by the GSUSA. Manitou's expectations are further exemplified by its continued acquiescence to GSUSA's efforts to complete the realignment plan in Wisconsin up until Manitou hired its legal counsel and discovered that the council might have an avenue for

relief through the WFDL.[90]   Moreover, GSUSA did not act in "bad faith," as it provided Manitou with countless opportunities to voice its concerns regarding realignment, including hearing Manitou's complaints several times well after the period to provide suggestions regarding realignment ended. In short, Manitou knew when its charter was renewed that realignment was looming, and GSUSA treated Manitou fairly in effectuating the realignment plan.  The court will deny Manitou's motion for summary judgment on the breach of contract claims relating to the jurisdictional change and charter revocation procedures contained in the *Blue Book*. As a result of the lack of any factual disputes, the court will likewise grant GSUSA summary judgment on the breach of contract claims relating to its use of the jurisdictional change provisions as a means to effectuate the combining of Manitou's jurisdiction with the northern councils.  The court proceeds to evaluate whether there are any other allegations of breach of contract from Manitou's complaint that can survive summary judgment.

In its latest complaint, Manitou alleges broadly  that GSUSA has failed to provide the council with a charter renewal application and that GSUSA has failed to perform in accordance with the charter renewal review and assessment procedures in deciding whether to renew Manitou's charter for 2010, constituting a breach of the parties' agreement. (Compl. ¶¶ 202-14).  GSUSA contends, in its briefs to the court, that the organization has followed the National Board's policies for the interim

---

[90] Perhaps the best example of this is the May 22, 2007 resolution by the Board of Directors of Manitou agreeing to  "proceed with the realignment as mandated by the [GSUSA] which requires Manitou Council [to] merge with the Northern councils."

-81-

chartering process for councils affected by realignment in deciding whether to renew Manitou's charter, including the use of "Council Performance Indicators" to evaluate whether the council's charter should be renewed. Manitou opted to not brief the court on whether summary judgment on the breach of the charter renewal policies was appropriate or to update the court regarding the facts about its claim, instead focusing its briefs on the breaches related to the jurisdictional change procedures. The facts, as provided to the court, show that Manitou did send a charter renewal application to GSUSA. Moreover, nothing in the record indicates that GSUSA departed from its stated policies when it evaluated whether Manitou's charter should be renewed. Manitou has not explained specifically how GSUSA has breached the charter renewal procedures, and the court will not speculate as to the precise nature of plaintiff's claim from the broad statements made in the complaint.[91] In fact, the defendant has stated in its brief to the court that "the charter will remain effective . . . until December 31, 2010." (Def's Br. 36). GSUSA is renewing or has already renewed Manitou's charter for 2010, no harm seems to be befalling Manitou related to this claim, and, accordingly, GSUSA is entitled to summary judgment on the breach of contract claims related to the charter renewal procedures.

Manitou's last claim for breach of contract relates to GSUSA's adherence to the provisions of Section IV of the jurisdictional change procedures in the *Blue Book*. Section IV states that, if agreement cannot be reached between councils regarding

---

[91] For example, nothing in the record indicates that GSUSA *permanently* suspended the charter application process. This claim seems to have been put in the complaint to prevent GSUSA from merely letting the current charter of Manitou expire.

combining or transferring jurisdiction, a national team is created who will develop a recommendation for changing jurisdictional boundaries. *See* GSUSA, *Blue Book of Basic Documents 2006*, at 29. Subsection three of Section IV states that the national team must base their recommendation from "data provided from the council and community sources." *Id.* Manitou alleges in its complaint that the national team did not base its decision on data provided from any of the councils or any community sources. (Compl. ¶ 217). GSUSA argues that the national team based its recommendation on all of the available documents that the national organization provided, which included, in part, documents submitted by Manitou and other councils. To the extent that the national team did not receive any additional information from Manitou, GSUSA casts blame on Manitou for opting to not participate in the national team's review. Manitou's sole response to GSUSA's argument lies in two solitary and baffling comments in a footnote in the plaintiff's response brief: "If the court were to [evaluate GSUSA's compliance with Section IV], the evidence establishes that GSUSA did not even follow its own procedures . . . *See* [FINDINGS RE: SAME]."[92] (Pl's Resp. Br. 38 n.13).

The court will not try to decipher Manitou's argument. Inadequately developed arguments are deemed waived. *Kraimer v. City of Schofield*, 342 F. Supp.2d 807, 826 (W.D. Wis. 2004) (citing *Central States, Southeast and Southwest Areas Pension Fund v. Midwest Motor Express*, 181 F.3d 799, 808 (7th Cir. 1999)). GSUSA complied with the terms of Section IV: the national team used information

---

[92] The court suspects that this was a typographical error.

provided, in part, from Manitou and other councils, to make its recommendation to the National Board. To the extent the national team failed to evaluate enough information in making its recommendation, this is largely due to Manitou opting to not submit any information to the national team. GSUSA is entitled to summary judgment on the remaining breach of contract claim.

## C.    Tortious Interference Claims

In its complaint, Manitou contends that GSUSA tortiously interfered with: (1) Manitou's economic interests, such as donations that were to be made to the council; and (2) Manitou's board of director's fiduciary duties to the council. GSUSA argues that Wisconsin does not recognize a cause of action for the latter claim, tortious interference with fiduciary duties. Manitou does not respond to this argument in its brief, and the court was unable to find any basis in Wisconsin law for the fifth count of Manitou's complaint and, accordingly, will grant summary judgment for GSUSA on that claim.

However, Wisconsin does recognize suits for tortious interference with expected economic advantages, including gifts or inheritances. *Gustafson v. Zumbrunnen*, 546 F.3d 398, 401 (7th Cir. 2008) (citing to the *Restatement (Second) of Torts* § 774(B) (1979) ("[O]ne who by fraud, duress or other tortious means intentionally prevents another from receiving from a third person an inheritance or gift that he would otherwise have received is subject to liability to the other for loss of the inheritance or gift.")). Under Wisconsin law, in order to prevail on a tortious interference claim, a plaintiff must satisfy five elements: (1) an actual or prospective

-84-

economic advantage provided to the plaintiff from a third party; (2) the defendant interfered with that economic advantage; (3) the interference was intentional; (4) the interference caused the plaintiff to sustain damages; and (5) the defendant was not justified or privileged to interfere. *Metso Minerals Indus. v. Flsmidth-Excel LLC*, No. 07-CV–0926, 2010 U.S. Dist. LEXIS 483, at *7 (E.D. Wis. Jan. 5, 2010); *see also Anderson v. Regents of University of California*, 203 Wis. 2d 469, 490 (Ct. App. 1996).

Here, even if the court assumes that Manitou can satisfy the first four elements of the tort claim, Manitou's claim ultimately fails on the fifth element – proving tortious interference. Under Wisconsin law, "interference alone" does not establish tortious interference; the interference must be improper. *Mackenzie v. Miller Brewing Co.*, 2000 WI App 48, ¶ 63 (Ct. App. 2000). To determine whether conduct is justified or privileged, the court must look to "the nature, type, duration and timing of the conduct, whether the interference is driven by an improper motive or self-interest, and whether the conduct, even though intentional, was fair and reasonable under the circumstances." *Briesemeister v. Lehner*, 2006 WI App 140, ¶ 51 (Ct. App. 2006). The court has already determined that GSUSA followed the procedures outlined in the *Blue Book* when it attempted to combine Manitou's jurisdiction with the northern councils. As such, any interference was fair and reasonable. Moreover, even if GSUSA was acting in breach of the terms outlined in the *Blue Book,* the defendant, as discussed above, was acting in good faith and under the honest belief that the actions it was taking were within the confines of its

agreement with Manitou. *Id.* at ¶ 53 (holding that interference is not improper if the action, "even if misguided," was "reasonable and espoused in good faith"). Accordingly, the court will grant GSUSA summary judgment on the tortious interference with economic advantage claim.

## D.    Economic Coercion Claim

The fourth count of Manitou's complaint alleges that GSUSA's realignment efforts constituted economic duress or coercion. (Compl. ¶¶ 159-67).   However, economic duress "cannot serve as the basis for an independent claim," but rather exists as a defense to liability, such as when a party claims that a contract was invalid because it was formed under duress. *Colortyme, Inc. v. Are Not, Inc.*, No. 03-CV-0404, 2004 U.S. Dist. LEXIS 6822, at *2 (W.D. Wis. Apr. 13, 2004).  The only case Manitou cites as a basis for asserting that economic duress can "stand on its own as an independent claim," (Pl's Resp. Br. 44), is *JPM, Inc. v. John Deere Indus. Equip. Co.*, 94 F.3d 270 (7th Cir. 1996).  However, that case merely stands for the proposition that "economic duress may serve as the basis for a claim of constructive termination" under the WFDL.    *Id.* at 272.    Given that the court cannot constitutionally apply the WFDL claim against the defendant, the economic coercion claim cannot stand on its own.  Moreover, as Manitou concedes in its brief, given the court's conclusion that GSUSA acted within the terms of its contract with Manitou, GSUSA did not take actions that amounted to placing Manitou under economic duress.  *T. F. Pagel Lumber Co. v. Webster*, 231 Wis. 222, 225 (1939) ("Threats to do what the threatening person has a legal right to do, do not constitute duress.")

-86-

Therefore, the court must grant summary judgment for GSUSA on the economic duress claim.

## E.     Civil Conspiracy Claims

In its complaint, Manitou further alleges that GSUSA is liable for a host of civil conspiracy claims: conspiracy to violate the WFDL; conspiracy to tortiously interfere with prospective economic advantage; conspiracy to economically coerce; conspiracy to tortiously interfere with fiduciary duties; and conspiracy to injure the plaintiff's reputation, trade, business or profession in violation of Wis. Stat. § 134.01. In Wisconsin, a civil conspiracy is defined as "a combination of two or more persons by some concerted action to accomplish some unlawful purpose or to accomplish by unlawful means some purpose not in itself unlawful." *Radue v. Dill,* 74 Wis. 2d 239, 241 (1976). However, as the plaintiff concedes, "if Manitou is not successful on its principal claims against GSUSA, the conspiracy claims will fail." (Pl's Resp. Br. 45). GSUSA did not act in concert either unlawfully or to accomplish an unlawful end. Accordingly, the court will grant summary judgment for GSUSA on the civil conspiracy claims.

## F.     Breach of Fiduciary Duty Claim

Manitou's final cause of action alleges that GSUSA has breached its fiduciary duties toward the plaintiff by "requir[ing] Manitou to adopt articles of incorporation that require its property and assets to revert to GSUSA if Manitou ceases to be a Girl Scout council and is dissolved" and by "causing [Manitou's] dissolution." (Pl's Resp. Br. 46). To recover on its breach of fiduciary duty claim against the defendant,

Manitou must establish: (1) the existence of a fiduciary duty; (2) the breach thereof; and (3) injury caused thereby. *Select Creations v. Paliafito Am.*, 911 F. Supp. 1130, 1150 (E.D. Wis. 1995). However, even assuming a fiduciary relationship existed between GSUSA and Manitou, the court cannot conclude that the defendant breached the fiduciary duties it owed to the plaintiff. A breach of a fiduciary duty does not occur simply because a fiduciary does something adverse to the principal; rather a breach of a fiduciary duty requires a specific state of mind of "disloyalty or infidelity." *Zastrow v. Journal Communs., Inc.*, 2006 WI 72, ¶ 30 (2006) ("At its core, a fiduciary's duty of loyalty involves a state of mind, so that a claimed breach of that duty goes beyond simple negligence.") Nothing in the evidence Manitou has provided indicates GSUSA undertook its realignment efforts with its personal interest in mind, such as initiating realignment as a means to seize Manitou's assets. In fact, Manitou's Rice and Schemenauer concede that GSUSA had no financial interest in attempting to join Manitou's jurisdiction with the northern councils. Moreover, nothing in the record allows for the possible conclusion that GSUSA was disloyal or unfaithful to Manitou. As discussed earlier in this order, the defendant acted with the utmost good faith toward Manitou. As a result, GSUSA is entitled to summary judgment on the fiduciary duty claim, the last remaining count from Manitou's complaint.

　　　　Accordingly,

**IT IS ORDERED** that defendant's motion for summary judgment on "all causes of action asserted against it in Plaintiff's Second Amended Complaint" (Docket #134) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that plaintiff's motion for partial summary judgment, on liability only at Counts I and II of its Second Amended Complaint (Docket #141) be and the same is hereby **DENIED**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED** with prejudice.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 31st day of March, 2010.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge